# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

DENNIS L. MONTGOMERY



                                              Plaintiff,

     v.

JAMES RISEN, an individual,
c/o  The New York Times
1627 "I" Street N.W., Suite 700
Washington, D.C. 20006-4007

                   and

HOUGHTON MIFFLIN HARCOURT PUBLISHING
COMPANY
222 Berkeley Street
Boston, Massachusetts 02116

                   and

HMH HOLDINGS, INC.
222 Berkeley Street
Boston, Massachusetts 02116

                   and

HOUGHTON MIFFLIN HARCOURT COMPANY
222 Berkeley Street
Boston, Massachusetts 02116

                   Defendants.

Civil Action No.  15-cv-20782

## AMENDED COMPLAINT (REDACTED)[1]

Plaintiff Dennis L. Montgomery, by counsel, sues the Defendants, acting in concert,

jointly and severally, in this civil action for Common Law Defamation *Per Se* (libel and slander),

---

[1] Address and Miami-Dade phone number of Plaintiff have been redacted for security reasons.
The address and phone number are being filed by motion in a Sealed Amended Complaint.

General Defamation (libel and slander), Defamation by Implication (libel and slander), Intentional Infliction of Emotional Distress, Tortious Interference with Prospective Advantage, and Assault, as a result of Defendants causing actual damages, compensatory damages, and giving rise to punitive damages as well, including continuing and aggravated harm to the Plaintiff's professional, business and personal reputation and livelihood.  As grounds therefore, Plaintiff alleges as follows:

I.  **JURISDICTION AND VENUE**

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 under diversity of citizenship. The parties are citizens of different states and the amount in controversy exceeds $75,000. Also, the Causes of Action arose in this judicial district.

2.      Venue is proper for Defendants pursuant to 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(e).

3.      The Causes of Action and the injuries were caused to the Plaintiff by the Defendants' defamation and other tortious conduct in this district, Florida in general, nationwide, and internationally.

4.      In addition, some of the most recent commercial opportunities for the Plaintiff's work were contracts and projects made available through military bases and Government facilities in Florida.

5.      The State of Florida is the third (3rd) largest state by population within the entire United States such that a huge and substantial portion of the nationwide harm has occurred in Florida.

6.      The United States Central Command ("CENTCOM") is located at MacDill Air Force Base, in Tampa, Florida. Central Command, then under the leadership of General Tommy

Ray Franks, led the attack on the Taliban in Afghanistan in response to the September 11 attacks

on the World Trade Center and The Pentagon in 2001. CENTCOM also led the 2003 invasion of

Iraq and the overthrow of Saddam Hussein. CENTCOM has been the center of the United

States' war on terror and related intelligence gathering during the past fifteen years.

7.     United States Southern Command ("SOCOM"), responsible for all U.S. military

and intelligence gathering activities in South America and Central America, is located in located

in Doral, Florida. The U.S. Southern Command works with CENTCOM. Al Qaeda, ISIS, and

other groups and interests, including the Islamic Republic of Iran are active and engaged in

South America and in Central America and in 1994 Iran blew up a synagogue in Buenos Aires,

Argentina.

8.     In addition, the U.S. Air Force maintains six (6) active military bases in Florida,

the U.S. Navy maintains ten (10) active military bases and two (2) hospital bases in Florida, the

U.S. Coast Guard maintains three (3) active military bases, and the U.S. Marines and the U.S.

Army each maintain one active military base in Florida.

9.     Many of the drones used for the wars in Iraq and Afghanistan have been operated

out of Florida. For example, the 2d Special Operations Squadron ("2 SOS") is an Air Force

Reserve Command unit Stationed at Hurlburt Field, Florida. The 2 SOS unit operates MQ-9

Reaper Remotely Piloted Vehicles.

10.     Defendants knew or should have known of the large counter-terrorism, military,

and intelligence presence within the state of Florida. Defendant Risen is a "national security

expert" who has intimate knowledge of the U.S. Military.

11.     Given the large counter-terrorism, military, and intelligence presence in Florida,

Defendants marketed the Book Pay Any Price into the state for Florida, as there is a large

readership there from military and intelligence personnel and retirees in these services, as well as the general population at large. Pay Any Price specifically deals with the United States' efforts in the war on terrorism and related intelligence gathering activities, and as such there would be substantial interest from those living within Florida, which has the largest military and intelligence presence in the nation.

12.     Defendants knew or should have known of Plaintiff's substantial ties to counter-terrorism, military, and intelligence contracts and intended on harming Plaintiff in Florida, which continues to be center of the war on terror.  Defendants knew that if Plaintiff's reputation was harmed in Florida, the large military presence in Florida would ensure that Plaintiff would lose jobs and contracts and not be hired for any more jobs and contracts.

II.     **THE PARTIES**

13.     Dennis L. Montgomery is a natural person, an individual, and a citizen of the United States.  He is a citizen of Florida, which as set forth above, is where much of this work has taken place and will continue to take place. He resides at ███████████ Miami, FL ███ and has a Miami-Dade telephone number of ███████. Mr. Montgomery is also registered to vote in Florida and has had multiple and ongoing business dealings within the state of Florida. Plaintiff is in poor health. He suffered a brain aneurysm and a related multi-infarct stroke on May 12, 2014.  He suffered both a hemorrhagic stroke (caused by ruptured blood vessels that cause brain bleeding) and an ischemic stroke (loss of blood flow).  He was in the hospital for two months, through July 2014.  He has been left permanently disabled and partially paralyzed. Plaintiff could suffer a similar or repeated event causing him to die at any time.  He is currently in outpatient physical therapy to work on ongoing left-sided weakness and speech therapy for stroke related cognitive and memory impairments along with swallowing difficulties.

14.     James Risen is a natural person who is a Pulitzer Prize-winning journalist for <u>The New York Times</u>, previously for <u>The Los Angeles Times</u>. He has written or co-written many articles concerning U.S. Government ("Government") activities and is the author or co-author of two books about the National Security Agency ("NSA") and the Central Intelligence Agency ("CIA").

15.     Defendant Houghton Mifflin Harcourt Publishing Company is the publisher of Risen's Book, "<u>Pay Any Price: Greed, Power and Endless War</u>" and is located in Boston, Massachusetts.

16.     Defendant HMH Holdings, Inc. is the parent company and owner of the Houghton Mifflin Harcourt Publishing Company and is incorporated in the State of Delaware.

17.     Defendant Houghton Mifflin Harcourt Company is the parent company and owner of the Houghton Mifflin Harcourt Publishing Company and is incorporated in the State of Delaware.

18.      Houghton Mifflin Harcourt Company and/or Houghton Mifflin Harcourt Publishing Company maintains offices throughout the United States, including an office in Orlando, Florida.

19.     With regard to each of the allegations in this complaint, all of the Defendants have acted in concert, jointly and severally, thus giving rise to joint and several liability for each of them. Thus, when a tortious act is attributed (and pled as) to Defendant Risen, it also applies to the other defendants, Houghton Mifflin Harcourt Publishing Company, HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company.

20.     All of the allegations of this Complaint refer or relate to the tortious, illegal conduct of each and every named Defendant, who acted individually and in concert, jointly and severally, to severely damage Plaintiff Montgomery.

III.    **FACTS COMMON TO ALL COUNTS**

21.     Plaintiff Montgomery sues for harm and thus damages in this district, Florida in general, nationwide and internationally to himself as an individual, which damages include financial harm to his business reputation as an individual and his business and professional opportunities as an individual, intentional infliction of emotional distress, and assault for placing Plaintiff Montgomery in immediate fear of bodily harm, injury, and death, by terrorists who have sworn to attack those assisting the U.S. military and Government.

22.     Plaintiff Montgomery sues for harm to his financial interests as an individual owner, investor, partner, shareholder and/or employee of companies impacted by these events, which has resulted in financial harm to Plaintiff Montgomery as an individual through the loss of value of his ownership interests in those companies as a result of Defendants' defamation and other tortious conduct.

23.     Plaintiff Montgomery sues for harm to his financial interests as an individual in the intellectual property of computer software, computer software techniques and encoding and decryption technologies which he developed and which have been harmed by Defendants' defamation and other tortious conduct, as well as other harm and thus damages to be uncovered during discovery.

**Dennis Montgomery Not a Public Figure**

24.     Plaintiff Montgomery is a private citizen and at all material times acted individually and in business.

25.     Plaintiff Montgomery has not sought any form of publicity, public note or prominence outside of implementing his own business affairs in private transactions.

26.     Plaintiff Montgomery has not sought or held any public office or Government position within the Government.

27.     Plaintiff Montgomery thus is not a public figure based on facts, including his work for the Government, which was secret, while he in effect worked undercover for the Government outside of the public eye.

28.     Plaintiff Montgomery has not sought or acquired any position of public power or influence which would give him the ability to protect himself apart from the courts within the meaning of *New York Times v. Sullivan*, 376 U.S. 254 (1964).

29.     Plaintiff Montgomery is not a public figure within the meaning of *New York Times v. Sullivan,* 376 U.S. 254 (1964) or its progeny.

### Defamation of Plaintiff Dennis Montgomery by Defendant James Risen in Recent Bestselling Book

30.     On October 14, 2014,[2] the publishing 'house' of Defendant Houghton Mifflin Harcourt Publishing Company at 215 Park Avenue South, New York, New York 10003, whose parent is Defendant HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company, published a book titled "Pay Any Price:  Greed, Power and Endless War" (referred to as "the Book" or "Book" below) by author Defendant James Risen, Copyright (c) 2014 by Defendant James Risen, designated by the Library of Congress by its index system as ISBN 978-0-544-

---

[2]     A book's official publication date is somewhat artificial for marketing, and books are often available and being promoted a week or two ahead of the official publication date.  In part, this is due to the task of distributing books to bookstores and on the Internet all across the nation by the official date of publication.

34141-8 (hardback edition). This publication dated October 14, 2014, was the first publication

of the Book in this district, Florida in general, domestically, and worldwide, in any language and

the first printing run of the Book. The Book was physically printed in the United States.

31. On information and belief, the Book Pay Any Price was sold starting in October

2014, in mainstream bookstores throughout this district, Florida in general, the United States as a

whole, internationally, and on the Internet.

32. Defendants advertised the sale of the Book Pay Any Price throughout this district,

Florida in general, the United States as a whole, internationally, and on the Internet.

33. The Book Pay Any Price was available for sale and was and is sold throughout

book stores such as Barnes and Noble, Books-A-Million bookstores, and throughout the state of

Florida and the United States.

34. The Book Pay Any Price was and is similarly sold throughout the internet on

websites such as Amazon.com and barnesandnoble.com, where it was purchased by citizens and

residents of Florida. As of April 27, 2015, Pay Any Price is still ranked by Amazon.com as the

fourteenth (14th) highest bestseller in books on national and international security.[3]

35. A complete copy of Chapter 2 of Pay Any Price is attached for the Court as

Exhibit A.

36. Chapter 2 of the Book Pay Any Price is devoted to the Plaintiff Montgomery –

though curiously not to Warren Trepp, Montgomery's much more politically connected business

partner, after whom their company eTreppid was named.

37. The Book could have been written and still be complete by omitting Plaintiff

Montgomery entirely from the Book. Plaintiff Montgomery is not necessary to the theme or

---

[3] *See* http://www.amazon.com/gp/bestsellers/books/3049231/ref=pd_zg_hrsr_b_1_5_last

message of the Book, but indeed the reports about Plaintiff Montgomery actually conflict with the Book overall.

38.     The Book was rated as #18 in the greatest quantity of sales nationwide on The New York Times' list rating the nation's bestselling books for the week of November 9 to 16, 2014, and #20 in quantity of sales nationwide for the week of October 26 to November 9, 2014.

39.     The Book was rated as #11 in the greatest quantity of sales nationwide on The Los Angeles Times' list rating the nation's bestselling books as of November 2, 2014, and #17 in quantity of sales nationwide as of November 16, 2014.

40.     The Book is listed on The New York Times' list of the 100 most notable books published in the year 2014.

41.     Apart from the Book itself, Defendant Risen also engaged in a flurry of radio and television news interviews and talk show interviews in and around September 2014 and October 2014, associated with the "roll out" of his Book in which Defendant Risen made further defamatory factual publications of and concerning Plaintiff Montgomery, in addition to the words and content of the Book itself.  In these interviews, Defendant Risen and the other Defendants repeated the false and misleading statements from the Book itself, and also added to those claims and even at times falsely and misleadingly contradicted the defamatory claims of his own Book.

42.     Many of Defendant Risen's and the other Defendants' libelous and slanderous statements were made during written news and talk show interviews during September 2014, October 2014, and November, 2014, some spoken, some in print and elsewhere, surrounding the publication of his Book rather than in the Book itself.  Defendants were purposely and intentionally marketing the book through the sensational defamatory statements made about

Plaintiff. In fact, Plaintiff is the focal point of the Book and that explains why he has been

defamed and thus trashed not just in the Book but Defendant's published interviews about the

Book, intended to get readers to buy the Book in Florida and elsewhere.

43.     Counsel for Plaintiff Montgomery served a demand for a retraction upon Jon

Stewart and "The Daily Show" airing on November 6, 2014 on the Comedy Central nationwide

television network after Defendant Risen's television interview on "The Daily Show."  Stewart

and the "The Daily Show" production did not air a correction or retraction, but later removed the

interview from its website. However, the publication is still out on - and being published on - the

Internet and other media sites.

44.     Plaintiff Montgomery also sent two demand letters to the Defendant publishers

pursuant to Florida Statute § 770.02. One was served on January 14, 2015 and the other was

served on February 13, 2015. Defendants responded on January 20, 2014, refusing to retract the

false information and pay damages. (Composite Exhibit B). To date, Defendants' have not

responded to Plaintiff Montgomery's letter of February 13, 2015. These are incorporated herein

by reference.

45.     Defendants' defamation that Plaintiff Montgomery convinced the Government of

false terror threats is false and misleading including but not limited to the fact that Plaintiff

Montgomery never offered any interpretation of the hidden data he uncovered, even when

pressured to give his conjecture about what the hidden data was, meant, or referred to.  Plaintiff

Montgomery left it up to intelligence experts of the Government to analyze and determine what

the hidden data and clues that he found actually meant.

46.     Defendants' defamation of Plaintiff Montgomery is false and misleading,

including but not limited to the fact that Plaintiff Montgomery and his partners turned down

other contracts of equal or greater profitability with private companies, but were urged by Government officials to help the Government for national defense instead.

47.    Defendants' defamation of Plaintiff Montgomery publishing that he defrauded the Government to make money out of greed is false and misleading, including but not limited to the fact that Plaintiff Montgomery was only a minority stockholder who did not receive any distribution of company profits.  Warren Trepp was the President and CEO and controlled all shareholder activities and financial decisions in the company, eTreppid.  Plaintiff Montgomery owned no stock in Edra Blixseth's later company BLIXWARE.

48.    Defendants' defamation of Plaintiff Montgomery publishing that he defrauded the Government is false and misleading including but not limited to the fact that the Government conducted its own independent tests of Plaintiff Montgomery's software and confirmed its effectiveness and reliability.

49.    Defendants' publications that Plaintiff Montgomery defrauded the Government are false and misleading including but not limited to the fact that the Government has continued to use Plaintiff Montgomery's software and technology.

50.    Defendant Risen and the other Defendants have misrepresented the truthful story of these events by faulting the wrong parties and thus defaming Plaintiff Montgomery.

51.    Defendants' defamation of Plaintiff Montgomery is false and malicious, including but not limited to the fact that Defendant Risen's Government sources would bear the blame and legal consequences if they did not portray Plaintiff Montgomery as at fault.

52.    In the alternative, Defendants, all of them, jointly and severally, manufactured the alleged facts pled in this Complaint and did not have confidential sources in Government.

53.     Defendants' defamation of Plaintiff Montgomery was made with actual malice. Defendants had knowledge of the falsity of the defamatory statements, and/or made the defamatory statements with reckless disregard to the truth. *See* Plaintiff's Affidavit, Exhibit C, incorporated herein by reference.

54.     Despite being a Pulitzer Prize-winning author, Defendant Risen has previously been alleged to engage in a pattern and practice of defaming individuals for profit. As one example revealed on Defendant Risen's Wikipedia page, specifically, Wen Ho Lee co-wrote a book called My Country Versus Me in which he described Defendant Risen as a "hatchet job on me, and a sloppy one at that." The New York Times and The Los Angeles Times jointly decided to settle the case brought by Wen Ho Lee on behalf of Defendant Risen and agreed to pay damages to settle the lawsuit.

### Use of False And Misleading Classified Information by Defendants or Failure to Fact Check

55.     Thus, either the Defendants, all of them, had in their possession classified national security and intelligence information from the Government and details of confidential private conversations and events within the Government (and falsified that information) or Defendants made up the entire defamatory story about Plaintiff Montgomery for sensationalism and thus just to sell more books and reap huge profits.

56.     Defendants Houghton Mifflin Harcourt Publishing Company ("Houghton Mifflin") and its parent, HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company, were required to fulfill their legal and ethical responsibilities before publishing a book of this nature and especially a book containing Chapter 2 and related passages which singles out a private citizen for intense defamation, to "fact check" and review the evidence for defamatory factual recitations made in the Book concerning Plaintiff Montgomery before publication.

57.     Houghton Mifflin and HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company, were required to ensure that the author, Defendant Risen, had sufficient factual basis for the Book's statements and claims about Plaintiff Montgomery.

58.     Here, however, even if true, the substance of the Book's published criticisms and descriptions of Plaintiff Montgomery would have required Defendant Risen to admittedly base his Book on information from the Government which is classified or secret or otherwise legally restricted on the grounds of national security or intelligence sources and methods.

59.     In the Book's preliminary pages, Defendant Risen writes and Defendants Houghton Mifflin, HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company published and admitted the following:

### A NOTE ON SOURCES

> "Many people have criticized the use of anonymous sources. Yet all reporters know that the very best stories – the most important, the most sensitive – rely on them. This book would not be possible without the cooperation of many current and former government officials and other individuals who were willing to discuss sensitive matters only on the condition of anonymity."

60.     Thus, Defendants admit that the Book is based upon inside, Governmental classified information, however false and misleading, from "many current and former government officials…"

61.     Among other occasions, Defendant Risen described in The New York Times telephone[4] interview posted on October 24, 2014, titled **"Inside The New York Times Book Review: James Risen's 'Pay Any Price'"**, that he was alerted about Plaintiff Montgomery by sources within the CIA.

---

[4]     Accessible at: http://artsbeat.blogs.nytimes.com/2014/10/24/book-review-podcast-james-risens-pay-any-price/

62.     Thus, the substance of the Book's false and misleading publications about

Plaintiff Montgomery, if true or otherwise, would have required Defendants Houghton Mifflin,

HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company to review information from

the Government which is classified or secret or otherwise legally restricted on the grounds of

national security or intelligence sources and methods. Since this would be illegal, one can only

conclude that Defendants fabricated the defamatory publications as alleged herein.

63.     Defendant Risen and the other Defendants' defamatory and false and misleading

factual assertions, descriptions, and reports in Chapter 2 of the Book Pay Any Price concerning

Plaintiff Montgomery relate in specific detail conversations, incidents, events, decisions, etc.,

that Defendant Risen could not possibly know without receiving information from the

Government that is classified, secret, or legally restricted.

64.     For example, the Book related and published conversations within the Oval Office

of The White House with President George W. Bush and his foreign policy team and the national

command authority of the United States, communications between the intelligence services of

France and the United States, deliberations within the CIA and NSA, and so on and so forth.

65.     Plaintiff Montgomery developed various software including software that

successfully decoded hidden messages from broadcast video.[5]

66.     However, as to why the Bush Administration cancelled flights from Europe and

ordered potential shoot-downs (see below), including the full range of their information, only the

---

[5]     Plaintiff Montgomery's company began originally developing software to colorize black-and-white movies, which requires an extraordinarily sophisticated ability to recognize specific objects and shapes – such as faces, individual parts of clothing, etc., as they are moving in three dimensional perspective and changing distances (affecting size in relation to other objects in the view) and to follow and track every object requiring a slightly different shade of color, brightness, including as impacted by shadows, etc.

Government intelligence officials themselves and the President of the United States at the time know why they did what they did.

67.     Defendants Risen, Houghton Mifflin, HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company, were used as tools by the CIA, NSA, and other Government agencies and their affiliates to maliciously destroy Plaintiff Montgomery because he came forward as a whistleblower in an attempt to reveal their unconstitutional and illegal actions in spying on all American citizens, regardless of whether there was probable cause that they were communicating with and/or aiding and abetting terrorists and/or committing crimes.

**Actual Malice and Punitive Damages:  Defendant James Risen is an Expert in Journalism**

68.     Actual malice can be found if Defendants published defamatory statements with a reckless disregard of the truth or used slipshod or sketchy investigative techniques.

69.     Reckless disregard of the truth can be shown when there is little investigative effort expended initially or signals of the falsehood of reporting are ignored, or no additional inquires were made after the editors knew or should have known that the published accounts were untrue.

70.     Actual malice can also be proved by circumstantial evidence. Evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity. *Reader's Digest Assn. v. Superior Court* 37 Cal.3d 244, 257 (1984).

71.     In his interview posted on October 24, 2014, called  "titled **"Inside The New York Times Book Review: James Risen's 'Pay Any Price:**  This week, James Risen and Lucy Worsley," **Defendant Risen admits that ….**

" . . . it is very difficult to tell what is actually true."[6]

72.     Defendant Risen is a Pulitzer Prize-winning investigative reporter for The New York Times, and accordingly trained, experienced, and disciplined in journalistic standards and ethics.

73.     Regarding Defendant Risen's status as an expert in accurate and reliable reporting as a journalist, Newsweek praises Defendant Risen on October 20, 2014, by claiming

> "At long last we can retire Bob Woodward and Carl Bernstein as the icons of investigative reporting. With his second book probing the dark tunnels of the so-called war on terror, James Risen has established himself as the finest national security reporter of this generation, a field crowded with first-rank talent at *The Washington Post*, *Wall Street Journal*, Associated Press, Reuters, McClatchy Newspapers and the *New York Times*, his employer and sometimes bane."[7]

74.     As "the finest national security reporter of this generation" according to Newsweek, Defendant Risen should have understood what Dan Aykroyd's character (Naval Intelligence Captain Raymond Thurman) in the movie Pearl Harbor explains to Admiral Chester Nimitz:

> **Admiral Chester W. Nimitz**:   So, sir, you would have us mobilize the entire fleet, at the cost of millions of dollars, based on this 'spine-tingling' feeling of yours?
>
> **Captain Raymond Thurman**:   No, sir. I understand my job is to gather and interpret material. Making difficult

---

[6]     ArtsBeat: Book Review Podcast: James Risen's 'Pay Any Price', by John Williams, New York Times, October 24, 2014,  http://artsbeat.blogs.nytimes.com/2014/10/24/book-review-podcast-james-risens-pay-any-price/ , based upon Louise Richardson's book review of Risen's book and publishing a podcast interview of James Risen with Lousia Worsley **"Inside The New York Times Book Review: James Risen's 'Pay Any Price'"** accessible at that website address.

[7]     **"Hustlers, Con Men & Dupes Cashing in on the War on Terror,"by Jeff Stein**, Time Magazine, October 20, 2014, http://www.newsweek.com/hustlers-con-men-dupes-cashing-war-terror-278503.   Risen did not make any new statements in the Newsweek article and apparently was not interviewed for the article.  However, Newsweek did republish the libel from Risen's Book.

decisions based on incomplete information from my
limited decoding ability is your job, sir.[8]

75.    Yet, Defendant Risen and the other Defendants defame a private citizen, Plaintiff

Montgomery, as responsible for the alleged decision of President George W. Bush's to ban many

incoming international flights around Christmas 2003 from entering U.S. airspace and to

(allegedly) nearly order the U.S. Air Force to shoot down around ten civilian aircraft over the

Atlantic Ocean as a result of Plaintiff Montgomery's claimed fraud and hoax.  Defendant Risen

portrays this as Plaintiff Montgomery's fault, not Bush's, assuming there is any truth at all to this

false and misleading account.

76.    At a time when the Government was encouraging people to: " . . . If you see

something, say something,"[9] Plaintiff Montgomery said something about what he saw,

innocently, diligently, legally and appropriately.

77.    The thesis of Defendant Risen's and the other Defendants' Book is that the war on

terror is illegitimate and unnecessary, motivated by personal greed, irrational paranoia, or

politics, and that the French government is wise and smart while our Government is stupid,

foolish, greedy, incompetent and criminally-minded.

78.    That is, Defendant Risen and the other Defendants' Book is not a neutral report,

in which errors could be classified as simply inadvertent.  The Book is an intentional, politically-

driven, falsified, and misleading attack on U.S. foreign, military, and intelligence policies in the

"war on terror" against Islamic terrorism, meant to mock and ridicule a strong national defense.

---

[8]    "Pearl Harbor" (2001) (Touchstone Pictures and Jerry Bruckheimer Films)
[9]    http://www.dhs.gov/if-you-see-something-say-something%E2%84%A2 .  In fact, the
DHS encourages partners, announcing "If you are interested in establishing a partnership with
DHS and the "If You See Something, Say Something™" Campaign, please email
seesay@hq.dhs.gov."  DHS has set up a special email address seesay@hq.dhs.gov to promote
this concept of vigilance.

Plaintiff Montgomery is illegally used as a whipping boy by Defendants in this regard to sensationalize and sell more books for a great profit.

79. Defendant Risen sets out to discredit what he calls "The Endless War" as being motivated by corruption, greed, personal profit, and irrational paranoia.

80. Yet curiously Defendant Risen goes very far out of his way to gratuitously and irrelevantly defame Plaintiff Montgomery as the villain and Government officials as Plaintiff Montgomery's unsuspecting victims, in conflict with the theme of his Book. Defendant Risen also deliberately looks past Warren Trepp, the owner of eTreppid, to oddly single out and blame only Plaintiff Montgomery.

81. That is, Defendant Risen and the other Defendants' defamation of Plaintiff Montgomery contradicts and undermines his own thesis in the Book Pay Any Price, curiously shifting the blame from Government officials to a lone private citizen, whom he falsely and misleadingly portrays as having no intelligence or defense background.

82. Defendant Risen ignores evidence that should have warned him and the other Defendants that their false and misleading publications are wrong into yet another example that Plaintiff Montgomery kept defrauding the Government.

83. The Government repeatedly rehiring Plaintiff Montgomery should have warned Defendant Risen that there is more than meets the eye to this falsified and misleading story, yet instead Risen portrays this as Plaintiff Montgomery defrauding it, the Government.

84. More than the average lay person, Defendant Risen knows or should know the unreliability of some sources and the information they provide and the motivations of sources.

85. A central claim of Defendant Risen's and the Defendants' defamation of Plaintiff Montgomery is that the stupid, foolish, Government was defrauded by Plaintiff Montgomery's

hoax until a private French firm opened its eyes and Government officials were tutored by the French to discover enlightenment.

86.    But in fact, Defendant Risen actually knew or should have known in advance of the Book's publication that France was an opponent of the Bush Administration's foreign policies in the relevant time period after Christmas 2003 and would neither have been trusted by the Government with such secrets nor believed.  Certainly, a private French firm would not have been so trusted.

87.    France at the time was actively involved in opposing the Bush Administration's foreign policy.[10]

88.    In particular, France's animosity toward U.S. foreign, military, and intelligence policies were driven by France's extensive commercial interests with the Middle East, such that a private French high-tech firm would be the least likely source to be believed by U.S. Government officials.

89.    In fact, so disgusted with France's opposition to U.S. foreign, military, and intelligence policies was President Bush's political party that the name of "French fries" was

---

[10]    *See* "**France raises terror war concerns**," CNN, February 7, 2002, ("A senior French government minister has attacked the U.S. approach to fighting terrorism as "simplistic.") http://www.cnn.com/2002/WORLD/europe/02/07/france.bush/  and "**France and allies rally against war,**" BBC News,  March 5, 2003, http://news.bbc.co.uk/2/hi/middle_east/2821145.stm and "**Israeli Analysts: France Ignored Islamic Terror Directed at Jewish Targets:  'Didn't want to deal with Islamic terror for political reasons,'**" Washington Free Beacon, January 12, 2015 ("Columnist Alex Fishman, who writes on security issues for the Tel Aviv daily, Yediot Achronot, said that French intelligence agencies "just didn't want to deal with Islamic terror for political reasons, both because of France's involvement in the Arab world and because 10 percent of its residents are Moslem. The French security services insisted on not touching Islamic terror professionally") http://freebeacon.com/national-security/israeli-analysts-france-ignored-islamic-terror-directed-at-jewish-targets/   With France as an outspoken opponent to President Bush's war on terror policies, perceived as driven by France's lucrative business opportunities in the Middle East, it is highly improbable that the CIA would share sensitive, classified information with France at that period in time.

changed to "Freedom Fries" in the cafeterias and restaurants in the Republican-controlled U.S. House of Representatives, as CNN reported on March 12, 2003.[11]  CNN reported:  "But House Majority Leader Tom DeLay, R-Texas, said he didn't think Congress needed to take any formal steps to signal its disapproval of France. 'I don't think we have to retaliate against France,' he said. '***They have isolated themselves. They have resigned from any responsibility for the war on terror.***'" (Emphasis added.)

90.     Thus Defendant Risen actually knew or should have known, as a Pulitzer Prize-winning expert reporter on national security, the war on terror, and foreign, military, and intelligence policies, that it was nearly impossible for the claim to be true that Plaintiff Montgomery pulled off a hoax against the Government until a private French high-tech firm blew the whistle on Plaintiff Montgomery's fraud using highly-classified intelligence.

91.     With regard to Defendant Risen's reporting about a Christmas 2003 alert concerning possible terrorism involving airliners, Defendant Risen actually knows and should have known that the French government does not have the authority to demand an explanation from the CIA.[12]

92.     Defendant Risen also knows and should have known that the Bush Administration would never have believed France's analysis as being unbiased and trustworthy, rather than politicized manipulation.

---

[11]     "**House cafeterias change names for 'french' fries and 'french' toast**," By Sean Loughlin, CNN, March 12, 2003.  http://www.cnn.com/2003/ALLPOLITICS/03/11/sprj.irq.fries/
[12]     Defendant Risen himself is under a court order in another case to divulge his sources as a journalist, which Risen has refused to comply with.  Risen knows that even journalists often do not reveal their sources.  See http://dissenter.firedoglake.com/2014/10/30/in-leak-prosecution-attorneys-demand-to-know-if-government-has-agreement-with-reporter-james-risen/

93.     Moreover, Defendant Risen repeatedly complains and admits in his Book and in interviews that <u>The New York Times</u> refused to publish many of his articles written on these topics.

94.     Thus, Risen has actual knowledge that experienced and well-established news sources such as <u>The New York Times</u> had serious doubts about the truthfulness of Defendant Risen's reporting on these and related topics, such that <u>The New York Times</u> refused to run many of Risen's filed reports, despite his Pulitzer Prize background. If anyone or entity was motivated by greed, it was not Plaintiff Montgomery but Defendants Risen, Houghton Mifflin, HMH Holdings, Inc., and/or Houghton Mifflin Harcourt Company, who fabricated false and misleading information and then published it for financial gain.

95.     Defendants' acts were willful malicious, deliberate, or were done with reckless indifference to the likelihood that such behavior would cause severe emotional distress and with utter disregard for the consequences of such actions, as well as encourage terrorists and others to threaten Plaintiff Montgomery with severe bodily injury or death; in effect causing a Fatwah to be placed on Plaintiff Montgomery's head and on his family.

IV.     **CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
*Common Law Defamation "Per Se"*

96.     Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

97.     The Defendants – all of the Defendants – together and each of them acting in concert, jointly and severally, and individually, have defamed the Plaintiff by knowingly, intentionally, willfully, or negligently publishing statements about the Plaintiff which they knew or should have known to be false.

98. Defendants' defamation of Plaintiff Montgomery was made with actual malice. Defendants had knowledge of the falsity of the defamatory statements, or made the defamatory statements with reckless disregard to the truth.

99. Defendants together and each of them acting in concert, jointly and severally, and individually, made false statements that are Defamation *Per Se*, accusing Plaintiff of fraud, crime, scams, and being a con-artist.

100. Among other accusations, Defendants state that Plaintiff Montgomery defrauded CIA Director George Tenet with regard to contracts with the Government, which published and accused Plaintiff Montgomery of having committed crimes under the False Claims Act, 31 U.S.C. §§ 3729 – 3733, and also common law and statutory fraud. This is Libel *Per Se.*

101. Defendants, together and each of them acting in concert, jointly and severally, and individually, knew that their public statements about the Plaintiff would cause severe damage to the reputation, business opportunities, social relationships, and the career of Plaintiff Montgomery.

102. A statement is per se defamatory if it falsely imputes to another conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession or office; in other words, or if it tended to injure Plaintiff in his trade or profession.

103. A statement is also per se defamatory if "it imputes to another (a) a criminal offense amounting to a felony, or (b) a presently existing venereal or other loathsome and communicable disease, or (c) conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession, or office, or (d) the other being a woman, acts of unchastity." *Campbell v. Jacksonville Kennel Club, Inc.*, 66 So. 2d 495, 497 (Fla. 1953) citing Restatement, Torts, Section 570.

104.    For Defamation Per Se, actual malice need not be shown because damages are presumed. *Campbell v. Jacksonville Kennel Club, Inc.*, 66 So. 2d 495, 497 (Fla. 1953); *Wolfson v. Kirk*, 273 So. 2d 774 (Fla. Dist. Ct. App. 4th Dist. 1973).

105.    Statements are "*defamatory per se,*" recognized under Florida law when statements are so powerful in their ability to hurt someone that Florida law presumes harmful as a matter of law. *Montgomery v. Knox,* 23 Fla. 595, 3 So. 211, 217 (1887), such that a court will allow damages to be awarded in these cases even if no evidence of harm has been presented. "[T]he law presumes malice in their utterance," *Abraham v. Baldwin*, 52 Fla. 151, 42 So. 591, 592 (1906), where the words are "… of such common notoriety established by the general consent of men, that the courts must of necessity take judicial notice of its harmful effect." *Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234, 236 (1933).

106.    *First*, on Page 32 of the Book, the Defendants published:[13]

> "Whatever else he was, Dennis Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post-9/11 age for what it was, a time to make money. Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it**.** The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in public, a series of civil lawsuits involving Montgomery.  It was as if everyone in

---

[13]    Note that several statements may qualify under different theories, but are presented in full for proper context.  Some statements are repeated for that portion of the statement that qualifies under different theories of defamation under Florida law.

Washington was afraid to admit that the Emperor of the War on Terror
had no clothes."

107.     As Libel *Per Se*, Defendants published about Plaintiff's actions and work that

"many current and former U.S. officials and others familiar with the case now believe was one of

the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that

it nearly convinced the Bush administration to order fighter jets to start shooting down

commercial airliners filled with passengers over the Atlantic."

108.     As Libel *Per Se*, Defendants published about the Plaintiff that "once the fever

broke and government officials realized that they had been taken in by a grand illusion, they did

absolutely nothing about it …"

109.     **Second, on Page 32 of the Book, the Defendants published:**

> "Consider the example of Dennis Montgomery.  He provides a perfect
> case study to explain how during the war on terror greed and ambition
> have been married to unlimited rivers of cash to create a climate in
> which someone who has been accused of being a con artist was able to
> create a rogue intelligence operation with little or no adult supervision.
> Crazy became the new normal in the war on terror, and the original
> objectives of the war got lost in the process."

110.     As Libel *Per Se*, Defendants published that out of "greed" Plaintiff Montgomery

"create[d] a rogue intelligence operation with little or no adult supervision" which was "crazy"

and that he was "someone who has been accused of being a con artist."

111.     **Third, on Page 33 of the Book, the Defendants published:**

> "A former medical technician, a self-styled computer software
> expert with no experience whatsoever in national security affairs,
> Dennis Montgomery almost singlehandedly prompted President
> Bush to ground a series of international commercial flights based
> on what now appears to have been an elaborate hoax. Even after it
> appeared that Montgomery had pulled off a scheme of amazing
> scope, he still had die-hard supporters in the government who
> steadfastly refused to believe the evidence suggesting that
> Montgomery was a fake, and who rejected the notion that the

super-secret computer software that he foisted on the Pentagon and CIA was anything other than America's salvation."

112.    As Libel *Per Se*, Defendants published that Plaintiff's work "now appears to have been an elaborate hoax."

113.    As Libel *Per Se*, Defendants published that "die-hard supporters in the government who steadfastly refused to believe the evidence suggesting that Plaintiff Montgomery was a fake."

114.    As Libel *Per Se*, Defendants published "that he foisted on the Pentagon and CIA" super-secret computer software.

115.    As Libel *Per Se*, Defendants published with reckless disregard for the lives of thousands of airplane passengers on approximately ten civilian aircraft, that Plaintiff Montgomery nearly caused Government policy to shoot down those airplanes causing certain death, despite being a private citizen, rather than looking to Government officials as responsible for the decisions.

116.    ***Fourth***, **on Page 34 of the Book, the Defendants published:**

> "Montgomery was an overweight, middle-aged, incorrigible gambler, a man who liked to play long odds because he was convinced that he could out-think the house. He once boasted to a business partner that he had a system for counting an eight-deck blackjack shoe, quite a difficult feat for even the best card sharks, and he regularly tested his theories at the El Dorado and the Peppermill Casino in Reno. He usually came up short but that didn't stop him from playing blackjack on a nightly basis, racking up unwieldy debts that eventually led to his 2010 arrest for bouncing more than $1 million in bad checks at Caesar's Palace in Las Vegas."

117.    As Libel *Per Se*, Defendants published about the Plaintiff that he was an "incorrigible gambler," meaning in effect that Plaintiff Montgomery was a gambling addict who

was "playing blackjack on a nightly basis." Historically, gambling, and in particular an

uncontrollable gambling addiction, is a loathsome social status.

118.    As Libel *Per Se*, Defendants published about the Plaintiff that he bounced more

than $1 million in bad checks.

119.    ***Fifth,*** **on Page 36 of the Book, the Defendants published:**

"Michael Flynn, Montgomery's former lawyer— who later
concluded that Montgomery was a fraud."

120.    As Libel *Per Se*, Defendants published about the Plaintiff that the Plaintiff's

lawyer "concluded that Montgomery was a fraud."

121.    ***Sixth,*** **on Page 37 of the Book, the Defendants published:**

*"*By the spring and summer of 2003, eTreppid was awarded contracts
by both the air force and U.S. Special Operations Command.
Montgomery was able to win over the government in part by offering
field tests of his technology — tests that former employees say were
fixed to impress visiting officials. Warren Trepp later told the FBI
that he eventually learned that Montgomery had no real computer
software programming skills, according to court documents that
include his statements to the FBI. Trepp also described to federal
investigators how eTreppid employees had confided to him that
Montgomery had asked them to help him falsify tests of his object
recognition software when Pentagon officials came to visit. Trepp
said that on one occasion, Montgomery told two eTreppid employees
to go into an empty office and push a button on a computer when they
heard a beep on a cell phone. Meanwhile, Montgomery carried a toy
bazooka into a field outside eTreppid. He was demonstrating to a
group of visiting U.S. military officials that his technology could
recognize the bazooka from a great distance."

122.    As Libel *Per Se*, Defendants published about the Plaintiff that he committed fraud

including defrauding the Government, prohibited under the False Claims Act codified at 31

U.S.C. §§ 3729 – 3733.

123.    ***Seventh,*** **on Page 37 of the Book, the Defendants published:**

"After he was in place in the field, he used a hidden cell phone to buzz the cell phone of one the eTreppid employees, who then pushed a key on a computer keyboard, which in turn flashed an image of a bazooka on another screen prominently displayed in front of the military officers standing in another room, according to court documents. The military officers were convinced that Montgomery's computer software had amazingly detected and recognized the bazooka in Montgomery's hands. (Montgomery insists that the eTreppid employees lied when they claimed that he had asked them to fix the tests, and also says that the air force issued a report showing that it had verified the tests.)"

124.   As Libel *Per Se*, Defendants published about the Plaintiff that he committed fraud including defrauding the Government, prohibited under the False Claims Act codified at 31 U.S.C. §§ 3729 – 3733.

125.   ***Eighth,*** **on Page 40 of the Book, the Defendants published:**

"Montgomery brilliantly played on the CIA's technical insecurities as well as the agency's woeful lack of understanding about al Qaeda and Islamic terrorism. He was able to convince the CIA that he had developed a secret new technology that enabled him to decipher al Qaeda codes embedded in the network banner displayed on the broadcasts of Al Jazeera, the Qatar-based news network. Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks. And only he had the technology to decode those messages, thus saving America from another devastating attack. The CIA— more credulous than Hollywood or Las Vegas— fell for Montgomery's claims. In short, he convinced CIA officials that he could detect terrorist threats by watching television."

126.   As Libel *Per Se*, Defendants published about the Plaintiff that "Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks."

127.   As Libel *Per Se*, Defendants published about the Plaintiff that he defrauded the CIA.

128.   ***Ninth,*** **on Page 42 of the Book, the Defendants published:**

"A CIA official defensively pointed out that the agency did not actually have a contract with eTreppid at the time Montgomery was providing data from the Al Jazeera videotapes. While they were working closely together during the final months of 2003, the CIA had not yet started paying Montgomery, the official said. The agency never finalized a contract with him because agency staff eventually realized they had been conned, according to this official. But that does not diminish the fact that for a few crucial months, the CIA took Montgomery and his technology very seriously."

129.     As Libel *Per Se*, Defendants published about the Plaintiff that "agency staff eventually realized they had been conned, according to this official."

130.     **Tenth, on Page 46 of the Book, the Defendants published:**

"It did not take long for the French firm to conclude that the whole thing was a hoax. The French company said that there were simply not enough pixels in the broadcasts to contain hidden bar codes or unseen numbers. The firm reported back to the French government that the supposed intelligence was a fabrication."

131.     As Libel *Per Se*, Defendants published about the Plaintiff that "the whole thing" (Plaintiff Montgomery's work) "was a hoax" and a "fabrication."

132.     **Eleventh, on Page 46 of the Book, the Defendants published:**

"The CIA never investigated the apparent hoax nor examined how it had been handled inside the agency. No one involved in promoting Montgomery, in vouching for his information to the president, or in proposing to shoot down planes based on his claims ever faced any consequences."

133.     As Libel *Per Se*, Defendants published about the Plaintiff that his work was a hoax.

134.     **Twelfth, on Page 47 of the Book, the Defendants published:**

"At the time of the Christmas 2003 scare, John Brennan was head of the newly created Terrorist Threat Integration Center and in charge of distributing terrorism-related intelligence throughout the government. That meant that Brennan's office was responsible for circulating Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration. But Brennan was never

28

admonished for his role in the affair. After Barack Obama became president, Brennan was named to be his top counterterrorism advisor in the White House. He later became CIA director."

135.   As Libel *Per Se*, Defendants published about the Plaintiff that "That meant that Brennan's office was responsible for circulating Plaintiff Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration."

136.   As Libel *Per Se*, Defendants published about the Plaintiff that "Brennan was never admonished for his role in the affair," to suggest that Brennan should have been admonished for his involvement with Plaintiff Montgomery's work with the Government.

137.   **Thirteenth, on Page 50 of the Book, the Defendants published:**

"Edra Blixseth was Dennis Montgomery's latest mark. After being introduced to him by a former Microsoft executive and then hearing Montgomery explain his software, she agreed in 2006 to bankroll Montgomery to launch a new company, to be called Blxware. Montgomery needed new government contracts for Blxware, and Edra Blixseth had the money and contacts to try to make it happen."

138.   As Libel *Per Se*, Defendants published about the Plaintiff that "Edra Blixseth was Dennis Montgomery's latest mark," clearly publishing that Plaintiff Montgomery is a con man.

139.   **Fourteenth,** on November 6, 2014, Defendant Risen appeared as an interview guest on "The Daily Show with Jon Stewart," by Comedy Central, and was interviewed by Jon Stewart. The television interview was taped at The Daily Show's studio 11th Avenue between 51st and 52nd Street, New York (Manhattan), New York, and broadcast for the first time in this district, Florida in general, nationwide across the United States, internationally, and through cable television, satellite television, and on YouTube and other Internet sites, on "The Comedy Central" channel.

140.     On November 13, 2014, Plaintiff Montgomery's undersigned counsel sent a letter

to Mr. Stewart requesting that he allow Mr. Montgomery to appear on his show to correct the

false and misleading publications of Defendants. Mr. Stewart declined to extend this courtesy.

141.     Defendant Risen stated in said television interview for his statements to be

broadcast on television and widely broadcast elsewhere that his favorite story is the story of –

> Dennis Montgomery who is this guy was as a computer software
> expert, supposed expert. Who convinced the CIA in 2003 that he had
> the super-secret technology to read Al Jazeera news broadcasts and
> decipher Al Qaeda codes inside the [interrupted by Jon Stewart]
>
> [Jon Stewart] An Enigma machine for Al Qaeda...?
>
> [Defendant Risen] Right. And he convinced the CIA in 2003 that he
> could read numbers and letters hidden in the Al Jazeera broadcasts that
> corresponded with flights that Al Qaeda was going to shoot down,
> knock--- or blow up….
>
> President Bush was so convinced of this that they grounded flights all
> over the world at Christmas 2003 based on this guy's intelligence or
> supposed intelligence. It took the French intelligence service, which
> had gotten very mad because they grounded flights from Paris to Los
> Angeles. And they demanded that the CIA tell them where they were
> getting this information. And so they finally [non-verbal
> interruption]. They finally got the information. The French told them
> this is a hoax. This is a fabrication.
>
> And as soon as the CIA agreed with them, they covered the whole thing
> up, and refused to ever talk about it. And Montgomery kept getting
> more contracts after that.
>
> [Other, extended discussion with Jon Stewart on other topics]
>
> There is lots of raw intelligence every day that says there is an attack
> about to happen. You really have to be a pretty sophisticated
> consumer of intelligence after several years to begin to realize what's
> real and what's not really a credible threat.

142.     As Libel *Per Se*, Defendant Risen published about the Plaintiff that "he convinced

the CIA in 2003 that he could read numbers and letters hidden in the Al Jazeera broadcasts that

corresponded with flights that Al Qaeda was going to shoot down, knock -- or blow up [something] ...."

143. As Libel *Per Se*, Defendant Risen published about the Plaintiff that "The French told them this is a hoax. This is a fabrication. And as soon as the CIA agreed with them, they covered the whole thing up, and refused to ever talk about it. And Montgomery kept getting more contracts after that." The statement that "the CIA agreed with them" is Risen's assertion about Plaintiff Montgomery's work that "this is a hoax. This is a fabrication."

144. As Libel *Per Se*, Defendant Risen published about the Plaintiff that "they covered the whole thing up, and refused to ever talk about it," as a way of saying that the CIA had been conned because the CIA was not openly discussing in public national security activities.

145. **Fifteenth,** on October 13, 2014, Defendant James Risen gave a television interview[14] with Judy Woodruff which was broadcast nationwide by the Public Broadcasting System (PBS). In that interview, Defendant James Risen made the following statements for broadcast on television, and Judy Woodruff repeated many points from James Risen's Book which Risen agreed with and endorsed. Much of the interview involved other chapters not relevant here.

> JUDY WOODRUFF: In the next chapter, JAMES RISEN, you write about millions of dollars spent on programs that were completely fraudulent. One was run by a man named Dennis Montgomery. He was a, He was a .... I guess he had worked in computer software... but he was a GAMBLER![15]

> JAMES RISEN: Right.

> JUDY WOODRUFF: And he sold the CIA and the Pentagon on technology that turned out to be not at all what he said it was.

---

[14]    http://www.pbs.org/newshour/bb/costs-security-price-high/
[15]    Emphasis, by exclamation in tone of voice, the in original conversation.

JAMES RISEN:   It is difficult to tell in some of these cases who is scamming who.  If you talk to Montgomery, he argues that the CIA wanted him to do what he was doing.  And so its a fascinating dynamic that's developed in the war on terror, between people who recognize the opportunities for this gold rush and the agencies which are... who have so much money to spend now, they're getting so much more money than they ever had before, that in some cases they don't know what to do with.

In this case, they began to believe, in this sort of war fever, that you could find Al Qaeda messages hidden in Al Jazeera broadcasts.  And so that.. that program, that highly secret program, was used to ground planes all over Europe and the United States

JUDY WOODRUFF:  When actually there was nothing to it.

JAMES RISEN:   Right

JUDY WOODRUFF:  It was a hoax.

JAMES RISEN:   Right.  Right.

JUDY WOODRUFF:  And then there was another part of it where he was saying he had special facial recognition software....

JAMES RISEN:   Right.  Right

JUDY WOODRUFF: ... used on drones?

JAMES RISEN:   Yeah.  There were cases in which people said that he was fooling the military and the CIA about his operations and how... what kind of techniques and technologies he had.  He would argue that the CIA actually wanted him and or the army believed him and tested it.  So it's this very complicated story about a man recognizing an opportunity who had never been involved in national security before and the CIA and the military all just hungry for whoever could come with the latest idea.

146.     As Libel *Per Se*, Defendant Risen published about the Plaintiff that "you write about millions of dollars spent on programs that were completely fraudulent.  One was run by a man named Dennis Montgomery," which Defendant Risen confirms by saying, "Right." (Where

the discussion is about "the next chapter," that chapter is exclusively about Plaintiff Montgomery alone.).

147.     As Libel *Per Se*, Defendant Risen published about the Plaintiff that "When actually there was nothing to it," which Risen confirms by saying "Right." And also "It was a hoax," which Risen confirms by saying "Right. Right."

148.     As Libel *Per Se*, Defendant Risen published about the Plaintiff that "There were cases in which people said that he was fooling the military and the CIA about his operations and how . . . what kind of techniques and technologies he had."

149.     **Sixteenth,** on October 24, 2014, Defendant Risen gave an audio interview with Lucy Worsley published on <u>The New York Times</u> website, titled **"Inside <u>The New York Times</u> Book Review: James Risen's 'Pay Any Price'"** which is accessible at that website address. [16] In this interview "**Inside <u>The New York Times</u> Book Review**," with Pamela Paul, October 24, 2014, Defendant Risen stated for national broadcast:

> PAMELA PAUL:   How do we count and account for the costs of the government's war on terror.  We'll talk to  James Risen, author of Pay Any Price:  Greed, Power, and Endless War.
>
> JAMES RISEN ("tease" audio clip):   It seems to me that what the war on terror had become in thirteen years was a search for cash and a search for power and status.
>
> PAMELA PAUL:   What is the British fascination with murder?  Lucy Worsley will explain all joining us to talk with us about her new book:  The Art of the English Murder.
>
> LUCY WORSLEY ("tease" audio clip):  The public used to consume murder in a way that you can still see the modern media doing it today.  Just look at the Pistorius trial.

---

[16]     *See* ArtsBeat: Book Review Podcast: James Risen's 'Pay Any Price', by John Williams, <u>New York Times</u>, October 24, 2014,  http://artsbeat.blogs.nytimes.com/2014/10/24/book-review-podcast-james-risens-pay-any-price/ , based upon Louise Richardson's book review of Risen's book.

PAMELA PAUL: Alexander Alter will be here with Notes from the Publishing world. And Greg Cole has bestseller news. This is "Inside the New York Times Book Review." I am Pamela Paul.

James Risen joins me now. His new book is Pay Any Price: Greed, Power, and Endless War. Hi James.

JAMES RISEN: Hi, thanks for having me.

PAMELA PAUL: Thanks for being here. Now this is a book that covers a lot of territory. Tell us briefly about what it is you set out to write about in the book.

JAMES RISEN: What I wanted to do was, I'd written one book before about the war on terror, and I wanted to follow up with a new book that kind of looked at where we were 13 years after 9/11 and how we had what started out in the immediate aftermath of 9/11 as kind of a search for justice or a search for retribution or whatever you want to think, say we were doing right after 9/11 as a country. It seemed to me that what the war had become in 13 years was a search for cash and a search for power and status and that it was becoming an endless war in which we had a new mercenary class of people who were taking advantage of the war on terror. And that enormous unintended consequences had happened. And I began to hear about just some really crazy things that were going on. And so I thought it would make a good story.

[The discussion then covers the Chapter "Rosetta" not relevant here, concerning a lawsuit for 9/11 families against Saudi Arabia, except the ending]

JAMES RISEN [winds up the Chapter on "Rosetta" by saying]: .... in the war on terror became so complicated and so difficult to tell what was really going on, to me it was like a case study in how the war on terror had been turned for other uses, and become a.... something that you could never tell what was the truth and what was not the truth. And that to me was at the heart of the problems with the war on terror, that you could never tell what's real and what was concoction today.

[The discussion then covers how Risen went about researching the book, not relevant here]

PAMELA PAUL: Did a lot of it arise out of stories that, reporting that you'd originally done for the Times?

34

JAMES RISEN:   Some of it. For instance, I did a chapter The Emperor of the War on Terror, about Dennis Montgomery who [laughs] who's a strange character, who I'd done a story about him for the New York Times along with Eric Lichtbau my colleague there at the Times.  He's one of the most fascinating characters in the war on terror.  He...  He was a computer software expert who convinced the CIA that he could decipher secret codes from Al Qaeda in the Al Jazeera news broadcasts.  And that he could tell the CIA numbers and letters that corresponded with flights that Al Qaeda wanted to attack. And the CIA took this so seriously that they grounded, that the Bush Administration grounded a bunch of international flights in Christmas 2003 based on what this guy was telling them.  And when they realized it was a hoax, they covered the whole thing up and never did anything about it.  So I had done a story for the Times with....  about that and then expanded on that and got a lot more information for the book.

PAMELA PAUL:   How did you find out about him?

JAMES RISEN:   Well he had been written about a little bit before we wrote about it.  But I had also, even before he was written about by other people, I had heard from people in the CIA that there was this crazy operation that nobody wanted to talk about, that they were all embarrassed by.  To me that, it was like a case study in just how crazy the war on terror has become. And the only thing that makes sense about why it's gotten so crazy, is I think we kind of have deregulated national security and we took all, you know, Cheney said we're going to take the gloves off.  And that means we deregulated national security at the same time we poured hundreds of billions of dollars into counter-terrorism.  And so it's had enormous unintended consequences from what is essentially a national security crisis that is kind of like the banking crisis.

[The interview discussion then turns to the alleged deregulation of national security on other topics not relevant here.]

150.    As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff that "And when they [the CIA] realized it was a hoax, they covered the whole thing up and never did anything about it."

151.    **Seventeenth,** Defendant Risen sat for a nationwide television news interview on the television show **DEMOCRACY NOW!** A Daily Independent Global News Hour, with Amy

Goodman & Juan González, at 207 W. 25th Street, Floor 11, New York, NY 10001 on October

14, 2014.  On this nationwide television news broadcast, the conversation turned to:

AMY GOODMAN**:** Dennis Montgomery?

JAMES RISEN**:** Dennis Montgomery is a fascinating character, who—he was a computer software person, self-styled expert, who developed what he said was special technology that would allow him to do things with computers that other people couldn't do. One of the things that he developed was this imaging technology that he said he could find images on broadcast network news tapes from Al Jazeera. He said that he could read special secret al-Qaeda codes in the banners on the broadcasts of Al Jazeera. And the CIA believed this. And he was giving them information based on watching hours and hours of Al Jazeera tapes, saying that "I know where the next al-Qaeda attack is going to be based—is going to happen." And the Bush administration and the CIA fell for this.

AMY GOODMAN**:** And it was in the news zipper at the bottom of the Al Jazeera broadcasts?

JAMES RISEN: Well, he says it was in the banner. But anyway. And so, it was this great—if you talk to him, he argues, well, they—that's what they were looking for. You know, they convinced him to look for this. You know, it depends on who you talk to. But it was one of the great hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush administration, based on information they were getting from Dennis Montgomery's so-called decryption of Al Jazeera broadcasts.

And then there's a whole number of other things, like Alarbus, which was this covert program at the Pentagon where a Palestinian involved in that was actually trying to use the bank account set up by the secret program, Pentagon program, to launder hundreds of millions of dollars. And the FBI investigated this, but then tried to keep the whole thing quiet.

AMY GOODMAN: How much did the Government give to Dennis Montgomery?

JAMES RISEN: Millions of dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial problems as a result of that. So, it's a strange—to me, the Dennis Montgomery story is one of the strangest, because what it shows is, early on in the war on terror, as I said, the CIA and all these other agencies had so

much money to spend on counterterrorism that they were willing to throw it at everything. They were so afraid of the next terrorist attack that they were willing to believe anybody who came up with some idea. And I called that chapter about Montgomery, you know, "The Emperor of the War on Terror," because nobody wanted to say that the emperor had no clothes.

AMY GOODMAN: I mean, it had very real effects, aside from spending all that money.

JAMES RISEN: Yeah.

AMY GOODMAN: For example, planes being sent back.

JAMES RISEN: Yes, yes. There were planes grounded. International flights between the United States and Europe and Mexico were grounded. There was talk at the White House even of shooting down planes based on this information.

AMY GOODMAN: Because they could be used, as with September 11th, as weapons?

JAMES RISEN: Yeah, as missiles or whatever. And so, it was crazy. It was absolutely insane.

AMY GOODMAN: And it was only the French government who then did a study?

JAMES RISEN: Yes, yes. Yeah, the French government finally—you know, the U.S.—the CIA and the Bush administration didn't want to tell anybody what was really happening, where they were getting this information. You know, "This supersecret information about Al Jazeera, we can't tell you." And finally, the French intelligence service and the French government said, "You know, you're grounding our planes. You've got to tell us where you're getting this information." And they got—they finally shared the information with them, and the French got a French tech firm to look at this, and they said, "This is nuts. This is fabrication." And after a while, the CIA was finally convinced maybe the French were right, and they stopped talking about it. They didn't do anything else. They just like shut it down eventually, but never wanted to talk about what had really happened.

AMY GOODMAN: Then Dennis Montgomery, revealed as a con man—

JAMES RISEN: Yeah, yeah.

AMY GOODMAN: —in jail for that?

JAMES RISEN: Well, no, he's not in jail. But it was a—he actually got more contracts after that, with the Pentagon and other agencies. And he continued to operate for a long time. You know, he kind of went from one agency to the other.

AMY GOODMAN: We're talking to James Risen, Pulitzer Prize-winning investigative journalist for *The New York Times*. His new book, just out today, *Pay Any Price: Greed, Power, and Endless War*. When we come back, war corrupts, endless war corrupts absolutely. Stay with us.

[break]

152.   As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff that "But it was one of the great hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush administration, based on information they were getting from Dennis Montgomery's so-called decryption of Al Jazeera broadcasts."

153.   As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff when asked "How much did the Government give to Dennis Montgomery?" Risen answered in reply: "Millions of dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial problems as a result of that."

154.   As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff that "the French got a French tech firm to look at this, and they said, 'This is nuts. This is fabrication.'"

155.   As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff when asked "Then Dennis Montgomery, revealed as a con man—" Risen confirmed in reply: "Yeah, yeah."

156.    As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other

Defendants, published about the Plaintiff that he should be in jail, publishing that Plaintiff

Montgomery committed a crime.

157.    ***Eighteenth***, Defendant James Risen gave an interview with "**Conversations with**

**Great Minds**" of "The Big Picture RT with talk show host Thom Hartmann on October 24,

2014.[17]

> THOM HARTMAN:   ...  [Abrupt change of topic starting at about
> time 5:27]  ...  There's just this enormous amount of government
> money.  Let's throw it at the private sector.  They'll make things well.
> One of the members of the private sector who came forward and said
> I've got a secret, I can figure this stuff out, was a guy by the name of
> Dennis Montgomery.
>
> JAMES RISEN:   Right.  Uh, Dennis Montgomery is one of the best
> stories in the war on terror.  I think somebody should make a movie
> about him.  Dennis Montgomery was a computer software expert who
> said that he had developed technology that basically could find objects
> hidden in the video on television.  And so he convinced, through a
> whole series of contacts and meetings that I detail in the book, he was
> able to get to the CIA  and convince the CIA that he had the technology
> to decipher Al Qaeda codes that were he said were hidden in Al Jazeera
> news broadcasts.
>
> THOM HARTMAN:   They were hidden in the Chiron or the --
>
> JAMES RISEN:   In the banner.  In the banner, actually.  He said that
> he could find numbers and letters that were constantly showing up, or
> not showing up but were being hidden, embedded deeply in the video.
> And he would then give these  numbers and letters to the CIA.  And the
> CIA, either he told them or they convinced themselves that these
> numbers and letters corresponded to flights, international airline flights,
> that Al Qaeda was going to attack.  And so in December, in Christmas
> 2003, the Bush Administration and the CIA took this so seriously that
> they actually grounded a whole series of international flights coming
> into and out of the United States, and the White House even considered
> shooting down some of these flights over the Atlantic.
>
> THOM HARTMAN:   Whoa.

---

[17]     https://www.youtube.com/watch?v=jc_8f4Pp9Zc

JAMES RISEN:   And once the CIA later was convinced by French intelligence that this was all a fabrication and that this kind of technology didn't exist and that these supposed Al Qaeda codes weren't really in the Al Jazeera newscasts, the CIA covered the whole thing up and never went public with it and just tried to act like it never happened.

THOM HARTMAN:   Well we know how aggressively this and particularly the Obama Administration right now has gone after whistleblowers and reporters.  You would think they would also go after people who had scammed the CIA.  If one of us walked in off the street and said to the CIA, hey have I got a deal for you, and it was just a total lie, and they gave us millions of dollars, which they gave to Dennis Montgomery, you'd think he would end up in prison.

JAMES RISEN:   Well, no, he ended up getting more contracts from the military... and the Pentagon.  And he was continuing, he continued to operate for several years.  It's really a remarkable story.

THOM HARTMAN:   Yeah, it really and truly is.

[Topic changes abruptly to discussions of torture in the war on terror]

158.     As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff that "the CIA later was convinced by French intelligence that this was all a fabrication and that this kind of technology didn't exist."

159.     As Libel *Per Se*, Defendant Risen, acting on behalf of himself and the other Defendants, published about the Plaintiff that he belongs in prison, responding to the question "You would think they would also go after people who had scammed the CIA.  If one of us walked in off the street and said to the CIA, hey have I got a deal for you, and it was just a total lie, and they gave us millions of dollars, which they gave to Dennis Montgomery, you'd think he would end up in prison," by Risen answering in reply:  "Well, no, he ended up getting more contracts from the military... and the Pentagon.  And he was continuing, he continued to operate for several years.  It's really a remarkable story."

## SECOND CAUSE OF ACTION
### *Common Law General Defamation*

160.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

161.    The Defendants – all of the Defendants – together and each of them acting in concert, jointly and severally, and individually, have defamed Plaintiff by knowingly, intentionally, willfully, or negligently publishing statements about the Plaintiff which they knew or should have known to be false or misleading.

162.    Defendants' defamation of Plaintiff Montgomery was made with actual malice. Defendants had knowledge of the falsity of the defamatory statements, or made the defamatory statements with reckless disregard to the truth. *See* Plaintiff's Affidavit, Exhibit C, incorporated herein by reference.

163.    To establish General Defamation, a plaintiff need only show: (1) publication; (2) falsity; (3) that the defendant acted with knowledge or reckless disregard as to the falsity on a matter concerning a public figure; (4) actual damages; and (5) the statement must be defamatory.

164.    Pleading in the alternative to the First Cause of Action, Plaintiff re-alleges each of the statements alleged under the First Cause of Action, *supra*, as Defamation *Per Se*, and here alleges that each of those statements are also General Defamation under Florida law.

165.    Plaintiff Montgomery thus claims here that if the Court finds that any of the statements labeled "First" through "Eighteenth" under the First Cause of Action above do not constitute as Defamation *Per Se*, than in the alternative the Plaintiff claims here that any and all such statements not qualifying as Defamation *Per Se* constitute General Defamation against the Plaintiff.

166.    Plaintiff therefore re-alleges and incorporates by reference as if set forth fully

herein each and all of the statements labeled "First" through "Eighteenth" above.

167.    In addition, Defendants also made other defamatory statements that are also

General Defamation.

168.    ***Nineteenth,* on Page 49 of the Book, the Defendants published:**

> "Trepp was furious. According to court documents, he told the FBI
> that Montgomery had stolen the software eTreppid had used on secret
> Pentagon contracts. As federal investigators moved in to investigate
> the alleged theft of the technology, they heard from Trepp and others
> that Montgomery's alleged technology wasn't real."

169.    As General Defamation, Defendants published about the Plaintiff that

Montgomery had stolen valuable software – yet Defendants also assert that the software "wasn't

real."  That is, Defendants simultaneously accuse Plaintiff Montgomery of profiting from

defrauding the Government with Plaintiff Montgomery's software, yet allege that the software

actually belonged to Warren Trepp and never belonged to Plaintiff Montgomery (that

Montgomery later stole it), but also allege that the software was worthless, yet the FBI

energetically investigated the alleged theft of software that was worth nothing.  The Defendants

randomly construct every possible way to defame the Plaintiff, no matter how inconsistent,

including with the FBI investigating the theft of a worthless item.

## THIRD CAUSE OF ACTION
### *Common Law Defamation By Implication*

170.    Plaintiff repeats and re-alleges each and every allegation of the foregoing

paragraphs as if fully set forth herein.

171.    The Defendants – all of the Defendants – together and each of them individually,

have defamed Plaintiff by knowingly, intentionally, willfully, or negligently publishing

statements about the Plaintiff which they knew or should have known to be false or misleading.

172.     Defendants' defamation of Plaintiff Montgomery was made with actual malice. Defendants had knowledge of the falsity of the defamatory statements, or made the defamatory statements with reckless disregard to the truth. *See* Plaintiff's Affidavit, Exhibit C, incorporated herein by reference.

173.     For Defamation by Implication: " . . . [L]iterally true statements can be defamatory where they create a false impression. This variation is known as Defamation by Implication and has a longstanding history in defamation law." *See Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008). Defamation by Implication occurs when a publication states facts that are literally true, but produces a defamatory meaning apparent from a plain reading of the publication in its entirety. *See Chapin v. Knight-Ridder, Inc.* 993 F.3d 1087 (4th Cir. 1993).

174.     Pleading in the alternative, Plaintiff re-alleges that each of the statements alleged under the First and Second Causes of Action, *supra*, are in the alternative also Defamation by Implication under Florida law.

175.     Plaintiff thus alleges here that if the Court finds that any of the statements labeled "First" through "Nineteenth" above do not constitute Defamation *Per Se* or General Defamation, then in the alternative the Plaintiff re-alleges here that any and all such statements not constituting as Defamation *Per Se* or General Defamation are Defamation by Implication against the Plaintiff.

176.     Plaintiff therefore re-alleges and incorporates by reference as if set forth fully herein each and all of the statements labeled "First" through "Nineteenth" above.

177.     Across the many examples of libelous statements from the Book or slanderous interviews, Defendants published that the Plaintiff deceived the Government as to the meaning,

purpose, or interpretation of hidden data and clues that Plaintiff Montgomery uncovered, publishing that Plaintiff Montgomery defrauded and conned the Government.

178.    Thus, Defendants libel and slander Plaintiff Montgomery by implication that he defrauded and scammed the Government concerning the meaning of the information Plaintiff Montgomery uncovered, publishing that Plaintiff Montgomery obtained millions of dollars by frightening and fooling child-like and gullible CIA officials.

179.    Across the many examples of defamatory statements from the Book or slanderous interviews, Defendants published that President George W. Bush's alleged decisions to ground and almost shoot down passenger aircraft around Christmas 2003 (which Defendants would have no way of knowing about) were a result of Plaintiff Montgomery's fraud and scams, deceptively manipulating the President of the United States and the U.S. national command authority.

180.    Across the many examples of defamatory statements from the Book or interviews, Defendants published that Plaintiff Montgomery should be indicted and convicted of crimes and sentenced to prison for his actions.

181.    Among the other statements, in particular, the **Second** example of libel**, on Page 32 of the Book,** states that:

> "Consider the example of Dennis Montgomery.  He provides a perfect case study to explain how during the war on terror greed and ambition have been married to unlimited rivers of cash to create a climate in which someone who has been accused of being a con artist was able to create a rogue intelligence operation with little or no adult supervision. Crazy became the new normal in the war on terror, and the original objectives of the war got lost in the process."

182.    Thus, as Defamation by Implication, Defendants published that Plaintiff Montgomery committed fraud and went to any lengths motivated by greed, to obtain money at any cost.

183.     Among the other statements, in particular, in the ***Eleventh*** example of defamation**,
on Page 46 of the Book,** states that:

> "The CIA never investigated the apparent hoax nor examined how
> it had been handled inside the agency."

184.     Here, as Defamation by Implication, even if it is true (which it is not) that "The

CIA never investigated" what Defendants describe as an "apparent hoax," the implication is that

Plaintiff Montgomery perpetrated a hoax upon the CIA, and in return for money, which would be

both a fraud and a crime.

185.     Similarly, in the ***Sixteenth*** example of slander from an interview, Defendant

Risen publishes that:

> "It seemed to me that what the war had become in 13 years was a
> search for cash and a search for power and status and that it was
> becoming an endless war in which we had a new mercenary class of
> people who were taking advantage of the war on terror,"

publishing that Plaintiff Montgomery's work is fraudulent in being merely an effort to get cash.

186.     Among the other statements, in particular, the ***Nineteenth*** example of defamation**,
on Page 49 of the Book,** states that:

> "Trepp was furious. According to court documents, he told the FBI
> that Montgomery had stolen the software eTreppid had used on secret
> Pentagon contracts. As federal investigators moved in to investigate
> the alleged theft of the technology, they heard from Trepp and others
> that Montgomery's alleged technology wasn't real."

187.     As Defamation by Implication, Defendants published that the Plaintiff stole

valuable software yet at the same time the software that the Plaintiff used to provide services to

the Government was in fact worthless.

188.     In addition, Defendants also made and published other defamatory statements that

are also Defamation by Implication under Florida law.

189. **_Twentieth,_ on the Preface Page of the Book, the Defendants publish:**

> "I've come back," he repeated. "I was the King of Kafiristan – me and Dravot – crowned Kings we was! In this office we settled it – you setting there and giving us the books. I am Peachey – Peachey Taliaferro Carnehan – and you've been setting here ever since – Oh, Lord!"

> I was more than a little astonished and expressed my feelings accordingly.

> "It's true," said Carnehan, with a dry cackle, nursing his fee, which were wrapped in rags. "True as gospel. Kings we were, with crowns upon our head – me and Dravot – poor Dan – oh, poor, poor Dan, that would never take advice, not though I begged of him!"

> -- Rudyard Kipling, _The Man Who Would be King._

190. As Defamation by Implication, Defendants published that Plaintiff Montgomery (along with others addressed in the Book) is a fraud and/or con man as in _The Man Who Would be King._

191. **_Twenty-first,_ in the Prologue on Page xiv of the Book, the Defendants publish:**

> "The new homeland security-industrial complex operates differently. It is largely made up of a web of intelligence agencies and their contractors, companies that mostly provide secret services rather than large weapons systems and equipment. These contractors are hired to help Washington determine the scale and scope of the terrorist threat; they make no money if they determine that the threat is overblown or, God forbid, if the war on terror ever comes to an end."

192. As Defamation by Implication, Defendants state "they make no money if they determine that the threat is overblown or, God forbid, if the war on terror ever comes to an end," suggesting that Plaintiff Montgomery's profits were _contingent_ upon results, such that Plaintiff Montgomery would make greater profits by providing false results at that.

193. **_Twenty-second,_ in the Prologue on Page xv of the Book, the Defendants published:**

"Thus, the creation of a homeland security complex at a time of
endless war has bequeathed us with the central narrative of the war on
terror – modern tales of greed joined hand in hand with stories of
abuse of power.  It was inevitable that those wise in the ways of the
world would flock to Washington to try to cash in on the war on terror
gold rush – and they have.  This book offers just a few of those
stories. But those trying to monetize America's obsession with
terrorism are not the only ones who have sought to exploit 9/11."

"Opportunism comes in many forms and is driven by more than just
greed.  Ambition and a hunger for power, status, and glory have
become great engines of post-9/11 opportunism as well.  The more
troubling stories here concern abuses of power that have extended
across two presidencies for well over a decade.  After 9/11, the United
States deregulated national security, stripping away the post-
Watergate intelligence reforms of the 1970's that had constrained
executive power for thirty years.  The results are morally challenging
– and continue to this day."

194.    Thus, as Defamation by Implication, Defendants published that Plaintiff

Montgomery committed fraud and went to any lengths motivated by greed, to obtain money at

any cost.

195.    ***Twenty-third,*** **in the Prologue on Page xvii of the Book, the Defendants**

**published:**

"Washington's global war on terror is now in its second decade,
thanks to the bipartisan veneer it has gained under Bush and Obama.
It shows no signs of slowing down, hustlers and freebooters continue
to take full advantage, and the war's unintended consequences
continue to pile up.  All too often, things are not what they seem."

196.    As Defamation by Implication, Defendants published that Plaintiff Montgomery –

one of the key objects of the Book – is a "hustler" and a "freebooter."

197.    ***Twenty-fourth,*** **Part 1 of the Book,** including but not limited to Chapter 2 which

is focused entirely on Plaintiff Montgomery, the Defendants have labeled "Part 1: Greed."

198.    Thus, by placing the chapter focused on Plaintiff Montgomery under a label for

the section of the Book of "Greed," Defendants defame the Plaintiff by implication as being

motivated by greed to commit fraud and carry out the alleged hoaxes identified in the rest of the Chapter 2.

199.    ***Twenty-fifth,*** the Defendants have labeled Chapter 2 of the Book which is focused entirely on Plaintiff Montgomery:  "Chapter 2: The Emperor of the War on Terror."

200.    By naming the chapter focused on Plaintiff Montgomery "The Emperor of the War on Terror," Defendants defame the Plaintiff by implication as being the mastermind of the fraud that Risen seeks to portray the war on terror to be.

201.    ***Twenty-Sixth,* on Page 40 of the Book, the Defendants published:**

> "The CIA's Science and Technology Directorate, which had largely been stuck on the sidelines of the war on terror, saw in Dennis Montgomery an opportunity to get in the game.  The directorate had played an important role in the Cold War, but in the first few years of the war on terror, it was struggling to determine how technology could be leveraged against groups of terrorists who were trying to stay off the grid."

202.    As Defamation by Implication, again, Defendant Risen falsely and misleadingly published statements which blamed Plaintiff Montgomery for the decisions of government officials and published that Plaintiff Montgomery defrauded the Government.

203.    ***Twenty-Seventh,* on Page 42 of the Book, the Defendants published:**

> "Montgomery was telling the CIA exactly what it wanted to hear.  At the time, the Bush Administration was obsessed with Al Jazeera, not only because of the networks' unrelenting criticism of the invasion of Iraq, but also because it had become Osama Bin Laden's favorite outlet for broadcasting his videotaped messages to the world."

204.    As Defamation by Implication, Defendants published that Plaintiff Montgomery defrauded and conned the CIA by "telling the CIA exactly what it wanted to hear."

205.    ***Twenty-Eighth,* on Page 42 of the Book, the Defendants published:**

> "What remains unclear is how Montgomery was able to convince all of them that he had developed secret software that could decode Al

> Qaeda's invisible messages. While he had gotten by a few credulous
> military officers who came to view his demonstrations, he apparently
> found it just as easy to persuade the CIA as well."

206.    As Defamation by Implication, Defendants published that Plaintiff Montgomery

conned the Government with a hoax. That is, it would be clear "how Montgomery was able to

convince all of them" if Plaintiff Montgomery's work and technology are legitimate.

207.    ***Twenty-Ninth,*** **on Page 46 of the Book, the Defendants published:**

> "Finally the French brought an end to it. Since Air France flights
> to the United States were among those that had been grounded,
> French officials had taken a dim view of the entire episode. They
> began demanding answers from the Americans. The French
> applied so much pressure on Washington that the CIA was finally
> forced to reveal to French intelligence the source of the threat
> information. Once they heard the story of Dennis Montgomery and
> eTreppid, French officials arranged for a French high-tech firm to
> reverse-engineer Montgomery's purported technology. The
> French wanted to see for themselves whether the claims of hidden
> messages in Al Jazeera broadcasts made any sense."

208.    As Defamation by Implication, if not explicit, the passage published that Plaintiff

Montgomery is a fraud and that his work is a scam and a hoax.

209.    ***Thirtieth,*** **on Page 52 of the Book, the Defendants publish:**

> "Montgomery continued to get defense contracts even during the
> Obama administration. In 2009, Montgomery was awarded another
> air force contract, and later claimed that he had provided the
> government with warning of a threatened Somali terrorist attack
> against President Obama's inauguration. Joseph Liberatore, an air
> force official who described himself as one of "the believers" in
> Montgomery and said he had heard from 'various federal agencies
> thanking us' for the support Montgomery and his company provided
> during Obama's inauguration. The threat, however, later proved to be
> a hoax."

210.    As Defamation by Implication, Defendants published that Plaintiff Montgomery's

ability to continue to receive contracts is due to Plaintiff Montgomery's ability to defraud the

Government (and stupidity of government officials) rather than an endorsement of the legitimacy of Plaintiff Montgomery's work.

211. ***Thirty-First,*** **on Page 31 of the Book, the Defendants published:**

> "and a new breed of entrepreneur learned that one of the surest and easiest paths to riches could be found not in Silicon Valley building computers or New York designing clothes but rather in Tysons Corner, Virginia, coming up with new ways to predict, analyze, and prevent terrorist attacks— or, short of that, at least in convincing a few government bureaucrats that you had some magic formula for doing so."

212. As Defamation by Implication, Defendants published that the Plaintiff engaged in fraud to convince a few government bureaucrats that he had a magic formula as an easy path to riches.

213. ***Thirty-Second,*** **on Page 33 of the Book, the Defendants published:**

> "Montgomery's story demonstrates how hundreds of billions of dollars poured into the war on terror went to waste. With all rules discarded and no one watching the bottom line, government officials simply threw money at contractors who claimed to offer an edge against the new enemies. And the officials almost never checked back to make sure that what they were buying from contractors actually did any good— or that the contractors themselves weren't crooks. A 2011 study by the Pentagon found that during the ten years after 9/ 11, the Defense Department had given more than $ 400 billion to contractors who had previously been sanctioned in cases involving $ 1 million or more in fraud."

214. As Defamation by Implication, Defendants published that the money provided to Plaintiff Montgomery (among others) went to "waste."

215. ***Thirty-Third,*** **on Page 33 of the Book, the Defendants published:**

> "The Montgomery episode teaches one other lesson, too: the chance to gain promotions and greater bureaucratic power through access to and control over secret information can mean that there is no incentive for government officials to question the validity of that secret information. Being part of a charmed inner circle holds a seductive power that is difficult to resist."

216.    As Defamation by Implication, Defendants published that Plaintiff Montgomery's

work was fraudulent.

217.    **_Thirty-Fourth,_ on Page 33 of the Book, the Defendants published:**

> "How his technology worked was a secret. Dennis Montgomery's
> computer code became the great treasure behind eTreppid
> Technologies, the company he and Trepp founded. Later, many of
> those around Montgomery began to suspect the reason why
> Montgomery had to guard his technological innovations so
> carefully. They came to believe that at least some of the
> technology didn't really exist."

218.    As Defamation by Implication, Defendants published that Plaintiff Montgomery

committed fraud.

219.    **_Thirty-Fifth,_ on Page 35 of the Book, the Defendants published:**

> "Montgomery was on the lookout for somebody to bankroll him,
> and had put out the word to his friends at the casinos that he
> frequented the most. A year later, Montgomery and Trepp were in
> business together. Trepp was one of the first, but hardly the last, to
> be beguiled by Montgomery's claims that he had achieved
> breakthroughs in computer technology of historic significance."

220.    As Defamation by Implication, Defendants published that Plaintiff Montgomery

"beguiled" Warren Trepp by committing fraud.

221.    **_Thirty-Sixth,_ on Page 39 of the Book, the Defendants published:**

> "For a few months in late 2003, the technology from Dennis
> Montgomery and eTreppid so enraptured certain key government
> officials that it was considered the most important and most sensitive
> counterterrorism intelligence that the Central Intelligence Agency had
> to offer President Bush. Senior officials at the CIA's Directorate of
> Science and Technology began to accept and vouch for Montgomery
> to officials at the highest levels of the government. Montgomery's
> claims grew ever more expansive, but that only solidified his position
> inside the national security arena. His technology became too
> impossible to disbelieve."

222.     As Defamation by Implication, the Defendants published that Plaintiff

Montgomery committed fraud and is a con man.

223.     ***Thirty-Seventh,*** **on Page 40 of the Book, the Defendants published:**

> *"*Montgomery persuaded the spy agency that his special computer
> technology could detect hidden bar codes broadcast on Al Jazeera,
> which had been embedded into the video feed by al Qaeda. Allegedly,
> al Qaeda was using that secret method to send messages to its terrorist
> operatives around the world about plans for new attacks. Montgomery
> convinced the CIA that his technology had uncovered a series of
> hidden letters and numbers that appeared to be coded messages about
> specific airline flights that the terrorists were targeting.

224.     As Defamation by Implication, the Defendants published that Plaintiff convinced

the CIA of claims that are not (were not) true.

225.     ***Thirty-Eighth,*** **on Page 42 of the Book, the Defendants published:**

> "Based on Montgomery's information, President Bush ordered the
> grounding of a series of international flights scheduled to fly into the
> United States. This step caused disruptions for thousands of
> travelers."

226.     As Defamation by Implication, the Defendants published that Plaintiff convinced

President Bush and the national command authority of conclusions drawn from Plaintiff

Montgomery's work.

227.     ***Thirty-Ninth,*** **on Page 42 of the Book, the Defendants published:**

> "One former senior CIA official recalled attending a White House
> meeting in the week following Christmas to discuss what to do next
> about the information coming from Montgomery. The official claims that
> there was a brief but serious discussion about whether to shoot down
> commercial airliners over the Atlantic based on the intelligence."

228.     As Defamation by Implication, the Defendants published that Plaintiff convinced

President Bush and the national command authority of conclusions drawn from Plaintiff

Montgomery's work.

229. ***Fortieth,*** **on Page 47 of the Book, the Defendants published:**

> "Even more stunning, after the debacle over the bogus Christmas
> 2003 terrorist threats, Montgomery kept getting classified government
> contracts awarded through several different corporate entities.
> Montgomery's problems with the CIA did not stop him from peddling
> variations of his technology to one government agency after another.
> The secrecy that surrounded his work once again worked in his favor.
> CIA officials were reluctant to tell their Pentagon counterparts much
> about their experiences with Montgomery, so Defense Department
> officials apparently did not realize that his technology was considered
> suspect at CIA headquarters."

230. As Defamation by Implication, Defendants published that Plaintiff continued to

defraud, con, and scam the government, rather than concluding that the Government recognized

the legitimacy of Plaintiff Montgomery's work.

231. ***Forty-First,*** **on Page 48 of the Book, the Defendants published:**

> "He successfully infused a sense of mystery around himself. He was
> like the Wizard of Oz, but now people were beginning to try to
> examine the man behind the curtain."

232. As Defamation by Implication, Defendants published that the Plaintiff engaged in

fraud and a hoax by keeping details mysterious, including the mystery was caused by Plaintiff

Montgomery rather than by Warren Trepp or the Government.

233. ***Forty-Second,*** **on Page 48 of the Book, the Defendants published:**

> "The technology didn't meet the requirements for us," said a Special
> Operations Command spokesman drily. Still, there is no evidence that
> officials at Special Operations Command ever talked with their
> counterparts at the CIA to check up on Montgomery before awarding
> him a contract. Special Operations Command paid a total of $ 9.6
> million to eTreppid under its contract with the firm."

234. As Defamation by Implication, the Defendants published that Plaintiff

Montgomery again repeated his fraud and hoax against a new government agency.

235.    *Forty-Third,* **on Page 54 of the Book, in the Chapter "The New Oligarchs,"**

**the Defendants published:**

> CHAPTER 3:   The New Oligarchs
> Page 54:  "Dennis Montgomery is, of course, an extreme example of
> the new kind of counterterrorism entrepreneur who prospered in the
> shadows of 9/11.  But he was hardly alone in recognizing the lucrative
> business opportunities that the war on terror has presented.  In fact, as
> trillions of dollars have poured into the nation's new homeland
> security-industrial complex, the corporate leaders at its vanguard can
> rightly be considered the true winners of the war on terror."

236.    As Defamation by Implication, Defendants published that Plaintiff engaged in

fraud and a hoax motivated by greed.

237.    **As additional instances of Defendants' defamation of Plaintiff Montgomery,**

on information and belief, Plaintiff alleges that Defendant Risen has spoken on these topics on

radio and on television in additional interviews about the Book and Plaintiff Montgomery since

the publication of the Book in October 2014, which the Plaintiff is continuing to investigate.

238.    **As additional instances of Defendants' defamation of Plaintiff Montgomery,**

on information and belief, discovery during this litigation will disclose additional instances of

Defendants having defamed Plaintiff Montgomery since October 2014.

239.    **As additional instances of Defendants' defamation of Plaintiff Montgomery,**

Defendants' defamation of Plaintiff Montgomery has been and is being republished through

book reviews and commentary since October 2014, and such republication of the defamation is

widespread and continuing on radio, television, written publications, and proliferating daily on

the Internet in this district, Florida in general, nationally, and internationally.

<u>**FOURTH CAUSE OF ACTION**</u>
*Common Law Intentional Infliction of Emotional Distress*

240.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

241.    Defendants' knowing and intentional publication of the harmful statements against the Plaintiff has foreseeably and proximately caused the Plaintiff emotional distress.

242.    Defendants' intentional actions were committed with the knowledge that they would cause extreme physical pain and suffering and cause severe emotional distress to the Plaintiff.

243.    Defendants' actions were willful malicious, deliberate, and were done with reckless or negligent indifference to the likelihood that such behavior would cause severe emotional distress and with utter disregard for the consequences of such actions.

## FIFTH CAUSE OF ACTION
### *Common Law Tortious Interference with Prospective Advantage*

244.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

245.    Defendants understood that Plaintiff was pursuing the future full value of his software, intellectual property and software technology and techniques and was over time negotiating to make further licenses and sales of the intellectual property.

246.    Defendants were aware that their publication of false and misleading statements about Plaintiff Montgomery harmed Plaintiff Montgomery's career and livelihood and his ability to earn a living, including the opportunity to sell his professional services and software.

247.    Defendants' defamation disparaged Plaintiff's intellectual property and software so as to render it commercially worthless, by claiming that it did not work.

248.    Defendants acted knowingly, willfully and with reckless and negligent disregard of the harm that their publication of their false statements would cause to Plaintiff Montgomery's

livelihood, career, and ability to earn a living, including his opportunity to enter into contracts for the sale of his services and/or intellectual property.

249.    Defendants acted with the intentional malicious purpose of defaming Plaintiff Montgomery as a way to smear aspects of U.S. foreign, military, and intelligence polices with which they disagree in pursuit of their ideological and political agenda.

### SIXTH CAUSE OF ACTION
*Common Law Assault (Apprehension)*

250.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

251.    Plaintiff Montgomery was in-effect working undercover and in secret for the CIA, NSA, and other agencies of the Government on classified programs of counter-terrorism and national security.

252.    Defendants' especially high profile publications of the defamatory factual statements have placed Plaintiff Montgomery's life at risk by revealing and disclosing him to public notice by Al Qaeda and its successors such as the Islamic State (I.S.I.S.), as well as other terrorists and terrorist groups, in Florida, domestically and internationally.

253.    ISIS has openly pledged to kill members of the U.S. military and persons who are associated with the U.S. military and their families and those assisting the U.S. military and Government, particularly in counter-terrorism efforts against Islamic Jihad organizations and terrorists.

254.    Defendants have subjected Plaintiff Montgomery to what is in effect a Fatwah, which is an open call that any and all militant Jihadi Muslims should kill Plaintiff Montgomery.

255.    Defendants have placed Plaintiff Montgomery in immediate fear of bodily harm, injury, and death to him and his family members.

256.     Defendants' tortious actions alleged herein were furthered and aided and abetted by the CIA and the NSA, who want to destroy Plaintiff Montgomery to prevent him from disclosing as a whistleblower the full extent of their unconstitutional and illegal Government surveillance on American citizens to the Congress, the Inspector General, and to the courts, specifically in cases styled *Klayman v. Obama*, No. 13-851, 13-881, 14-92 (D.D.C.); *Klayman v. Obama*, No. 14-5004, 14-5005, 14-5016, 14-5017 (D.C. Cir.).

## DAMAGES WITH REGARD TO ALL COUNTS

257.     As a direct and proximate result of the intentional, willful, malicious or negligent actions of Defendants, Plaintiff Montgomery demands judgment be entered against Defendants each and every one of them, jointly and severally, including an award of compensatory and actual damages in an amount to be determined at trial, as pled below, punitive damages, reasonable attorneys fees, pre-judgment interest, post-interest and costs, and such other relief as the Court may deem just and proper.

258.     As a result of Defendants' actions, Plaintiff Montgomery suffered significant personal harm, including to his business and professional endeavors and prospects, career, and finances.

259.     As just one example, Plaintiff Montgomery negotiated for the sale of his technology to the Government for the price of $100 million.

260.     Plaintiff Montgomery was able to obtain a Top Secret clearance in less than a year in 2003.  He passed all of the security issues that were involved in obtaining that level of clearance. His clearance allowed him to courier top-secret material worldwide.  In 2007, the Plaintiff entered The White House and the Pentagon with full access to Top Secret material. As of 2010, the Plaintiff still held that clearance level, and to the best of his knowledge still does.

261.    As a result of his security clearances, the Plaintiff would be employable in high-paying jobs but for the defamation of his character and other tortious actions by the Defendants.

262.    Plaintiff Montgomery has been harmed by the loss of the economic value of his intellectual property, and the value of licensing the intellectual property and/or providing services based upon or incorporating his intellectual property.

263.    Defendants' conduct was unreasonable and outrageous and exceeds the bounds tolerated by decent society, and was done willfully, maliciously and deliberately, or with reckless indifference or negligence, to cause Plaintiff severe mental and emotional pain, distress, and anguish and loss of enjoyment of life, so as to also justify the award of punitive and exemplary damages.

264.    On information and belief, at least the Defendant Houghton Mifflin Harcourt Co., as a publicly traded corporation, was required to publicly disclose the Plaintiff's threatened lawsuit on reports filed with the Securities and Exchange Commission.  A liability or contingent liability, including threatened litigation must be reported under Item 103 "Legal Proceedings," in Management's Discussion and Analysis (MD&A) -- Item 303, and/or in Item 503(c) "Risk Factors."

265.    This information was required on Defendant's regularly scheduled SEC Form 10-Q (quarterly report) and/or SEC Form 10-K (annual report) but also on SEC Form 8-K triggered (within four days) by certain events, because "Form 8-K is the 'current 'report' companies must file with the SEC to announce major events that shareholders should know about."  http://www.sec.gov/answers/form8k.htm.

266.    Defendant's SEC Form 10-Q for the fourth quarter of 2014 was due on February 10, 2015, but is not publicly on file.  Defendant's quarterly SEC Form 10-Q filed on November

6, 2014, covered the period ended September 30, 2014.

267.     In the most recent exchange of correspondence, on January 20, 2015, Houghton Mifflin's Associate General Counsel David Eber replied to Larry Klayman's January 14, 2015, litigation demand concerning Defendants' defamation of Plaintiff Montgomery, copied by Ebers to General Counsel William Bayers, and refused to take any corrective action.

268.     In addition, on information and belief, the Defendant was required to disclose the litigation as non-public information prior to engaging in trades.  On January 31, 2015, and February 17, 2015, General Counsel William Frederick Bayers reported the sales of HMHC stock on SEC Form 4.

### **PRAYER FOR RELIEF**

With regard to all counts, Plaintiff demands that judgment be entered against Defendants, each and every one of them, acting in concert, jointly and severally, for compensatory and actual damages in excess of $120 million U.S. Dollars resulting from their financial, reputational, emotional and professional injury to Plaintiff, as well as equitable relief as may be appropriate, and such other relief the Court may deem just and proper.  Plaintiff further prays for an award of punitive damages in an amount in excess of $350,000,000.00 U.S. Dollars, to punish Defendants for their outrageous, deceitful, unprecedented, vicious and malicious conduct toward Plaintiff Montgomery designed so Defendants can reap huge profits for their defamatory works. Defendants' actions have left Plaintiff in ruins. According to Bloomberg Business, the market capitalization of Houghton Mifflin Harcourt is $2.8 Billion U.S Dollars. Large punitive damages will deter Defendants from committing such egregious acts in the future against Plaintiff Montgomery and others similarly situated.

## **JURY DEMAND**

**Plaintiff respectfully demands a jury trial on all issues so triable.**

Dated: April 27, 2015

Respectfully submitted,

*/s/ Larry Klayman*
Larry Klayman, Esq.
Klayman Law Firm
FL Bar No. 246220
7050 W Palmetto Park Rd.
Suite 15-287
Boca Raton, FL 33433
(310) 595-0800
leklayman@gmail.com
Attorney for Plaintiff

Case 1:15-cv-01955-JLR Document 1-1 Filed 12/08/15 Page 61 of 271

# Exhibit A

# PAY ANY PRICE

## GREED, POWER, AND ENDLESS WAR

# JAMES RISEN

Author of *STATE OF WAR*

much Iraqi
the Ameri-

matter, the
cash in Leb-
use no one
ed with the

nker is one
rules and
alikely that
Most of the
d to still be
iting to be

as a fitting
It certainly
iventure in
Hussein in
2003 when

## 2



# THE EMPEROR OF THE
# WAR ON TERROR

Greed and power, when combined, can be devastating. In the case of the missing cash of Baghdad, greed tempted Americans and Iraqis alike, while the power of the Coalition Provisional Authority to make fast, sweeping decisions with little oversight allowed that greed to grow unchecked. Billions of dollars disappeared as a result.

Throughout the war on terror, greed and power have flourished just as readily back home in the United States, where the government's surging counterterrorism spending created a new national security gold rush. The post-9/11 panic led Congress to throw cash at the FBI, CIA, and Pentagon faster than they were able to spend it. Soon, a counterterrorism bubble, like a financial bubble, grew in Washington, and a new breed of entrepreneur learned that one of the surest and easiest paths to riches could be found not in Silicon Valley building computers or New York designing clothes but rather in Tysons Corner, Virginia, coming up with new ways to predict, analyze, and prevent terrorist attacks—or, short of that, at least in convincing a few government bureaucrats that you had some magic formula for doing so.

Consider the example of Dennis Montgomery. He provides the

31

GREED

perfect case study to explain how during the war on terror greed and ambition have been married to unlimited rivers of cash to create a climate in which someone who has been accused of being a con artist was able to create a rogue intelligence operation with little or no adult supervision. Crazy became the new normal in the war on terror, and the original objectives of the war got lost in the process.

\*

Whatever else he was, Dennis Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post-9/11 age for what it was, a time to make money.

Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it. The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in a series of civil lawsuits involving Montgomery.

It was as if everyone in Washington was afraid to admit that the Emperor of the War on Terror had no clothes.

\*

A former medical technician, a self-styled computer software expert with no experience whatsoever in national security affairs, Dennis Montgomery almost singlehandedly prompted President Bush to ground a series of international commercial flights based on what

32

now appears to have been an elaborate hoax. Even after it appeared that Montgomery had pulled off a scheme of amazing scope, he still had die-hard supporters in the government who steadfastly refused to believe the evidence suggesting that Montgomery was a fake, and who rejected the notion that the super-secret computer software that he foisted on the Pentagon and CIA was anything other than America's salvation.

Montgomery's story demonstrates how hundreds of billions of dollars poured into the war on terror went to waste. With all rules discarded and no one watching the bottom line, government officials simply threw money at contractors who claimed to offer an edge against the new enemies. And the officials almost never checked back to make sure that what they were buying from contractors actually did any good—or that the contractors themselves weren't crooks. A 2011 study by the Pentagon found that during the ten years after 9/11, the Defense Department had given more than $400 billion to contractors who had previously been sanctioned in cases involving $1 million or more in fraud.

The Montgomery episode teaches one other lesson, too: the chance to gain promotions and greater bureaucratic power through access to and control over secret information can mean that there is no incentive for government officials to question the validity of that secret information. Being part of a charmed inner circle holds a seductive power that is difficult to resist.

Montgomery strongly denies that he peddled fraudulent technology. He insists that the charges have been leveled by critics with axes to grind, including his former lawyer and former employees. He claims that he was following direct orders from both the NSA and the CIA, and says that the CIA, NSA, and U.S. military took his technology so seriously that it was used to help in the targeting of Predator strikes and other raids. Montgomery adds that he is limited in what he can say about his software and business dealings with the CIA and Pentagon without the approval of the Justice Department. The fact that the government is blocking public disclosure of the details of its relationship with him, he adds, shows that his work was considered

serious and important. "Do you really think," he asked, "the government invoked the state secrets privilege just from being embarrassed or conned?"



The strange tale of Dennis Montgomery and his self-proclaimed plan to win the war on terror begins, appropriately enough, inside the El Dorado Casino in downtown Reno.

Montgomery was an overweight, middle-aged, incorrigible gambler, a man who liked to play long odds because he was convinced that he could out-think the house. He once boasted to a business partner that he had a system for counting an eight-deck blackjack shoe, quite a difficult feat for even the best card sharks, and he regularly tested his theories at the El Dorado and the Peppermill Casino in Reno. He usually came up short but that didn't stop him from playing blackjack on a nightly basis, racking up unwieldy debts that eventually led to his 2010 arrest for bouncing more than $1 million in bad checks at Caesar's Palace in Las Vegas.

Gambling is how he met his first backer, Warren Trepp. Trepp got rich in the biggest casino of them all, Wall Street. He had been Michael Milken's right-hand man in the heyday of Milken's famous Beverly Hills trading desk during the "greed is good" era of insider trading in the 1980s. When a hungry federal prosecutor named Rudolph Giuliani went after Milken for insider trading, he tried to get Trepp to roll over on his boss. Trepp refused, even in the face of a threat that he would be charged himself if he failed to cooperate. Milken went to jail, but Giuliani never could nail Trepp. Instead of facing criminal charges, Trepp became the subject of a marathon investigation by the Securities and Exchange Commission (SEC), which tried to impose civil sanctions for Trepp's alleged part in Milken's insider-trading bonanza. It took nearly a decade, but Trepp finally beat the feds. In 1997, the SEC's case against him was dismissed. He walked away from the Milken years with a fortune.

Warren Trepp may have been able to defeat Rudy Giuliani and a

*The Emperor of the War on Terror*

whole legion of federal investigators, but he couldn't outwit Dennis Montgomery.

By the late 1990s, Trepp was living in Incline Village, a wealthy enclave on the Nevada side of Lake Tahoe, where he was shaking off his past and trying to remake himself into a respected philanthropist, theater angel, and canny private investor. And then he met Montgomery.

Trepp was introduced to Montgomery by a casino host at the El Dorado in 1997. Montgomery was on the lookout for somebody to bankroll him, and had put out the word to his friends at the casinos that he frequented the most. A year later, Montgomery and Trepp were in business together. Trepp was one of the first, but hardly the last, to be beguiled by Montgomery's claims that he had achieved breakthroughs in computer technology of historic significance. The two founded a company together and tried to find buyers for Montgomery's alleged miracle software.

Montgomery convinced Trepp that he had achieved a series of major technological advances in computer software that could be worth millions. One was the development of software that he argued provided a new method of video compression, allowing for greater video storage and transmission than was ever available before. Another innovation was stunningly detailed video facial recognition. But the most dazzling claim of all involved software that Montgomery said could identify objects and anomalies embedded in video with unprecedented detail. He claimed that his technology could even find and identify objects hidden inside videotape that were not visible to the naked eye.

How his technology worked was a secret. Dennis Montgomery's computer code became the great treasure behind eTreppid Technologies, the company he and Trepp founded. Later, many of those around Montgomery began to suspect the reason why Montgomery had to guard his technological innovations so carefully. They came to believe that at least some of the technology didn't really exist.

\*

35

To commercialize his technology, Montgomery first tried to convince Hollywood that he had developed a new and efficient means of colorizing old movies. His object identification software, he claimed, could speed the process of deciding where and how to colorize each frame of film. Warren Trepp later told a court that Montgomery had given him a demonstration of his software's ability to identify patterns and images in a video of the 1939 black-and-white classic *Gunga Din*.

But after failing to strike it big in Hollywood, Montgomery and Trepp shifted their focus to the casino industry in Reno and Las Vegas. Montgomery later bragged that he had developed pattern recognition software specifically for casinos that could help identify cheaters. He even claimed he had technology that could identify high-value chips inside piles of chips on gaming tables, to detect when dealers tried to steal from the casinos by slipping valuable chips to friends. Montgomery also said he had developed video compression software that would allow casinos to more easily store thousands of hours of surveillance tapes, rather than erase all of their old footage.

But his technology was never a big hit with the casino industry, either. So Montgomery turned to Washington. There, Montgomery finally succeeded in his new search for clients through a series of coincidences and chance encounters, along with strong political and financial connections that helped to smooth the way. And it all started, like so many other things in his life, in a casino.

In 2002, Warren Trepp arranged for the MGM Grand Casino to take a look at Montgomery's technology. An air force colonel who had heard about Montgomery's work decided to come and see it as well. Impressed, he helped Montgomery and eTreppid land a contract with the air force.

Michael Flynn, Montgomery's former lawyer—who later concluded that Montgomery was a fraud—said that Montgomery had told him that Montgomery had won over the visiting air force officer, who became convinced that Montgomery's object recognition and video compression technologies could help the air force's Predator drone program. The CIA and air force were flying Predator drones over Afghanistan at the time, and they were sending back thousands of hours of video that needed to be analyzed and stored. Just like

36

r first tried to convince
ficient means of color-
ware, he claimed, could
colorize each frame of
tgomery had given him
entify patterns and im-
assic *Gunga Din*.

ood, Montgomery and
In Reno and Las Ve-
developed pattern rec-
r could help identify
at could identify high-
ables, to detect when
ying valuable chips to
ed video compression
fir store thousands of
of their old footage.
the casino industry,
There, Montgomery
brough a series of co-
trong political and fi-
ery. And it all started,

GM Grand Casino to
force colonel who had
he and see it as well.
land a contract with

er—who later con-
at Montgomery had
visiting air force offi-
s object recognition
he air force's Preda-
ting Predator drones
ling back thousands
and stored. Just like

Las Vegas casinos, the air force needed a way to maintain the massive piles of video generated by its own version of the eye in the sky. Montgomery's object recognition technology could provide new ways for the air force to track suspected terrorists with the Predator. Montgomery claimed that his facial recognition software was so good that he could identify individual faces from the video camera flying on a Predator high above the mountains of southern Afghanistan.

By the spring and summer of 2003, eTreppid was awarded contracts by both the air force and U.S. Special Operations Command. Montgomery was able to win over the government in part by offering field tests of his technology—tests that former employees say were fixed to impress visiting officials. Warren Trepp later told the FBI that he eventually learned that Montgomery had no real computer software programming skills, according to court documents that include his statements to the FBI. Trepp also described to federal investigators how eTreppid employees had confided to him that Montgomery had asked them to help him falsify tests of his object recognition software when Pentagon officials came to visit. Trepp said that on one occasion, Montgomery told two eTreppid employees to go into an empty office and push a button on a computer when they heard a beep on a cell phone. Meanwhile, Montgomery carried a toy bazooka into a field outside eTreppid. He was demonstrating to a group of visiting U.S. military officials that his technology could recognize the bazooka from a great distance.

After he was in place in the field, he used a hidden cell phone to buzz the cell phone of one the eTreppid employees, who then pushed a key on a computer keyboard, which in turn flashed an image of a bazooka on another screen prominently displayed in front of the military officers standing in another room, according to court documents. The military officers were convinced that Montgomery's computer software had amazingly detected and recognized the bazooka in Montgomery's hands. (Montgomery insists that the eTreppid employees lied when they claimed that he had asked them to fix the tests, and also says that the air force issued a report showing that it had verified the tests.)

Montgomery had a lot of support when it came to dealing with the

government. Through Warren Trepp, he had excellent political connections, and in Washington that can take you a very long way.

To help eTreppid get more government business, Trepp brought in Letitia White, a Washington lobbyist with ties to congressional Republicans. She was particularly close with her former boss, California congressman Jerry Lewis. He, in turn, was chairman of the powerful House Defense Appropriations Subcommittee (he later became chairman of the full appropriations committee) and so was able to steer billions of dollars in spending to programs he favored throughout the Pentagon. Letitia White, who had been one of Lewis's closest aides, had left to go to work with the Washington lobbying firm of Copeland Lowery, where she specialized in arranging custom-built earmarks in the defense and intelligence budgets for her clients.

The connections among Lewis, White, and Copeland Lowery later became the subject of a long-running criminal investigation by the Justice Department. The U.S. attorney in Los Angeles probed whether Lewis had steered huge amounts of money to Copeland Lowery's clients in return for large campaign donations from the lobbying firm and from the defense contractors that were its clients. The investigation of Jerry Lewis was ongoing when the U.S. attorney handling the case, Carol Lam, was fired by the Bush administration in 2007, making her one of eight U.S. attorneys pushed aside by the Bush White House in a famously controversial, possibly political decision. The investigation into Lewis and his ties to Copeland Lowery was eventually dropped, but the lobbying firm broke up under the pressure, and Letitia White moved to a new firm. In 2009, Citizens for Responsibility and Ethics in Washington (CREW) named Lewis one of the fifteen most corrupt members of Congress.

But Trepp wasn't finished after hiring White. He convinced another heavyweight Nevada investor, Wayne Prim, to put money into eTreppid. In September 2003, Prim hosted a dinner that brought together Trepp, Montgomery, and Rep. Jim Gibbons of Nevada, a former airline pilot and rising star among congressional Republicans. Gibbons, an influential member of the House Intelligence Committee, almost certainly played a critical role in helping Montgomery to gain access to the Central Intelligence Agency.

ellent political con-
ery long way.
s. Trepp brought in
y congressional Re-
ner boss, California
tan of the powerful
later became chair-
o was able to steer
ted throughout the
wis's closest aides,
g firm of Copeland
i-built earmarks in

eland Lowery later
vestigation by the
es probed whether
eland Lowery's cli-
the lobbying firm
ns. The investiga-
rney handling the
ion in 2007, mak-
g the Bush White
l decision. The in-
wery was eventu-
the pressure, and
s for Responsibil-
one of the fifteen

He convinced an-
o put money into
r that brought to-
of Nevada, a for-
nal Republicans.
ligence Commit-
g Montgomery to

Gibbons did not need much coaxing to try to assist eTreppid. Not only was the company based in his home state, but both Prim and Warren Trepp were longtime campaign contributors. After the dinner at Prim's house, Gibbons went to work immediately opening doors in Washington for eTreppid. Flynn said that Montgomery later told him that Gibbons quickly arranged to meet with Porter Goss, then the chairman of the House Intelligence Committee, to discuss eTreppid and Montgomery's technology.

By the fall of 2003, Dennis Montgomery had made a series of impressive moves to gain access to the black budget of the government's national security apparatus. He had the backing of two wealthy investors, had one of the nation's most influential lobbyists scouring the federal budget for earmarks on his behalf, and had the support of a key member of the CIA's oversight committee. After obtaining a series of small contracts with the air force and the Special Operations Command, Montgomery was ready for the big time.

★

For a few months in late 2003, the technology from Dennis Montgomery and eTreppid so enraptured certain key government officials that it was considered the most important and most sensitive counterterrorism intelligence that the Central Intelligence Agency had to offer President Bush. Senior officials at the CIA's Directorate of Science and Technology began to accept and vouch for Montgomery to officials at the highest levels of the government. Montgomery's claims grew ever more expansive, but that only solidified his position inside the national security arena. His technology became too impossible to disbelieve.

Montgomery's big moment came at Christmas 2003, a strange time of angst in the American national security apparatus. It was two years after the 9/11 attacks, and the war in Iraq was getting worse. Iraq was turning into a new breeding ground for terrorism, and Osama bin Laden was still on the loose, regularly thumbing his nose at the Americans by issuing videotaped threats of further terrorist strikes. The CIA, still stumbling in the aftermath of the two greatest

intelligence failures in its history—missing 9/11 and getting it wrong on Iraq's supposed weapons of mass destruction—was desperate for success, a quick win with which to answer its critics.

The CIA's Science and Technology Directorate, which had largely been stuck on the sidelines of the war on terror, saw in Dennis Montgomery an opportunity to get in the game. The directorate had played an important role in the Cold War, but in the first few years of the war on terror, it was still struggling to determine how technology could be leveraged against small groups of terrorists who were trying to stay off the grid.

Montgomery brilliantly played on the CIA's technical insecurities as well as the agency's woeful lack of understanding about al Qaeda and Islamic terrorism. He was able to convince the CIA that he had developed a secret new technology that enabled him to decipher al Qaeda codes embedded in the network banner displayed on the broadcasts of Al Jazeera, the Qatar-based news network. Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks. And only he had the technology to decode those messages, thus saving America from another devastating attack. The CIA—more credulous than Hollywood or Las Vegas—fell for Montgomery's claims. In short, he convinced CIA officials that he could detect terrorist threats by watching television.

By late 2003, CIA officials began to flock to eTreppid's offices in Reno to see Montgomery's amazing software. Michael Flynn, Montgomery's former lawyer, said that Montgomery had dealings with or knew the identities of at least sixteen different CIA officials. These people now joined the senior military officers who had frequented the company since the previous spring, when it first began to work on the Predator program.

Montgomery persuaded the spy agency that his special computer technology could detect hidden bar codes broadcast on Al Jazeera, which had been embedded into the video feed by al Qaeda. Allegedly, al Qaeda was using that secret method to send messages to its terrorist operatives around the world about plans for new attacks. Montgomery convinced the CIA that his technology had uncovered a series

40

I and getting it wrong
m — was desperate for
mix.

ate, which had largely
saw in Dennis Mont-
directorate had played
so few years of the war
w technology could be
to were trying to stay

IA's technical insecu-
understanding about al
convince the CIA that he
abled him to decipher
over displayed on the
s network. Montgom-
was using the broadcasts
rist attacks. And only
ges, thus saving Amer-
— more credulous than
r's claims. In short, he
urist threats by watch-

to eTreppid's offices in
Michael Flynn, Mont-
y had dealings with or
nt CIA officials. These
who had frequented the
it began to work on the

it his special computer
adcast on Al Jazeera,
by al Qaeda, Allegedly,
messages to its terror-
or new attacks. Mont-
had uncovered a series

of hidden letters and numbers that appeared to be coded messages about specific airline flights that the terrorists were targeting.

Montgomery insists that he did not come up with the idea of analyzing Al Jazeera videotapes—he says that the CIA came to him in late 2003 and asked him to do it. CIA officials brought Montgomery two different versions of al Qaeda videotapes, he claims. They gave him original al Qaeda videotapes obtained independently by the CIA, and then also gave him recordings of the same videotapes recorded as they had been broadcast on Al Jazeera. The CIA wanted him to compare the two, he claims.

But even if it wasn't Montgomery's idea, he ran with it as fast as he could. He told the CIA that he had found that the versions of the tapes broadcast on Al Jazeera had hidden letters and numbers embedded in them. He says that he found that each bin Laden video broadcast on al Jazeera had patterns and objects embedded in the network's own banner displayed with the video recordings.

Montgomery let the CIA draw its own conclusions based on the information he gave them. After he reported to the CIA that he had detected a series of hidden letters and numbers, he left it up to the CIA to conclude that those numbers and letters referred to specific airline flights. He insists that he did not offer the CIA his own conclusions about what the data meant.

By the middle of December 2003, Montgomery reported to the CIA that he had discovered certain combinations of letters and numbers. For example, coded messages that included the letters "AF" followed by a series of numbers, or the letters "AA" and "UA" and two or three digits, kept repeating. In other instances, he told the agency that he had found a series of numbers that looked like coordinates for the longitude and latitude of specific locations.

The CIA made the inevitable connections. "They would jump at conclusions," says Montgomery. "There would be things like C4, C4, and they would say that's explosives. They jumped to conclusions." He added that he "never suggested it was airplanes or a threat."

Montgomery's data triggered panic at the CIA and the White House—and urgent demands that Montgomery produce more. On Christmas Eve, CIA officials showed up at Montgomery's house in

Reno and told him that he had to go back to his office to keep digging through incoming videotapes and Al Jazeera broadcasts throughout the holidays, Montgomery recalled.

Montgomery was telling the CIA exactly what it wanted to hear. At the time, the Bush administration was obsessed with Al Jazeera, not only because of the network's unrelenting criticism of the invasion of Iraq, but also because it had become Osama bin Laden's favorite outlet for broadcasting his videotaped messages to the world. Each time bin Laden released a new video, the American media immediately turned to the CIA for a quick response and analysis of whether the recording was genuine and where and when it had been taped. Each new broadcast on Al Jazeera forced the CIA to scramble to stay one step ahead of Western reporters baying for answers. At first, when bin Laden released videotapes filmed outdoors in what appeared to be the mountainous terrain of northwestern Pakistan, the CIA even tried to conduct a geological analysis of the rocky outcroppings that served as the backdrop for the video, to try to figure out where bin Laden was. His broadcast statements prompted the CIA to look for new methods of analyzing the news network, and also led some American officials to suspect that there was a covert relationship between Al Jazeera and al Qaeda.

Former senior CIA officials say that officials from the CIA's Science and Technology Directorate, including the directorate's chief, Donald Kerr, believed Montgomery's claims about al Qaeda codes. They also convinced CIA director George Tenet to take the technology and intelligence flowing from Montgomery's software seriously. As a result, in December 2003, Tenet rushed directly to President Bush when information provided by Montgomery and his software purported to show that a series of flights from France, Britain, and Mexico to the United States around Christmas were being targeted by al Qaeda. The data strongly suggested that the terrorist group was planning to crash the planes at specific coordinates.

Based on Montgomery's information, President Bush ordered the grounding of a series of international flights scheduled to fly into the United States. This step caused disruptions for thousands of travelers on both sides of the Atlantic, while further stoking public fears of an-

42

to his office to keep digging
were broadcasts throughout

or what it wanted to hear. At
messed with Al Jazeera, not
a criticism of the invasion of
the bin Laden's favorite out-
ges to the world. Each time
American media immediately
and analysis of whether the
an it had been taped. Each
IA to scramble to stay one
answers. At first, when bin
to what appeared to be the
warn, the CIA even tried to
eavesdroppings that served as
out where bin Laden was.
A to look for new methods
of some American officials
nship between Al Jazeera

tals from the CIA's Science
Directorate's chief, Donald
al Qaeda codes. They also
the technology and intel-
e seriously. As a result, in
esident Bush when infor-
mware purported to show
and Mexico to the United
ed by al Qaeda. The data
was planning to crash the

esident Bush ordered the
scheduled to fly into the
or thousands of travelers
aking public fears of an-

---

### The Emperor of the War on Terror

other spectacular al Qaeda attack just two years after the 9/11 attacks on New York and Washington.

\*

Years later, several former CIA officials who eventually pieced together what had happened in those frenzied days became highly critical of how Montgomery's information was handled by Tenet and other senior CIA managers. The critics came to believe that top officials in the CIA's Science and Technology Directorate became fierce advocates for Montgomery's information because they were eager to play a more prominent role in the Bush administration's war on terror. The scientists were tired of being shunted aside, and Montgomery gave them what they wanted: technology that could prove their worth. "They wanted in," said one former senior CIA official, "they wanted to be part of the game."

But former CIA officials blame Tenet even more; the CIA director enabled the overeager scientists. He allowed them to circumvent the CIA's normal reporting and vetting channels, and rushed the raw material fed to the agency by Montgomery directly to the president. Bush himself had no way of vetting the material he was being handed by the CIA. "Tenet made George Bush the case officer on this," said one former senior CIA official. "The president was deciding how this was being handled."

One former senior CIA official said that for two or three months in late 2003 and early 2004, the intelligence from Montgomery was treated like it was the most valuable counterterrorism material at the CIA. Special briefings were given almost daily on the intelligence, but only a handful of CIA officials were told where the intelligence was coming from. "They treated this like the most important, most sensitive compartmented material they had on terrorism," said one former CIA official.

Officially, the CIA still refuses to discuss any details of the episode. One CIA official offered a qualified defense of Tenet's handling of Montgomery's information, saying that the decision to share the threat information with President Bush was debated and approved by

43

## GREED

the administration's so-called principals committee, made up of Vice President Dick Cheney, the secretaries of state and defense, and other members of the cabinet. Only after the principals agreed did Tenet take the intelligence in to Bush. In other words, Tenet wasn't the only one who appears to have been hoodwinked. Dennis Montgomery's information received the stamp of approval by the entire upper echelon of the Bush administration.

*

What remains unclear is how Montgomery was able to convince all of them that he had developed secret software that could decode al Qaeda's invisible messages. While he had gotten by a few credulous military officers who came to view his demonstrations, he apparently found it just as easy to persuade the CIA as well.

A CIA official defensively pointed out that the agency did not actually have a contract with eTreppid at the time Montgomery was providing data from the Al Jazeera videotapes. While they were working closely together during the final months of 2003, the CIA had not yet started paying Montgomery, the official said. The agency never finalized a contract with him because agency staff eventually realized they had been conned, according to this official. But that does not diminish the fact that for a few crucial months, the CIA took Montgomery and his technology very seriously.

Montgomery was able to succeed with the CIA in part because senior agency officials considered his technology so important that they turned the knowledge of its existence into a highly compartmented secret. Few at the CIA knew any more than that there was a new intelligence source providing highly sensitive information about al Qaeda's plans for its future terrorist strikes. In other words, the CIA officials working with Montgomery—people who had already bought into Montgomery—controlled who else was told about the man and his technology. By limiting access to the information, they enhanced their own standing within the CIA; they were the high priests in on the agency's biggest secret. There would be no second-guessing.

The fact that Montgomery and eTreppid had such powerful con-

44

e, made up of Vice
Defense, and other
agreed did Tenet
t wasn't the only
Montgomery's in-
are upper echelon

s to convince all
could decode al
a few credulous
as, he apparently

ncy did not actu-
gomery was pro-
ey were working
CIA had not yet
ency never final-
lly realized they
es not diminish
ontgomery and

art because sen-
rtant that they
ompartmented
e was a new in-
ation about al
words, the CIA
already bought
it the man and
they enhanced
h priests in on
guessing,
powerful con-

### The Emperor of the War on Terror

nections in Washington also reduced the incentives for anyone at the CIA to speak up. Raising questions about Dennis Montgomery would almost certainly lead to a grilling in front of the House Intelligence Committee and Jim Gibbons. It might also incur the wrath of Jerry Lewis and the Defense Appropriations Subcommittee, which, along with the House intelligence panel, controlled the intelligence budget.

✳

For those few allowed into the CIA's charmed circle of secret knowledge, Montgomery seemed to be providing powerful and frightening information.

The string of numbers flowing inexorably from Dennis Montgomery's computers prompted President Bush to act. One set of flights he ordered grounded were Air France flights from Paris to Los Angeles. French security detained seven men at Charles de Gaulle Airport in Paris for questioning, but then released them after no further evidence of a pending attack was uncovered. Christmas 2003 came and went with no attacks. But that did not make the White House any more skeptical of Dennis Montgomery.

One former senior CIA official recalled attending a White House meeting in the week following Christmas to discuss what to do next about the information coming from Montgomery. The official claims that there was a brief but serious discussion about whether to shoot down commercial airliners over the Atlantic based on the intelligence. The former CIA official said that during the meeting, Frances Townsend—then a counterterrorism official on the National Security Council—discussed with an NSC lawyer the fact that the president had the legal authority to shoot down planes believed to be terrorist threats, and that it might be time to exercise that authority. "I couldn't believe they were talking about it," the former senior CIA official said. "I thought this was crazy."

Townsend denied ever having such a discussion. The former CIA official repeated his version of events after being told of her denial.

✳

### GREED

Finally, the French brought an end to it. Since Air France flights to the United States were among those that had been grounded, French officials had taken a dim view of the entire episode. They began demanding answers from the Americans. The French applied so much pressure on Washington that the CIA was finally forced to reveal to French intelligence the source of the threat information. Once they heard the story of Dennis Montgomery and eTreppid, French officials arranged for a French high-tech firm to reverse-engineer Montgomery's purported technology. The French wanted to see for themselves whether the claims of hidden messages in Al Jazeera broadcasts made any sense.

It did not take long for the French firm to conclude that the whole thing was a hoax. The French company said that there were simply not enough pixels in the broadcasts to contain hidden bar codes or unseen numbers. The firm reported back to the French government that the supposed intelligence was a fabrication.

At first, CIA officials were taken aback by the French company's findings and did not want to believe that they had been fooled. Montgomery says that CIA officials continued to work with him for months after Christmas 2003, and that CIA personnel were still showing up at his offices in Nevada until late 2004.

Once the CIA officials finally accepted the truth, however, and agreed with the French findings, George Tenet and others at the CIA who had been Montgomery's advocates tried to forget all about him. They never talked about the operation again. Within the CIA, it was as if Dennis Montgomery had never existed.

The CIA never investigated the apparent hoax nor examined how it had been handled inside the agency. No one involved in promoting Montgomery, in vouching for his information to the president, or in proposing to shoot down planes based on his claims ever faced any consequences. Donald Kerr, the head of the CIA's Science and Technology Directorate at the time, was never held to account for the role the CIA's technical experts played in advocating for Montgomery. Instead, Kerr kept getting promoted. He received several other senior assignments in the intelligence community, and was eventually

named deputy dire:
to requests for com

At the time of th
of the newly create
of distributing term
ment. That meant
ing Montgomery's
reaches of the Bush
ished for his role in
Brennan was nam
White House. He la

In 2013, while
Brennan to run th
can who was vice
submitted a writter
gence community's
denied that he had
nology, and insist
was merely a recip
had been passed a
Montgomery's dan
not to know what
pid, "other than n
information."

There was no f
body was blamed.
got promoted."

Even more stu
2003 terrorist th
ment contracts aw
Montgomery's pro
variations of his te
The secrecy that s
CIA officials were
about their exper:

46

Air France flights to
m grounded, French
ode. They began de-
tch applied so much
= forced to reveal to
rmation. Once they
pptd, French officials
engineer Montgom-
to see for themselves
era broadcasts made

clude that the whole
at there were simply
hidden bar codes or
French government

the French company's
d been fooled. Mont-
with him for months
are still showing up at

truth, however, and
and others at the CIA
forget all about him.
Within the CIA, it was

ax nor examined how
involved in promoting
to the president, or in
claims ever faced any
IA's Science and Tech-
to account for the role
ting for Montgomery.
ved several other sen-
y, and was eventually

named deputy director of national intelligence. Kerr did not respond to requests for comment.

At the time of the Christmas 2003 scare, John Brennan was head of the newly created Terrorist Threat Integration Center and in charge of distributing terrorism-related intelligence throughout the government. That meant that Brennan's office was responsible for circulating Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration. But Brennan was never admonished for his role in the affair. After Barack Obama became president, Brennan was named to be his top counterterrorism advisor in the White House. He later became CIA director.

In 2013, while the Senate was considering whether to confirm Brennan to run the CIA, Sen. Saxby Chambliss, a Georgia Republican who was vice chairman of the Senate Intelligence Committee, submitted a written question to Brennan about his role in the intelligence community's dealings with Montgomery. In response, Brennan denied that he had been an advocate for Montgomery and his technology, and insisted that the Terrorism Threat Integration Center was merely a recipient of Montgomery's information and data, which had been passed on by the CIA. He said that the center included Montgomery's data "in analytic products as appropriate." He claimed not to know what had become of the CIA's program with eTreppid, "other than it was determined not to be a source of accurate information."

There was no further inquiry on the matter from Congress. "Nobody was blamed," complains one former CIA official. "Instead, they got promoted."

Even more stunning, after the debacle over the bogus Christmas 2003 terrorist threats, Montgomery kept getting classified government contracts awarded through several different corporate entities. Montgomery's problems with the CIA did not stop him from peddling variations of his technology to one government agency after another. The secrecy that surrounded his work once again worked in his favor. CIA officials were reluctant to tell their Pentagon counterparts much about their experiences with Montgomery, so Defense Department

officials apparently did not realize that his technology was considered suspect at CIA headquarters.

In February 2004, just two months after the Christmas 2003 airplane scare, eTreppid was awarded a new contract with Special Operations Command. The contract was for both data compression and "automatic target recognition software," Montgomery's purported technology to recognize the faces of people on the ground filmed in videos on Predator drones. Special Operations Command gave eTreppid access to video feeds from Predator drones controlled from Nellis Air Force Base in Nevada. It is not certain how long officials there tested Montgomery's facial recognition technology before realizing that eTreppid had no secret formula for identifying terrorists from Predator drone video feeds. But eventually, Special Operations Command also began to see through Montgomery.

"The technology didn't meet the requirements for us," said a Special Operations Command spokesman drily. Still, there is no evidence that officials at Special Operations Command ever talked with their counterparts at the CIA to check up on Montgomery before awarding him a contract. Special Operations Command paid a total of $9.6 million to eTreppid under its contract with the firm.



By late 2005, Dennis Montgomery was in trouble. Employees at eTreppid were becoming more openly skeptical of Montgomery and trying to get access to his secret technology to see if it really existed. For years, Montgomery had somehow managed to hide the truth about his secret work for the government from the small number of employees he had hired. He successfully infused a sense of mystery around himself. He was like the Wizard of Oz, but now people were beginning to try to examine the man behind the curtain.

Sloan Venables, hired by Montgomery to be eTreppid's director of research and development, later told the FBI that another employee, Patty Gray, began to suspect that Montgomery "was doing something other than what he was actually telling people he was doing." Venables added in his statement to the FBI that he knew that "Montgom-

48

logy was considered

Christmas 2003 air-
ct with Special Op-
ta compression and
mery's purported
se ground filmed in
mand gave eTrep-
controlled from Nel-
long officials there
gy before realizing
ing terrorists from
al Operations Com-

for us," said a Spe-
here is no evidence
er talked with their
try before awarding
a total of $9.6 mil-

ble. Employees at
f Montgomery and
if it really existed.
to hide the truth
te small number of
a sense of mystery
t now people were
certain.

reppid's director of
another employee,
s doing something
e was doing," Ven-
w that "Montgom-

ery promised products to customers that had not been completed or
even assigned to programmers."

At the same time, Montgomery was arguing with Warren Trepp
over money; Montgomery needed cash and claimed that Trepp had
shortchanged him on his share of the revenue from eTreppid's con-
tracts. In December 2005, Montgomery asked Trepp for a personal
loan of $275,000, on top of the $1.375 million Trepp had already
loaned him since 1999, according to court documents. This was too
much for Trepp, who finally became fed up with Montgomery.

But Montgomery moved first. Over the Christmas holidays,
Montgomery allegedly went into eTreppid's offices and deleted all of
the computer files containing his source code and software develop-
ment data, according to court documents. He broke with Trepp, left
eTreppid, and began looking for new backers. Trepp soon discovered
that Montgomery had asked yet another casino host at the El Dorado
if he knew of any wealthy gamblers who would be willing to invest
$5 to $10 million in a new business he was about to launch. Trepp
later told the FBI that on his way out the door at eTreppid, Montgom-
ery screamed at one employee, "You're an asshole and I will see you
again!"

Trepp was furious. According to court documents, he told the FBI
that Montgomery had stolen the software eTreppid had used on se-
cret Pentagon contracts. As federal investigators moved in to investi-
gate the alleged theft of the technology, they heard from Trepp and
others that Montgomery's alleged technology wasn't real. Yet they
doggedly kept probing Montgomery's theft of secret technology, and
even raided Montgomery's home searching for the computer codes,
all the while largely ignoring the evidence that he had perpetrated a
hoax.

After their partnership broke up, Montgomery and Trepp re-
mained locked in a series of nasty and lingering legal battles. The
worst involved Montgomery's allegations that Jim Gibbons, the Ne-
vada Republican congressman whom he had met at Wayne Prim's
house, had received bribes from Warren Trepp in return for help-
ing eTreppid to obtain defense contracts. Montgomery's accusations
were explosive because they became public just as Gibbons was be-

## GREED

ing elected governor of Nevada. They helped to trigger a federal corruption investigation, but the inquiry was eventually shelved amid questions about whether e-mails that Montgomery claimed showed that Gibbons had accepted money and a Caribbean cruise in exchange for help in winning contracts for eTreppid—and thus supposedly provided evidence of bribery—may have been forgeries. Dennis Montgomery was widely suspected of having fabricated the e-mails in an effort to damage both Trepp and Gibbons.

In 2008, Abbe Lowell, the Washington attorney representing Gibbons, announced that Gibbons had been cleared of wrongdoing and that prosecutors had told him that he would not be charged in the corruption investigation. Lowell said, "It should be crystal clear that the only persons who should be investigated or charged are those who made false allegations of wrongdoing and who tried to fuel this investigation for their own private purposes," according to an account of his statement in the Associated Press. Gibbons added that "today, I am exceedingly pleased that the FBI and the Justice Department have vindicated me from the allegations and claims of Mr. Montgomery."

\*

Montgomery was able to recover from his battle with Trepp once he landed another wealthy patron, Edra Blixseth, the wife of billionaire Tim Blixseth. Tim Blixseth had made his fortune in timber land swaps in the Pacific Northwest, and then turned his focus to developing a mountain resort for the uber-rich in Montana called the Yellowstone Club. Set in the Rocky Mountains not far north of Yellowstone National Park, the 13,600-acre club was said to be the only private ski resort in the world. It attracted jet-setters who were willing to pay to avoid mixing with the rabble at public ski resorts.

Developing the Yellowstone Club helped to secure for Tim Blixseth the ultimate status symbol—a spot on the Forbes 400. Tim and Edra enjoyed all of the perks of the super-rich—among many other things, they owned a private jet, a yacht, and a massive estate in Rancho Mirage, California, called Porcupine Creek, which came with its own private golf course. Their wealth and ownership of the Yellow-

ager a federal cor-
ally shelved amid
r claimed showed
cruise in exchange
is supposedly pro-
ies. Dennis Mont-
the e-mails in an

representing Gib-
f wrongdoing and
be charged in the
t crystal clear that
ged are those who
to fuel this inves-
g to an account of
ided that "today, I
Department have
c Montgomery."

tch Trepp once he
wife of billionaire
timber land swaps
s to developing a
d the Yellowstone
f Yellowstone Na-
le only private ski
e willing to pay to

sure for Tim Blix-
rbes 400. Tim and
mong many other
sive estate in Ran-
nch came with its
hip of the Yellow-

stone Club also meant that the Blixseths were networking with some
of the most famous and powerful people in the world, from Bill Gates
to Jack Kemp to Benjamin Netanyahu.

Edra Blixseth was Dennis Montgomery's latest mark. After being
introduced to him by a former Microsoft executive and then hear-
ing Montgomery explain his software, she agreed in 2006 to bankroll
Montgomery to launch a new company, to be called Blxware. Mont-
gomery needed new government contracts for Blxware, and Edra
Blixseth had the money and contacts to try to make it happen. Jack
Kemp, the former congressman and onetime Republican vice presi-
dential candidate, was a member of the Yellowstone Club, and in 2006
he helped to arrange a White House meeting for Montgomery to push
his technology. Thanks to Kemp, Montgomery met with Samantha
Ravich, a national security aide to Vice President Dick Cheney, who
was an old friend of Kemp. Montgomery explained his technology to
Ravich and then tried to convince her that Cheney should support
his bid for more government funding. But unlike other officials who
had dealt with Montgomery in the past, Ravich demanded proof. She
told Montgomery that she could not do anything for him unless some
technical experts in the government vouched for his technology. He
was never able to get anyone from the Pentagon to call Ravich on his
behalf, and so she dropped the matter. She said in an interview that
she never tried to help him obtain any new government business.

Montgomery also sought to convince Israeli officials to use his
technology, but, like Samantha Ravich, the Israelis were unimpressed
and rejected his offer. Still, Montgomery continued to find ways to
get Pentagon contracts. He says that his technology was often used to
provide targeting information in raids in Iraq and Afghanistan, and
that he was given access to the Predator Operations Center at Nel-
lis Air Force Base—a sign that his work was playing a role in Preda-
tor strikes. "Months of testing and validation at Nellis," as well as at
other bases, "confirmed the value of the technology," insists Mont-
gomery.

Edra Blixseth refused a request for an interview.

★

GREED

Montgomery continued to get defense contracts even during the Obama administration. In 2009, Montgomery was awarded another air force contract, and later claimed that he had provided the government with warning of a threatened Somali terrorist attack against President Obama's inauguration. Joseph Liberatore, an air force official who described himself as one of "the believers" in Montgomery and his technology, e-mailed Montgomery and said he had heard from "various federal agencies thanking us" for the support Montgomery and his company provided during Obama's inauguration. The threat, however, later proved to be a hoax.

*

Inevitably, Montgomery had a falling out with Edra Blixseth. He then turned to Tim Blixseth to invest and back his operation. By then, Tim and Edra Blixseth were going through an extremely bitter divorce, and Montgomery became caught up in their legal battles. Mysteriously, government lawyers sometimes sought to intervene in their court cases, with vague references to the need to keep classified information stemming from Montgomery's work with the intelligence community out of the public record.

When Montgomery approached him, Tim Blixseth had no intention of giving money to Montgomery, his ex-wife's erstwhile partner. Blixseth was interested in finding out what Montgomery was really doing, however, and so he played along when Montgomery called desperate for money. At one point, Montgomery's wife even called Blixseth to plead for help with bail after Montgomery was arrested for passing bad checks at Caesar's Palace in Las Vegas. (Eventually, Montgomery was forced into personal bankruptcy proceedings.) Blixseth refused to help but kept talking to Montgomery.

In 2010, Blixseth finally went to see Montgomery's latest computer software operation, hidden away in a nondescript warehouse near Palm Springs. Blixseth says that throughout the darkened office, Montgomery had mounted at least eight large-screen televisions, all tuned to Al Jazeera and all tied in to a computer in the middle of the room.

Dennis Montg
ing technology to
given up on his se
Blixseth took in th
his Al Jazeera dat

In fact, Mont
wavering. He clai
network broadca
Olympics in the s

Today, Dennis M
that his technolo
tive and valuable
NSA contracted f
domestic surveil
me that he could
that he had been
top U.S. intellig
erations.

But Montgo
his assertions."

* Eric Lichtblau and
Aram Roston also wr

as even during the
as awarded another
rovided the govern-
orist attack against
ere, an air force of-
ers" in Montgom-
- said he had heard
the support Mont-
s inauguration. The

Dennis Montgomery was once again using his top-secret decoding technology to scour Al Jazeera broadcasts. Montgomery had not given up on his secret project, despite being abandoned by the CIA. As Blixseth took in the bizarre scene, Montgomery proudly told him that his Al Jazeera data was all being fed "straight to the Pentagon."

In fact, Montgomery says that his focus on Al Jazeera was unwavering. He claims that he recorded every minute of Al Jazeera's network broadcast nonstop from February 2004 until the London Olympics in the summer of 2012. "That's over 8 billion frames."

a Blixseth. He then
ation. By then, Tim
ally bitter divorce,
al battles. Mysteri-
intervene in their
keep classified in-
on the intelligence

★

Today, Dennis Montgomery continues to argue that he is not a fraud, that his technology is genuine, and that he performed highly sensitive and valuable work for the CIA and the Pentagon. After former NSA contractor Edward Snowden leaked documents about the NSA's domestic surveillance operations in 2013, Montgomery suggested to me that he could provide the documents that would prove not only that he had been telling the truth, but that he had also been used by top U.S. intelligence officials in highly questionable intelligence operations.

seth had no inten-
erstwhile partner.
gomery was really
gomery called des-
e even called Blix-
was arrested for
Eventually, Mont-
eedings.) Blixseth

But Montgomery has never provided the documents to back up his assertions.*

ery's latest com-
script warehouse
a darkened office,
on televisions, all
the middle of the

---

\* Eric Lichtblau and James Risen reported about Montgomery for the *New York Times*. Aram Roston also wrote an excellent story about Montgomery for *Playboy* magazine.

Exhibit B

# Klayman Law Firm

2020 Pennsylvania Avenue, N.W., Suite 800, Washington, DC 20006-1811 ❖ Telephone: (310) 595-0800 ❖ leklayman@gmail.com

VIA FEDERAL EXPRESS AND CERTIFIED MAIL

January 14, 2015

 **① URGENT**

Linda K. Zecher
President, Chief Executive Officer and Director

William Bayers
Executive Vice President and General Counsel

Houghton Mifflin Harcourt
222 Berkeley Street
Boston, MA 02116

## Re: Defamation of Dennis Montgomery in "Pay Any Price" by James Risen.

Dear Ms. Zecher and Mr. Bayers:

I am counsel for Dennis Montgomery.

My client has brought it my attention that the recent publication of "Pay Any Price," written by James Risen, is defamatory. In a later correspondence, I will outline in detail all of the defamatory statements, which are actionable as libel per se. And because Mr. Montgomery is not a public figure, in fact having worked with various intelligence agencies and The White House, he was "undercover" given his duties and responsibilities in gathering intelligence concerning various matters related to terrorism. Thus, to prove a case for defamation, which we will file in Florida if this matter cannot be resolved, one need not even show malice, although it arises in any event from libel per se.

In Risen's book, as just one example of the defamatory conduct, he writes at pages 32-33:

> Whatever else he was, Dennis Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post-9/11 age for what it was, a time to make money.

1

Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it. The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in a series of civil lawsuits involving Montgomery.

It was as if everyone in Washington was afraid to admit that the Emperor of the War on Terror had no clothes.

A former medial technician, a self-styled computer software expert with no experience whatsoever in national security affairs, Dennis Montgomery almost singlehandedly prompted President Bush to ground a series of international commercial flights based on what now appears to have been an elaborate hoax. Even after it appeared that Montgomery had pulled off a scheme of amazing scope, he still had die-hard supporters in the government who steadfastly refused to believe the evidence suggesting that Montgomery was a fake, and who rejected the notion that the super-secret computer software that he foisted on the Pentagon and CIA was anything other than America's salvation.

It is therefore clear that Houghton Mifflin Harcourt, in order to fact-check Risen's statements to responsibly exercise due diligence, even assuming that Risen's statements are not defamatory, would have had to have had access to top secret highly classified information. However, for you the publisher, to have access to this information, without the authorization of the government, would constitute crimes.

Thus, I want to understand how you fact checked Risen before you both decided to defame my client and how, after publication of his book, you furthered Risen's continuing defamatory statements in the print, television and radio media. In short, you not only have corporate and personal significant civil liability to my client, but have you also collectively engaged what is in effect a criminal enterprise for profit.

If you would like to discuss this matter before Mr. Montgomery takes other avenues of redress, please contact me immediately. I am available to meet with you at the end of this month if such a meeting could prove productive to try to resolve this serious matter. Let me know if there is an interest by January 20, 2015 to discuss how you fact-checked Risen's statements; otherwise we will contact the Federal Bureau of Investigation and seek other suitable redress.

Although I am representing Mr. Montgomery in my private capacity, as also a public interest advocate, there is a duty and responsibility on my part not to accede to top secret classified

information being strewn all over the public record, particularly given the rise of Islamic terrorism in recent months and the even heightening risks this presents to the this nation and the free world.

Please govern yourselves accordingly.

Sincerely,

Larry Klayman

cc:     Dennis Montgomery
        James Risen



**Houghton
Mifflin
Harcourt**

David Eber
Vice President
Associate General Counsel

January 20, 2015

VIA U.S. MAIL AND ELECTRONIC MAIL

Larry Klayman
Klayman Law Firm
2020 Pennsylvania Avenue, N.W.
Suite 800
Washington, DC 20006-1811
leklayman@gmail.com

 Re: *Pay any Price*, by James Risen

Dear Mr. Klayman:

 We have received your letter dated January 14, 2015, to Linda Zecher and William Bayers at Houghton Mifflin Harcourt Publishing Company ("HMH").

 We deny your allegations that *Pay any Price* contains defamatory statements concerning your client Dennis Montgomery, or that HMH or Mr. Risen engaged in any criminal conduct in preparing and vetting the book. We also decline your invitation to meet to discuss HMH's manuscript review processes.

Sincerely,

David Eber

cc: William Bayers
 James Risen

# Klayman Law Firm

2020 Pennsylvania Avenue, N.W., Suite 800, Washington, DC 20006-1811 ® Telephone: (310) 595-0800 ® leklayman@gmail.com

Via Fax and Mail

February 13, 2015

Mr. William Bayers, Esq.
General Counsel
Houghton Mifflin Harcourt Publishing Company
222 Berkeley Street, FL 1-11
Boston, Massachusetts 02116

Mr. James Risen
c/o The New York Times
1627 "I" Street N.W., Suite 700
Washington, D.C. 20006-4007

Mr. James Risen
c/o Houghton Mifflin Harcourt Publishing Company
222 Berkeley Street, FL 1-11
Boston, Massachusetts 02116

Re:   **Demand for Retraction of Defamation Pursuant to § 770.02 Florida Statutes (2012)**

Dear Mr. Bayers and Mr. Risen:

     I am writing as legal counsel for Mr. Dennis Montgomery, who is the subject of Chapter 2 and other portions of a book published by Houghton Mifflin Harcourt Publishing Company titled "Pay Any Price: Greed, Power and Endless War" authored by James Risen.

     This letter is to place you on notice pursuant to § 770.02 Florida Statutes (2012) "Notice condition precedent to action or prosecution for libel or slander" that you have published statements concerning our client Dennis Montgomery which constitute defamation *per se*, general defamation and defamation by inference (hereafter "defamatory statements").

     You are now on notice that these materials have resulted in severe damage to Dennis Montgomery personally and in his trade and profession, for which you may be held to account for legally.

     Your defamatory statements were first and continue to be published in a book with publication date October 14, 2014, by Houghton Mifflin Harcourt Publishing Company at 215 Park Avenue South, New York, New York 10003, under the title "Pay Any Price: Greed, Power and Endless War" (referred to as "the Book) by author James Risen, Copyright (c) 2014 by James Risen, designated by the Library of Congress by its index system as ISBN 978-0-544-34141-8 (hardback edition).

Retraction Letter
February 13, 2015
Page | 2

The publication dated October 14, 2014, was the first publication of the book worldwide in any language and the first printing run of the book. The book was physically printed in the United States of America. We understand that copies of the Book were distributed to bookstores and/or the public up to a week or two earlier than the designated date of publication (a book's designated publication date being primarily of marketing significance, not necessarily the earliest date of a book's release).

Apart from the book itself, James Risen on behalf of himself and the publisher also engaged in a flurry of news interviews and talk show interviews starting in September, and continuing until the present time, associated with the publication 'roll out' of his book in which Risen made further statements in addition to the words of the book itself and repeated claims from the book itself.

Many of Risen's libelous and slanderous statements were made during written news and talk show interviews in September 2014, October 2014, and November, 2014, and since then, some spoken, some in print, surrounding the publication of his book rather than in the book itself.

Your defamatory statements against Dennis Montgomery are exceedingly numerous, extensive, detailed, and often each defamatory in numerous respects. Many statements each include multiple and overlapping topics of defamation against Dennis Montgomery.

As a result, we have attached as "Attachment A" to this letter a 28-page restatement, summary, and analysis of at least 43 examples of defamatory statements. We expect that James Risen also made other statements during additional radio, television, and print interviews about the Book.

You are now on notice that this article resulted in severe damage to Mr. Montgomery personally and in his trade and profession, for which you all will be held to legally account for.

We demand that you issue a retraction immediately. In your previous letter of January 20, 2015, you denied that any defamatory statements were made. We strongly suggest that you reconsider. Please govern yourselves accordingly.

Sincerely,

Larry Klayman

cc: Dennis Montgomery

## ATTACHMENT A

### LIST OF EXAMPLES OF DEFAMATORY STATEMENTS, COMMENTS

### DEFAMATION *PER SE*

1.        The following statements are "*defamatory per se*," recognized under Florida law

when statements are so powerful in their ability to hurt someone that Florida law presumes

harmful as a matter of law. *Montgomery v. Knox*, 23 Fla. 595, 3 So. 211, 217 (1887), such that a

judge will allow damages to be awarded in these cases even if no evidence of harm has been

presented. "[T]he law presumes malice in their utterance," *Abraham v. Baldwin*, 52 Fla. 151, 42

So. 591, 592 (1906), where the words are "… of such common notoriety established by the

general consent of men, that the courts must of necessity take judicial notice of its harmful

effect." *Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234, 236 (1933). [1]

2.        **First, on Page 32 of the Book, Risen writes: [2]**

"Consider the example of Dennis Montgomery. He provides a
perfect case study to explain how during the war on terror greed and
ambition have been married to unlimited rivers of cash to create a
climate in which someone who has been accused of being a con
artist was able to create a rogue intelligence operation with little or
no adult supervision. Crazy became the new normal in the war on
terror, and the original objectives of the war got lost in the process."

3.        As libel *per se*, Risen asserted that out of "greed" Montgomery "create[d] a rogue

intelligence operation with little or no adult supervision and that he was "someone who has been

accused of being a con artist."

---

[1]        Examples of defamation *per se* include those that hurt one's profession, business or trade;
falsely state that a person has a socially unacceptable illness or disease; or falsely state that a
person has been involved in some kind of criminal activity. *Lawnwood Medical Center Inc. v.
Sadow*, 43 So. 3d 710, 729 (Fla. 4th DCA 2010).

[2]        Note that several statements may qualify under different theories, but are presented in full
for proper context. Some statements are repeated for that portion of the statement that qualifies
under different theories of defamation under Florida law.

4.   **Second, on Page 32 of the Book, the Risen writes:**

> "Whatever else he was, Dennis Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post-9/11 age for what it was, a time to make money. Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it**.** The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in public, a series of civil lawsuits involving Montgomery.  It was as if everyone in Washington was afraid to admit that the Emperor of the War on Terror had no clothes."

5.   As libel *per se*, Risen asserted Montgomery's work "many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic."

6.   As libel *per se*, Risen asserted about the Montgomery that "once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it …"

7.   **Third, on Page 33 of the Book, Risen writes:**

> "A former medical technician, a self-styled computer software expert with no experience whatsoever in national security affairs, Dennis Montgomery almost singlehandedly prompted President Bush to ground a series of international commercial flights based on what now appears to have been an elaborate hoax. Even after it appeared that Montgomery had pulled off a scheme of amazing

2

scope, he still had die-hard supporters in the government who
steadfastly refused to believe the evidence suggesting that
Montgomery was a fake, and who rejected the notion that the
super-secret computer software that he foisted on the Pentagon and
CIA was anything other than America's salvation."

8.      As libel *per se*, Risen asserted that Montgomery's work "now appears to have

been an elaborate hoax."

9.      As libel *per se*, Risen asserted that "die-hard supporters in the government who

steadfastly refused to believe the evidence suggesting that Montgomery was a fake."

10.     As libel *per se*, Risen asserted that he "that he foisted on the Pentagon and CIA"

super-secret computer software.

11.     **Fourth, on Page 34 of the Book, the Risen writes:**

"Montgomery was an overweight, middle-aged, incorrigible gambler,
a man who liked to play long odds because he was convinced that he
could out-think the house. He once boasted to a business partner that
he had a system for counting an eight-deck blackjack shoe, quite a
difficult feat for even the best card sharks, and he regularly tested his
theories at the El Dorado and the Peppermill Casino in Reno. He
usually came up short but that didn't stop him from playing blackjack
on a nightly basis, racking up unwieldy debts that eventually led to his
2010 arrest for bouncing more than $ 1 million in bad checks at
Caesar's Palace in Las Vegas."

12.     As libel *per se*, Risen asserted about the Montgomery that he was an "incorrigible

gambler," meaning in effect that Montgomery was a gambling addict who was "playing

blackjack on a nightly basis."  Historically, gambling and in particular an uncontrollable

gambling addict is a loathsome social status.

13.     ***Fifth,*** **on Page 36 of the Book, Risen writes:**

"Michael Flynn, Montgomery's former lawyer— who later
concluded that Montgomery was a fraud."

3

14. As libel *per se*, Risen asserted about the Montgomery that Montgomery's lawyer "concluded that Montgomery was a fraud."

15. **Sixth, on Page 37 of the Book, Risen writes:**

> *"By the spring and summer of 2003, eTreppid was awarded contracts by both the air force and U.S. Special Operations Command. Montgomery was able to win over the government in part by offering field tests of his technology —tests that former employees say were fixed to impress visiting officials. Warren Trepp later told the FBI that he eventually learned that Montgomery had no real computer software programming skills, according to court documents that include his statements to the FBI. Trepp also described to federal investigators how eTreppid employees had confided to him that Montgomery had asked them to help him falsify tests of his object recognition software when Pentagon officials came to visit. Trepp said that on one occasion, Montgomery told two eTreppid employees to go into an empty office and push a button on a computer when they heard a beep on a cell phone. Meanwhile, Montgomery carried a toy bazooka into a field outside eTreppid. He was demonstrating to a group of visiting U.S. military officials that his technology could recognize the bazooka from a great distance."*

16. As libel *per se*, Risen asserted about Montgomery that he committed fraud including defrauding the U.S. Government, prohibited under the False Claims Act codified at 31 U.S.C. §§ 3729 – 3733.

17. **Seventh, on Page 37 of the Book, Risen writes:**

> "After he was in place in the field, he used a hidden cell phone to buzz the cell phone of one the eTreppid employees, who then pushed a key on a computer keyboard, which in turn flashed an image of a bazooka on another screen prominently displayed in front of the military officers standing in another room, according to court documents. The military officers were convinced that Montgomery's computer software had amazingly detected and recognized the bazooka in Montgomery's hands. (Montgomery insists that the eTreppid employees lied when they claimed that he had asked them to fix the tests, and also says that the air force issued a report showing that it had verified the tests.)"

4

18. As libel *per se*, Risen asserted about Montgomery that he committed fraud including defrauding the U.S. Government, prohibited under the False Claims Act codified at 31 U.S.C. §§ 3729 – 3733.

19. ***Eighth,*** **on Page 40 of the Book, Risen writes:**

> "Montgomery brilliantly played on the CIA's technical insecurities as well as the agency's woeful lack of understanding about al Qaeda and Islamic terrorism. He was able to convince the CIA that he had developed a secret new technology that enabled him to decipher al Qaeda codes embedded in the network banner displayed on the broadcasts of Al Jazeera, the Qatar-based news network. Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks. And only he had the technology to decode those messages, thus saving America from another devastating attack. The CIA— more credulous than Hollywood or Las Vegas— fell for Montgomery's claims. In short, he convinced CIA officials that he could detect terrorist threats by watching television."

20. As libel *per se*, Risen asserted about Montgomery that "Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks."

21. As libel *per se*, Risen asserted about Montgomery that he defrauded the CIA.

22. ***Ninth,*** **on Page 42 of the Book, Risen writes:**

> "A CIA official defensively pointed out that the agency did not actually have a contract with eTreppid at the time Montgomery was providing data from the Al Jazeera videotapes. While they were working closely together during the final months of 2003, the CIA had not yet started paying Montgomery, the official said. The agency never finalized a contract with him because agency staff eventually realized they had been conned, according to this official. But that does not diminish the fact that for a few crucial months, the CIA took Montgomery and his technology very seriously."

23. As libel *per se*, Risen asserted about Montgomery that "agency staff eventually realized they had been conned, according to this official."

24. ***Tenth,*** **on Page 46 of the Book, the Risen writes:**

"It did not take long for the French firm to conclude that the whole thing was a hoax. The French company said that there were simply not enough pixels in the broadcasts to contain hidden bar codes or unseen numbers. The firm reported back to the French government that the supposed intelligence was a fabrication."

25. As libel *per se*, Risen asserted about Montgomery that "the whole thing" (Montgomery's work) "was a hoax" and a "fabrication."

26. ***Eleventh,*** **on Page 46 of the Book, the Risen writes:**

"The CIA never investigated the apparent hoax nor examined how it had been handled inside the agency. No one involved in promoting Montgomery, in vouching for his information to the president, or in proposing to shoot down planes based on his claims ever faced any consequences."

27. As libel *per se*, Risen asserted about Montgomery that his work was a hoax.

28. ***Twelfth,*** **on Page 47 of the Book, the Risen writes:**

"At the time of the Christmas 2003 scare, John Brennan was head of the newly created Terrorist Threat Integration Center and in charge of distributing terrorism-related intelligence throughout the government. That meant that Brennan's office was responsible for circulating Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration. But Brennan was never admonished for his role in the affair. After Barack Obama became president, Brennan was named to be his top counterterrorism advisor in the White House. He later became CIA director."

29. As libel *per se*, Risen asserted about Montgomery that "That meant that Brennan's office was responsible for circulating Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration."

30. ***Thirteenth,*** **on Page 50 of the Book, Risen writes:**

"Edra Blixseth was Dennis Montgomery's latest mark. After being introduced to him by a former Microsoft executive and then hearing Montgomery explain his software, she agreed in 2006 to bankroll Montgomery to launch a new company, to be called Blxware.

> Montgomery needed new government contracts for Blxware, and
> Edra Blixseth had the money and contacts to try to make it happen."

31.     As libel *per se*, Risen asserted about Montgomery that "Edra Blixseth was Dennis

Montgomery's latest mark," clearly asserting Montgomery to be a con man.

32.     The libel is false, including because Montgomery owed no stock or ownership in

BLIXWARE so as to be able to make a "mark" of Edra Blixseth.

33.     **Fourteenth,** on November 6, 2014, James Risen appeared as an interview guest

on "The Daily Show with Jon Stewart," by Comedy Central, interviewed by Jon Stewart.

Exhibit A, attached. The television interview was taped at The Daily Show's studio 11th Avenue

between 51st and 52nd Street, New York (Manhattan), New York, and broadcast for the first time

nationwide across the United States of America through cable television and satellite television

on "The Comedy Central" channel.

34.     James Risen stated in said television interview for his statements to be broadcast

on TV that his favorite story is the story of –

> Dennis Montgomery who is this guy was as a computer software
> expert, supposed expert. Who convinced the CIA in 2003 that he had
> the super-secret technology to read Al Jazeera news broadcasts and
> decipher Al Qaeda codes inside the [interrupted by Jon Stewart]
>
> [Jon Stewart]  An Enigma machine for Al Qaeda...?
>
> [Dennis Montgomery] Right.  And he convinced the CIA in 2003 that
> he could read numbers and letters hidden in the Al Jazeera broadcasts
> that corresponded with flights that Al Qaeda was going to shoot down,
> knock--- or blow up….
>
> President Bush was so convinced of this that they grounded flights all
> over the world at Christmas 2003 based on this guy's intelligence or
> supposed intelligence.  It took the French intelligence service, who had
> gotten very mad because they grounded flights from Paris to Los
> Angeles.  And they demanded that the CIA tell them where they were
> getting this information.   And so they finally [non-verbal

interruption].  They finally got the information.   The French told them this is a hoax.  This is a fabrication.

And as soon as the CIA agreed with them, they covered the whole thing up, and refused to ever talk about it.  And Montgomery kept getting more contracts after that.

[Other, extended discussion with Jon Stewart on other topics]

There is lots of raw intelligence every day that says there is an attack about to happen.   You really have to be a pretty sophisticated consumer of intelligence after several years to begin to realize what's real and what's not really a credible threat.

35.     As libel *per se*, Risen asserted about Montgomery that "he convinced the CIA in 2003 that he could read numbers and letters hidden in the Al Jazeera broadcasts that corresponded with flights that Al Qaeda was going to shoot down, knock--- or blow up….

36.     As libel *per se*, Risen asserted about Montgomery that "The French told them this is a hoax.  This is a fabrication.  And as soon as the CIA agreed with them, they covered the whole thing up, and refused to ever talk about it.  And Montgomery kept getting more contracts after that."  The statement that "the CIA agreed with them" is Risen's assertion about Montgomery's work that "this is a hoax.  This is a fabrication."

37.     As libel *per se*, Risen asserted about Montgomery that "they covered the whole thing up, and refused to ever talk about it,"  as a way of saying that the CIA had been conned.

38.     **Fifteenth,** on October 13, 2014, James Risen gave a television interview [3] with Judy Woodruff which was broadcast nationwide by the Public Broadcasting System (PBS).   In that interview, James Risen made the following statements for broadcast on television, and Judy Woodruff repeated many points from James Risen's book which Risen agreed with and endorsed.  Much of the interview involved other chapters not relevant here.

---

[3]     http://www.pbs.org/newshour/bb/costs-security-price-high/

JUDY WOODRUFF:  In the next chapter, JAMES RISEN, you write about millions of dollars spent on programs that were completely fraudulent.  One was run by a man named Dennis Montgomery.  He was a, He was a .... I guess he had worked in computer software... but he was a GAMBLER! [4]

JAMES RISEN:   Right.

JUDY WOODRUFF:  And he sold the CIA and the Pentagon on technology that turned out to be not at all what he said it was.

JAMES RISEN:   It is difficult to tell in some of these cases who is scamming who.  If you talk to Montgomery, he argues that the CIA wanted him to do what he was doing.  And so its a fascinating dynamic that's developed in the war on terror, between people who recognize the opportunities for this gold rush and the agencies which are... who have so much money to spend now, they're getting so much more money than they ever had before, that in some cases they don't know what to do with.

In this case, they began to believe, in this sort of war fever, that you could find Al Qaeda messages hidden in Al Jazeera broadcasts.  And so that.. that program, that highly secret program, was used to ground planes all over Europe and the United States

JUDY WOODRUFF:  When actually there was nothing to it.

JAMES RISEN:   Right

JUDY WOODRUFF:  It was a hoax.

JAMES RISEN:   Right.  Right.

JUDY WOODRUFF:  And then there was another part of it where he was saying he had special facial recognition software....

JAMES RISEN:   Right.  Right

JUDY WOODRUFF:  ... used on drones?

JAMES RISEN:   Yeah.  There were cases in which people said that he was fooling the military and the CIA about his operations and how... what kind of techniques and technologies he had.  He would argue that the CIA actually wanted him and or the army believed him

---

[4]    Emphasis, by exclamation in tone of voice, the in original conversation.

and tested it.  So it's this very complicated story about a man
recognizing an opportunity who had never been involved in national
security before and the CIA and the military all just hungry for
whoever could come with the latest idea.

39.    As libel *per se*, Risen asserted about Montgomery that "you write about millions

of dollars spent on programs that were completely fraudulent.  One was run by a man named

Dennis Montgomery," which Risen confirms by saying "Right." (Actually where the discussion

is about "the next chapter" that chapter is exclusively about Dennis Montgomery alone.)

40.    As libel *per se*, Risen asserted about Montgomery that "When actually there was

nothing to it," which Risen confirms by saying "Right." And also "It was a hoax," which Risen

confirms by saying "Right.  Right."

41.    As libel *per se*, Risen asserted about Montgomery that "There were cases in

which people said that he was fooling the military and the CIA about his operations and how...

what kind of techniques and technologies he had."

42.    **Sixteenth,** on October 24, 2014, James Risen gave an audio interview with Lucy

Worsley published on the <u>New York Times</u> website, titled **"Inside The New York Times Book**

**Review: James Risen's 'Pay Any Price'"** which is accessible at that website address. [5]  In this

interview  "**Inside <u>The New York Times</u> Book Review**," with Pamela Paul, October 24, 2014,

James Risen stated for national broadcast:

> PAMELA PAUL:   How do we count and account for the costs of the
> government's war on terror.  We'll talk to  James Risen, author of Pay
> Any Price:  Greed, Power, and Endless War.

---

[5]     See:  ArtsBeat: Book Review Podcast: James Risen's 'Pay Any Price', by John Williams,
<u>New York Times</u>, October 24, 2014, http://artsbeat.blogs.nytimes.com/2014/10/24/book-review-
podcast-james-risens-pay-any-price/ , based upon Louise Richardson's book review of Risen's
book.

JAMES RISEN ("tease" audio clip): It seems to me that what the war on terror had become in thirteen years was a search for cash and a search for power and status.

PAMELA PAUL: What is the British fascination with murder? Lucy Worsley will explain all joining us to talk with us about her new book: The Art of the English Murder.

LUCY WORSLEY ("tease" audio clip): The public used to consume murder in a way that you can still see the modern media doing it today. Just look at the Pistorius trial.

PAMELA PAUL: Alexander Alter will be here with Notes from the Publishing world. And Greg Cole has bestseller news. This is "Inside the New York Times Book Review." I am Pamela Paul.

James Risen joins me now. His new book is Pay Any Price: Greed, Power, and Endless War. Hi James.

JAMES RISEN: Hi, thanks for having me.

PAMELA PAUL: Thanks for being here. Now this is a book that covers a lot of territory. Tell us briefly about what it is you set out to write about in the book.

JAMES RISEN: What I wanted to do was, I'd written one book before about the war on terror, and I wanted to follow up with a new book that kind of looked at where we were 13 years after 9/11 and how we had what started out in the immediate aftermath of 9/11 as kind of a search for justice or a search for retribution or whatever you want to think, say we were doing right after 9/11 as a country. It seemed to me that what the war had become in 13 years was a search for cash and a search for power and status and that it was becoming an endless war in which we had a new mercenary class of people who were taking advantage of the war on terror. And that enormous unintended consequences had happened. And I began to hear about just some really crazy things that were going on. And so I thought it would make a good story.

[The discussion then covers the Chapter "Rosetta" not relevant here, concerning a lawsuit for 9/11 families against Saudi Arabia, except the ending]

JAMES RISEN [winds up the Chapter on "Rosetta" by saying]: ....in the war on terror became so complicated and so difficult to tell what was really going on, to me it was like a case study in how the

war on terror had been turned for other uses, and become a.... something that you could never tell what was the truth and what was not the truth. And that to me was at the heart of the problems with the war on terror, that you could never tell what's real and what was concoction today.

[The discussion then covers how Risen went about researching the book, not relevant here]

PAMELA PAUL: Did a lot of it arise out of stories that, reporting that you'd originally done for the Times?

JAMES RISEN: Some of it. For instance, I did a chapter The Emperor of the War on Terror, about Dennis Montgomery who [laughs] who's a strange character, who I'd done a story about him for the New York Times along with Eric Lichtbau my colleague there at the Times. He's one of the most fascinating characters in the war on terror. He... He was a computer software expert who convinced the CIA that he could decipher secret codes from Al Qaeda in the Al Jazeera news broadcasts. And that he could tell the CIA numbers and letters that corresponded with flights that Al Qaeda wanted to attack. And the CIA took this so seriously that they grounded, that the Bush Administration grounded a bunch of international flights in Christmas 2003 based on what this guy was telling them. And when they realized it was a hoax, they covered the whole thing up and never did anything about it. So I had done a story for the Times with.... about that and then expanded on that and got a lot more information for the book.

PAMELA PAUL: How did you find out about him?

JAMES RISEN: Well he had been written about a little bit before we wrote about it. But I had also, even before he was written about by other people, I had heard from people in the CIA that there was this crazy operation that nobody wanted to talk about, that they were all embarrassed by. To me that, it was like a case study in just how crazy the war on terror has become. And the only thing that makes sense about why it's gotten so crazy, is I think we kind of have deregulated national security and we took all, you know, Cheney said we're going to take the gloves off. And that means we deregulated national security at the same time we poured hundreds of billions of dollars into counter-terrorism. And so it's had enormous unintended consequences from what is essentially a national security crisis that is kind of like the banking crisis.

12

[The interview discussion then turns to the alleged deregulation of national security on other topics not relevant here.]

43.     As libel *per se*, Risen asserted about Montgomery that "And when they [the CIA] realized it was a hoax, they covered the whole thing up and never did anything about it."

44.     The libel is false, for the reasons identified above, and including that Montgomery never purported to be an expert in intelligence but left interpretation of the data he uncovered to intelligence experts of the U.S. Government.

45.     ***Seventeenth,*** James Risen sat for a nationwide television news interview on the television show ***DEMOCRACY NOW!*** A Daily Independent Global News Hour, with Amy Goodman & Juan González, at 207 W. 25th St., Floor 11, New York, NY 10001 on October 14, 2014.  On this nationwide television news broadcast, the conversation turned to:

> **AMY GOODMAN:** Dennis Montgomery?
>
> **JAMES RISEN:** Dennis Montgomery is a fascinating character, who—he was a computer software person, self-styled expert, who developed what he said was special technology that would allow him to do things with computers that other people couldn't do. One of the things that he developed was this imaging technology that he said he could find images on broadcast network news tapes from Al Jazeera. He said that he could read special secret al-Qaeda codes in the banners on the broadcasts of Al Jazeera. And the CIA believed this. And he was giving them information based on watching hours and hours of Al Jazeera tapes, saying that "I know where the next al-Qaeda attack is going to be based—is going to happen." And the Bush administration and the CIA fell for this.
>
> **AMY GOODMAN:** And it was in the news zipper at the bottom of the Al Jazeera broadcasts?
>
> **JAMES RISEN:** Well, he says it was in the banner. But anyway. And so, it was this great—if you talk to him, he argues, well, they—that's what they were looking for. You know, they convinced him to look for this. You know, it depends on who you talk to. But it was one of the great hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush administration, based on information they

13

were getting from Dennis Montgomery's so-called decryption of Al Jazeera broadcasts.

And then there's a whole number of other things, like Alarbus, which was this covert program at the Pentagon where a Palestinian involved in that was actually trying to use the bank account set up by the secret program, Pentagon program, to launder hundreds of millions of dollars. And the FBI investigated this, but then tried to keep the whole thing quiet.

**AMY GOODMAN:** How much did the U.S. government give to Dennis Montgomery?

**JAMES RISEN:** Millions of dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial problems as a result of that. So, it's a strange—to me, the Dennis Montgomery story is one of the strangest, because what it shows is, early on in the war on terror, as I said, the CIA and all these other agencies had so much money to spend on counterterrorism that they were willing to throw it at everything. They were so afraid of the next terrorist attack that they were willing to believe anybody who came up with some idea. And I called that chapter about Montgomery, you know, "The Emperor of the War on Terror," because nobody wanted to say that the emperor had no clothes.

**AMY GOODMAN:** I mean, it had very real effects, aside from spending all that money.

**JAMES RISEN:** Yeah.

**AMY GOODMAN:** For example, planes being sent back.

**JAMES RISEN:** Yes, yes. There were planes grounded. International flights between the United States and Europe and Mexico were grounded. There was talk at the White House even of shooting down planes based on this information.

**AMY GOODMAN:** Because they could be used, as with September 11th, as weapons?

**JAMES RISEN:** Yeah, as missiles or whatever. And so, it was crazy. It was absolutely insane.

**AMY GOODMAN:** And it was only the French government who then did a study?

14

**JAMES RISEN:** Yes, yes. Yeah, the French government finally—you know, the U.S.—the CIA and the Bush administration didn't want to tell anybody what was really happening, where they were getting this information. You know, "This supersecret information about Al Jazeera, we can't tell you." And finally, the French intelligence service and the French government said, "You know, you're grounding our planes. You've got to tell us where you're getting this information." And they got—they finally shared the information with them, and the French got a French tech firm to look at this, and they said, "This is nuts. This is fabrication." And after a while, the CIA was finally convinced maybe the French were right, and they stopped talking about it. They didn't do anything else. They just like shut it down eventually, but never wanted to talk about what had really happened.

**AMY GOODMAN:** Then Dennis Montgomery, revealed as a con man—

**JAMES RISEN:** Yeah, yeah.

**AMY GOODMAN:** —in jail for that?

**JAMES RISEN:** Well, no, he's not in jail. But it was a—he actually got more contracts after that, with the Pentagon and other agencies. And he continued to operate for a long time. You know, he kind of went from one agency to the other.

**AMY GOODMAN:** We're talking to James Risen, Pulitzer Prize-winning investigative journalist for *The New York Times*. His new book, just out today, *Pay Any Price: Greed, Power, and Endless War*. When we come back, war corrupts, endless war corrupts absolutely. Stay with us.

[break]

46.     As libel *per se*, Risen asserted about Montgomery that "But it was one of the great hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush administration, based on information they were getting from Dennis Montgomery's so-called decryption of Al Jazeera broadcasts."

47.     As libel *per se*, Risen asserted about Montgomery when asked "How much did the U.S. government give to Dennis Montgomery?" Risen answered in reply: "Millions of

dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial

problems as a result of that."

48.     As libel *per se*, Risen asserted about Montgomery that "the French got a French

tech firm to look at this, and they said, 'This is nuts. This is fabrication.'"

49.     As libel *per se*, Risen asserted about Montgomery when asked "Then Dennis

Montgomery, revealed as a con man—" Risen confirmed in reply: "Yeah, yeah."

50.     As libel *per se*, Risen asserted about Montgomery that he should be in jail.

51.     ***Eighteenth***, James Risen gave an interview with "Conversations with Great

Minds" of "The Big Picture RT with talk show host Thom Hartmann on October 24, 2014. [6]

> THOM HARTMAN:   ...  [Abrupt change of topic starting at about
> time 5:27]  ...  There's just this enormous amount of government
> money.  Let's throw it at the private sector.  They'll make things well.
> One of the members of the private sector who came forward and said
> I've got a secret, I can figure this stuff out, was a guy by the name of
> Dennis Montgomery.
>
> JAMES RISEN:   Right.  Uh, Dennis Montgomery is one of the best
> stories in the war on terror.  I think somebody should make a movie
> about him.  Dennis Montgomery was a computer software expert who
> said that he had developed technology that basically could find objects
> hidden in the video on television.  And so he convinced, through a
> whole series of contacts and meetings that I detail in the book, he was
> able to get to the CIA  and convince the CIA that he had the technology
> to decipher Al Qaeda codes that were he said were hidden in Al Jazeera
> news broadcasts.
>
> THOM HARTMAN:   They were hidden in the Chiron or the --
>
> JAMES RISEN:   In the banner.  In the banner, actually.  He said that
> he could find numbers and letters that were constantly showing up, or
> not showing up but were being hidden, embedded deeply in the video.
> And he would then give these  numbers and letters to the CIA.  And the
> CIA, either he told them or they convinced themselves that these
> numbers and letters corresponded to flights, international airline flights,
> that Al Qaeda was going to attack.  And so in December, in Christmas

---

[6]     https://www.youtube.com/watch?v=jc_8f4Pp9Zc

2003, the Bush Administration and the CIA took this so seriously that they actually grounded a whole series of international flights coming into and out of the United States, and the White House even considered shooting down some of these flights over the Atlantic.

THOM HARTMAN:   Whoa.

JAMES RISEN:    And once the CIA later was convinced by French intelligence that this was all a fabrication and that this kind of technology didn't exist and that these supposed Al Qaeda codes weren't really in the Al Jazeera newscasts, the CIA covered the whole thing up and never went public with it  and just tried to act like it never happened.

THOM HARTMAN:   Well we know how aggressively this and particularly the Obama Administration right now has gone after whistleblowers and reporters.  You would think they would also go after people who had scammed the CIA.  If one of us walked in off the street and said to the CIA, hey have I got a deal for you, and it was just a total lie, and they gave us millions of dollars, which they gave to Dennis Montgomery, you'd think he would end up in prison.

JAMES RISEN:   Well, no, he ended up getting more contracts from the military... and the Pentagon.  And he was continuing, he continued to operate for several years.  It's really a remarkable story.

THOM HARTMAN:   Yeah, it really and truly is.

[Topic changes abruptly to discussions of torture in the war on terror]

52.     As libel *per se*, Risen asserted about Montgomery that "the CIA later was

convinced by French intelligence that this was all a fabrication and that this kind of technology

didn't exist."

53.     As libel *per se*, Risen asserted about Montgomery that he belongs in prison,

responding to the question "You would think they would also go after people who had scammed

the CIA.  If one of us walked in off the street and said to the CIA, hey have I got a deal for you,

and it was just a total lie, and they gave us millions of dollars, which they gave to Dennis

Montgomery, you'd think he would end up in prison," by Risen answering in reply:  "Well, no,

he ended up getting more contracts from the military... and the Pentagon. And he was continuing, he continued to operate for several years. It's really a remarkable story."

## GENERAL DEFAMATION

54. In addition, Risen also made additional defamatory statements that are explicit defamation under Florida law.

55. *Nineteenth,* **on Page 49 of the Book, Risen writes:**

"Trepp was furious. According to court documents, he told the FBI that Montgomery had stolen the software eTreppid had used on secret Pentagon contracts. As federal investigators moved in to investigate the alleged theft of the technology, they heard from Trepp and others that Montgomery's alleged technology wasn't real."

56. As explicit libel, Risen asserted about Montgomery that Montgomery had stolen valuable software – yet also asserted that the software "wasn't real."

## DEFAMATION BY IMPLICATION UNDER FLORIDA LAW

### Analogous to False Light

57. For defamation by implication: " . . . [L]iterally true statements can be defamatory where they create a false impression. This variation is known as defamation by implication and has a longstanding history in defamation law." *See Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008). Defamation by implication occurs when a publication states facts that are literally true, but produces a defamatory meaning apparent from a plain reading of the publication in its entirety. See *Chapin v. Knight-Ridder, Inc.* 993 F.3d 1087 (4th Cir. 1993).

58. Montgomery thus claims here that if the Court finds that any of the statements labeled "First" through "Nineteenth" do not qualify as defamation *per se* or general defamation,

then in the alternative Montgomery claims here that any and all such statements not qualifying as defamation *per se* or general defamation are defamation by implication against Montgomery.

59.     Across the many examples of libelous statements from the Book or slanderous interviews, Risen implies that Montgomery deceived the U.S. Government as to the meaning, purpose, or interpretation of hidden data and clues that Montgomery uncovered, implying that Montgomery defrauded and conned the U.S. Government.

60.     In fact, Montgomery refused to speculate as to the interpretation or meaning of the data and analyses he uncovered, even when pressed to state what he thought the data might mean, but Montgomery left the role of interpretation to U.S. Government intelligence experts.

61.     Thus, throughout the statements presented herein, Risen libels and slanders Montgomery by implication that Montgomery defrauded and scammed the U.S. Government concerning the meaning of the information Montgomery uncovered, implying that Montgomery obtained millions of dollars by frightening and fooling child-like and gullible CIA officials.

62.     Across the many examples of libelous statements from the Book or slanderous interviews, Risen implies that President George W. Bush's alleged decisions to ground and almost shoot down passenger aircraft around Christmas 2003 (which Risen would have no way of knowing about) were a result of Montgomery's fraud and scams, deceptively manipulating the President of the United States and the U.S. national command authority.

63.     Across the many examples of libelous statements from the Book or slanderous interviews, Risen implies that Montgomery should be in jail.

64.     Among the other statements, in particular, the ***First*** example of libel**, on Page 32 of the Book,** states that:

> "Consider the example of Dennis Montgomery.  He provides a perfect
> case study to explain how during the war on terror greed and ambition

> have been married to unlimited rivers of cash to create a climate in
> which someone who has been accused of being a con artist was able to
> create a rogue intelligence operation with little or no adult supervision.
> Crazy became the new normal in the war on terror, and the original
> objectives of the war got lost in the process."

65.     Thus, as libel by implication, Risen implies that Montgomery committed fraud

and went to any lengths motivated by greed, to obtain money at any cost.

66.     Among the other statements, in particular, in the **Eleventh** example of libel**, on

Page 46 of the Book,** states that:

> "The CIA never investigated the apparent hoax nor examined how it
> had been handled inside the agency."

67.     Here, as libel by implication, even if it is true that "The CIA never investigated"

what Risen describes as an "apparent hoax," the implication is that Montgomery perpetrated a

hoax upon the CIA, and in return for money, which would be both a fraud and a crime.

68.     Similarly, in the **Sixteenth** example of slander from an interview, Risen states that

"It seemed to me that what the war had become in 13 years was a search for cash and a search

for power and status and that it was becoming an endless war in which we had a new mercenary

class of people who were taking advantage of the war on terror," implying that Montgomery's

work is fraudulent in being merely an effort to get cash.

69.     Among the other statements, in particular, the **Nineteenth** example of libel**, on

Page 49 of the Book,** states that:

> "Trepp was furious. According to court documents, he told the FBI
> that Montgomery had stolen the software eTreppid had used on secret
> Pentagon contracts. As federal investigators moved in to investigate
> the alleged theft of the technology, they heard from Trepp and others
> that Montgomery's alleged technology wasn't real."

70.     As libel by implication, Risen implies that Montgomery stole valuable software

yet at the same time the software was in fact worthless.

71. In addition, Risen also made additional defamatory statements that are defamation by implication under Florida law.

72. ***Twentieth,*** **on the Preface Page of the Book, Risen writes:**

> "I've come back," he repeated. "I was the King of Kafiristan – me and Dravot – crowned Kings we was! In this office we settled it – you setting there and giving us the books. I am Peachey – Peachey Taliaferro Carnehan – and you've been setting here ever since – Oh, Lord!"
>
> I was more than a little astonished and expressed my feelings accordingly.
>
> "It's true," said Carnehan, with a dry cackle, nursing his fee, which were wrapped in rags. "True as gospel. Kings we were, with crowns upon our head – me and Dravot – poor Dan – oh, poor, poor Dan, that would never take advice, not though I begged of him!"
>
>       -- Rudyard Kipling, *The Man Who Would be King.*

73. As libel by implication, Risen implies that Montgomery (along with others addressed in the book) is a fraud and/or con man as in *The Man Who Would be King.*

74. ***Twenty-first,*** **in the Prologue on Page xiv of the Book, Risen writes:**

> "The new homeland security-industrial complex operates differently. It is largely made up of a web of intelligence agencies and their contractors, companies that mostly provide secret services rather than large weapons systems and equipment. These contractors are hired to help Washington determine the scale and scope of the terrorist threat; they make no money if they determine that the threat is overblown or, God forbid, if the war on terror ever comes to an end."

75. As libel by implication, Risen states "they make no money if they determine that the threat is overblown or, God forbid, if the war on terror ever comes to an end," suggesting that Montgomery's and eTreppid's profits were *contingent* upon results, and false results at that.

76. ***Twenty-second,*** **in the Prologue on Page xv of the Book, Risen writes:**

"Thus, the creation of a homeland security complex at a time of endless war has bequeathed us with the central narrative of the war on terror – modern tales of greed joined hand in hand with stories of abuse of power. It was inevitable that those wise in the ways of the world would flock to Washington to try to cash in on the war on terror gold rush – and they have. This book offers just a few of those stories. But those trying to monetize America's obsession with terrorism are not the only ones who have sought to exploit 9/11."

"Opportunism comes in many forms and is driven by more than just greed. Ambition and a hunger for power, status, and glory have become great engines of post-9/11 opportunism as well. The more troubling stories here concern abuses of power that have extended across two presidencies for well over a decade. After 9/11, the United States deregulated national security, stripping away the post-Watergate intelligence reforms of the 1970's that had constrained executive power for thirty years. The results are morally challenging – and continue to this day."

77.     Thus, as libel by implication, Risen implies that Montgomery committed fraud and went to any lengths motivated by greed, to obtain money at any cost.

78.     ***Twenty-third,* in the Prologue on Page xvii of the Book, Risen writes:**

"Washington's global war on terror is now in its second decade, thanks to the bipartisan veneer it has gained under Bush and Obama. It shows no signs of slowing down, hustlers and freebooters continue to take full advantage, and the war's unintended consequences continue to pile up. All too often, things are not what they seem."

79.     As libel by implication, Risen implies that Montgomery – one of the key objects of the Book – is a "hustler" and a "freebooter."

80.     ***Twenty-fourth,* Part 1 of the Book,** including Chapter 2 which is focused entirely on Dennis Montgomery, Risen have labeled "Part 1:  Greed"

81.     Thus, by placing the chapter focused on Dennis Montgomery under a label for the section of the Book of "Greed," Risen libels Montgomery by implication as being motivated by greed to commit fraud and carry out the alleged hoaxes identified in the rest of the Chapter 2.

82.    **Twenty-fifth,** Risen have labeled Chapter 2 of the Book which is focused entirely on Dennis Montgomery:  "Chapter 2: The Emperor of the War on Terror."

83.    By naming the chapter focused on Dennis Montgomery "The Emperor of the War on Terror," Risen libels Montgomery by implication as being the mastermind of the fraud that Risen seeks to portray the war on terror to be.

84.    **Twenty-Sixth,** on Page 40 of the Book, Risen writes:

> "The CIA's Science and Technology Directorate, which had largely been stuck on the sidelines of the war on terror, saw in Dennis Montgomery an opportunity to get in the game.  The directorate had played an important role in the Cold War, but in the first few years of the war on terror, it was struggling to determine how technology could be leveraged against groups of terrorists who were trying to stay off the grid."

85. As libel by implication, again, Risen blames Montgomery for the decisions of government officials.

86. **Twenty-Seventh,** on Page 42 of the Book, Risen writes:

> "Montgomery was telling the CIA exactly what it wanted to hear.  At the time, the Bush Administration was obsessed with Al Jazeera, not only because of the networks' unrelenting criticism of the invasion of Iraq, but also because it had become Osama Bin Laden's favorite outlet for broadcasting his videotaped messages to the world."

87. As libel by implication, Risen implies that Montgomery defrauded and conned the CIA by "telling the CIA exactly what it wanted to hear."

88. **Twenty-Eighth,** on Page 42 of the Book, Risen writes:

> "What remains unclear is how Montgomery was able to convince all of them that he had developed secret software that could decode Al Qaeda's invisible messages.  While he had gotten by a few credulous military officers who came to view his demonstrations, he apparently found it just as easy to persuade the CIA as well."

89. As libel by implication, Risen implies that Montgomery conned the U.S. Government

with a hoax.  It would of course be entirely clear "how Montgomery was able to convince all of

them" if Montgomery's work and technology are legitimate.

90. ***Twenty-Ninth,*** **on Page 46 of the Book, Risen writes:**

> "Finally the French brought an end to it.  Since Air France flights
> to the United States were among those that had been grounded,
> French officials had taken a dim view of the entire episode.  They
> began demanding answers from the Americans.  The French
> applied so much pressure on Washington that the CIA was finally
> forced to reveal to French intelligence the source of the threat
> information. Once they heard the story of Dennis Montgomery and
> eTreppid, French officials arranged for a French high-tech firm to
> reverse-engineer Montgomery's purported technology.  The
> French wanted to see for themselves whether the claims of hidden
> messages in Al Jazeera broadcasts made any sense."

91. As libel by implication, if not explicit, the passage implies that Montgomery is a fraud

and that his work is a scam and a hoax.

92. ***Thirtieth,*** **on Page 52 of the Book, Risen writes:**

> "Montgomery continued to get defense contracts even during the
> Obama administration.  In 2009, Montgomery was awarded another
> air force contract, and later claimed that he had provided the
> government with warning of a threatened Somali terrorist attack
> against President Obama's inauguration.  Joseph Liberatore, an air
> force official who described himself as one of "the believers"  in
> Montgomery and said he had heard from 'various federal agencies
> thanking us' for the support Montgomery and his company provided
> during Obama's inauguration.  The threat, however, later proved to be
> a hoax."

93. As libel by implication, Risen implies that Montgomery's ability to continue to receive

contracts is due to Montgomery's ability to defraud the government (and stupidity of government

officials) rather than an endorsement of the legitimacy of Montgomery's work.

94. ***Thirty-First,*** **on Page 31 of the Book, Risen writes:**

"and a new breed of entrepreneur learned that one of the surest and easiest paths to riches could be found not in Silicon Valley building computers or New York designing clothes but rather in Tysons Corner, Virginia, coming up with new ways to predict, analyze, and prevent terrorist attacks— or, short of that, at least in convincing a few government bureaucrats that you had some magic formula for doing so."

95. As libel by implication, Risen implies that Montgomery engaged in fraud to convince a few government bureaucrats that he had a magic formula as an easy path to riches.

96. **Thirty-Second,** on Page 33 of the Book, Risen writes:

"Montgomery's story demonstrates how hundreds of billions of dollars poured into the war on terror went to waste. With all rules discarded and no one watching the bottom line, government officials simply threw money at contractors who claimed to offer an edge against the new enemies. And the officials almost never checked back to make sure that what they were buying from contractors actually did any good— or that the contractors themselves weren't crooks. A 2011 study by the Pentagon found that during the ten years after 9/ 11, the Defense Department had given more than $ 400 billion to contractors who had previously been sanctioned in cases involving $ 1 million or more in fraud."

97. As libel by implication, Risen implies that the money provided to Montgomery (among others) went to "waste."

98. **Thirty-Third,** on Page 33 of the Book, Risen writes:

"The Montgomery episode teaches one other lesson, too: the chance to gain promotions and greater bureaucratic power through access to and control over secret information can mean that there is no incentive for government officials to question the validity of that secret information. Being part of a charmed inner circle holds a seductive power that is difficult to resist."

99. As libel by implication, Risen implies that Montgomery's work was fraudulent.

100. **Thirty-Fourth,** on Page 33 of the Book, Risen writes:

"How his technology worked was a secret. Dennis Montgomery's computer code became the great treasure behind eTreppid Technologies, the company he and Trepp founded. Later, many of

those around Montgomery began to suspect the reason why
Montgomery had to guard his technological innovations so
carefully. They came to believe that at least some of the
technology didn't really exist."

101.    As libel by implication, Risen implies that Montgomery committed fraud.

102.    ***Thirty-Fifth*, on Page 35 of the Book, Risen writes:**

"Montgomery was on the lookout for somebody to bankroll him,
and had put out the word to his friends at the casinos that he
frequented the most. A year later, Montgomery and Trepp were in
business together. Trepp was one of the first, but hardly the last, to
be beguiled by Montgomery's claims that he had achieved
breakthroughs in computer technology of historic significance."

103.    As libel by implication, Risen implies that Montgomery "beguiled" Warren Trepp

by committing fraud.

104.    ***Thirty-Sixth*, on Page 39 of the Book, Risen writes:**

"For a few months in late 2003, the technology from Dennis
Montgomery and eTreppid so enraptured certain key government
officials that it was considered the most important and most sensitive
counterterrorism intelligence that the Central Intelligence Agency had
to offer President Bush. Senior officials at the CIA's Directorate of
Science and Technology began to accept and vouch for Montgomery
to officials at the highest levels of the government. Montgomery's
claims grew ever more expansive, but that only solidified his position
inside the national security arena. His technology became too
impossible to disbelieve."

105.    As libel by implication, Risen imply that Montgomery committed fraud and is a

con man.

106.    ***Thirty-Seventh*, on Page 40 of the Book, Risen writes:**

"Montgomery persuaded the spy agency that his special computer
technology could detect hidden bar codes broadcast on Al Jazeera,
which had been embedded into the video feed by al Qaeda. Allegedly,
al Qaeda was using that secret method to send messages to its terrorist
operatives around the world about plans for new attacks. Montgomery
convinced the CIA that his technology had uncovered a series of

hidden letters and numbers that appeared to be coded messages about specific airline flights that the terrorists were targeting.

107.    As libel by implication, Risen imply that Montgomery convinced the CIA of claims that are not (were not) true.

108.    ***Thirty-Eighth,* on Page 42 of the Book, Risen writes:**

"Based on Montgomery's information, President Bush ordered the grounding of a series of international flights scheduled to fly into the United States. This step caused disruptions for thousands of travelers."

109.    As libel by implication, Risen imply that Montgomery convinced President Bush and the national command authority of conclusions drawn from Montgomery's work.

110.    ***Thirty-Ninth,* on Page 42 of the Book, Risen writes:**

"One former senior CIA official recalled attending a White House meeting in the week following Christmas to discuss what to do next about the information coming from Montgomery. The official claims that there was a brief but serious discussion about whether to shoot down commercial airliners over the Atlantic based on the intelligence."

111.    As libel by implication, Risen imply that Montgomery convinced President Bush and the national command authority of conclusions drawn from Montgomery's work.

112.    ***Fortieth,* on Page 47 of the Book, Risen writes:**

"Even more stunning, after the debacle over the bogus Christmas 2003 terrorist threats, Montgomery kept getting classified government contracts awarded through several different corporate entities. Montgomery's problems with the CIA did not stop him from peddling variations of his technology to one government agency after another. The secrecy that surrounded his work once again worked in his favor. CIA officials were reluctant to tell their Pentagon counterparts much about their experiences with Montgomery, so Defense Department officials apparently did not realize that his technology was considered suspect at CIA headquarters."

113. As libel by implication, Risen implies that Montgomery continued to defraud, con, and scam the government, rather than concluding that the U.S. Government recognized the legitimacy of Montgomery's work.

114. **_Forty-First,_ on Page 48 of the Book, Risen writes:**

"He successfully infused a sense of mystery around himself. He was like the Wizard of Oz, but now people were beginning to try to examine the man behind the curtain."

115. As libel by implication, Risen implies that the Montgomery engaged in fraud and a hoax by keeping details mysterious.

116. **_Forty-Second,_ on Page 48 of the Book, Risen writes:**

"The technology didn't meet the requirements for us," said a Special Operations Command spokesman drily. Still, there is no evidence that officials at Special Operations Command ever talked with their counterparts at the CIA to check up on Montgomery before awarding him a contract. Special Operations Command paid a total of $ 9.6 million to eTreppid under its contract with the firm."

117. As libel by implication, Risen imply that Montgomery again repeated his fraud and hoax against a new government agency.

118. **_Forty-Third,_ on Page 54 of the Book, in the Chapter "The New Oligarchs,"**

**Risen writes:**

CHAPTER 3: The New Oligarchs
Page 54: "Dennis Montgomery is, of course, an extreme example of the new kind of counterterrorism entrepreneur who prospered in the shadows of 9/11. But he was hardly alone in recognizing the lucrative business opportunities that the war on terror has presented. In fact, as trillions of dollars have poured into the nation's new homeland security-industrial complex, the corporate leaders at its vanguard can rightly be considered the true winners of the war on terror."

119. As libel by implication, Risen implies that Montgomery engaged in fraud and a hoax motivated by greed.

Exhibit C

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

DENNIS L. MONTGOMERY

                     Plaintiff,

      v.

JAMES RISEN, ET AL.,

                     Defendants.

Civil Action No. 1:15-cv-20782-JEM

---

**DECLARATION OF PLAINTIFF DENNIS MONTGOMERY, IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
CHALLENGING FLORIDA JURISDICTION AND VENUE**

Pursuant to 28 U.S.C. §1746, I, Dennis Montgomery, hereby declare under penalty of perjury

that the following is true and correct:

1) I am over the age of 18 years old and I make this affidavit on personal knowledge and

    belief. I am mentally and legally competent to make this affidavit sworn under oath,

    despite having suffered a brain aneurism and serious related health issues. *See*

    Exhibits 9, 10, 11, attached to this affidavit.

2) Reporter James Risen of <u>The New York Times</u> and publisher Houghton Mifflin

    Harcourt Publishing Company published a book <u>Pay Any Price: Greed, Power and</u>

    <u>Endless War</u> in October 2014 (hereafter "the Book").

3) In Chapter 2 of the Defendants' Book, James Risen and Houghton Mifflin Harcourt

    Publishing Company lie about me and my work and libel me extensively.

4) Chapter 2 involves me and James Risen focuses almost exclusively on defaming me

    alone to sell copies of the Book in marketing interviews. Having read the book, I am

its centerpiece, that is, Defendants "punching boy" to sell books. Risen conspicuously ignores the many other events and incidents in the Book and focuses almost exclusively on me when promoting his book for sales in Florida and elsewhere.

5) Whereas, the Defendants, especially Houghton Mifflin Harcourt Publishing Company, have great resources and no doubt have "errors and omissions" insurance to finance their legal defense, I have no money or resources at all. I lost my house in foreclosure. The Defendants will be able to afford to litigate the claims in Florida.

6) My finances, employment, career and business opportunities have been severely devastated and destroyed by the false and misleading statements made by the Defendants, contributing to the loss of my previous house in foreclosure and driving me into poverty just at the time I have also been diagnosed with serious medical problems.

7) The Defendants' published defamatory and false and misleading statements which are not opinion or hyperbole and are not fair reporting of their sources or public records. The defamation is specifically false and misleading in factually verifiable terms, including in that:

   a. Defendants published defamatory material and statements from confidential government sources in the intelligence and military communities. The false and misleading statements did not result from fair reporting of previously published material. They admit this on page ix of the Book stating, "Many people have criticized the use of anonymous sources. Yet all reporters know that the very best stories – the most important, the most sensitive – rely on them. This book would not be possible without the cooperation of may current

2

and former government officials and other individuals who were willing to discuss sensitive matters only on the condition of anonymity." Indeed, this is a big selling point of Defendants' book. It publishes new information, however defamatory, that had not been accessible or published before. This is why the Book is a bestseller in Florida and elsewhere, particularly given that Florida is at the center of U.S. Government counterterrorism military and intelligence operations, as I testify to below.

b. The Defendants actually know that their U.S. Government sources are the ones who will bear the public blame for their own poor decisions if they do not shift the blame implausibly to me with the Defendants' concerted help.

c. Defendant James Risen intentionally omitted several important facts while fabricating defamatory statements and stories about me.

d. The Defendants actually knew that Warren Trepp received most of the money, yet accuse me of fraud to obtain money while excusing politically-connected Warren Trepp who took and kept the money and controlled the company.

e. The Defendants' falsely and misleadingly state that I fabricated intelligence to make money. In fact, eTreppid was paid for software work and analysis, not contingent upon results or conditional upon finding any terrorist threats. Our work was complete and payment due merely for doing the analysis the CIA and other Government officials asked us to do.

f. My software and technology did work, does work, and is still being used successfully by the U.S. Government today.

g. The Defendants actually know that Warren Trepp has never paid back any of

the $30 million that eTreppid received from the U.S. Government nor offered

to pay any of it back nor has the U.S. Government asked for any of the money

back. Therefore, James Risen actually knows that his defamation of me is

false and misleading. If eTreppid received $30 million from the U.S.

Government for the use of my software and technology that was a purported

fraud or a hoax, eTreppid would have to pay the money back to the U.S.

Government. But the U.S. Government knows that my software and

technology actually worked and works and is valuable, which is why eTreppid

does not have to pay any of the $30 million back.

h. In fact, the Defendants ignore and intentionally omit my ten (10) patent

applications, which attest to and show my expertise.

i. The U.S. Government independently tested and verified the results of my

software and technology and did not rely upon my word alone. The U.S.

Government officials sought me and my technology out.

j. The data detected by my software and technology did predict actual terrorist

incidents and/or meetings in advance.

k. I could not have fabricated intelligence from my work, as Defendants defame

me, without being certain that no one else would independently verify my

work in any number of other ways available to the CIA, NSA, and military.

l. I and the companies I worked with had equal or better opportunities to provide

my services to private sector companies, and had no need to work for the U.S.

Government to make the same amount of money or less.

m. I was motivated by patriotism, not greed, in turning down equivalent

opportunities to provide services to the private sector to answer requests for help in the war on terror by the U.S. Government.

n.  The Central Intelligence Agency ("CIA") wanted experts to analyze Al Qaeda videos.

o.  It was the CIA who proposed to eTreppid that we would analyze Al Qaeda videos.  The defamation of me states that I fraudulently sold the CIA and U.S. Government on a fantasy using fabricated intelligence.  In fact, the CIA and the U.S. Government approached us with what they wanted analyzed.

p.  The Defendants actually knew that Warren Trepp closed the "sales" of contracts by persuading the U.S. Government, yet falsely accuse me of selling a fantasy of fabricated intelligence to the U.S. Government, while excusing Trepp, as a fraudulent scheme to obtain money.

q.  Defendants' falsely state that I persuaded the President George W. Bush to ban international passenger aircraft from entering U.S. airspace and nearly shoot down passenger aircraft. However, I never provided any interpretation of what the hidden data we uncovered meant.  We merely provided the uncovered data to the U.S. Government experts for their interpretation.  Even when pressed, I refused to offer any national security interpretation of the data.

r.  As obvious from the records and documents that the Defendants rely upon, the Defendants' so-called sources Michael Flynn, Tim Blixseth, and Warren Trepp went to extraordinary and expensive legal and extra-legal (self help) efforts to furiously get ownership of my work as being extremely valuable,

5

while simultaneously stating that my work had no value.

s.   Michael Flynn, Tim Blixseth, and Warren Trepp were attempting to invoke

the fraud exception to bankruptcy laws to invalidate my bankruptcy, and

therefore the Defendants knew that they had motives to fabricate or embellish

their false statements against me.

t.   The public records that the Defendants claim to be relying upon – though

voluminous – overwhelmingly contradict the Defendants defamation of me.

u.   On September  28, 1998, I and Warren Trepp co-founded eTreppid

Technologies ("eTreppid") based on  a "Contribution Agreement" of that date

in which we agreed to own the LLC in equal 50% shares. Trepp put up money

and I conveyed his "software compression technology contained on CD No.

1" to eTreppid. The business plan of eTreppid and the application of the

"compression technology" were to compress VHS videotapes used for

surveillance in casinos for archiving and more efficient storage.  Over the

preceding 20 years I developed and copyrighted other types of software

technology, including but not limited to "Object Detection Software" which is

a crucial component of, among other things, colorizing black and white

movies.  In order for the computer to add color, it must be able to recognize

individual objects in the movie which are moving in three dimensions, (that is

moving toward or away from the camera and changing in apparent size),

aspect angle, orientation, etc.  This was not conveyed to eTreppid and which,

per the terms of the "Contribution Agreement", was expressly excluded.

Shortly after the formation of eTreppid, I offered to sell one part of his

"Object Detection System" ("ODS") software to Warren Trepp for the sum of $10 million dollars, which Trepp rejected.

v. As reflected in a form SF-95 Attachment A prepared by me with my then attorney Michael Flynn for presentation to the Government, "Beginning on or about November 2002, on behalf of the US Air Force, Montgomery began work on military applications of his technology at Eglin Air Force base [in Florida] to demonstrate the application of his technologies in the war on terror."

w. Defendants make the technically absurd and false statement that "The French company said that there were simply not enough pixels in the broadcasts to contain hidden bar codes or unseen numbers," only by falsely misrepresenting that the data was contained only in the "crawl" at the bottom of the screen. This falsified and misleading misdirection and deception to focus only on the crawl is deceptive. It is patently unbelievable, which Defendant Risen should have known as an expert in national security, that a television signal could not contain such simple data as latitude and longitude coordinates, consisting of only six numbers and two letters (East or West longitude, North or South latitude).

8) I am a citizen of the State of Florida, with a residence in an apartment community in Miami, Florida. I have a Florida telephone number in this district. I am reporting my address and Miami-Dade, Florida phone number under seal.

9) I am registered to vote in Florida, as shown in Exhibit 1, attached to this affidavit. I previously had a temporary address while settling on the permanent address that I

7

have now.  I have updated my voter registration to reflect my current Miami address.

10) I have reviewed the affidavit of defense counsel Laura Handman attached to the

Defendants' motion stating that I had not registered to vote in Florida.  The

Defendants' affidavit is false.  I am registered to vote in the State of Florida, and am

now updating my voter registration with my new address. I was registered to vote in

Florida when Ms. Handman signed her affidavit. She misled this Court.

11) I found on the website of the publisher Houghton Mifflin Harcourt, that Houghton

Mifflin Harcourt Publishing Company maintains permanent and general offices in

Orlando, Florida at 9400 Southpark Center Loop, Orlando, Florida 32819. Exhibit 2,

attached to this affidavit, which I downloaded from the Defendant publisher's website

at  http://www.hmhco.com/about-hmh/our-offices.  These are statements made by the

Defendants about themselves.

12) On the website of the Florida Department of State Division of Corporations, I found

that Defendant Houghton Mifflin Publishing Company is registered to do business in

Florida through the Florida Department of State Division of Corporations. Exhibit 3,

attached to this affidavit, which I downloaded from the Florida Department of State's

website.

13) As shown in those Florida Government documents, in 2008 Defendant changed its

name from "Houghton Mifflin Harcourt" to "Houghton Mifflin Publishing

Company." *Id.*  These are statements made by Defendants about themselves.

14) My research of the publisher also uncovered that Defendants rely significantly upon

sales in the Southeast of the United States through a company "Amazon" for very

substantial sales over the internet.  Amazon's regional distribution centers or

"fulfillment centers" are located in Ruskin, Florida in Hillsborough County and Lakeland, Florida, in Polk County.  *See* Exhibit 4, attached to this affidavit.

15) Much of the defamation which my lawsuit contests is contained within the physical product physically shipped into Florida for sale, the Book written by James Risen and published by Houghton Mifflin Harcourt Publishing Company.

16) In 2012, Edra Blixseth brought Chris Pipes, from the U.S. Special Operations Command ("SOCOM") from MacDill Air Force Base in Florida to our Palm Desert offices. SOCOM was interested in pursuing object tracking, mass surveillance, and research on cloaking technologies. Chris Pipes met at our facility, with a representative of the CIA. While he was in our building, Chris Pipes then received a telephone call from SOCOM in Florida, and then told us that SOCOM could not pursue the technology because of what was written about me in the news media. Exhibit 18, attached to this affidavit.

17) SOCOM is the Unified Combatant Command charged with overseeing the various Special Operations Component Commands of the Army, Air Force, Navy and Marine Corps of the United States Armed Forces. The command is part of the Department of Defense and is the only Unified Combatant Command legislated into being by the U.S. Congress. SOCOM is headquartered at MacDill Air Force Base in Tampa, Florida. *See*, Exhibit 12, attached to this affidavit.

18) U.S. Central Command ("CENTCOM") is a theatre-level Unified Combatant Command of the U.S. Department of Defense, established in 1983. CENTCOM Area of Responsibility includes countries in the Middle East, North Africa, and Central Asia, most notably Afghanistan and Iraq. CENTCOM has been the main American

presence in many military and intelligence operations. It is headquartered in Tampa, Florida. *See*, Exhibit 12, attached to this affidavit.

19) The Defendant author James Risen actually knew or should have known that most of my work was with U.S. Government organizations in Florida and the contracting offices for my work are in Florida. A competent Pulitzer Price winning <u>New York Times</u> reporter who wrote the Book over a four-year period from 2011 through 2014 would have reviewed the <u>Wall Street Journal</u> article from November 1, 2006, attached, which includes the explanation:

### Source of Secret Funds

**One source of secret funds for eTreppid and other companies is the Special Operations Command. Based in Tampa, Fla., the command fields special-operations military and intelligence forces around the globe and is at the forefront of the fight in Iraq and Afghanistan. It has also been rocked by a criminal investigation of a former contracting officer. The investigation is continuing, according to a spokesman for the U.S. attorney in Tampa.**

In a separate inquiry, Pentagon investigators last year found evidence that the command kept special accounts for "unrequested congressional plus-ups," or earmarks. The plus-ups were used to reward lawmakers with projects in their districts, according to declassified investigators' notes reviewed by <u>The Wall Street Journal</u>. The Pentagon's inspector general closed the inquiry after finding that the accounts weren't illegal.

Mr. Trepp said eTreppid won classified work on its merits and already had a number of government contracts before Mr. Gibbons starting making introductions on the company's behalf. Mr. Gibbons's campaign manager, Robert Uithoven, said the congressman has been a strong supporter of new defense technology, particularly after 9/11. But he said there was "no quid pro quo whatsoever" for contributions from contractors. And while some funding was secret, "it was because of the sensitive nature of the work," Mr. Uithoven said, not to avoid public scrutiny.

> For Mr. Trepp, eTreppid's success at winning multimillion-dollar
> federal contracts marks a comeback from his Drexel days. He sat at
> Mr. Milken's right arm on the firm's famous X-shaped trading desk
> in Beverly Hills, sometimes trading as much as $2 billion in
> securities a day. Federal regulators filed a civil securities-fraud
> claim against him in 1995, and a Securities and Exchange
> Commission administrative judge found that his violations had
> been "egregious, recurring and intentional." But she dismissed the
> proceeding against him, noting that the allegations were old and he
> had left the securities business years earlier. (Emphasis added).

20) This article and dozens of others, as well as court documents, caused Risen to know

or he should have known upon reasonable inquiry over four years that Warren Trepp

was furiously trying to take ownership of my software and technology, which directly

calls into question his self-serving false statements that the software and technology

he was trying to acquire rights to was worthless.  The same article also reports:

> Mr. Gibbons also got other, unreported gifts of cash and casino
> chips from Mr. Trepp, according to sworn testimony in a civil
> lawsuit brought by a former executive at eTreppid, Dennis
> Montgomery. The suit, filed in February in federal court in Reno,
> involves a dispute between Messrs. Trepp and Montgomery over
> the rights to certain software code . . .
>
> The suit has raised alarms in Washington because of concern that
> national secrets will be revealed if it goes to trial. For example, one
> of the entities that funded eTreppid is code-named Big Safari and
> is a classified program, documents in the case show. The nation's
> top intelligence official, John D. Negroponte, recently filed a
> statement with the court seeking to seal the case. He wrote that
> after personally reviewing the matter, he has concluded that
> disclosure of some information connected with the case could do
> "exceptionally grave damage" to national security.

21) My greatest opportunities for employment, business, and/or an income are at either

Macdill Air Base near Tampa, Florida and Eglin Air Force Base near Fort Walton

Beach, Florida, which is at the center of U.S. Government intelligence and

counterterrorism operations. *See* Exhibit 12, attached to this affidavit.

11

22) As a result, I have settled in Florida not just for professional reasons but also because of my failing health and desire to enjoy Florida at this stage in my life. Florida has no personal income tax as well as a Homestead exception should I buy a home. Florida is a great place to live.

23) In 2011, I incorporated a business with a partner in Florida to contract with the military and U.S. Government at bases in Florida to continue the same type of services and software and technological work that I had performed under eTreppid and BLXWARE.  This business was named Alex James LLC, which I incorporated through the "Legal Zoom" service company. I set up the articles of incorporation, paid for and set up this company. Judy Crowhurst is the woman I chose to run it. Exhibit 17, attached to this affidavit.

24) Exhibit 5, attached to this affidavit, presents the papers I processed through the "Legal Zoom" company and my payment information paying for the company in Florida in 2011.

25) As an expert in national security issues, Defendant James Risen knows that the war in Afghanistan was and is run largely from Florida electronically and by drone controllers located in Florida. For instance, following September 11, 2001, General Tommy Franks rarely set foot in Afghanistan and fought the war from U.S. Air Force Bases in Florida, including from SOCOM and CENTCOM. This explains my work with SOCOM and CENTOM in large part and why it continued there.

26) Defendant James Risen also knows that the U.S. military leadership and personnel are concentrated mainly in Florida. Because U.S. military servicemen can choose their state of residence despite being deployed elsewhere, Florida's lack of an income tax

makes Florida a very attractive State for U.S. servicemen, often poorly paid.  As a result, most of the nation's top military leaders, current and former servicemen, chose Florida as their residency.

27) Defendant Risen knew in publishing the Book that Florida is an enormous market as the nation's now third largest State, including Florida's significant military and intelligence and counterterrorism personnel, with many retirees (including retired U.S. Government employees in the military and intelligence fields) with more time to read books than the average American. For instance, former Secretary of Defense Donald Rumsfeld now lives in Florida, as well as former Chairman of the U.S. Senate Intelligence Committee and CIA Director Porter Goss, who lives in Miami.

28) The team on which I worked had contracts directly with the intelligence agencies at the military bases **in Florida**.  I have video showing the work.  The contracting officers are out of those military bases, many of which are classified. I met and worked with CIA officials in Florida at various military bases.  However, I cannot identify here the exact units stationed at those bases, which is classified information. Exhibit 19, attached to this affidavit.

29) We at eTreppid and later BLXWARE did most of our work with units stationed at MacDill Air Force Base and Eglin Air Force Base, whose identity is secret.  *See* February 14, 2004, "Order for Supplies or Services" attached, with the "Ship To" address of UQ USSOCOM/SOAL-SP (Mohr), 7701 Tampa Point Boulevard, MacDill Air Force Base, Florida 33621.

30) Most of the payments for our work, the work I did for eTreppid and later BLXWARE, came out of the CIA offices in Florida and SOCOM, the U.S. Special

Operations Command of the U.S. military at Macdill Air Force Base, Florida.

31) SOCOM of the U.S. military is located at 7701 Tampa Point Boulevard, MacDill Air Force Base, Florida. *See* Exhibit 6, attached to this affidavit.

32) CENTCOM of the U.S. military is located at MacDill Air Force Base near Tampa, Florida. *See* Exhibit 7, attached to this affidavit.

33) Relating to my work conducting surveillance of international communications, major fiber optics cables run from Florida across the ocean, which is partly why my work opportunities for my experience and capabilities are in Florida.

34) I intend to call witnesses who can testify that my defamed software and technology does indeed work and is not a hoax. These witnesses are personnel based at Macdill Air Base near Tampa, Florida and at Eglin Air Force Base near Fort Walton Beach, Florida, where I did a lot of his work. The organizational units housed at Macdill and Eglin used my software, technology, and work extensively during the time period addressed by Defendants' defamation of me. Those witnesses will testify and thus help me prove that the defamatory statements about me are indeed false and misleading.

35) Relevant officials at Macdill and Eglin (and all facilities that my work has provided services to anywhere) make their own contracting decisions and do not rely upon contracting offices in Washington, D.C., nor even at the CIA in Langley, Virginia, the Pentagon in Arlington, Virginia, or the NSA in Fort Meade, Maryland.

36) Many of the witnesses in this case, with whom I have worked, are largely in Florida, including, but not limited to:

    Goss, Porter, former Director of CIA, now in Miami, Florida

14

Johns, Ken, Macdill AFB, Florida

Lyons, XXXXX, Macdill AFB, Florida

Macbeth, W. Rhys, Eglin AFB, Florida

Nazelrod, Craig, Eglin AFB, Florida

Pipes, XXXXX, Macdill AFB, Florida

Roche, James, Macdill, Florida

Rumsfeld, Donald, now in Florida

Stillman, Phillip, Attorney for Dennis Montgomery, now in Miami, Florida

Madden, Tom, Boca Raton, Florida

Olivia, Adrian, Eglin AFB, Florida

Bartholomew, Mary L, Eglin AFB, Florida

Fiamengo, Nicholas A, Eglin AFB, Florida

Freeman, Gregory J, Eglin AFB, Florida

Savage, Cynthia, Eglin AFB, Florida

McCool, John C, Eglin AFB, Florida

Temple, James K, Eglin AFB, Florida

Griffin, Susan M., Macdill AFB, Florida

Russell, Deborah, Macdill AFB, Florida

Nettelhorst, Doug M, Macdill AFB, Florida

Stallworth, Hugh T, Macdill AFB, Florida

Bob McCaskey, Macdill AFB, Florida

Crutchfield, Chris, Macdill AFB, Florida

Melnyk, Michael S., Macdill AFB, Florida

Lopez, Tina M, Macdill AFB, Florida

Cerny, Jeffrey D., Macdill AFB, Florida

Muccio, Anthony B., Eglin AFB, Florida

McKinney, Scott E Lt.Col., Eglin AFB, Florida

Purvis, Brad Civ, Eglin AFB, Florida

'Kirsch, Jim', Eglin AFB, Florida

Hughes, Stacey L, Eglin AFB, Florida (*See* Exhibit 13, attached to this affidavit).

37) Ultimately, I became aware that James Risen had published these false reports in the Book and that Risen was conducting a nationwide publicity campaign to sell the Book.

38) I heard and watched James Risen repeatedly in national and radio interviews discussing his book but primarily about me, mostly ignoring and intentionally omitting the rest of his Book in those interviews while attacking and defaming me as a private individual.

39) In radio, television, and newspaper interviews, James Risen mainly focused on slandering me in order to sell the Book in Florida and elsewhere.

40) Risen's appearances on radio and television were not just commentary but attempts to stimulate the sale of books inside Florida and elsewhere.

41) Risen was speaking on the radio and television shows in order to move books off of Florida bookstore shelves and to the checkout counters in Florida and elsewhere.

42) The defamation by Defendants of me is not a criticism of the U.S. Government in the District of Columbia, but *excuses* the U.S. Government as an innocent and unsuspecting victim, while blaming me. Therefore, the U.S. Government has not

suffered harm within Washington, D.C.

43) I had relatively little contact with the U.S. Government in Washington, D.C., Maryland or Virginia. It was the companies that I worked under, eTreppid and later BLXWARE, who contracted with regional offices at various U.S. Government bases or facilities. I interacted almost entirely with technical people pursuant to the contracts.

44) It was Warren Trepp and later Edra Blixseth who used their contacts with the U.S. Government to seek and arrange contracts for our work. I did not persuade the U.S. Government to hire me, Trepp and Blixseth did. My own interaction with offices or officials in Washington, D.C. was very limited because I was not the one running the companies nor primarily interacting with the U.S. Government.

45) Starting as early as 2011, I was contacted by James Risen asking about my secret work under contract for the U.S. Government in support of anti-terrorism efforts.

46) I see that in James Risen's Declaration attached to the Defendants' Motion to Dismiss, Risen states that he has been working on the Book since 2011.

47) I continually provided numerous warnings, in writing, to James Risen that the false statements he mentioned and later published in October 2014 in the Book are false.

48) However, James Risen attempted to blackmail me by demanding that I provide classified documents and information to him or else he would publish the false and misleading statements that he later did publish in the Book. That is, when I warned him that the reports were false and misleading, James Risen responded to me by telling me that he would not publish those false statements if instead I provided him with classified information and documents. That is, James Risen demanded that I

commit multiple crimes as the price for Risen not publishing the false and misleading reports about me. Of course, I refused to be blackmailed into breaking the law as the price for not being defamed.

49) Writers Aram Roston and James Risen were both after John Brennan's information. They both knew that I had worked for John Brennan. Both wanted his emails.

50) Roston and Risen published false and defamatory information about me to try to pressure me into releasing classified information about John Brennan and others in the war on terror to them as the price for them telling the truth.

51) However, Roston and Risen knew that my work was real and legitimate, because they sought to obtain secret and classified information from Brennan from me.

52) Roston and Risen published defamation about me to punish and pressure me for not illegally disclosing classified information and material to them.

53) In both cases, I told Risen and Roston I would have to turn over classified information, a road I wasn't willing to go down. I was never what they were after. They were writing these stories to hurt me so that I would provide classified information about the various administrations. I was just their pawn.

54) Attached to this affidavit as Exhibit 8 are a few of my communications to James Risen informing him in advance of the publication of the Book that his statements were not only false but preposterous and that his sources were clearly unreliable.

55) In fact, on November 1, 2012, discussing the Book that he was then writing, I warned James Risen under the email address "TheAgencyInsider@Hotmail.com" that his reporting was false including because Warren Trepp was the CEO of eTreppid and kept all the money. *See* Exhibit 8, attached to this affidavit.

56) Risen also promised in that same email thread: "If you give us the Brennan emails, we will write a story." *See* Exhibit 8, attached to this affidavit.

57) However, this response was in the context of a long back-and-forth discussion concerning the falsehood of Risen's false and misleading statements against me.

58) Risen also promised in the attached email thread: "As I said on the phone, I protect my sources. I will never divulge the identify of my sources in a leak investigation. But I also have to know that the source is telling me the truth. Jim"

59) So Risen admitted that it was his professional responsibility to determine that the sources he used to defame me are telling the truth. But Risen did not do that. The sources he relied upon were obviously not telling the truth, as is patently obvious.

60) I warned James Risen concerning the falsehood of his reporting in that November 1, 2012, email thread, attached:

> There is a reason the CIA and NSA were there, you must know that.
>
> Do you really think the government invoked the State Secrets Privilege from being embarrassed or conned? Negroponte in his in camera declaration, if ever released, was spell it all of out.
>
> They government never wanted information to come out regarding the other work. The program started out spying on terrorist, and under Obama quickly moved to spying on Americans!! A program which was started by Brennan in 2003 and continues to this day. This technology is being used today to spy on Americans, including candidate Romney.
>
> I don't see you ever publishing that information? *See* Exhibit 8[1],

attached to this affidavit.

---

[1] While my counsel turned over these initial disclosures to Defendants' counsel, Defendants did not turn over initial disclosure documents to my counsel in violation of the Court's Order of April 1, 2015. I have asked my counsel to file a motion for order to show cause.

61) Furthermore, this November 1, 2012, exchange concerning Risen's plans writing the Book which was eventually published on October 14, 2014, was seven (7) months before the revelations by Edward Snowden that mass surveillance of Americans was occurring. Therefore, Risen actually knew in 2013 that I was telling the truth and was being lied about by his so-called sources. My discussions with James Risen on November 1, 2012, were proven true in mid-2013. Therefore, Risen had actual knowledge that I was indeed a whistleblower and that the sources he relied upon were falsely discrediting me to cover up wrong-doing. In this, of course, Pulitzer Prize winning <u>New York Times</u> reporter James Risen intentionally and falsely omitted the real story.

62) I made it clear to James Risen, in the phone call referenced in the email, that the Obama administration used mass surveillance technology to alter the 2012 election *in* **Florida**, and that they will use the technology again in 2016.

63) In June of 2012, in a telephone call, I told James Risen and Eric Lichtblau that their information about me in their 2011 <u>New York Times</u> story was incorrect, and they needed to correct it. I also made it clear that I was under a federal court Protective Order in Nevada, and a State Secrets Privilege order by the Director of National Intelligence not allowing me to discuss my work. In addition, there were sealed documents still in the Nevada case. I also made it clear, that the State secrets privilege was also issued, to protect the work I did on domestic surveillance. I told them I knew they met with my ex attorney Mike Flynn, for several days, in regards to their story, and suggested, he had other motives for his conduct.

64) I also made it clear in June of 2012 that I had a brain aneurysm that was going to be

repaired soon, and a risky procedure, and wanted my name cleared in case I died.

65) Therefore, the Defendants believed they could get away with their defamation because I would probably die in the meantime.

66) In 2013, going over Risen's and Lichtblau's heads, I sent emails directly to the editors of <u>The New York Times</u> telling them their story was wrong and to retract it.

67) I sent an email to the Editors of <u>The New York Times</u>, demanding that they correct the false reporting about me in 2012.

68) I believe that <u>The New York Times</u> conveyed my emails requesting a retraction of the false statements to James Risen.

69) In 2012-2014, on at least 10 different occasions I made it clear to Aram Roston of Playboy that his story was wrong and told him to retract it.

70) Carlotta Wells, a U.S. Department of Justice attorney assigned to matters involving me, told me that if I talk to the press or leaked information, I will be charged with treason for disclosing my work with the NSA and CIA. She told me when I signed my Top Secret clearance, I forfeited my right to protect my first amendment rights.

71) Carlotta Wells additionally said that "If the US Government wants to leak false information to the press to hide successful work, and to confuse terrorist groups, they will do it irrespective of my rights. Deal with it!"

72) Carlotta Wells also stated to me and Jack Kemp, about my legal matters with the CIA that "I [Carlotta Wells] am just a foot solder doing what I am told of to do from the White House. I don't agree with their strategy, but that is the way it is." Jack Kemp replied, "You are a senior litigation attorney for the DOJ, hard for me to believe that you were listening to them." Carlotta Wells in turn replied "Take it up with you

21

friend George Bush."

73) I am personally aware that, through my counsel, two separate letters were sent to executives at Houghton Mifflin requesting a retraction of the false and misleading publication.

74) The first letter was sent on January 14, 2015 to Linda K. Zecher, President and Chief Executive Officer and Director of Houghton Mifflin Harcourt, William Bayers, Executive Vice President and General Counsel, and Houghton Mifflin Harcourt located in Boston. *See* Exhibit 14, attached to this affidavit.

75) The second letter was sent on February 13, 2015, pursuant to Florida Statute § 770.02 again requesting a retraction of the false and misleading published statements. *See* Exhibit 15, attached to this affidavit.

76) On January 20, 2015, I, through my counsel, received a letter from David Eber, cc'ing James Risen and William Bayers, declining to redact the false and misleading statements and also declining to meet my counsel to resolve matters amicably. *See* Exhibit 16, attached to this affidavit.

I hereby swear under oath and penalty of perjury that the foregoing facts are true and correct to the best of my personal knowledge and belief:

April 27, 2015

//Dennis Montgomery//

Mr. Dennis Montgomery

Case 1:15-cv-01955-JLR Document 2-1 Filed 12/08/15 Page 144 of 271

# Exhibit 1



Voter Registration as of: 4/7/2015    Republican: 4,183,006    Democrat: 4,613,370    Other: 3,212,454    Total: 12,008,830

# Check Your Voter Status

# Verifique su estado como votante

**Below is your voter information as it appears on your voter record.**

**A continuación encontrará sus datos de votante según nuestros registros.**

Full Name
Nombre completo : **DENNIS LEE MONTGOMERY**

Street Address
Dirección : ▮▮▮▮▮▮▮▮

City
Ciudad : **MIAMI**

Zip Code
Código postal : ▮▮▮▮

County Name
Condado : **MIAMI-DADE**

Voter Gender
Género del votante : **Male**

Date Of Registration
Fecha de inscripción : **02/23/2015**

Party
Partido : **Republican Party Of Florida**

Voter Status
Calificación como votante : **Active\***

> **The following 2 links will take you to your County's Supervisor of Elections Website where you can get additional information on:**
>
> **Los siguientes dos vínculos lo conectarán con el Sitio de su Supervisor de Elecciones del Condado para obtener información sobre:**
>
> Your Absentee Ballot Status. / Estado como votante en ausencia. ▮
>
> Your Precinct Location. / Localización de su Distrito. ▮

*An active voter refers to a registered voter who is eligible to vote.
*El votante activo es un votante inscrito en el padrón, que cumple con los requisitos necesarios para votar.

[ New Search / Nueva búsqueda ]

If you are experiencing a problem with this web site please email BVRS Help for assistance.
Si tiene problemas con esta página web por favor contáctese por correo electrónico BVRS Help con la División de Elecciones.
Florida Department of State▮Division of Elections▮Accessibility▮Privacy Policy▮Contact Us

Exhibit 2



# Corporate Headquarters

**Boston**
222 Berkeley Street
Boston, MA 02116
(617) 351-5000

# United States Offices

**Austin**
10801 North Mopac Expressway
Austin, TX 78759
(512) 721-7000

**Denver**
5680 Greenwood Plaza Blvd
Suite 550
Greenwood Village, CO 80111
(303) 504-9312

**Evanston**
909 Davis St # 300
Evanston, IL 60201
(847) 869-2300

**Geneva**
1900 South Batavia Avenue
Geneva, IL 60134-3399
(630) 232-2550

**Indianapolis**
2700 North Richart Avenue
Indianapolis, IN 46219

**Itasca**
761 District Drive
Itasca, IL 60143

**New York City**
215 Park Ave S # 12
New York, NY 10003-1621
(212) 420-5800

345 Seventh Avenue
New York, NY 10001

**Orlando**
9400 Southpark Center Loop
Orlando, FL 32819
(407) 345-2000

**Portsmouth**
361 Hanover Street
Portsmouth, NH 03801

**Puerto Rico**
B7 Calle Tabonuco, Suite 1410
Guaynabo, PR 00968-3003
(787) 520-9599/9585

**Rolling Meadows**
3800 Golf Road
Rolling Meadows, IL 60008
(630) 467-7000

**Troy**
465 South Lincoln Drive
Troy, MO 63379
636-528-8110

**Wilmington**
181 Ballardvale Street
Wilmington, MA 01887
(978) 661-1300

# International Offices

**Canada**
4200 Boulevard St. Laurent
Suite 1203
Montreal, Qc H2W 2R2
Tel: (514) 598-0444

**China**
59 A Zhongguancun Street
Haidian District
Room 1004
HMH
Beijing, 100872
Tel: 86 10 62602236

**Dubai**
Standard Chartered Tower, Level 5
PO 35482, Emaar Square,
Downtown Burj Khalifa
Dubai
United Arab Emirates

**Ireland**
152 – 160 Pearse Street
Dublin 2
Ireland
Tel: +353 1 240 5900

**Singapore**
67 Ubi Road 1
#05-08 Bizhub
Singapore 408730
Tel: +65 6635 6825

**South Korea**
#501 KGIT SangAm Center
1601, SangAm-dong
Mapo-gu, Seoul
123-913, S. Korea
Tel: +82 (0)2 6393
5790/5792

Exhibit 3

Division of Corporations

8 0 3 6 9 5

Page 1 of 1

## Florida Department of State
Division of Corporations
Public Access System

### Electronic Filing Cover Sheet

**Note: Please print this page and use it as a cover sheet. Type the fax audit number (shown below) on the top and bottom of all pages of the document.**

(((H08000044388 3)))



H080000443883ABC2

**Note: DO NOT hit the REFRESH/RELOAD button on your browser from this page. Doing so will generate another cover sheet.**

To:
    Division of Corporations
    Fax Number      : (850)617-6380

From:
    Account Name    : C T CORPORATION SYSTEM
    Account Number  : FCA000000023
    Phone           : (850)222-1092
    Fax Number      : (850)878-5926

## OR AMND/RESTATE/CORRECT OR O/D RESIGN

### HOUGHTON MIFFLIN COMPANY

| Certificate of Status | 0 |
|---|---|
| Certified Copy | 0 |
| Page Count | 03 |
| Estimated Charge | $35.00 |

Electronic Filing Menu        Corporate Filing Menu        Help

FEB 2 1 2008

https://efile.sunbiz.org/scripts/efilcovr.exe                                2/20/2008

## PROFIT CORPORATION
## APPLICATION BY FOREIGN PROFIT CORPORATION TO FILE AMENDMENT TO
## APPLICATION FOR AUTHORIZATION TO TRANSACT BUSINESS IN FLORIDA
(Pursuant to s. 607.1504, F.S.)

### SECTION I
(1-3 MUST BE COMPLETED)

862195

(Document number of corporation (if known)

1. HOUGHTON MIFFLIN COMPANY

(Name of corporation as it appears on the records of the Department of State)

2. Massachusetts                                     3. 03/27/1930

(Incorporated under laws of)          (Date authorized to do business in Florida)

### SECTION II
(4-7 COMPLETE ONLY THE APPLICABLE CHANGES)

4. If the amendment changes the name of the corporation, when was the change effected under the laws of

its jurisdiction of incorporation? 12/12/2007

5. Houghton Mifflin Harcourt Publishing Company

(Name of corporation after the amendment, adding suffix "corporation," "company," or "incorporated," or
appropriate abbreviation, if not contained in new name of the corporation)

(If new name is unavailable in Florida, enter alternate corporate name adopted for the purpose of transacting
business in Florida)

6. If the amendment changes the period of duration, indicate new period of duration.

(New duration)

7. If the amendment changes the jurisdiction of incorporation, indicate new jurisdiction.

(New jurisdiction)

8. Attached is a certificate or document of similar import, evidencing the amendment, authenticated not more than
90 days prior to delivery of the application to the Department of State, by the Secretary of State or other official
having custody of corporate records in the jurisdiction under the laws of which it is incorporated.

(Signature of a director, president or other officer - if in the hands
of a receiver or other court appointed fiduciary, by that fiduciary)

Kathleen    Rideout                           Asst Secretary
(Typed or printed name of person signing)          (Title of person signing)

FL321 - 06/22/2007 C'C Filing Manager Online



*The Commonwealth of Massachusetts*

*Secretary of the Commonwealth*

*State House, Boston, Massachusetts 02133*

William Francis Galvin
Secretary of the
Commonwealth

**February 14, 2008**

TO WHOM IT MAY CONCERN:

I hereby certify that

### HOUGHTON MIFFLIN COMPANY

appears by the records of this office to have been incorporated under the General Laws of this Commonwealth on May 18, 1908.

I also certify that by Articles of Amendment filed here **December 12, 2007**, the name of said corporation was changed to

### HOUGHTON MIFFLIN HARCOURT PUBLISHING COMPANY

I also certify that so far as appears of record here, said corporation still has legal existence.



Processed By crm

In testimony of which,

I have hereunto affixed the

Great Seal of the Commonwealth

on the date first above written.

*William Francis Galvin*

Secretary of the Commonwealth

Exhibit 4



# Amazon confirms fulfillment centers in Ruskin, Lakeland

 **Susan Thurston, Times Staff Writer**

**Tuesday, October 22, 2013 4:56pm**

TAMPA — Online retailer Amazon confirmed Tuesday that it will open a 1-million-square-foot distribution center in Hillsborough County and announced plans for a second, similar warehouse about an hour away in Polk County.

The announcement came nearly two weeks after Hillsborough officials said the retailer had completed a real estate deal for a center in Ruskin, and it ended speculation about whether Amazon wanted two facilities so close to each other.

Amazon said the centers will process different kinds of orders from customers.

The Ruskin center will pick, pack and ship small items, including books, electronics and consumer goods. A center to be located on Lakeland will ship large goods such as kayaks and televisions.

Seattle-based Amazon said it would create more than 1,000 full-time jobs at the centers with health care, stock awards and other benefits. It didn't say when the distribution centers would open or when they would start hiring.

Site work has already begun on the Hillsborough location at Interstate 75 and State Road 674, and at the Lakeland location at 1760 County Line Road.

"We appreciate the state, city and county officials who have worked with us to bring these fulfillment centers to Florida," said a statement from Mike Roth, Amazon's vice president of North America operations. "We're excited to join the community, bringing great jobs and investment to the area."

Gov. Rick Scott announced in June that Amazon would invest $300 million in new warehouses and hire 3,000 people as part of a deal that would eventually require Amazon to charge Florida customers sales tax on purchases. Currently, those taxes are not collected on purchases because Amazon doesn't have a physical presence in the state.

But the issue of online sales taxes is being debated in other states and could be resolved nationally by Congress or courts.

In a statement Tuesday, Scott applauded Amazon for choosing Florida for its new warehouses, known as fulfillment centers.

"I would like to thank Amazon for recognizing that Florida's business-friendly environment we've helped create is the perfect place for their latest expansion," he said.

Case 1:15-cv-01955-JLR Document 21-1 Filed 12/08/15 Page 156 of 448

Amazon spokeswoman Kelly Cheeseman said the centers combined would employ more than 1,000 full-time workers but didn't have an exact figure. Amazon prefers to hire full-time workers but may employ part-timers who request it, she said.

Thousands more could work at the centers as seasonal employees to handle the holiday shopping rush.

Both Hillsborough and Polk counties lured Amazon with financial incentives. Hillsborough approved $6.4 million in property tax breaks over seven years and $1.1 million in payments to Amazon for bringing 375 above-average paying jobs. Polk okayed a $4.5 million package that would require Amazon to create at least 100 high-paying jobs and make a minimum investment of $10 million.

Founded by Jeff Bezos, Amazon is expected to post $75 billion in revenue this year — but not a lot of profit.

Despite its stock reaching a record high, Amazon lost money last year. Analysts expect another loss when the company releases third-quarter results Thursday.

By contrast, McDonald's restaurants this week reported a $1.52 billion profit for the quarter.

*Information from the New York Times supplemented this report.*

**Amazon confirms fulfillment centers in Ruskin, Lakeland 10/22/13**
**Photo reprints | Article reprints**

© 2015 Tampa Bay Times

80          Tweet ⟨ 6          86

Commenting Guidelines          Abuse Policy

Ads by Adblade

# Articles and offers from around the Web

Case 1:15-cv-01955-JLR Document 2-1 Filed 12/08/15 Page 156 of 271

# Exhibit 5

🖶 Print

# legalzoom

## RECEIPT

| | |
|---|---|
| **Order Confirmation Number:** | 27340424 |
| **Date of Purchase:** | 09-01-2011 |
| **Grand Total:** | $612.00 |

| Order Summary | Amount |
|---|---|
| **Express Gold LLC ~ Alex James LLC** | $359.00 |
|     Filed Articles of Organization | Included |
|     Operating Agreement | Included |
|     Corporate Kit | Included |
|     Priority Rush Service | Included |
|   FL State-required filing fee | $155.00 |
|   Tax ID Obtainment | $49.00 |
|   Two-Day Delivery (Two Business Days) | $0.00 |
| **30-Day Trial of Business Advantage Pro** | $0.00 |
|     BAP Member Center Access | Included |
|     Access to Forms Library | Included |
| **State Tax ID** | $49.00 |
|   Standard Shipping | $0.00 |
| **Registered Agent Fee (One Month Free)** | $0.00 |
| **Total Charges:** | $612.00 |

| Contact Info | Shipping Info |
|---|---|
| Dennis Montgomery | Dennis Montgomery |
| 760.799.5908 | 760.799.5908 |
| dennis@ncoder.net | dennis@ncoder.net |
| 75180 Mediterranean | 75180 Mediterranean |
| Palm Desert, CA 92211 | Palm Desert, CA 92211 |

### Payments & Credits

| Date | Transaction | Payment Method | Payment Status | Amount |
|---|---|---|---|---|
| 9/1/11 | Initial Payment | Charge To Visa Card xxxx0790 | Approved | $612.00 |
| | | | **Total Payment/Credits:** | $612.00 |
| | | | **Customer Balance Due:** | $0.00 |

# Exhibit 6

Case 2:15-cv-01955-JEB   Document 2-1   Filed 12/08/15   Page 160 of 448

Search

ABOUT     FORCE & FAMILY     NEWS & PUBS     CARE COALITION     ACQUISITION





### Healing Afghanistan: A Soldier's Story

JUNCTION, Texas – More than 10,000 miles away from home, four Afghan National Army wounded soldiers sit with their sergeant major and some American men and women in the heart land of America for a weeklong seminar, March 31- April 3, 2015, to learn skills that will better enable them to take care of their Afghan brothers wounded in combat.








CULTURAL SUPPORT PROGRAM     THE PARA-COMMANDOS     PRESERVATION OF THE FORCE & FAMILY

    

Headquarters, United States Special Operations Command
7701 Tampa Point Boulevard
MacDill Air Force Base, Florida 33621

**Service Links**
Army | Navy | Air Force | Marines

**USSOCOM Links**
Contact | Employment | FOIA | Accessibility/Section 508 | Privacy Policy

**Common Access Card (CAC) Required Links**
SOF Portal | USSOCOM Web Mail | Concord Residences | USSOCOM Lessons Learned | SO-P Equipment Help Desk | SOCOM Training Portal

Exhibit 7

# UNITED STATES CENTRAL COMMAND

EGYPT | IRAN | IRAQ | JORDAN | KAZAKHSTAN | KUWAIT | KYRGYZSTAN
SYRIA | TAJIKISTAN | TURKMENISTAN | U.A.E. | UZBEKISTAN | SAUDI ARABIA

Home | Contact Us

## Contact Us

**U.S. Central Command**
*Address:*

7115 South Boundary Boulevard
MacDill AFB, FL
33621-5101
USA

*MacDill AFB Base Operator*
(813) 828-1110

*MacDill AFB Base Locator:*
(813) 828-2444

**Central Command Communications Integration Public Affairs (CCCI PA)**
*For Public Affairs*
(813) 529-0214
DSN: (312) 529-0214

*For Media Queries*
(813) 529-0220
(813) 529-0213
After hours: (813) 966-8937

*For Community Relations Questions*
(813) 529-0235
(813) 529-0218

**CENTCOM Reserve Affairs**
Army: (813) 529-1074
Air Force: (813) 529-1004
Marine Corps: (813) 529-1088
Navy: (813) 529-1098

**CENTCOM Inspector General**
(813) 529-0275

**MacDill AFB Public Affairs**
(813) 828-2215

**ISAF Public Affairs**

*ISAF HQ Public Affairs Office in Kabul*

pressoffice@hq.isaf.nato.int

+93 (0) 700 13 - 2114 / 2928 / 2482

*ISAF Joint Command Public Affairs Office*

ijc.media@afghan.swa.army.mil

jcmediaopsnu@apod-kaia.isaf.nato.int

+93 (0) 799 51 3999 (Wait For Voice Prompt) 688-4441/4447

+93 (0) 701 13 2000 (Wait For Voice Prompt) 318-449-9244/9153/9154

*NATO Public Information Office*

Media Operations Center

NATO Headquarters

Blvd Leopold III

1110 Brussels, Belgium

moc.web@hq.nato.int

---

**U.S. Department of Defense**

*Public Affairs*

703-697-5131

# Exhibit 8

| | |
|---|---|
| **From:** | james_risen |
| **To:** | Sectec Astronomy |
| **Subject:** | Re: Agency |
| **Date:** | Thursday, November 01, 2012 1:44:59 PM |

If you give us the Brennan emails, we will write a story

On Thu, Nov 1, 2012 at 4:34 PM, Sectec Astronomy <theagencyinsider@hotmail.com> wrote:

> Hard to imagine that you guys would ever report on anything negative regarding Obama?
>
> DM made it clear who was at the building, and why they were all there.  There is a reason the CIA and NSA were there, you must know that.
>
> Do you really think the government invoked the State Secrets Priviledge from beiing embarrassed or conned?  Negroponte in his in camera declaration, if ever released, was spell it all of out.
>
> They governemnt never wanted information to come out regarding the other work.  The program started out spying on terrorist, and under Obama quickly moved to spying on Americans!!  A program which was started by Brennan in 2003 and continues to this day.  This technology is being used today to spy on Americans, including candidate Romney.
>
> I don't see you ever publishing that information?
>
> ---
>
> Date: Thu, 1 Nov 2012 16:07:07 -0400
>
> Subject: Re: Agency
> From: jrisen31@gmail.com
> To: theagencyinsider@hotmail.com
>
> Hi. As you recall, we had a very long phone conversation recently where we discussed how it would be good to report on many of the things that we didn't report on previously. I would like to include all of the points that you have raised in my book, and also to write about many of these issues in the newspaper. For the newspaper, I am particularly interested in the issue of Brennan, and his emails and related documents, which you said when we last talked that you might be willing to share with me. So I am open to discussing everything with you.
> Jim
>
> On Thu, Nov 1, 2012 at 3:58 PM, Sectec Astronomy <theagencyinsider@hotmail.com> wrote:
>
>> You didn't answer my question:
>>
>> *You reported on FBI documents, as if they were accurate, when that the Judge tossed out all of the claims in their report. The FBI refused to produce any of the people in their report for examination by the court. That include Daniel Bogden, who was reinstated by Obama as the US Attorney for Nevada.*

*Why did you not mention in your story Judge Cooke scathing report against the Warren Trepp, FBI, and other government officials? Judge Cooke reported that DM had his 4th admendment constituional rights violated?*

How can I ever trust that you will report accurate information when your prior story was based on information provided to you by Mike Flynn my ex attorney?

---

Date: Thu, 1 Nov 2012 15:21:02 -0400

Subject: Re: Agency
From: jrisen31@gmail.com
To: theagencyinsider@hotmail.com

I have tried West and Venables.  I am writing a chapter in my book about all this largely because we weren't able to tell much of the story in the paper. I would like your input, and your voice in the chapter.

On Thu, Nov 1, 2012 at 3:16 PM, Sectec Astronomy
<theagencyinsider@hotmail.com> wrote:

> DM doesn't need another hachet job on him.  Have you
> tried Agent West or Sloan Venables?
>
> You reported on FBI documents, as if they were accurate,
> when that the Judge tossed out all of the claims in their
> report.  The FBI refused to produce any of the people in
> their report for examination by the court.  That include
> Daniel Bogden, who was reinstated by Obama as the US
> Attorney for Nevada.
>
> Why did you not mention in your story Judge Cooke
> scathing report against the Warren Trepp, FBI, and other
> government officials?  Judge Cooke reported that DM had
> his 4th admendment constituional rights violated?
>
> This is so much you guys missed.

---

Date: Thu, 1 Nov 2012 14:54:31 -0400

Subject: Re: Agency
From: jrisen31@gmail.com
To: theagencyinsider@hotmail.com

Well, I would like to write more about him and everyone else involved in my book now.

On Thu, Nov 1, 2012 at 12:51 PM, Sectec Astronomy <theagencyinsider@hotmail.com> wrote:

His role?  He is the CEO of eTreppid.  He got all of the money.  Why was he not in your story?

Date: Thu, 1 Nov 2012 12:36:09 -0400

Subject: Re: Agency
From: jrisen31@gmail.com
To: theagencyinsider@hotmail.com

I have tried to talk to Warren Trepp. If you have any information about his role, I would like to talk to you about it.

On Thu, Nov 1, 2012 at 12:18 PM, Sectec Astronomy <theagencyinsider@hotmail.com> wrote:

Why have you not chased the money, and contacted Warren Trepp who kept all of the money? I don't get that?

Date: Thu, 1 Nov 2012 11:41:01 -0400

Subject: Re: Agency
From: jrisen31@gmail.com
To: theagencyinsider@hotmail.com

Both. We discussed how you have information that would be very good for a story about his involvement.
But I also want to talk to you more generally about your experiences and work during the war on terror.
On Thu, Nov 1, 2012 at 10:55 AM, Sectec Astronomy <theagencyinsider@hotmail.com> wrote:

Is talking to me or Brennan emails what your after?

What other information are you after?

Date: Wed, 31 Oct
2012 23:25:56 -0400

Subject: Re: Agency
From:
jrisen31@gmail.com
To:
theagencyinsider@hotmail.com


I thought what we
discussed before was
really interesting, and I
would like to continue
our discussion. As I
mentioned, I am
writing about it in my
book, and I would like
to talk to you for
that.But I would also
like to talk about what
you said about
Brennan and the White
House.

On Wed, Oct 31, 2012
at 7:06 PM, Sectec
Astronomy
<theagencyinsider@hotmail.com
> wrote:

> Regarding?
> So DM
> get attack
> in another
> article?

> _____

> Date: Wed,
> 31 Oct
> 2012
> 16:47:58 -
> 0400

> Subject:
> Re:
> Agency
> From:
> jrisen31@gmail.com

> To:
> theagencyinsider@hotmail.com

Hi. Can we talk?
Jim Risen

On Fri, Oct 5, 2012 at 6:51 PM, Sectec Astronomy <theagencyinsider@hotmail.com> wrote:

I guess you can investigate what I disclosed and then decide.

Date: Fri, 5 Oct 2012 18:47:34 -0400

Subject: Re: Agency

From: jrisen31@gmail.com

To: theagencyinsider@hotmail.com

As I said on the phone, I

protect my sources. I will never divulge the identify of my sources in a leak investigation. But I also have to know that the source is telling me the truth.

Jim

On Fri, Oct 5, 2012 at 5:51 PM, Sectec Astronomy <theagencyinsider@hotmail.com> wrote:

Before documents are sent,

you
agree
that
you
will
protect
Dennis
Montgomery
as
a
protected
source.
If
the
US
Government
attacks
Dennis
Montgomery
you,
and
your
organization
will
do
everything
possible
to protect
and
defend
Dennis
Montgomery.
Agreed.

.

Date:
Fri,
5
Oct
2012
17:32:30
-
0400

Subject:
Re:
Agency

From:
jrisen31@gmail.com

To:
theagencyinsider@hotmail.com

got
it,
thanks

Jim
Risen

On
Fri,
Oct
5,
2012
at
5:11
PM,
Sectec
Astronomy
<theagencyinsider@hotmail.com
>
wrote:

> This
> is
> my
> email
> address…

Case 1:15-cv-01955-JLR Document 2-1 Filed 12/08/15 Page 172 of 271

Exhibit 9



**SWEDISH** MEDICAL CENTER

May 27, 2014

Re: Dennis Lee Montgomery (DOB 7/11/1953)

To Whom It May Concern:

Mr. Dennis Montgomery underwent aneurysm surgery on 5/16/2014 that was unfortunately complicated by multi-infarct strokes with resultant severe left sided weakness and impaired vision. He is currently on the Swedish inpatient rehab unit and will be here until at least late June 2014. He will not be able to testify out of state as a result of his current disability.

Please feel free to contact me if you have any questions.

Sincerely,

**Paul Chuwn Lim, MD**
Medical Director of Swedish Rehabilitation Services
Swedish Physical Medicine and Rehabilitation
1600 E Jefferson Street, Suite #600 | Seattle, WA 98122
(clinic) 206-320-2600 | (fax) 206-320-4054

Exhibit 10



**SWEDISH** MEDICAL CENTER

January 6, 2015

Re: Dennis Lee Montgomery  (DOB 7/11/1953)

To Whom It May Concern:

Mr. Dennis Montgomery unfortunately sustained recent multi-infarct strokes with resultant severe left sided weakness and impaired vision.  He completed Swedish inpatient rehab unit under my guidance on 6/21/2014.  He is now in outpatient PT, OT to work on ongoing left sided weakness and speech therapy for stroke related cognitive and memory impairments along with swallowing difficulties.  He has severe left shoulder pain impacting his stroke recovery.  He will also undergo neuropsychological testing to evaluate his cognitive strengths and weakness.

Lastly, he is having false visual imagery related to his stroke and is being followed by neuro-ophthalmology with Dr. Eugen May.

Please feel free to contact me if you have any questions.

Sincerely,

**Paul Chuwn Lim, MD**
Medical Director of Swedish Rehabilitation Services
Swedish Physical Medicine and Rehabilitation
1600 E Jefferson Street, Suite #600 | Seattle, WA 98122
(clinic) 206-320-2600 | (fax) 206-320-4054

Exhibit 11

# Joe Eskridge, M.D.

Swedish  Neuroscience Institute
550 17th Ave #500
Seattle WA 98122
206.320.4144

June 27, 2014

To Whom It May Concern

Dear Sirs,

I, Dr. Joe Eskridge recently treated Dennis Montgomery who is a 60 year old man who suffered from a cerebral aneurysm.  His aneurysm was detected in 2011.  He does not smoke and does not have any congenital blood vessel diseases that contribute to aneurysm development.

High blood pressure can accelerate aneurysm growth and increase the risk of rupture and stroke.  Stress can increase blood pressure and contribute to aneurysm growth.  On a more probable than not basis stress related hypertension caused the development and growth of his aneurysm.

I have performed over 5000 brain artery repair and embolization procedures over the past 30 years.  I was Professor of Radiology and Neurosurgery at the University of Washington Medical School from 1987-2004.

Sincerely yours,

Joe Eskridge, M.D.

Exhibit 12



# United States Special Operations Command

From Wikipedia, the free encyclopedia

The **United States Special Operations Command** (USSOCOM or SOCOM) is the Unified Combatant Command charged with overseeing the various Special Operations Component Commands of the Army, Air Force, Navy and Marine Corps of the United States Armed Forces. The command is part of the Department of Defense and is the only Unified Combatant Command legislated into being by the U.S. Congress. USSOCOM is headquartered at MacDill Air Force Base in Tampa, Florida.

The idea of a unified special operations command had its origins in the aftermath of Operation Eagle Claw, the disastrous attempted rescue of hostages at the American embassy in Iran in 1980. The ensuing investigation, chaired by Admiral James L. Holloway III, the retired Chief of Naval Operations, cited lack of command and control and inter-service coordination as significant factors in the failure of the mission.[2] Since its activation on 16 April 1987, U.S. Special Operations Command has participated in many operations, from the 1989 invasion of Panama to the ongoing Global War on Terrorism.[3][4]

USSOCOM conducts several covert and clandestine missions, such as direct action, special reconnaissance, counter-terrorism, foreign internal defense, unconventional warfare, psychological warfare, civil affairs, and counter-narcotics operations. Each branch has a Special Operations Command that is unique and capable of running its own operations, but when the different special operations forces need to work together for an operation, USSOCOM becomes the joint component command of the operation, instead of a SOC of a specific branch.[5]



**United States Special Operations Command (USSOCOM)**

United States Special Operations Command Emblem

| | |
|---|---|
| Active | April 16, 1987 – present[1] |
| Country | United States of America |
| Type | Special operations |
| Role | Provide fully capable special operations forces to defend the United States and its interests and plan and synchronize operations against terrorist networks[1] |
| Size | 63,000[1] |
| Part of | Department of Defense |
| Garrison/HQ | MacDill AFB, Florida, U.S. |
| Nickname | "USSOCOM", "SOCOM" |
| Engagements | Operation Earnest Will Invasion of Panama Persian Gulf War Unified Task Force Operation Gothic Serpent<br><br>• Battle of Mogadishu<br><br>Operation Uphold Democracy Global War on Terrorism<br><br>• War in Afghanistan<br>• Iraq War |

**Commanders**

| | |
|---|---|
| Current commander | General Joseph L. Votel[1] |

## Contents

- 1 History
    - 1.1 Operation Earnest Will
    - 1.2 Somalia
    - 1.3 Iraq
- 2 Current role
    - 2.1 War in Afghanistan
    - 2.2 Global presence
- 3 Subordinate Commands
    - 3.1 Joint Special Operations Command
    - 3.2 Special Operations Command – Joint Capabilities
    - 3.3 Army
    - 3.4 Navy
    - 3.5 Air Force
    - 3.6 Marine Corps
- 4 List of USSOCOM Combatant Commanders
- 5 USSOCOM medal
- 6 See also
- 7 References
    - 7.1 Citations
    - 7.2 Bibliography
- 8 External links

## History

The unworkable command and control structure of separate U.S. military special operations forces (SOF), which led to the failure of Operation Eagle Claw in 1980, highlighted the need within the Department of Defense for reform and reorganization. Since the incident, the Army Chief of Staff, General Edward C. "Shy" Meyer, called for a further restructuring of special operations capabilities, eventually helping to create the U.S. Delta Force.[6] Although unsuccessful at the joint level, Meyer nevertheless went on to consolidate Army SOF units under the new 1st Special Operations Command in 1982, a significant step to improve the U.S. Army's SOF.

By 1983, there was a small but growing sense in the Congress for the need for military reforms. In June, the Senate Armed Services Committee (SASC) began a two-year-long study of the Defense Department, which included an examination of SOF spearheaded by Senator Barry Goldwater (R-AZ). With concern mounting on Capitol Hill, the Department of Defense created the Joint Special Operations Agency on 1 January 1984; this agency, however, had neither operational nor command authority over any SOF.[7][8] The Joint Special Operations Agency thus did little to improve SOF readiness, capabilities, or policies, and therefore was insufficient. Within the Defense Department, there were a few staunch SOF supporters. Noel Koch, Principal Deputy Assistant Secretary of Defense for International Security Affairs, and his deputy, Lynn Rylander, both advocated SOF reforms.[9]

At the same time, a few on Capitol Hill were determined to overhaul United States Special Operations Forces. They included Senators Sam Nunn (D-GA) and William Cohen (R-ME), both members of the Armed Services Committee, and Representative Dan Daniel (D-VA), the chairman of the United States House Armed Services Subcommittee on Readiness. Congressman Daniel had become convinced that the U.S. military establishment was not interested in special operations, that the country's

capability in this area was second rate, and that SOF operational command and control was an endemic problem.[9] Senators Nunn and Cohen also felt strongly that the Department of Defense was not preparing adequately for future threats. Senator Cohen agreed that the U.S. needed a clearer organizational focus and chain of command for special operations to deal with low-intensity conflicts.[7]



In October 1985, the Senate Armed Services Committee published the results of its two-year review of the U.S. military structure, entitled "Defense Organization: The Need For Change."[10] Mr. James R. Locher III, the principal author of this study, also examined past special operations and speculated on the most likely future threats. This influential document led to the Goldwater-Nichols Defense Reorganization Act of 1986.[11][12] By spring 1986, SOF advocates had introduced reform bills in both houses of Congress. On 15 May, Senator Cohen introduced the Senate bill, co-sponsored by Senator Nunn and others, which called for a joint military organization for SOF and the establishment of an office in the Defense Department to ensure adequate funding and policy emphasis for low-intensity conflict and special operations.[13] Representative Daniel's proposal went even further—he wanted a national special operations agency headed by a civilian who would bypass the Joint Chiefs and report directly to the Secretary of Defense; this would keep Joint Chiefs and the Services out of the SOF budget process.[8]

Senator Barry Goldwater, Former Chairman of the Senate Armed Services Committee

Congress held hearings on the two bills in the summer of 1986. Admiral William J. Crowe Jr., Chairman of the Joint Chiefs of Staff, led the Pentagon's opposition to the bills. He proposed, as an alternative, a new Special Operations Forces command led by a three-star general. This proposal was not well received on Capitol Hill—Congress wanted a four-star general in charge to give SOF more clout. A number of retired military officers and others testified in favor of the need for reform.[9] By most accounts, retired Army Major General Richard Scholtes gave the most compelling reasons for change. Scholtes, who commanded the joint special operations task force in Grenada, explained how conventional force leaders misused SOF during the operation, not allowing them to use their unique capabilities, which resulted in high SOF casualties. After his formal testimony, Scholtes met privately with a small number of Senators to elaborate on the problems that he had encountered in Grenada.[14]

Both the House and Senate passed SOF reform bills, and these went to a conference committee for reconciliation. Senate and House conferees forged a compromise. The bill called for a unified combatant command headed by a four-star general for all SOF, an Assistant Secretary of Defense for Special Operations and Low-Intensity Conflict, a coordinating board for low-intensity conflict within the National Security Council, and a new Major Force Program (MFP-11) for SOF (the so-called "SOF checkbook").[15][16] The final bill, attached as a rider to the 1987 Defense Authorization Act, amended the Goldwater-Nichols Act and was signed into law in October 1986. Congress clearly intended to force DOD and the Administration to face up to the realities of past failures and emerging threats. DOD and the Administration were responsible for implementing the law, and Congress subsequently had to pass two additional bills to ensure proper implementation.[9] The legislation promised to improve SOF in several respects. Once implemented, MFP-11 provided SOF with control over its own resources, better enabling it to modernize the force. Additionally, the law fostered interservice cooperation: a single commander for all SOF promoted interoperability among the forces assigned to the same command. The establishment of a four-star Commander in Chief and an Assistant Secretary of Defense for Special Operations and Low Intensity Conflict eventually gave SOF a voice in the highest councils of the Defense Department.[15]



General James Lindsay the first Commander in Chief, Special Operations Command

Implementing the provisions and mandates of the Nunn-Cohen Act, however, was neither rapid nor smooth. One of the first issues to surface was appointing an ASD (SO/LIC), whose principal duties included monitorship of special operations activities and low-intensity conflict activities of the Department of Defense. The Congress even increased the number of assistant secretaries of defense from 11 to 12, but the Department of Defense still did not fill this new billet. In December 1987, the Congress directed Secretary of the Army John O. Marsh to carry out the ASD (SO/LIC) duties until a suitable replacement was approved by the Senate. Not until 18 months after the legislation passed did Ambassador Charles Whitehouse assume the duties of ASD (SO/LIC).[17]

Meanwhile, the establishment of USSOCOM provided its own measure of excitement. A quick solution to manning and basing a brand new unified command was to abolish an existing command. United States Readiness Command (USREDCOM), with an often misunderstood mission, did not appear to have a viable mission in the post Goldwater-Nichols era, and its Commander in Chief, General James Lindsay, had had some special operations experience. On 23 January 1987, the Joint Chiefs of Staff recommended to the Secretary of Defense that USREDCOM be disestablished to provide billets and facilities for USSOCOM. President Ronald Reagan approved the establishment of the new command on 13 April 1987. The Department of Defense activated USSOCOM on 16 April 1987 and nominated General Lindsay to be the first Commander in Chief Special Operations Command (USCINCSOC). The Senate accepted him without debate.[9]

## Operation Earnest Will

USSOCOM's first tactical operation involved SEALs, Special Boat Teams (SBT), and 160th Special Operations Aviation Regiment (Airborne) ("Night Stalkers") aviators working together during Operation Earnest Will in September 1987. During Operation Earnest Will, the United States ensured that neutral oil tankers and other merchant ships could safely transit the Persian Gulf during the Iran–Iraq War. Iranian attacks on tankers prompted Kuwait to ask the United States in December 1986 to register 11 Kuwaiti tankers as American ships so that they could be escorted by the U.S. Navy. President Reagan agreed to the Kuwaiti request on 10 March 1987, hoping it would deter Iranian attacks.[9] The protection offered by U.S. naval vessels, however, did not stop Iran, which used mines and small boats to harass the convoys steaming to and from Kuwait. In late July 1987, Rear Admiral Harold J. Bernsen, commander of the Middle East Force, requested NSW assets. Special Boat Teams deployed with six Mark III Patrol Boats and two SEAL platoons in August.[9] The Middle East Force decided to convert two oil servicing barges, Hercules and Wimbrown VII, into mobile sea bases. The mobile sea bases allowed SOF in the northern Persian Gulf to thwart clandestine Iranian mining and small boat attacks.



MH-60 landing on Hercules

On 21 September, Nightstalkers flying MH-60 and Little Birds took off from the frigate USS Jarrett to track an Iranian ship, the Iran Ajr. The Nightstalkers observed the Iran Ajr turn off its lights and begin laying mines. After receiving permission to attack, the helicopters fired guns and rockets, stopping the ship. As the Iran Ajr's crew began to push mines over the side, the helicopters resumed firing until the crew abandoned ship. Special Boat Teams provided security while a SEAL team boarded the vessel at first light and discovered nine mines on the vessel's deck, as well as a logbook revealing areas where previous mines had been laid. The logbook implicated Iran in mining international waters.[9]

Within a few days, the Special Operations forces had determined the Iranian pattern of activity; the Iranians hid during the day near oil and gas platforms in Iranian waters and at night they headed toward the Middle Shoals Buoy, a navigation aid for tankers. With this knowledge, SOF launched three Little Bird helicopters and two patrol craft to the buoy. The Little Bird helicopters arrived first and were fired upon by three Iranian boats anchored near the buoy. After a short but intense firefight, the helicopters sank all three boats. Three days later, in mid-October, an Iranian Silkworm missile hit the tanker Sea Isle City near the oil terminal outside Kuwait City. Seventeen crewmen and the American captain were injured in the missile attack.[9][18] During Operation Nimble Archer, four destroyers shelled two oil platforms in the Rostam oil field. After the shelling, a SEAL platoon and a demolition unit planted explosives on one of the platforms to destroy it. The SEALs next boarded and searched a third platform 2 miles (3 km) away. Documents and radios were taken for intelligence purposes.

On 14 April 1988, 65 miles (100 km) east of Bahrain, the frigate USS Samuel B. Roberts (FFG-58) hit a mine, blowing an immense hole in its hull.[19] Ten sailors were injured. During Operation Praying Mantis the U.S. retaliated fiercely, attacking the Iranian frigate Sahand and oil platforms in the Sirri and Sassan oil fields.[18] After U.S. warships bombarded the Sirri platform and set it ablaze, a UH-60 with a SEAL platoon flew toward the platform but was unable to get close enough because of the roaring fire. Secondary explosions soon wrecked the platform.[9] Thereafter, Iranian attacks on neutral ships dropped drastically. On 3 July 1988, the USS Vincennes shot down an Iranian civilian airliner, Iran Air Flight 655, killing all 290 people on board, including 66 children. On 18 July, Iran accepted the United Nations cease fire; on 20 August 1988, the Iran–Iraq War ended. The remaining SEALs, patrol boats, and helicopters then returned to the United States.[9] Special operations forces provided critical skills necessary to help CENTCOM gain control of the northern Persian Gulf and balk Iran's small boats and minelayers. The ability to work at night proved vital, because Iranian units used darkness to conceal their actions. Additionally, because of Earnest Will operational requirements, USSOCOM would acquire new weapons systems—the patrol coastal ships and the Mark V Special Operations Craft.[9]

## Somalia



One of two Iranian oil platform set ablaze after shelling by American destroyers.

Special Operations Command first became involved in Somalia in 1992 as part of Operation Provide Relief. C-130s circled over Somali airstrips during delivery of relief supplies. Special Forces medics accompanied many relief flights into the airstrips throughout southern Somalia to assess the area. They were the first U.S. soldiers in Somalia, arriving before U.S. forces who supported the expanded relief operations of Restore Hope.[9][20][21] The first teams into Somalia were CIA Special Activities Division paramilitary officers with elements of JSOC. They conducted very high risk advanced force operations prior to the entry of the follow on forces. The first casualty of the conflict came from this team and was a Paramilitary officer and former Delta Force operator name Larry Freedman. Freedman was awarded the Intelligence Star for "extraordinary heroism" for his actions.[22]

The earliest missions during Operation Restore Hope were conducted by Navy SEALs. The SEALs performed several hydro-graphic reconnaissance missions to find suitable landing sites for Marines. On 7 December, the SEALs swam into Mogadishu Harbor, where they found suitable landing sites, assessed the area for threats, and concluded that the port could support offloading ships. This was a tough mission because the SEALs swam against a strong current which left many of them overheated and exhausted. Furthermore, they swam through raw sewage in the harbor, which made them sick.[9] When the first SEALs hit the shore the following night, they were surprised to meet members of the news media. The first Marines came ashore soon thereafter, and the press redirected their attention to them. Later, the SEALs provided personal security for President George Bush during a visit to Somalia.[9][21] In December 1992, Special Forces assets in Kenya moved to Somalia and joined Operation Restore Hope. January 1993, a Special Forces command element deployed to Mogadishu as the Joint Special Operations Forces-Somalia (JSOFOR) that would command and control all special operations for Restore Hope. JSOFOR's mission was to make initial contact with indigenous factions and leaders; provide information for force protection; and provide reports on the area for future relief and security operations. Before redeploying in April, JSOFOR elements drove over 26,000 miles (42,000 km), captured 277 weapons, and destroyed over 45,320 pounds (20,560 kg) of explosives.[9]



Bravo Company, 3rd Battalion of the 75th Ranger Regiment in Somalia, 1993.

In August 1993, Secretary of Defense Les Aspin directed the deployment of a Joint Special Operations Task Force (JSOTF) to Somalia in response to attacks made by General Mohamed Farrah Aidid's supporters upon U.S. and UN forces. The JSOTF, named Task Force (TF) Ranger, was charged with a mission named Operation Gothic Serpent to capture Aidid. This was an especially arduous mission, for Aidid had gone underground, after several Lockheed AC-130 air raids and UN assaults on his strongholds.[9][23][24]

While Marines from the 24th MEU provided an interim QRF (Force Recon Det and helicopters from HMM-263), the task force arrived in the country, and began training exercises. The Marines were asked to take on the Aidid snatch mission, but having the advantage of being in the area for more than two months, decided after mission analysis that the mission was a "no-go" due to several factors, centered around the inability to rescue the crew of a downed helicopter (re: the indigenous forces technique of using RPGs against helicopters and blocking the narrow streets in order to restrict the movement of a ground rescue force). This knowledge was not passed on to the Rangers, due to the Marines operating from the USS Wasp and the Rangers remaining on land. TF Ranger was made up of operators from Delta Force, 75th Ranger Regiment, 160th SOAR, Air Force special tactics units, and SEALs from the Naval Special Warfare Development Group.[9][23] During August and September 1993, the task force conducted six missions into Mogadishu, all of which were successes. Although Aidid remained free, the effect of these missions seriously limited his movements.[24]

On 3 October, TF Ranger launched its seventh mission, this time into Aidid's stronghold the Bakara Market to capture two of his key lieutenants. The mission was expected to take only one or two hours.[23] Helicopters carried an assault and a ground convoy of security teams launched in the late afternoon from the TF Ranger compound at Mogadishu airport. The TF came under increasingly heavy fire, more intense than during previous missions. The assault team captured 24 Somalis including Aidid's lieutenants and were loading them onto the convoy trucks when a MH-60 Blackhawk was hit by a rocket-propelled grenade (RPG).[9][24] A small element from the security force, as well as an MH-6 assault helicopter and an MH-60 carrying a fifteen man combat search and rescue (CSAR) team, rushed to the crash site.[9][23][24] The battle became increasingly worse. An RPG struck another MH-60, crashing less than 1 mile (1.6 km) to the south of the first downed helicopter. The task force faced overwhelming Somali mobs that overran the crash sites, causing a dire situation.[23] A Somali mob overran the second site, and, despite a heroic defense, killed everyone except the pilot, whom they took prisoner. Two defenders of this crash site, Master Sergeant Gary Gordon and Sergeant First Class Randall Shughart, were posthumously awarded the Medal of Honor.[9][23][24] About this time, the mission's quick reaction force (QRF) also tried to reach the second crash site. This force too was pinned by Somali fire and required the fire support of two AH-6 helicopters before it could break contact and make its way back to the base.[9]

The assault and security elements moved on foot towards the first crash area, passing through heavy fire, and occupied buildings south and southwest of the downed helicopter. They fought to establish defensive positions so not to be pinned down by very heavy enemy fire, while treating their wounded, and worked to free the pilot's body from the downed helicopter. With the detainees loaded on trucks, the ground convoy force attempted to reach the first crash site. Unable to find it amongst the narrow, winding alleyways, the convoy came under devastating small arms and RPG fire. The convoy had to return to base after suffering numerous casualties, and sustaining substantial damage to their vehicles.

Reinforcements, consisting of elements from the QRF, 10th Mountain Division soldiers, Rangers, SEALs, Pakistan Army tanks and Malaysian armored personnel carriers, finally arrived at 1:55 am on 4 October. The combined force worked until dawn to free the pilot's body, receiving RPG and small arms fire throughout the night.[9] All the casualties were loaded onto the armored personnel carriers, and the remainder of the force was left behind and had no choice but to move out on foot.[23] AH-6 gunships raked the streets with fire to support the movement. The main force of the convoy arrived at the Pakistani Stadium-compound for the QRF-at 6:30 am,[23] thus concluding one of the bloodiest and fiercest urban firefights since the Vietnam War. Task Force Ranger experienced a total of 17 killed in action and 106 wounded. Various estimates placed Somali casualties above 1,000.[23] Although Task Force Ranger's few missions were successes, the overall outcome of Operation Gothic Serpent was deemed a failure because of the Task Force's failure to complete their stated mission, capturing Mohamed Farrah Aidid.[23] Most U.S. forces pulled out of Somalia by March 1994.

The withdrawal from Somalia, was completed on March 1995.[9] Even though Operation Gothic Serpent failed, USSOCOM still made significant contributions to operations in Somalia. SOF performed reconnaissance and surveillance missions, assisted with humanitarian relief, protected American forces and conducted riverine patrols. Additionally, they ensured the safe landing of the Marines and safeguarded the arrival of merchant ships carrying food.[9][18]

## Iraq

USSOCOM's 10th Special Forces Group, elements of JSOC and CIA/SAD Paramilitary Officers linked up again and were the first to enter Iraq prior to the invasion. Their efforts organized the Kurdish Peshmerga to defeat Ansar Al Islam in Northern Iraq before the invasion. This battle was for control of a territory in Northeastern Iraq that was completely occupied by Ansar Al Islam, an ally of Al Qaeda. This was a very significant battle and led to the termination of a substantial number of terrorists and the uncovering of a chemical weapons facility at Sargat. These terrorists would have been in the subsequent insurgency had they not been eliminated during this battle. Sargat was the only facility of its type discovered in the Iraq war. This battle may have been the Tora Bora of Iraq, but it was a sound defeat for Al Qaeda and their ally Ansar Al Islam. This combined team then led the Peshmerga against Saddam's northern Army. This effort kept Saddam's forces in the north and denied the ability to redeploy to contest the invasion force coming from the south. This effort may have saved the lives of hundreds if not thousands of coalition service men and women.[25]

At the launch of the Iraq War dozens of 12-member Special Forces teams infiltrated southern and western Iraq to hunt for Scud missiles and pinpoint bombing targets. Scores of Navy SEALs seized oil terminals and pumping stations on the southern coast.[26] Air Force combat controllers flew combat missions in MC-130H Combat Talon IIs and established austere desert airstrips to begin the flow of soldiers and supplies deep into Iraq. It was a far cry from the Persian Gulf war of 1991, where Special Operations forces were kept largely on the sidelines. But it would not be a replay of Afghanistan, where Army Special Forces and Navy SEALs led the fighting. After their star turn in Afghanistan, many special operators were disappointed to play a supporting role in Iraq. Many special operators felt restricted by cautious commanders.[27] From that point, USSOCOM has since killed or captured hundreds of insurgents and Al-Qaeda terrorists. It has conducted several foreign internal defense missions successfully training the Iraqi security forces.[28][29]

# Current role

United States Special Operations Command played a pivotal role in fighting the former Taliban government in Afghanistan in 2001[30] and toppling it thereafter, as well as combating the insurgency and capturing Saddam Hussein in Iraq. USSOCOM in 2004 was developing plans to have an expanded and more complex role in the global campaign against terrorism,[31] and that role continued to emerge before and after the killing of Osama bin Laden in Pakistan in 2011.[32][33] In 2010, "of about 13,000 Special Operations forces deployed overseas, about 9,000 [were] evenly divided between Iraq and Afghanistan."[32]


Map of the main battle sites during the Battle of Mogadishu.

## War in Afghanistan

In the initial stages of the War in Afghanistan, USSOCOM forces linked up with CIA Paramilitary Officers from Special Activities Division to defeat the Taliban without the need for large-scale conventional forces.[34] This was one of the biggest successes of the global War on Terrorism.[35] These units linked up several times during this war and engaged in several furious battles with the enemy. One such battle happened during Operation Anaconda the mission to squeeze life out of a Taliban and Al-Qaeda stronghold dug deep into the Shah-i-Kot mountains of eastern Afghanistan. The operation was seen as one of the heaviest and bloodiest fights in the War in Afghanistan.[36] The battle on an Afghan mountaintop called Takur Ghar featured special operations forces from all 4 services and the CIA. Navy SEALs, Army Rangers, Air Force Combat Controllers, and Pararescuemen fought against entrenched Al-Qaeda fighters atop a 10,000-foot (3,000 m) mountain. Subsequently, the entrenched Taliban became targets of every asset in the sky. According to an executive summary, the battle of Takur Ghar was the most intense firefight American special operators have been involved in since 18 U.S. Army Rangers were killed in Mogadishu, Somalia, in 1993.[37][38][39] During Operation Red Wings on 28 June 2005, four Navy SEALs, pinned down in a firefight, radioed for help. A Chinook helicopter, carrying 16 service members, responded but was shot down. All members of the rescue team and three of four SEALs on the ground died. It was the worst loss of life in Afghanistan since the invasion in 2001. The Navy SEAL Marcus Luttrell alone survived.[40][41] Team leader Michael P. Murphy was awarded the Medal of Honor for his actions in the battle.

A 7th SFG Special Forces medic in Kandahar Province, Afghanistan, in September 2008.

## Global presence

SOC chief Olson said in 2011 that SOCOM "is a microcosm of the Department of Defense, with ground, air, and maritime components, a global presence, and authorities and responsibilities that mirror the Military Departments, Military Services, and Defense Agencies."[33] In 2010, special operations forces were deployed in 75 countries, compared with about 60 at the beginning of 2009.[32] In 2011, SOC spokesman Colonel Tim Nye[42] was reported to have said that the number of countries with SOC presence will likely reach 120 and that joint training exercises will have been carried out in most or all of those countries during the year. One study identified joint-training exercises in Belize, Brazil, Bulgaria, Burkina Faso, Germany, Indonesia, Mali, Norway, Panama, and Poland in 2010 and also, through mid-year 2011, in the Dominican Republic, Jordan, Romania, Senegal, South Korea, and Thailand, among other nations. In addition, SOC forces executed the high profile killing of Osama bin Laden in Pakistan in 2011.[33]

Wikileaks' releases of cables from the U.S. Embassy, Pakistan, revealed the presence of a detachment of SOCOM (or possibly United States Army Special Operations Command) referred to as SOC(FWD)-PAK (09ISLAMABAD2449, 9 August 2010). This unit or headquarters may be, in full form, Special Operations Command (Forward)-Pakistan. It seems unlikely that the – symbol refers to the minus sign that sometimes means that the unit or headquarters is operating at less than full strength. The unit or headquarters includes a Military Information Support Team (MIST [1] (http://www.africom.mil/getArticle.asp?art=4866)).[43] Another story that reported on JSOC/Blackwater anti-terrorist operations in Pakistan was Jeremy Scahill's "The Secret U.S. War in Pakistan" (http://www.thenation.com/article/secret-us-war-pakistan), in the 7 November 2009, issue of The Nation.

In 2010, White House counterterrorism director John O. Brennan said that the United States "will not merely respond after the fact" of a terrorist attack but will "take the fight to al-Qaeda and its extremist affiliates whether they plot and train in Afghanistan, Pakistan, Yemen, Somalia and beyond." Olson said, "In some places, in deference to host-country sensitivities, we are lower in profile. In every place, Special Operations forces activities are coordinated with the U.S. ambassador and are under the operational control of the four-star regional commander."[32]

The conduct of actions by SOC forces outside of Iraq and Afghan war zones has been the subject of internal U.S. debate, including between representatives of the Bush administration such as John B. Bellinger III, on one hand, and the Obama administration on another. The United Nations in 2010 also "questioned the administration's authority under international law to conduct such raids, particularly when they kill innocent civilians. One possible legal justification – the permission of the country in question – is complicated in places such as Pakistan and Yemen, where the governments privately agree but do not publicly acknowledge approving the attacks," as one report put it.[32]

## Subordinate Commands



Special Operations Command Structure (Media:U.S. Special Operations Command.png).

### Joint Special Operations Command

[44] Joint Special Operations Command is a component command of the USSOCOM and is charged to study special operations requirements and techniques to ensure interoperability and equipment standardization, plan and conduct special operations exercises and training, and develop Joint Special Operations Tactics.[1] It was established in 1980 on recommendation of Col. Charlie Beckwith, in the aftermath of the failure of Operation Eagle Claw.[45]

Units

- The U.S. Army's 1st Special Forces Operational Detachment-Delta, popularly known as Delta Force, is the first of the two primary counter-terrorist units of JSOC and SOCOM.[46] Modeled after the British Special Air Service, Delta Force is regarded as one of the premier special operations forces in the world.[47] This is because of Delta's stringent training and selection process. Delta recruits primarily from the most talented and highly skilled operators in the Army Special Forces and the 75th Ranger Regiment although Delta will take anyone and everyone that can pass their screening.[23][47] Recruits must pass a rigid selection course before beginning training. Delta has received training from numerous U.S. government agencies and other tier one SOF and has created a curriculum based on this training and techniques that it has developed.[47] Delta conducts clandestine and covert special operations all over the world.[47] It has the capability to conduct myriad special operations missions but specializes in counter-terrorism and hostage rescue operations.[23][46][48]
- The Naval Special Warfare Development Group (DEVGRU, SEAL Team Six) is the second of the two primary counter-terrorist units of JSOC and SOCOM.[46] DEVGRU is Naval Special Warfare's counterpart to Delta. Like Delta, DEVGRU recruits the best operators from the best units in its branch, the Navy SEALs. DEVGRU is capable of performing any type of special operations mission, but trains especially for counter-terrorist and hostage rescue operations.[23][46]
- The Intelligence Support Activity (ISA, The Activity) is the support branch of JSOC and USSOCOM. Its primary missions are to provide Human Intelligence (HUMINT) and Signal Intelligence (SIGINT) mainly for Delta and DEVGRU's operations.[46][49] Before the establishing of the Strategic Support Branch in 2001, the ISA needed the permission of the CIA to conduct its operations, which sometimes caused it to be less effective in its support of JSOC's primary units.[46][50][51]
- The Air Force 24th Special Tactics Squadron (24th STS) is the AFSOC component of JSOC. The 24th STS usually operates with Delta and DEVGRU because of the convenience of 24th STS ability to synchronize and control the different elements of air power and enhance air operations deep in enemy territory.[23]

Portions of JSOC units have made up the constantly changing special operations task force, operating in the U.S. Central Command area of operations. The Task Force 11, Task Force 121, Task Force 6-26 and Task Force 145 are creations of the Pentagon's post-11 September campaign against terrorism, and it quickly became the model for how the military would gain intelligence and battle insurgents in the future. Originally known as Task Force 121, it was formed in the summer of 2003, when the military merged two existing Special Operations units, one hunting Osama bin Laden in and around Afghanistan, and the other tracking Sadaam Hussein in Iraq.[52][53]

### Special Operations Command – Joint Capabilities

Special Operations Command – Joint Capabilities (SOC-JC) was transferred to USSOCOM from the soon to be disestablished United States Joint Forces Command.[54]

Primary Mission: SOC-JC trains conventional and SOF commanders and their staffs, supports USSOCOM international engagement training requirements, and supports implementation of capability solutions in order to improve strategic and operational Warfighting readiness and joint interoperability. SOC-JC must also be prepared to support deployed Special Operations Joint Task Force (SOJTF) Headquarters (HQ).

As a joint sub-unified command under USSOCOM, SOC-JC's core function is to enhance the interoperability of conventional and Special Operations Forces (SOF) commanders and staffs through robust strategic and operational level joint training. In coordination with the USSOCOM J3, J7/9 and Joint Special Operations University (JSOU), SOC-JC provides excellent training and support to the education for SOF and Conventional Forces (CF) worldwide. Additionally, SOC-JC supports the joint SOF capabilities development process while maintaining the flexibility to support emerging initiatives.

The Joint Special Operations Command insignia

## Army

On 1 December 1989 the United States Army Special Operations Command (USASOC) activated as the 16th major Army command. These special operations forces have been America's spearhead for unconventional warfare for more than 40 years. USASOC commands such units as the well known Special Forces (SF, or the "Green Berets") and Rangers, and such relatively unknown units as the Psychological Operations Group (PSYOP) and Civil Affairs Brigade (CA). These are one of the USSOCOM's main weapons for waging unconventional warfare and counter-insurgency. The significance of these units is emphasized as conventional conflicts are becoming less prevalent as insurgent and guerrilla warfare increases.[55][56]



USASOC patch.

### Units

- The 75th Ranger Regiment (U.S. Army Rangers) is the premier light-infantry unit of the United States Army and is headquartered at Fort Benning, Georgia. The 75th Ranger Regiment's mission is to plan and conduct special missions in support of U.S. policy and objectives.[57] The Rangers are a flexible and rapid-deployable force. Each battalion can deploy anywhere in the world within 18 hours notice. The Army places much importance on the 75th Ranger Regiment and its training; it possesses the capabilities to conduct conventional and most special operations missions. Rangers are capable of infiltrating by land, sea, or air and direct action operations such as conducting raids or assaulting buildings or airfields.[58]

- United States Army Special Forces (SF) aka Green Berets perform several doctrinal missions: unconventional warfare, foreign internal defense, special reconnaissance, direct action and counter-terrorism. These missions make Special Forces unique in the U.S. military, because they are employed throughout the three stages of the operational continuum: peacetime, conflict and war.[59] Foreign internal defense operations, SF's main peacetime mission, are designed to help friendly developing nations by working with their military and police forces to improve their technical skills, understanding of human rights issues, and to help with humanitarian and civic action projects. Special Forces unconventional warfare capabilities provide a viable military option for a variety of operational taskings that are inappropriate or infeasible for conventional forces. Special Forces are the U.S. military's premier unconventional warfare force.[60] Foreign internal defense and unconventional warfare missions are the bread and butter of Special Forces soldiers. For this reason SF candidates are trained extensively in weapons, engineering, communications and medicine. SF soldiers are taught to be warriors first and teachers second because they must be able to train their team and be able to train their allies during a FID or UW mission.[59][61] Often SF units are required to perform additional, or collateral, activities outside their primary missions. These collateral activities are coalition warfare/support, combat search and rescue, security assistance, peacekeeping, humanitarian assistance, humanitarian de-mining and counter-drug operations.[62]

- The 160th Special Operations Aviation Regiment (Night Stalkers) headquartered at Fort Campbell, Kentucky provides aviation support to units within USSOCOM. The Regiment consists of MH-6 and AH-6 light helicopters, MH-60 helicopters and MH-47 heavy assault helicopters. The capabilities of the 160th SOAR (A) have been evolving since the early 1980s. Its focus on night operations resulted in the nickname, the "Night Stalkers."[63] The primary mission of the Night Stalkers is to conduct overt or covert infiltration, exfiltration, and resupply of special operations forces across a wide range of environmental conditions.[64]



Special Forces on a patrol in Afghanistan.

- 4th Military Information Support Group (Airborne) and 8th Military Information Support Group (Airborne) Soldiers use persuasion to influence perceptions and encourage desired behavior.[65][66] PSYOP soldiers supports national objectives at the tactical, operational and strategic levels of operations. Strategic psychological operations advance broad or long-term objectives; global in nature, they may be directed toward large audiences or at key communicators. Operational psychological operations are conducted on a smaller scale. 4th PSYOP Gp is employed by theater commanders to target groups within the theater of operations. 4th PSYOP Gp purpose can range from gaining support for U.S. operations to preparing the battlefield for combat. Tactical psychological operations are more limited, used by commanders to secure immediate and near-term goals. In this environment, these force-enhancing activities serve as a means to lower the morale and efficiency of enemy forces.[67]

- 95th Civil Affairs Brigade (Airborne) specialists identify critical requirements needed by local citizens in war or disaster situations. They also locate civilian resources to support military operations, help minimize civilian interference with operations, support national assistance activities, plan and execute noncombatant evacuation, support counter-drug operations and establish and maintain liaison with civilian aid agencies and other nongovernmental organizations. In support of special operations, these culturally oriented, linguistically capable Soldiers may also be tasked to provide functional expertise for foreign internal defense operations, unconventional warfare operations and direct action missions.[68]

- Sustainment Brigade (Special Operations) (Airborne) (SBSO(A)) has a difficult mission supporting USASOC. In their respective fields, signal and support soldiers provide supplies, maintenance, equipment and expertise allowing Special Operation Forces to "shoot, move and communicate" on a continuous basis. Because USASOC often uses Special Operations Forces-unique items, soldiers assigned to these units are taught to operate and maintain a vast array of specialized equipment not normally used by their conventional counterparts. SBSO(A) also provides the USASOC with centralized and integrated material management of property, equipment maintenance, logistical automation and repair parts and supplies.[69]

- John F. Kennedy Special Warfare Center (USAJFKSWCS) trains USSOCOM and Army Special Operations Forces through development and evaluation of special operations concepts, doctrines and trainings.[70]

## Navy

The United States Naval Special Warfare Command (NAVSPECWARCOM, NAVSOC, or NSWC) was commissioned April 16, 1987, at Naval Amphibious Base Coronado in San Diego as the Naval component to the United States Special Operations Command. Naval Special Warfare Command provides vision, leadership, doctrinal guidance, resources and oversight to ensure component special operations forces are ready to meet the operational requirements of combatant commanders.[71] Today, SEAL Teams and Special Boat Teams comprise the elite combat units of Naval Special Warfare. These teams are organized, trained, and equipped to conduct a variety of

missions to include direct action, special reconnaissance, counter-terrorism, foreign internal defense, unconventional warfare and support psychological and civil affairs operations. Their highly trained operators are deployed worldwide in support of National Command Authority objectives, conducting operations with other conventional and special operations forces.

Units

- United States Navy SEALs have distinguished themselves as an individually reliable, collectively disciplined and highly skilled special operations force. The most important trait that distinguishes Navy SEALs from all other military forces is that SEALs are maritime special operations, as they strike from and return to the sea. SEALs (SEa, Air, Land) take their name from the elements in and from which they operate. SEALs are experts in direct action and special reconnaissance missions. Their stealth and clandestine methods of operation allow them to conduct multiple missions against targets that larger forces cannot approach undetected. Because of the dangers inherent in their operations, prospective SEALs go through what is considered by many military experts to be the toughest training regime in the world.[72][73]



United States Naval Special Warfare Command emblem.

- Naval Special Warfare Development Group (DEVGRU), referred to as SEAL Team Six, the name of its predecessor which was officially disbanded in 1987.
- SEAL Delivery Vehicle Teams are SEAL teams with an added underwater delivery capability who use the SDV MK VIII and the Advanced SEAL Delivery System (ASDS), submersibles that provides NSW with an unprecedented capability that combines the attributes of clandestine underwater mobility and the combat swimmer.[74][75]
- Special Warfare Combatant-craft Crewmen (SWCC) operate and maintain state-of-the-art surface craft to conduct coastal patrol and interdiction and support special operations missions. Focusing on infiltration and exfiltration of SEALs and other SOF, SWCCs provide dedicated rapid mobility in shallow water areas where larger ships cannot operate. They also bring to the table a unique SOF capability: Maritime Combatant Craft Aerial Delivery System—the ability to deliver combat craft via parachute drop.[1] Like SEALs, SWCCs must have excellent physical fitness, highly motivated, combat-focused and responsive in high stress situations.[76]



SEALs emerge from the water during a demonstration.

## Air Force

Air Force Special Operations Command was established May 22, 1990, with headquarters at Hurlburt Field, Florida. AFSOC is one of the 10 Air Force Major Commands or MAJCOMs, and the Air Force component of United States Special Operations Command. It contains the Twenty-Third Air Force and holds operational and administrative oversight of subordinate special operations wings and groups in the regular Air Force, Air Force Reserve Command and the Air National Guard.

AFSOC provides Air Force special operations forces for worldwide deployment and assignment to regional unified commands. The command's SOF are composed of highly trained, rapidly deployable airmen, conducting global special operations missions ranging from precision application of firepower via airstrikes or close air support, to infiltration, exfiltration, resupply and refueling of SOF operational elements.[77] AFSOC's unique capabilities include airborne radio and television broadcast for psychological operations, as well as aviation foreign internal defense instructors to provide other governments military expertise for their internal development.

The command's core missions include battlefield air operations; agile combat support; aviation foreign internal defense; information operations; precision aerospace fires; psychological operations; specialized air mobility; specialized refueling; and intelligence, surveillance and reconnaissance.[27][78][79]

Units

- Combat Controllers (CCT) are ground combat forces specialized in a traditional pathfinder role while having a heavy emphasis on simultaneous air traffic control, fire support (via airstrikes, close air support and command, control, and communications in covert or austere environments.[80][81]
- Pararescuemen (PJ) are the only Department of Defense specialty specifically trained and equipped to conduct conventional and unconventional personnel recovery operations. A PJ's primary function is as a personnel recovery specialist with emergency trauma medical capabilities in humanitarian and combat environments.
- Special Operations Weather Technicians (SOWT) gather, assess, and interpret weather and environmental intelligence from forward deployed locations, working alongside special operations forces.

Organization

- The 1st Special Operations Wing (1 SOW) is located at Hurlburt Field, Florida. Its mission focus is unconventional warfare: counter-terrorism, combat search and rescue, personnel recovery, psychological operations, aviation assistance to developing nations, "deep battlefield" resupply, interdiction and close air support. The wing's core missions include aerospace surface interface, agile combat support, combat aviation advisory operations, information operations, personnel recovery/recovery operations, precision aerospace fires, psychological operations dissemination, specialized aerospace mobility and specialized aerial refueling.[82] Among its aircraft is the MC-130 Combat Talon II, a low-level terrain following special missions transport that can evade radar detection and slip into enemy territory at a 200-foot (61 m) altitude for infiltration/exfiltration missions, even in zero visibility, dropping off or recovering men or supplies with pinpoint accuracy. It also operates the AC-130 Spooky and Spectre gunships that provide highly accurate airborne gunfire for close air support of conventional and special operations forces on the ground.[46]
- The 24th Special Operations Wing (24 SOW) is located at Hurlburt Field, Florida. It's composed of the 720th Special Tactics Group, 724th Special Tactics Group, Special Tactics Training Squadron and 16 recruiting locations across the United States.[83][84] The Special Tactics Squadrons, under the 720th STG and 724th STG, are made up of Special Tactics Officers, Combat Controllers, Combat Rescue Officers, Pararescuemen, Special Operations Weather Officers and Airmen, Air Liaison Officers, Tactical Air Control Party operators, and a number of combat support airmen which comprise 58 Air Force specialties.[84]

- The 27th Special Operations Wing (27 SOW) is located at Cannon AFB, New Mexico. Its primary mission includes infiltration, exfiltration and re-supply of special operations forces; air refueling of special operations rotary wing and tiltrotor aircraft; and precision fire support. These capabilities support a variety of special operations missions including direct action, unconventional warfare, special reconnaissance, counter-terrorism, personnel recovery, psychological operations and information operations.[85]

- The 193d Special Operations Wing (193 SOW) is an Air National Guard (ANG) unit, operationally gained by AFSOC, and located at Harrisburg International Airport/Air National Guard Station (former Olmsted Air Force Base), Pennsylvania. Under Title 32 USC, the 193 SOW performs state missions for the Governor of Pennsylvania as part of the Pennsylvania Air National Guard. Under Title 10 USC, the 193 SOW is part of the Air Reserve Component (ARC) of the United States Air Force. Its primary wartime and contingency operations mission as an AFSOC-gained unit is psychological operations (PSYOP). The 193 SOW is unique in that it is the only unit in the U.S. Air Force to fly and maintain the Lockheed EC-130J Commando Solo aircraft.



- The 919th Special Operations Wing (919 SOW) is an Air Force Reserve Command (AFRC) unit, operationally gained by AFSOC, and located at Eglin AFB Auxiliary Field #3/Duke Field, Florida. The 919 SOW flies and maintains the MC-130E Combat Talon I and MC-130P Combat Shadow special operations aircraft designed for covert operations.

- The 352d Special Operations Wing (352 SOW) at RAF Mildenhall, United Kingdom serves as the core to United States European Command's standing Joint Special Operations Air Component headquarters. The squadron provides support for three flying squadrons, one special tactics squadron and one maintenance squadron for exercise, logistics, and war planning; aircrew training; communications; aerial delivery; medical; intelligence; security and force protection; weather; information technologies and transformation support and current operations.[86]



Air Force Special Operators on a training mission.

- The 353d Special Operations Group (353 SOG) is the focal point for all U.S. Air Force special operations activities throughout the United States Pacific Command (USPACOM) theater. Headquartered at Kadena AB, Okinawa, Japan the group is prepared to conduct a variety of high-priority, low-visibility missions. Its mission is air support of joint and allied special operations forces in the Pacific. It maintains a worldwide mobility commitment, participates in Pacific theater exercises as directed and supports humanitarian and relief operations.[87]

- The United States Air Force Special Operations School (USAFSOS) at Hurlburt Field, Florida is a primary support unit of the Air Force Special Operations Command. The USAFSOS prepares special operations Airmen to successfully plan, organize, and execute global special operations by providing indoctrination and education for AFSOC, other USSOCOM components, and joint/interagency/ coalition partners.[88]

## Marine Corps

In October 2005, the Secretary of Defense directed the formation of United States Marine Corps Forces Special Operations Command, the Marine component of United States Special Operations Command. It was determined that the Marine Corps would initially form a unit of approximately 2500 to serve with USSOCOM. On February 24, 2006 MARSOC activated at Camp Lejeune, North Carolina. MARSOC initially consisted of a small staff and the Foreign Military Training Unit (FMTU), which had been formed to conduct foreign internal defense. FMTU is now designated as the Marine Special Operations Advisor Group (MSOAG).[89]



As a service component of USSOCOM, MARSOC is tasked by the Commander USSOCOM to train, organize, equip, and deploy responsive U.S. Marine Corps special operations forces worldwide, in support of combatant commanders and other agencies. MARSOC has been directed to conduct foreign internal defense, direct action and special reconnaissance. MARSOC has also been directed to develop a capability in unconventional warfare, counter-terrorism, and information operations. MARSOC deployed its first units in August 2006, six months after the group's initial activation. MARSOC reached full operational capability in October 2008.[90]

United States Marine Corps Forces Special Operations Command emblem

### Units

- Marine Special Operations "Raider" Regiment (MSOR) consists of a Headquarters Company and three Marine Special Operations Battalions, the 1st, 2nd and 3rd MSOB. The Regiment provides tailored military combat-skills training and advisor support for identified foreign forces in order to enhance their tactical capabilities and to prepare the environment as directed by USSOCOM as well as the capability to form the nucleus of a Joint Special Operations Task Force. Marines and Sailors of the MRR train, advise and assist friendly host nation forces – including naval and maritime military and paramilitary forces – to enable them to support their governments' internal security and stability, to counter subversion and to reduce the risk of violence from internal and external threats. MRR deployments are coordinated by MARSOC, through USSOCOM, in accordance with engagement priorities for Overseas Contingency Operations.



- Marine Intelligence Battalion (MIB) trains, sustains, maintains combat readiness, and provides intelligence support at all operational levels in order to support MARSOF training and operations worldwide with mission-specific intelligence capability.

- Marine Special Operations Support Group (MSOSG) trains, equips, structures, and provides specially qualified Marine forces, including, operational logistics, intelligence, Military Working Dogs, Firepower Control Teams, and communications support in order to sustain worldwide special operations missions as directed by Commander, U.S. Marine Corps Forces Special Operations Command (COMMARFORSOC).

DA/SR Operators from 1st SOB (Special Operations Battalion) respond to enemy fire in Afghanistan

- The Marine Special Operations School (MSOS) performs the screening, recruiting, training, assessment and doctrinal development functions for MARSOC. It includes two subordinate Special Missions Training Branches (SMTBs), one on each coast.
  - The Special Mission Training Branch—East provide special operations training in tactics, techniques and procedures, and evaluation and certification of MARSOC forces to specified conditions and standards for SOF. The Marines of MSOS are operators with the training, experience and mature judgment to plan,

coordinate, instruct and supervise development of SOF special reconnaissance and direct action skills.[91]

## List of USSOCOM Combatant Commanders

| No. | Image | Name | Branch | Start of Term | End of Term | Time in office |
|-----|-------|------|--------|---------------|-------------|----------------|
| 1. | | GEN James J. Lindsay | USA | 16 April 1987 | 27 June 1990 | 1,168 days |
| 2. | | GEN Carl W. Stiner | USA | 27 June 1990 | 20 May 1993 | 1,058 days |
| 3. | | GEN Wayne A. Downing | USA | 20 May 1993 | 29 February 1996 | 1,015 days |
| 4. | | GEN Henry H. Shelton | USA | 29 February 1996 | 25 September 1997 | 574 days |
| (Acting) | | RADM Raymond C. Smith, Jr. | USN | 25 September 1997 | 5 November 1997 | 41 days |
| 5. | | GEN Peter J. Schoomaker | USA | 5 November 1997 | 27 October 2000 | 1,087 days |
| 6. | | GEN Charles R. Holland | USAF | 27 October 2000 | 2 September 2003 | 1,040 days |
| 7. | | GEN Bryan D. Brown | USA | 2 September 2003 | 9 July 2007 | 1,406 days |
| 8. | | ADM Eric T. Olson | USN | 9 July 2007 | 8 August 2011 | 1,491 days |
| 9. | | ADM William H. McRaven | USN | 8 August 2011 | 28 August 2014 | 1,116 days |
| 10. | | GEN Joseph L. Votel | USA | 28 August 2014 | Present | days |

## USSOCOM medal

The United States Special Operations Command Medal was introduced in 1994 to recognize individuals for outstanding contributions to, and in support of, special operations. Since it was created, there have been more than 50 recipients, four of which are not American. Some of which includes: General broni Włodzimierz Potasiński (Poland, 2010, posthumously),[92][93] Kaptein Gunnar Sønsteby (Norway, 2008), Generał brygady Jerzy Gut (Poland, June 2014)[94] and Generał dywizji Piotr Patalong (Poland, October 2014).[95]

## See also

# References

## Citations

1. SOCOM Public Affairs (2013). SOCOM Fact Book 2013 (http://www.socom.mil/News/Documents/USSOCOM_Fact_Book_2013.pdf). SOCOM Public Affairs.

2. "Biography of Admiral James L. Holloway III, US Navy (Ret.)" (http://www.history.navy.mil/bios/holloway_j.htm). June 2006. Retrieved 21 March 2008. |first1= missing |last1= in Authors list (help)

3. Rother, Larry (6 December 1996). "With a Bang, Panama Is Erasing House of Horrors". The New York Times.

4. Shanker, Thom (12 February 2004). "Regime Thought War Unlikely, Iraqis Tell U.S". The New York Times.

5. "USSOCOM Posture Statement" (http://web.archive.org/web/20080227010822/http://www.socom.mil/Docs/USSOCOM_Posture_Statement_2007.pdf) (PDF). USSOCOM. 2007. Archived from the original (http://www.socom.mil/Docs/USSOCOM_Posture_Statement_2007.pdf) on 27 February 2008. Retrieved 12 February 2008.

6. Delta: America's Elite Counterterrorist Force. Terry Griswold, D. M. Giangreco. Zenith Imprint, 2005. ISBN 0-7603-2110-8. p. 35

7. Sloan, Stephen (October 1992). Beating International Terrorism: An Action Strategy for Preemption and Punishment. Diane Pub Co. ISBN 1-56806-104-8.

8. Daniel, W.C. (September 1986). "H.R.5109". A bill to establish a National Special Operations Agency within the Department of Defense to have unified responsibility for all special operations forces and activities within the Department.

9. "USSOCOM Command History" (http://fas.org/irp/agency/dod/socom/2007history.pdf) (PDF). Retrieved 12 October 2014.

10. Goldwater, Barry; Sam Nunn. "S.CON.RES.80". A concurrent resolution to authorize the printing of 2,000 additional copies of the Committee Print of the Committee on Armed Services (99th Congress, 1st Session) entitled "Defense Organization: The Need for Change".

11. Nichols, Bill; Barry Goldwater (1986). "H.R.3622". A bill to amend title 10, United States Code, to strengthen the position of Chairman of the Joint Chiefs of Staff, to provide for more efficient and effective operation of the Armed Forces, and for other purposes.

12. Lederman, Gordon Nathaniel (November 1999). Reorganizing the Joint Chiefs of Staff: The Goldwater-Nichols Act of 1986. Greenwood Press. ISBN 0-313-31085-8.

13. Cohen, William (May 1986). "S.2453". A bill to enhance the capabilities of the United States to combat terrorism and other forms of unconventional warfare.

14. Taubman, Philip (5 December 1984). "U.S. Military tries to catch up in fighting terror". New York Times.

15. "Special Operations/Low Intensity Conflict & Interdependent Capabilities (ASD SO/LIC & IC)" (http://www.defenselink.mil/policy/sections/policy_offices/solic/). DoD. Retrieved 19 March 2008. |first1= missing |last1= in Authors list (help)

16. Giles, James E.; Altizer, Harrell B. ; Glass, David V. Parker, Robert W. (March 1989). "Providing Resources for Special Operations Forces: Completing the Transition" (http://stinet.dtic.mil/oai/oai?verb=getRecord&metadataPrefix=html&identifier=ADA210951). Retrieved 19 March 2008.

17. Lewis, Paul (1 July 2001). "Charles S. Whitehouse, 79, Diplomat and C.I.A. Official". New York Times.

18. Andrew Kelley, Stephen (June 2007). "Better Lucky Than Good: Operation Earnest Will as Gunboat Diplomacy" (http://web.archive.org/web/20090318120640/http://www.ccc.nps.navy.mil/research/theses/kelley07.pdf) (PDF). Naval Postgraduate School. Archived from the original (http://www.ccc.nps.navy.mil/research/theses/kelley07.pdf) on 18 March 2009. Retrieved 12 May 2008.

19. Peniston, Bradley (July 2006). No Higher Honor: Saving the USS Samuel B. Roberts in the Persian Gulf. United States Naval Institute Press. ISBN 1-59114-661-5.

20. "A Big Second Step in Somalia". New York Times. 4 May 1993.

21. "Two Tough Tracks in Somalia". New York Times. 10 December 1992.

22. The Book of Honor: Cover Lives and Classified Deaths at the CIA by Ted Gup, 2000

23. Bowden, Mark (2001). Black Hawk Down: A Story of Modern War. Signet. ISBN 0-451-20393-3.

24. Eversmann, Matt; Dan Schilling (July 2006). The Battle of Mogadishu: Firsthand Accounts from the Men of Task Force Ranger. Presidio Press. ISBN 0-345-46668-3.

25. Plan of Attack, Bob Woodward, 2004

26. Dao, James (22 March 2003). "The Commandos; Navy Seals Easily Seize 2 Oil Sites". New York Times.

27. Dao, James (28 April 2003). "Aftereffects: Special Operations Forces; War Plan Drew U.S. Commandos From Shadows". The New York Times.

28. Kruzel, John (26 May 2007). "Navy SEALs share war stories from Anbar province". American Forces Press Service.

29. R. Gordon, Michael (13 June 2003). "After The War: The Allies; In Major Assault, U.S. Forces Strike Hussein Loyalists". New York Times.

30. D. Kozaryn, Linda (14 December 2001). "U.S. Special Operations Forces Change "Face of War"". American Forces Press Service.

31. Thom Shanker, Eric Schmitt (2 August 2004). "The Reach of War: Military; Special Warriors Have Growing Ranks and Growing Pains in Taking Key Antiterror Role" (http://www.nytimes.com/2004/08/02/world/reach-war-military-special-warriors-have-growing-ranks-growing-pains-taking-key.html). The New York Times. Retrieved 11 March 2008.

32. DeYoung, Karen, and Greg Jaffe, "U.S. 'secret war' expands globally as Special Operations forces take larger role" (http://www.washingtonpost.com/wp-dyn/content/article/2010/06/03/AR2010060304965.html?nav=emailpage), Washington Post, 4 June 2010. Retrieved 5 June 2010.

33. Turse, Nick, "A Secret War in 120 Countries: The Pentagon's New Power Elite" (http://counterpunch.org/turse08042011.html), CounterPunch, 4 August 2011. Retrieved 5 August 2011.

34. Washington Post op-ed, John Lehman former Secretary of the Navy, October 2008

35. Waller, Douglas (3 February 2003). "The CIA Secret Army" (http://www.time.com/time/magazine/article/0,9171,1004145,00.html). Time Magazine (Washington). Retrieved 28 September 2009.

36. "Operation Anaconda" (http://www.time.com/time/covers/1101020318/popup/). Time. 10 March 2002.

37. Garamone, Jim. "The Battle of Takur Ghar" (http://www.defenselink.mil/news/newsarticle.aspx?id=44020). American Forces Press Service.

38. Executive summary of the Battle of Takur Ghar (http://www.defenselink.mil/news/May2002/d20020524takurghar.pdf) (PDF). Retrieved |first1= missing |last1= in Authors list (help)

39. MacPherson, Malcolm (2006). Roberts Ridge: A Story of Courage and Sacrifice on Takur Ghar Mountain, Afghanistan. Dell. ISBN 0-553-58680-7.

40. Luttrell, Marcus; Patrick Robinson (2007). Lone Survivor: The Eyewitness Account of Operation Redwing and the Lost Heroes of SEAL Team 10. Little, Brown and Company. ISBN 0-316-06759-8.

41. Blumenfeld, Laura (11 June 2007). "The Sole Survivor" (http://www.washingtonpost.com/wp-dyn/content/article/2007/06/10/AR2007061001492.html). Washington Post.

42. Naylor, Sean D., "McRaven tapped to lead SOCOM" (http://www.armytimes.com/news/2011/03/military-mcraven-picked-to-lead-socom-030111/), Army Times, 1 March 2011 16:53:04 EST. Retrieved 5 August 2011.

43. http://www.imgc-global.com/testimonials.html. Retrieved February 2012.

44. Risen, James (20 September 1998). "The World: Passing the Laugh Test; Pentagon Planners Give New Meaning to 'Over the Top'". New York Times.

45. Emerson 1988, p. 26.

46. Emerson, Steven (13 November 1988). "Stymied Warriors". New York Times.

47. L. Haney, Eric (August 2005). Inside Delta Force: The Story of America's Elite Counterterrorist Unit. Delta. ISBN 0-385-33936-4.

48. Mark Mazzetti (13 January 2007). "Pentagon Sees Move in Somalia as Blueprint". New York Times.

49. Smith, Michael (2007). Killer Elite: The Inside Story of America's Most Secret Special Operations Team. New York, New York: St. Martin's Press. ISBN 0-312-36272-2.
50. Gellman, Barton (23 January 2005). "Secret Unit Expands Rumsfeld's Domain". Washington Post.
51. Gerth, Jeff; Philip Taubman (8 June 1984). "U.s. military creates secret units for use in sensitive tasks abroad". New York Times.
52. Schmitt, Eric (19 March 2006). "In Secret Unit's 'Black Room,' a Grim Portrait of U.S. Abuse". New York Times.
53. E. Sanger, David (29 February 2004). "New U.S. Effort Steps Up Hunt For bin Laden". New York Times.
54. SOCJFCOM transitions to USSOCOM and becomes Special Operations Command – Joint Capabilities (http://www.jfcom.mil/newslink/storyarchive/2011/pa050211.html), 2 May 2011
55. "USASOC overview" (http://www.soc.mil/sofinfo/story.html). Retrieved 8 January 2008.
56. Schmitt, Eric; Michael R. Gordon (21 September 2001). "A Nation Challenged: The Military: Top Air Chief Sent". New York Times.
57. "75th Ranger Regiment website" (http://web.archive.org/web/20080127071358/http://www.soc.mil/75thrr/75th_home.htm). Archived from the original (http://www.soc.mil/75thrr/75th_home.htm) on 27 January 2008. Retrieved 12 February 2008.
58. "75th Ranger Regiment website" (http://web.archive.org/web/20080208083040/http://www.soc.mil/75thrr/75thrrfs.html). Archived from the original (http://www.soc.mil/75thrr/75thrrfs.html) on 8 February 2008. Retrieved 12 February 2008.
59. Couch, Dick (March 2007). Chosen Soldier: The Making of a Special Forces Warrior. Three Rivers Press. ISBN 0-307-33939-4.
60. Shanker, Thom (21 January 2002). "A Nation Challenged: Battlefield; Conduct of War Is Redefined By Success of Special Forces". New York Times.
61. Schmitt, Eric; Thom Shanker (2 March 2008). "U.S. Plan Widens Role in Training Pakistani Forces in Qaeda Battle". New York Times.
62. "USASF mission" (http://web.archive.org/web/20071211221352/http://www.soc.mil/SF/mission.htm). Archived from the original (http://www.soc.mil/SF/mission.htm) on 11 December 2007. Retrieved 8 January 2008.
63. "Night Stalkers fact sheet" (http://web.archive.org/web/20071217230457/http://www.soc.mil/160soar/soar_home.htm). Archived from the original (http://www.soc.mil/160soar/soar_home.htm) on 17 December 2007. Retrieved 8 January 2008.
64. "160th SOAR,MH-60 Black Hawk Helicopter Fact Sheet" (http://www.soc.mil/160soar/Blkhawk.html). Retrieved 12 February 2008.
65. "PSYOP Recruiting website" (http://web.archive.org/web/20080204120503/http://www.bragg.army.mil/psyop/psyopintro.htm). Archived from the original (http://www.bragg.army.mil/psyop/psyopintro.htm) on 4 February 2008. Retrieved 12 February 2008.
66. "Army Civil Affairs, Psychological Operations Soldiers Deploy in Support of Tsunami Relief Efforts" (http://www.defenselink.mil/home/articles/2005-01/a010705tj1.html) (Press release). Department of Defense. 7 January 2005. Retrieved 14 March 2008.
67. "PSYOP fact sheet" (http://web.archive.org/web/20080203103530/http://www.soc.mil/psyop/psyop_default.htm). Archived from the original (http://www.soc.mil/psyop/psyop_default.htm) on 3 February 2008. Retrieved 12 February 2008.
68. "95th Civil Affairs Fact Sheet" (http://web.archive.org/web/20080119211325/http://www.soc.mil/ca/ca_default.htm). Archived from the original (http://www.soc.mil/ca/ca_default.htm) on 19 January 2008. Retrieved 21 January 2008.
69. "SOSCOM Home Page" (http://web.archive.org/web/20080119210555/http://www.soc.mil/soscom/soscom_default.htm). Archived from the original (http://www.soc.mil/soscom/soscom_default.htm) on 19 January 2008. Retrieved 12 February 2008.
70. "USAJFKSWCS" (http://web.archive.org/web/20080119211345/http://www.soc.mil/swcs/swcs_default.htm). Archived from the original (http://www.soc.mil/swcs/swcs_default.htm) on 19 January 2008. Retrieved 19 February 2008.
71. "NAVSOC info website" (https://www.navsoc.navy.mil/). Retrieved 8 January 2008.
72. "Official U.S. Navy SEAL Info Website" (http://199.208.208.41/seal/introduction.aspx). Retrieved 11 January 2008.
73. Couch, Dick (October 2001). The Warrior Elite: The Forging of SEAL Class 228. Crown. ISBN 0-609-60710-3.
74. "Navy SEALs insertion/extraction page" (http://www.navyseals.com/insertion-extraction). Retrieved 11 January 2008.
75. Tiron, Roxana (February 2002). "New Mini-Sub Gives SEALs Extra Speed, Range, Payload". National Defense Magazine.
76. "Official U.S. Navy SWCC Info Website" (http://www.seal.navy.mil/swcc/introduction.aspx). Retrieved 11 January 2008.
77. Steven Lee Meyers, Thom Shanker (16 October 2001). "A Nation Challenged: The Offensive; Special Operations Gunship Being Used Against Taliban". New York Times.
78. "AFSOC" (http://www2.afsoc.af.mil/). Retrieved 11 January 2008.
79. Meyers, Steven Lee; Thom Shanker (17 October 2001). "A Nation Challenged: Air War; Pilots Told to Fire at Will in Some Zones". New York Times.
80. "Combat Control Fact Sheet" (http://archive.is/8rCmr). Air Force Special Operations Command. United States Air Force. Archived from the original (http://www.af.mil/information/factsheets/factsheet.asp?id=174) on 21 February 2013. Retrieved 13 January 2013.
81. "Combat Control career description" (http://www.airforce.com/careers/detail/combat-control-males-only/). Retrieved 12 January 2013.
82. "1st SOW Fact Sheet" (http://www2.hurlburt.af.mil/library/factsheets/factsheet.asp?id=3485). AFSOC. Retrieved 20 January 2008.
83. "Air Force launches first special tactics wing" (http://archive.is/Do72). 2012-06-13. Archived from the original (http://www.af.mil/news/story.asp?id=123305724) on December 12, 2012. Retrieved January 15, 2013.
84. "24th SOW Factsheet" (http://www.afsoc.af.mil/library/factsheets/factsheet.asp?id=19566). Retrieved January 15, 2013.
85. "N.M. Delegation Welcomes 27th Special Ops. Wing to Cannon" (http://bingaman.senate.gov/news/record.cfm?id=281393) (Press release). 29 August 2007. Retrieved 21 March 2008.
86. "352nd Fact Sheet" (http://www2.afsoc.af.mil/library/factsheets/factsheet.asp?id=224). AFSOC. Retrieved 21 January 2008.
87. "353rd SOG Fact Sheet" (http://www2.afsoc.af.mil/library/factsheets/factsheet.asp?id=225). AFSOC. Retrieved 21 January 2008.
88. "USAFOS fact sheet" (http://web.archive.org/web/20080109132212/http://www.af.mil/factsheets/factsheet.asp?id=186). Archived from the original (http://www.af.mil/factsheets/factsheet.asp?id=186) on 9 January 2008. Retrieved 8 January 2008.
89. Kenyon, Henry (May 2006). "Marine Corps Special Operations Command Hits the Beach" (http://www.afcea.org/signal/articles/templates/SIGNAL_Article_Template.asp?articleid=1123&zoneid=182). Signal Magazine. Retrieved 10 April 2008.
90. "MARSOC" (http://www.marsoc.usmc.mil/). Retrieved 8 January 2008.
91. "MARSOC, MSOS Info website" (http://web.archive.org/web/20080209195131/http://www.marsoc.usmc.mil/msos.html). Archived from the original (http://www.marsoc.usmc.mil/msos.html) on 9 February 2008. Retrieved 21 January 2008.
92. USSOCOM Medal recipients (http://www.shadowspear.com/th/threads/united-states-special-operations-command-medal-to-lt-gen-wlodzimierz-potasinski.6197/)
93. "NEWS | USSOCOM Commander visits POLSOCOM | Dowództwo Wojsk Specjalnych" (http://www.wojskaspecjalne.mil.pl/45,more,129-ussocom_commander_visits_polsocom.html?ln=en). Wojskaspecjalne.mil.pl. 2010-05-14. Retrieved 2013-04-22.
94. "Amerykańskie Dowództwo Operacji Specjalnych docenilo polskiego generala" (http://www.wojsko-polskie.pl/pl/z-zycia-wojska/30655,amerykanskie-dowodztwo-operacji-specjalnych-docenilo-polskiego-generala.html). wojsko-polskie.pl. 2014-06-03. Retrieved 2014-06-03.
95. "Medal USSOCOM dla polskiego generala" (http://mon.gov.pl/aktualnosci/artykul/najnowsze/2014-10-29-medal-dowodztwa-operacji-specjalnych-usa-dla-polskiego-generala/). mon.gov.pl. 2014-10-29. Retrieved 2014-10-29.

## Bibliography

- Briscoe, Charles (2001). Weapon of Choice: ARSOF in Afghanistan. Combat Studies Institute Press.
- Couch, Dick (March 2007). Chosen Soldier: The Making of a Special Forces Warrior. Three Rivers Press. ISBN 0-307-33939-4.
- Couch, Dick (2006). Down Range: Navy SEALs in the War on Terrorism. New York, New York: Three Rivers Press. ISBN 1-4000-8101-7.
- Kelley, Stephen Andrew (June 2007). "Better Lucky Than Good: Operation Earnest Will as Gunboat Diplomacy" (http://web.archive.org/web/20090318120640/http://www.ccc.nps.navy.mil/research/theses/kelley07.pdf) (PDF). Naval Postgraduate School. Archived from the original (http://www.ccc.nps.navy.mil/research/theses/kelley07.pdf) on 18 March 2009. Retrieved 12 May 2008.
- Luttrell, Marcus; Patrick Robinson (June 2007). Lone Survivor: The Eyewitness Account of Operation Redwing and the Lost Heroes of SEAL Team 10. Little, Brown and Company. ISBN 0-316-06759-8.
- Pirnie, Bruce R. (August 1998). Assessing Requirements for Peacekeeping, Humanitarian Assistance and Disaster Relief. RAND Corporation. ISBN 0-8330-2594-5.
- Pushies, Fred (2007). U.S. Air Force Special Ops. Osceola, Wisconsin: MBI Publishing Company. ISBN 0-7603-0733-4.
- Smith, Michael (2007). Killer Elite: The Inside Story of America's Most Secret Special Operations Team. New York, New York: St. Martin's Press. ISBN 0-312-36272-2.
- Sweetman, Jack (March 1999). Great American Naval Battles. Naval Institute Press. ISBN 1-55750-794-5.
- David Tucker, Christopher J. Lamb (2007). United States Special Operations Forces. Columbia University Press. ISBN 0-231-13190-9.
- Wise, Harold Lee (May 2007). Inside the Danger Zone: The U.S. Military in the Persian Gulf, 1987–1988. US Naval Institute Press. ISBN 1-59114-970-3.

Web

- USDOD. U.S. DOD Dictionary of Military Terms (http://www.dtic.mil/doctrine/jel/doddict/). United States of America: U.S. Department of Defense. 5 June 2003.
- USDOD. U.S. DOD Dictionary of Military Terms: Joint Acronyms and Abbreviations (http://www.dtic.mil/doctrine/jel/doddict/). United States of America: U.S. Department of Defense. 5 June 2003.
- Talmadge, Eric (27 February 2008). "New US Submarines Trade Nukes for SEALs" (http://www.foxnews.com/wires/2008Feb27/0,4670,StealthatSea,00.html). Fox News. Associated Press.
- Eric Schmitt, Michael R. Gordon (4 February 2008). "Leak on Cross-Border Chases From Iraq" (http://www.nytimes.com/2008/02/04/washington/04rules.html?_r=1&scp=3&sq=Army+Rangers&st=nyt&oref=slogin). New York Times.
- von Zielbauer, Paul (27 April 2007). "Criminal Charges Are Expected Against Marines, Official Says" (http://www.nytimes.com/2007/04/27/world/asia/27abuse.html?scp=1&sq=MARSOC&st=nyt). New York Times.
- Graham, Bradley (2 November 2005). "Elite Marine Unit to Help Fight Terrorism" (http://www.washingtonpost.com/wp-dyn/content/article/2005/11/01/AR2005110102069.html). Washington Post. Retrieved 27 May 2010. Check date values in: |year= / |date= mismatch (help)

## External links

- U.S. Special Operations Command (http://www.socom.mil/)
- Air Force Special Operations Command (http://www2.afsoc.af.mil/)
- U.S. Army Special Operations Command (http://www.soc.mil/)
- U.S. Naval Special Warfare Command (http://www.navsoc.navy.mil/)
- U.S. Marine Corps Forces Special Operations Command (http://www.marines.mil/unit/marsoc/Pages/default.aspx)
- Department of Defense (http://www.defenselink.mil/)
- Joint Special Operations University (https://jsou.socom.mil/)



Wikimedia Commons has media related to United States Special Operations Command.

Retrieved from "http://en.wikipedia.org/w/index.php?title=United_States_Special_Operations_Command&oldid=656910583"

Categories: Special operations commands of the United States Armed Forces | Military units and formations in Florida | Counter-terrorism

- This page was last modified on 17 April 2015, at 15:26.
- Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

# United States Central Command

From Wikipedia, the free encyclopedia

The United States Central Command (USCENTCOM or CENTCOM) is a theater-level Unified Combatant Command of the U.S. Department of Defense, established in 1983, taking over the 1980 Rapid Deployment Joint Task Force (RDJTF) responsibilities.

The CENTCOM Area of Responsibility (AOR) includes countries in the Middle East, North Africa, and Central Asia, most notably Afghanistan and Iraq. CENTCOM has been the main American presence in many military operations, including the Persian Gulf War, the War in Afghanistan (2001–present), and the Iraq War. As of 2015 CENTCOM forces are deployed primarily in Iraq and Afghanistan in combat roles and have support roles at bases in Kuwait, Bahrain, Qatar, the United Arab Emirates, Oman, Pakistan, and central Asia. CENTCOM forces have also been deployed in Jordan, and Saudi Arabia in the past, with a small presence remaining there.as of 2009.

As of 22 March 2013 CENTCOM's commander is General Lloyd J. Austin, U.S. Army.

Of all 6 American regional unified combatant commands CENTCOM is among the three with headquarters outside its area of operations. CENTCOM's main headquarters is located at MacDill Air Force Base, in Tampa, Florida. A forward headquarters was established in 2002 at Camp As Sayliyah in Doha, Qatar, which in 2009 transitioned to a forward headquarters at Al Udeid Air Base in Qatar to serve American strategic interests. On 12 January, 2015, CENTCOM's Twitter and YouTube accounts were hacked.[2]



| United States Central Command | |
|---|---|
| colspan | Emblem of the United States Central Command. |
| Active | 1983–present |
| Country | 🇺🇸 United States of America |
| Type | Unified Combatant Command |
| Headquarters | MacDill Air Force Base Tampa, Florida, U.S. |
| Nickname | CENTCOM |
| Engagements | Persian Gulf War Iraq War War in Afghanistan |
| Commanders | |
| Combatant Commander | General Lloyd Austin, USA |
| Deputy Commander | Vice Admiral Mark Fox, USN [1] |
| Notable commanders | General David Petraeus Admiral William Fallon General John Abizaid General Tommy Franks General Anthony Zinni General James Mattis |

## Contents

- 1 History
- 2 Structure
  - 2.1 War planning

- 3 Geographic scope
- 4 Commanders
  - 4.1 Unit decorations
- 5 See also
- 6 References
- 7 External links

General Norman Schwarzkopf

Insignia

Shoulder sleeve insignia (US Army only)



# History

In 1983, U.S. Central Command was established to succeed the Rapid Deployment Joint Task Force, formed at MacDill AFB, Florida on 1 March 1980, to handle US national security interests in Southwest Asia, Central Asia and the Persian Gulf.[3]

On 17 May 1987, the USS Stark (FFG-31), conducting operations in the Persian Gulf during the Iran-Iraq War, was struck by Exocet missiles fired by an Iraqi aircraft, resulting in 37 casualties. Soon afterward, as part of what became known as the "Tanker War", the Federal government of the United States reflagged and renamed 11 Kuwaiti oil tankers. In Operation Earnest Will, these tankers were escorted by USCENTCOM's Middle East Force through the Persian Gulf to Kuwait and back through the Strait of Hormuz.[3]

With the 1990 Invasion of Kuwait and the subsequent Operation Desert Shield, hundreds of thousands of troops were transferred to Saudi Arabia. Islamists objected to non-Muslim troops in Saudi Arabia, and their use in Operation Desert Storm; this with other attacks on Iraq became a key rallying cry for opposition movements in Saudi Arabia and elsewhere. By the late 1990s, Central Command gradually moved troops to other countries, particularly Bahrain, Kuwait, Qatar, Oman, and the United Arab Emirates.

Exercise Internal Look has been one of CENTCOM's primary planning events. It had frequently been used to train CENTCOM to be ready to defend the Zagros Mountains from a Soviet attack and was held annually.[4] In autumn 1989, the main CENTCOM contingency plan, OPLAN 1002-88, assumed a Soviet attack through Iran to the Persian Gulf. The plan called for five and two-thirds US divisions to deploy, mostly light and heavy forces at something less than full strength (apportioned to it by the Joint Strategic Capability Plan [JSCAP]). The strategy of the original plan called for these five and two-thirds divisions to march from the Persian Gulf to the Zagros Mountains and prevent the Soviet Ground Forces from seizing the Iranian oil fields.[5] After 1990 Norman Schwarzkopf reoriented CENTCOM's planning to fend off a threat from Iraq and the exercise moved to a biennial schedule. The exercise has been employed for explicit war planning on at least two occasions: Internal Look '90, which dealt with a threat from Iraq,[4] and Internal Look '03, which was used to plan what became Operation Iraqi Freedom.

From April to July 1999 CENTCOM conducted Exercise Desert Crossing 1999 centered on the scenario of Saddam Hussein being ousted as Iraq's dictator. It was held in the McLean, Virginia, offices of Booz Allen.[6]:6-7 The exercise concluded that unless measures were taken, "fragmentation and chaos" would ensue after Saddam Hussein's overthrow.

In January 2015, CENTCOM's Twitter feed was reported to have been hacked on 11 January by ISIS sympathizers.[7] for less than one hour. No classified information was posted and "none of the information posted came from CENTCOM's server or social media sites",[8] however, some of the slides came from federally funded Lincoln Laboratory at MIT.[7]

# Structure

CENTCOM headquarters staff directorates include personnel, intelligence, operations, logistics, plans & policy, information systems, training & exercises, and resources, and other functions. The intelligence section is known as Joint Intelligence Center, Central Command, or JICCENT, which serves as a Joint Intelligence Center for the co-ordination of intelligence. Under the intelligence directorate, there are several divisions including the Afghanistan-Pakistan Center of Excellence.

CENTCOM directs four "service component commands" and one subordinate unified command and no fighting units directly subordinate to it:

The United States Army Central (USARCENT), and the United States Air Forces Central Command (USAFCENT), both headquartered at Shaw Air Force Base in South Carolina, the U.S. Marine Forces Central Command (USMARCENT), headquartered at MacDill Air Force Base, Florida and the U.S. Naval Forces Central Command (USNAVCENT), headquartered at Naval Support Activity Bahrain in the Kingdom of Bahrain. MacDill Air Force Base also hosts a Sub-unified command called the Special Operations Command Central (USSOCCENT).

Two major subordinate multi-service commands reporting to Central Command were responsible for Afghanistan: Combined Joint Task Force 180 and Combined Forces Command Afghanistan (CFC-A). CFC-A was disestablished in February 2007.[9] From that point onward, the International Security Assistance Force directed most U.S. forces in Afghanistan, and a U.S. general, General Dan K. McNeill, assumed command of ISAF that same month.[10]

Temporary task forces include the Central Command Forward - Jordan (CF-J), established in Jordan after 2011. The reason for its establishment has been reported as to seize Syrian WMD if necessary.[11]

On 1 October 2008 Combined Joint Task Force - Horn of Africa at Camp Lemonnier in Djibouti was transferred to United States Africa Command (USAFRICOM).[12] The United States Forces – Iraq or USF-I, was a major subordinate multi-service command during the Iraq War order of battle until it was disestablished in 2011.

Elements of other Unified Combatant Commands, especially United States Special Operations Command (USSOCOM), operate in the CENTCOM area. It appears that SOCCENT does not direct the secretive Task Force 77, the ad-hoc grouping of Joint Special Operations Command 'black' units such as Delta Force and Army Rangers, which is tasked to pursue the most sensitive high value targets such as Al Qaeda and the Taliban leadership since 11 September 2001. Rather TF 77, which started out as Task Force 11 and has gone through a number of name/number changes, reports directly to Joint Special Operations Command, part of USSOCOM.

## War planning

The following code names are known to have been associated with was planning per William Arkin:[13]:46

- CENTCOM OPORDER 01-97, Force Protection
- SOCEUR SUPPLAN 1001-90, 9 May 1989
- CENTCOM CONPLAN 1010, July 2003
- CENTCOM CONPLAN 1015-98, possibly support to OPLAN 5027 for Korea, 15 March 1991
- CENTCOM 1017, 1999
- CONPLAN 1020
- CONPLAN 1067, for possible Biological Warfare response
- CENTCOM CONPLAN 1100-95, 31 March 1992

Globalsecurity.org also lists OPLAN 1002 (Defense of the Arabian Peninsula).

# Geographic scope

With the 1983 establishment of CENTCOM Egypt, Sudan, Kenya, Ethiopia, Somalia and Djibouti came within the area of responsibility (AOR). Thus CENTCOM directed the 'Natural Bond' exercises with Sudan, the 'Eastern Wind' exercises with Somalia, and the 'Jade Tiger' exercises with Oman, Somalia, and Sudan. Exercise Jade Tiger involved the 31st Marine Expeditionary Unit with Oman from 29 November 82-8 Dec 82.[13]:404


CENTCOM Area Of Responsibility

The Area of Responsibility extends to 27 countries: Afghanistan, Bahrain, Egypt, Iran, Iraq, Jordan, Kazakhstan, Kuwait, Kyrgyzstan, Lebanon, Oman, Pakistan, Qatar, Saudi Arabia, Syria, Tajikistan, Turkmenistan, United Arab Emirates (UAE), Uzbekistan, and Yemen. International waters included are the Red Sea, Persian Gulf, and western portions of the Indian Ocean.[14] Syria and Lebanon were transferred from the United States European Command on 10 March 2004.

Israel is surrounded by CENTCOM countries but remains in United States European Command (EUCOM). General Norman Schwarzkopf expressed the position over Israel frankly in his 1992 autobiography: 'European Command also kept Israel, which from my viewpoint was a help: I'd have had difficulty impressing the Arabs with Central Command's grasp of geopolitical nuance if one of the stops on my itinerary had been Tel Aviv.'[4]:318

On 7 February 2007, plans were announced for the creation of a United States Africa Command which transferred strategic interest responsibility for all of Africa to the new USAFRICOM, except for Egypt. On 1 October 2008, the Africa Command became operational and Combined Joint Task Force - Horn of Africa, the primary CENTCOM force on the continent, started reporting to AFRICOM at Stuttgart instead of CENTCOM in Tampa.

4/27/2015 United States Central Command - Wikipedia, the free encyclopedia
Case 1:15-cv-01955-JEB Document 24-1 Filed 12/03/15 Page 195 of 271
Case 2:15-cv-01955-JEB Document 24-1 Filed 12/03/15 Page 195 of 448

The U.S. armed forces use a variable number of base locations depending on its level of operations. With ongoing warfare in Iraq and Afghanistan in 2003, the United States Air Force used 35 bases, while in 2006 it used 14, including four in Iraq. The United States Navy maintains one major base and one smaller installation, with extensive deployments afloat and ashore by U.S. Navy, U.S Marine Corps and U.S. Coast Guard ships, aviation units and ground units.

# Commanders

As of March 2013, GEN Lloyd Austin is commander. He took command from General James Mattis, USMC. Mattis took command from [15][16][17] Lieutenant General John R. Allen, USMC, the deputy commander since July 2008, who took temporary command when the previous commander, General David Petraeus, USA, left to take command of the International Security Assistance Force (ISAF) in Afghanistan on 23 June 2010.[18]

| No. | Image | Name | Service | Start | End | Time in office |
|---|---|---|---|---|---|---|
| 1. |  | GEN Robert Kingston | United States Army | 1 January 1983 | 27 November 1985 | 1,061 days |
| 2. |  | Gen George B. Crist | United States Marine Corps | 27 November 1985 | 23 November 1988 | 1,092 days |
| 3. |  | GEN H. Norman Schwarzkopf | United States Army | 23 November 1988 | 9 August 1991 | 989 days |
| 4. |  | Gen Joseph P. Hoar | United States Marine Corps | 9 August 1991 | 5 August 1994 | 1,092 days |
| 5. |  | GEN J. H. Binford Peay III | United States Army | 5 August 1994 | 13 August 1997 | 1,104 days |
| 6. |  | Gen Anthony Zinni | United States Marine Corps | 13 August 1997 | 6 July 2000 | 1,058 days |

| | | | | | | |
|---|---|---|---|---|---|---|
| 7. |  | GEN Tommy Franks | United States Army | 6 July 2000 | 7 July 2003 | 1,096 days |
| 8. |  | GEN John Abizaid | United States Army | 7 July 2003 | 16 March 2007 | 1,348 days |
| 9. |  | ADM William J. Fallon | United States Navy | 16 March 2007 | 28 March 2008 | 378 days |
| (Acting) |  | LTG Martin E. Dempsey | United States Army | 28 March 2008 | 31 October 2008 | 217 days |
| 10. |  | GEN David H. Petraeus | United States Army | 31 October 2008 | 30 June 2010 | 607 days |
| (Acting) |  | LtGen John R. Allen | United States Marine Corps | 30 June 2010 | 11 August 2010 | 42 days |
| 11. |  | Gen James Mattis | United States Marine Corps | 11 August 2010 | 22 March 2013 | 954 days |
| 12. |  | GEN Lloyd Austin | United States Army | 22 March 2013 | Incumbent | Expression error: Unexpected number. days |

## Unit decorations

The unit awards depicted below are for Headquarters, US Central Command at MacDill AFB. Award for unit decorations do not apply to any subordinate organization such as the service component commands or any other activities unless the orders specifically address them.

| Award streamer | Award | Dates | Notes |
|---|---|---|---|
| | Joint Meritorious Unit Award | 2 August 1990 – 21 April 1991 | Department of the Army General Order (DAGO) 1991-22 & 1992-34[19] |
| | Joint Meritorious Unit Award | 1 August 1992 – 4 May 1993 | DAGO 1994-12 & 1996-01 |
| | Joint Meritorious Unit Award | 8 October 1994 – 16 March 1995 | DAGO 2001–25 |
| | Joint Meritorious Unit Award | 1 September 1996 – 6 January 1997 | Joint Staff Permanent Order (JSPO) J-ISO-0012-97 |
| | Joint Meritorious Unit Award | 1 October 1997 – 15 July 1998 | JSPO J-ISO-0241-98 |
| | Joint Meritorious Unit Award | 16 July 1998 – 1 November 1999 | JSPO J-ISO-0330-99 / DAGO 2001–25 |
| | Joint Meritorious Unit Award | 2 November 1999 – 15 March 2001 | |
| | Joint Meritorious Unit Award | 11 September 2001 – 1 May 2003 | DAGO 2005–09 |
| | Joint Meritorious Unit Award | 2 May 2003 – 31 December 2005 | |
| | Joint Meritorious Unit Award | 1 January 2006 – 1 March 2008 | JSPO J-ISO-0061-08 |
| | Joint Meritorious Unit Award | 2 March 2008 – 1 July 2010 | |
| | Joint Meritorious Unit Award | 2 July 2010 – 31 July 2012 | |

# See also

- Strategic Army Corps

# References

1. http://www.centcom.mil/en/about-centcom-en/leadership-en
2. "Centcom hacked: This was no more harmful than a teenager's prank" (http://www.telegraph.co.uk/news/worldnews/islamic-state/11342416/Centcom-hacked-This-was-no-more-harmless-than-a-teenagers-prank.html). The Telegraph. Retrieved 12 January 2015.
3. Anthony Cordesman, USCENTCOM Mission and History (http://csis.org/files/media/csis/pubs/uscentcom3%5B1%5D.pdf), Center for Strategic and International Studies, August 1998
4. Norman Schwarzkopf (1993). It Doesn't Take a Hero. Bantam Books paperback edition. pp. 331–2,335–6. ISBN 0-553-56338-6.Harold Coyle's novel Sword Point gives an impression of what such planning envisaged, by a U.S. Army officer who would have had some idea of the general planning approach.
5. Richard Moody Swain, Lucky War: Third Army in Desert Storm, U.S. Army Command and General Staff College Press via Google Books, 6.
6. Michael R. Gordon, Bernard E. Trainor(2012). The Endgame: The Inside Story of the Struggle for Iraq, from George W. Bush to Barack Obama. New York: Pantheon Books. ISBN 978-0-307-37722-7.
7. "U.S. Central Command Twitter feed appears hacked by Islamic State sympathizers" (http://www.reuters.com/article/2015/01/12/us-cybersecurity-centcom-hack-idUSKBN0KL1UZ20150112). Reuters. 12 January 2015. Retrieved 12 January 2015.
8. CHRIS GOOD, JOSHUA COHAN and LEE FERRAN (12 January 2015). "Home> International 'Cybervandalism': ISIS Supporters Hijack US Military Social Media Accounts" (http://abcnews.go.com/International/us-military-twitter-account-apparently-hijacked-isis-supporters/story?id=28170963). ABC (ABC news Internet Venture). Retrieved 12 January 2015.
9. Jan Goldman Ph.D., The War on Terror Encyclopedia: From the Rise of Al-Qaeda to 9/11 and Beyond, 100-101.
10. Auerswald and Saideman, 2014, 96f
11. Nicola Nasser (5 September 2013). "Jordan Invites US Targets for Syrian Retaliation" (http://www.globalresearch.ca/jordan-invites-us-targets-for-syrian-retaliation/5348258). Centre for Research on Globalization.
12. "Africans Fear Hidden U.S. Agenda in New Approach to Africom" (http://www.foxnews.com/story/0,2933,430564,00.html). Associated Press. 2008-09-30. Retrieved 2008-09-30.
13. Arkin, William (25 January 2005). Code Names: Deciphering U.S. Military Plans, Programs and Operations in the 9/11 World (First ed.). Steerforth. ISBN 1586420836.
14. "Central Command" (http://www.globalsecurity.org/military/agency/dod/centcom.htm). Global Security.org. n.d. Retrieved 13 January 2015.
15. "Mattis takes over Central Command, vows to work with Mideast allies in Afghanistan, Iraq" (http://www.foxnews.com/us/2010/08/11/mattis-takes-central-command-vows-work-mideast-allies-afghanistan-iraq/). Fox News Channel. Associated Press. 11 August 2010. Retrieved 15 March 2012.
16. Mitchell, Robbyn (12 August 2010). "Mattis takes over as CentCom chief" (http://www.tampabay.com/news/article1114800.ece). St. Petersburg Times. p. 1. Retrieved 12 August 2010.
17. "Mattis assumes command of CENTCOM" (http://www.centcom.mil/news/mattis-assumes-command-of-centcom). U.S. Central Command. 11 August 2010. Retrieved 12 August 2010.

18. "Lt. Gen. Allen named CENTCOM acting commander" (http://www.centcom.mil/en/press-releases/lt-gen-allen-named-centcom-acting-commander) (Press release). U.S. Central Command. 30 June 2010. Retrieved 2 July 2010.

19. "Department of the Army General Orders" (http://armypubs.army.mil/epubs/da_general_orders_1.html). United States Army Publications Directorate. Retrieved 30 April 2011. (Army Knowledge Online account may be required.)

# External links

- U.S. Central Command official website (http://www.centcom.mil/)
- Multi-National Force – Iraq.com mnf-iraq.com (http://www.mnf-iraq.com) (English)
- Multi-National Force – Iraq (http://www.shurakaal-iraq.com) shurakaal-iraq.com (Arabic)
- Combined Joint Task Force – Horn of Africae official site (http://www.hoa.centcom.mil/)
- Spiegel, Peter (5 January 2007). "Naming New Generals A Key Step In Shift On Iraq" (http://articles.latimes.com/2007/jan/05/nation/na-generals5). Los Angeles Times.
- Foreign Policy, Pentagon Ups the Ante in Syria Fight (http://foreignpolicy.com/2015/03/30/the-pentagon-ups-the-ante-in-syria-fight-iraq-islamic-state-delta-force/)
- http://www.armytimes.com/story/military/pentagon/2014/12/30/iraq-1st-infantry-funk/21062071/ - Combined Joint Forces Land Component Command - Iraq

Retrieved from "http://en.wikipedia.org/w/index.php?title=United_States_Central_Command&oldid=655960119"

Categories: Military units and formations in Florida | Organizations based in Tampa, Florida | Unified combatant commands of the United States Armed Forces | Military units and formations established in 1983 | 1983 establishments in the United States

- This page was last modified on 11 April 2015, at 11:43.
- Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

# Police show off Homeland Security intelligence center

By Linda Trischitta
Sun Sentinel

MARCH 20, 2015, 12:15 AM  |  DORAL

At a secret location in Miami-Dade County, analysts and investigators tasked with preventing terrorist attacks study tips about possible plots that could be carried out between Key West and Palm Beach.

They are part of the Southeast Florida Fusion Center, one of 78 centers in the United States and Guam, Puerto Rico and the U.S. Virgin Islands that make sure federal and local police agencies talk to one another about pending threats.

On Thursday, the center promoted its "See Something, Say Something" campaign to engage residents of Monroe, Miami-Dade, Broward and Palm Beach counties in its efforts.

Before the Sept. 11, 2001 al-Qaeda attacks when nearly 3,000 died, some of the terrorists trained at Florida air fields before flying jets into the World Trade Center, a field in Pennsylvania and the Pentagon in Washington, D.C.

"There was information out there that wasn't being shared," said Lt. Mario Hernandez of Miami-Dade police, the agency that manages the eight-year-old center. "One agency had a piece of the puzzle, another agency had a piece of the puzzle, nobody had the whole puzzle. We're trying to prevent that from happening again."

Besides crime analysis, they help local authorities prepare for big national events that South Florida frequently hosts and will lend equipment such as cameras to monitor crowds.

The center's director, acting Maj. Janna Bolinger-Heller, of Miami-Dade Police, said she could not disclose most of its success stories or the number of terrorism incidents that have been thwarted.

But officials said they helped investigate Raees Alam Qazi, 22, and his brother Sheheryar Alam Qazi, 32, of Oakland Park, who pleaded guilty March 12 to federal terrorism charges and admitted they plotted a terrorist attack on New York City landmarks.

The center coordinated in 2014 with Miami Gardens police, U.S. Customs and Border Protection and Interpol in an investigation of two Bahamian men here illegally. One was sought in his country for the murder of a U.S. citizen; Bahamian authorities took him into custody. The other man was deported, according to Homeland Security.

An example of what Bolinger-Heller called "unintended benefits" was how the center's cameras that had been lent ... ounty Fair helped recover lost children.

... ban Beach Week in Miami Beach, a camera placed on a causeway showed police racing to a ... and a burglary suspect jumping off a backyard dock into Biscayne Bay, she said. The camera ... s to the swimming suspect.

... price on the kinds of resources we have here and how we can use them to benefit the

r-Heller said.

SEARCH

SUBSCRIBE　LOG IN

MEMBER CENTER

NEWS

CLASSIFIED

BROWARD

PALM BEACH

SPORTS

ENTERTAINMENT

BUSINESS

LIFESTYLE

HEALTH

TRAVEL

OPINION

WEATHER

SF PARENTING

CARS & TRUCKS

VIDEOS & PHOTO

ort Lauderdale's air show or a Super Bowl, the center will begin its threat assessment months
the other centers in the country for intelligence reports, Lt. Margarita Varela said.

cal criminal activity, concerns for police and public safety in their preparations. Regardless of
orts, Varela said, "the bottom line for the public is we can't do it alone. We have to work hand
rder to prevent criminal activity or a terrorism attack from happening in our hometown. Our
e, our families work here, we go to the malls here, we celebrate here."

center's tip lines — iwatchsouthflorida.com, seffc@mdpd.com and 855-352-7233 — to be
e Stoppers.

ype of person being reported on," Varela said. "Look at the behavior. Was a vehicle or item left
ve could walk by and not even challenge those things. In today's society, we can't. Bring this
authorities and let us follow up on it."

gns of Terrorism

one recording or monitoring activities, taking notes, drawing diagrams, marking maps or
ther visual devices.

or individuals seeking information in person or by mail, phone or email about military
es or personnel.

Attempts to measure reaction times by police to security breaches; efforts to go through
onitor procedures to assess strengths and weaknesses.

s transactions involving large cash payments, withdrawals or deposits; asking for money for
or criminal activities.

ng or stealing explosives, weapons or ammunition; acquiring military uniforms, decals, flight
lges or equipment to make them and other items.

eople who don't seem to belong, whether in a workplace, neighborhood, business or at border
onation of law enforcement, military or corporate employees.

people in place and moving them according to a plan without actually committing a terrorist
is activity includes mapping routes and timing traffic lights and flow.

e and supplies getting into position to commit an act. This is the last chance for someone to
e a terrorist event happens.

lorida Fusion Center

Ltrischitta@Tribune.com, 954-356-4233 or Twitter @Linda Trischitta

Copyright © 2015, Sun Sentinel

FROM AROUND THE WEB　　　　　　　　　　Sponsored Links by Taboola

1 Dirty Little Secret To Eliminate 15 Years Of Mortgage Payments
LowerMyBills

7 Outrageous Credit Cards For Those Of Us That Have Excellent Credit
NextAdvisor

This $15 Product is Changing a $13 Billion Industry
Harry's

Ex-Microsoft exec is disrupting the traditional broker model
Yahoo! Finance | Motif Investing

Kate Upton and Tracy Morgan's Super Bowl Touchdown Dance
Vogue

30 Highest Paid Performers In The World
Forbes

Why You Should Be Getting Your Wine Online
Betches Love This | Lot 18

Russell Wilson Disagrees With Aaron Rodgers, Says God Does Care About Football
ThePostGame



## POLITICS

# Sheriff Joe vs. Uncle Sam

Joe Arpaio, America's most flamboyant lawman, hired a private detective to investigate the wife of a federal judge considering whether he was in contempt of court.



Ross D. Franklin / AP

**DAVID A. GRAHAM**
**APR 25, 2015**

Lots of conservatives talk a good game about how citizens should resist federal control and devolve power to local governments. Few of them are willing to put their convictions into action in quite the same way that Sheriff Joe Arpaio is.

The man who calls himself "America's toughest sheriff" was already in trouble with Uncle Sam, on trial for contempt of court in a U.S. district court.

It was only once that was under way that Arpaio and his lawyer apparently had the idea to sic a private investigator on the wife of the federal judge hearing his case. That shows toughness. It shows a willingness to use unorthodox tactics to resist federal interference. It's also not especially bright.

Reporters in the courtroom describe a somewhat shocking scene. Lawyers had completed their questioning when Judge Murray Snow announced he had some questions for Arpaio. After a series of queries, Snow asked: "Are you aware that I've been investigated by anyone?"

The sheriff then admitted that his former attorney had hired the private investigator to look into a tipster's allegation that Snow's wife had told someone at a restaurant that Snow wanted to prevent Arpaio from being reelected. Arpaio's amazing rationalization: "We weren't investigating you. We were investigating some comments that came to our attention."

**RELATED STORY**



Sheriff Joe Arpaio: The Most Lawless Lawman in America

The sheriff was on trial for, well, thumbing his nose at the federal government. In 2011, Judge Murray Snow issued a ruling demanding that Arpaio stop anti-immigration patrols arresting people solely on suspicion of being in the country illegally, while Snow continued to consider whether they

4/27/2015                                    Sheriff Joe vs. Uncle Sam - The Atlantic

Case 1:15-cv-00662-TSE   Document 21-1   Filed 03/08/16   Page 207 of 448        206 of 271

constituted illegal racial profiling. (In 2013, Snow finally ruled that they did, forcing Arpaio to drop the patrols permanently.) Arpaio simply disregarded the order for 18 months—as he now acknowledges. The question is whether that was intentional or not; if the judge decides it's the former, he could find Arpaio in contempt. The sheriff's somewhat improbable explanation is that he simply didn't realize that a federal judge had issued the order.

"I have a deep respect for the courts," Arpaio said. "It really hurts me after 55 years to be in this position. I want to apologize to the judge. I should have known more about these court orders that slipped through the cracks."

There are two problems with that. One is that a deputy testified this week that Arpaio had personally instructed him to continue enforcing federal immigration laws, in defiance of the judge's order. The second is that hiring a PI to investigate the judge who's considering whether you're in contempt of court isn't what most people would consider deep respect.

"It is contemptuous behavior on its face," a former U.S. attorney told The Arizona Republic. "And it is information deserving of further investigation to determine if other criminal misconduct occurred here."

Intimidating or trying to improperly influence a federal judge is in fact a crime. But this isn't the first time Arpaio has pulled a stunt like this—and in fact, he has a long history of launching investigations into political opponents. In 2012, a federal grand jury concluded a three-year investigation into abuse-of-power allegations without charging Arpaio.

The U.S. Department of Justice also has a civil-rights lawsuit pending against the sheriff accusing him of retaliating against critics. In a bizarre Spy vs. Spy moment, Arpaio also admitted to Snow that he had used county funds in 2013 to launch an investigation into ... the Justice Department. Elsewhere during the questioning, Arpaio "conced[ed] that the agency employed

unreliable informants, private investigators and an unknown amount of public funds to investigate Arpaio's political enemies," as the *Republic* put it.

Arpaio's current attorney pushed back on the big revelation after the hearing, telling reporters: "These been no evidence that the sheriff ordered the judge's wife to be investigated." But his client's use of the first-person plural ("we were investigating some comments that came to our attention") would seem to contradict that.

Courts have already found that Arpaio violated the law, and there's no longer any question that other aspects of his behavior—even those not yet adjudicated for legality—are outlandish. The law isn't especially conflicted on many of the issues about which he's outspoken. The federal government has authority to enforce immigration laws; Arpaio's racial profiling was unlawful; intimidating a judge, if that's what he's found to be doing, is unlawful too; and yes, Barack Obama was born in the United States.

## "I have a deep respect for the courts. I want to apologize to the judge. I should have known more about these court orders that slipped through the cracks."

But there's a conflict between rule of law and rule of the people, and between the federal government and local authority. Arpaio has won six elections, never by less than six points. The closest was in 2012, when his legal trouble was already underway and well into his ill-advised birther crusade against Obama, but in 2008 he won by a comfortable 13 points. The point is: Maricopa County voters like Arpaio and have kept returning him to office, even as his M.O. has become abundantly clear. Maybe Washington doesn't want him enforcing federal immigration laws, but a majority of Phoenix-area voters apparently do. Besides, not all of the raps on Arpaio have stuck—

witness the federal grand jury that didn't charge him (though that may have been mostly because of a challenging burden of proof).

This conflict between federal and local authority, never far from the surface in American history, has seen a resurgence in recent years, as conservative governments—mostly at the state level—have reacted to legislation passed by Democrats and backed by Obama by attempting to nullify or reject federal law. On issues from Obamacare to gun control, state legislators have even tried to write laws that would make enforcing federal statutes illegal. Few of these laws have passed, though, and if they did, they'd have little chance of surviving judicial review.

What's interesting about Arpaio is that unlike lawmakers who have pursued doomed legislative attempts to stop the liberal agenda, the sheriff is fighting back using his own executive authority, mixed with street-fighting moves. And when the federal judiciary has smacked him down, he's simply ratcheted up those efforts.

Perhaps investigating a federal judge's wife will be one step too far and spell his demise. If not, he could run for a seventh time in 2016. There's some precedent for voters punishing anti-federal pols in Arizona—they tossed State Senator Russell Pearce, the major proponent of Arizona's controversial illegal-immigration bill, after he seemed to have gone too far. Don't assume the same rules will apply to Joe Arpaio that apply to everyone else, though—he certainly doesn't think they do.

---

**ABOUT THE AUTHOR**



**DAVID A. GRAHAM** is a staff writer at *The Atlantic*, where he covers political and global news. He previously reported for *Newsweek*, *The Wall Street Journal*, and *The National*.

🐦 @GrahamDavidA    ✉ Email

# U.S. Air Force Intel Unit Helped Kill 1,200 People in a Year

## 361st Intelligence, Surveillance and Reconnaissance Group fed information to commandos

by DAVID AXE

A secretive group of U.S. Air Force intelligence specialists flying aboard American spy planes helped U.S. military commandos kill more than a thousand enemy combatants in just a single year back in 2012.

That's one startling revelation in the official annual history for 2012 of the Air Force's Intelligence, Surveillance and Reconnaissance Agency, a heavily-redacted copy of which War Is Boring obtained through the Freedom of Information Act.

Linguists and analysts from the 361st Intelligence, Surveillance and Reconnaissance Group at Hurlburt Field in Florida flew on at least 31,180 combat sorties in 2012, supporting no fewer than 960 separate operations that resulted in Special Operations Forces detaining more than 3,980 people and killing at least 1,210, according to the history.

That single year's kill tally probably makes the 361st one of the deadliest individual organizations in the entire U.S. military.



The 361st began as an aerial mapping unit during World War II. In 2008, the Air Force revived the unit as part of a massive expansion of intel units to support counterterrorism operations and the wars in Iraq and Afghanistan.

Between 2008 and 2012, the Pentagon grew its fleet of spy planes and surveillance drones by 238 percent—until they accounted for half of all Air Force aircraft, according to the ISR Agency history. By 2012 the Defense Department was spending $67 billion a year on intelligence and surveillance.



*Above—a U.S. Air Force MC-12W. At top—airmen from the Air Force's ISR Agency at work. Air Force photos*

Many intel flights require specialists to fly aboard the aircraft to quickly analyze the video the plane is shooting or translate the communications between enemy fighters that the aircraft's receivers pick up.

The intelligence personnel can then pass the information they gather to troops on the ground. The info might include the locations and strength of enemy fighters.

The 361st—which oversees two smaller units of linguists and analysts, the 19th and 25th Intelligence Squadrons—provides the specialists for spy flights supporting Special Operations Forces. The group "is heavily tasked around the world," the Air Force stated in a fact sheet.

Tech. Sgt. Brandi Fast from the 25th Intelligence Squadron was the Defense Department's Language Professional of the Year in 2013. That year she deployed twice to Southwest Asia—Afghanistan, presumably—and helped during a mission to rescue 14 crew from a coalition helicopter that crashed.

*Fast has a 16,000-word vocabulary in three languages, according to the Air Force.*

Lt. Col. John Shirley, the 361st's commander since April 2014, called his people "the best and brightest America and the Air Force has to offer."



*A U.S. Air Force U-28. Air Force photo*

The planes the 361st's specialists ride in could include special commando aircraft belonging to the Air Force or the Army. The Air Force's few public releases concerning the 361st specifically mention U-28 and MC-12W spy planes, which are heavily-modified turboprop transports sporting sophisticated sensors.

The MC-12W was a fixture in Afghanistan until recently. The U-28s spend much of their time in Africa.

The 361st's intel personnel also support drone flights, presumably by sitting in the robot planes' command trailers and analyzing video and communications intercepts the drones pipe in. In 2012, 19 percent of the 31,180 sorties the 361st's people supported were drone flights, according to the ISR Agency history.

*Based on the more than 1,200 people the 361st helped to kill in 2012, the group's work is certainly deadly to the bad guys. But the unit has also suffered casualties of its own.*

On Feb. 18, 2012, a U-28 crashed in Djibouti in East Africa, killing Senior Airman Julian Scholten from the 25th Intelligence Squadron.

And the 361st's Staff Sgt. Richard Dickson, who operated signals-intercepting gear, died in Afghanistan on April 27, 2013, when his MC-12W went down in hostile territory.









RSS



TWITTER

## The NSA Listened as Chinese MiGs Shot Down American Warplanes

Declassified docs detail Vietnam War air clashes

medium.com

## The U.S. Is Sending Specialists to Iraq to Keep Tabs on Iran's Agents

Counterintelligence troops help guard against spies

medium.com

## The Pentagon Deployed Scent Warfare in Vietnam

Electronic sniffers literally smelled for the enemy

medium.com

Exhibit 13

**IN UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: 15-cv-20782-Martinez

DENNIS MONTGOMERY,

                    Plaintiff,

v.

RISEN, ET AL.

                    Defendants.

_____/

**PLAINTIFF'S REVISED INITIAL DISCLOSURE WITNESS LIST**

Montgomery, Dennis
Miami, Florida
Software Validation and all issues relevant to the Complaint

Risen, James
Maryland
Book, defamatory statements, actual malice, communications with Dennis Montgomery and all issues relevant to the Complaint

**FRCP Rule 30(b)(6) witnesses of corporate Defendants**

Mr. William Bayers, Esq.
General Counsel
Boston, Massachusetts 02116
Defamation, classified information, asked to correct defamatory statements, no journalistic standards, Florida contacts and sales, fact checking and all issues relevant to the Complaint

Linda K. Zecher
President, Chief Executive Officer and Director
Boston, Massachusetts 02116
Defamation, classified information, asked to correct defamatory statements, fact checking, Florida contacts and sales and all issues relevant to the Complaint

David Eber
Vice President and Associate General Counsel
Boston, Massachusetts 02116
Defamation, classified information, asked to correct defamatory statements, all issues relevant to the Complaint

Brook Colangelo
VP Houghton Mifflin Harcourt
White House Network Email and Network Infrastructure
all issues relevant to the Complaint

Houghton Mifflin Harcourt Publishing Company
Boston, Massachusetts 02116
all issues relevant to the Complaint

Rosemary Moseley
Lake Placid, Florida
Purchase of Book in Florida
all issues relevant to the Complaint

Kimberly Hines
Ft. Lauderdale, Florida
Montgomery Reputation, Purchase of Book in Florida
all issues relevant to the Complaint

Goss, Porter
Director of CIA
Miami, Florida
Software Validation, White House and Congressional Briefing
all issues relevant to the Complaint

Johns, Ken
Macdill AFB, Florida
Software Validation, White House and Congressional Briefing, Montgomery Reputation
all issues relevant to the Complaint

Lyons, XXXXX
Macdill AFB, Florida
Software Validation, White House and Congressional Briefing, Montgomery Reputation
all issues relevant to the Complaint

Macbeth, W. Rhys
Eglin AFB, Florida
Software Validation, White House and Congressional Briefing, Montgomery Reputation
all issues relevant to the Complaint

Nazelrod, Craig
Eglin AFB, Florida
Software Validation, White House and Congressional Briefing
all issues relevant to the Complaint

Pipes, XXXXX

Macdill AFB, Florida
Reputation Damage
all issues relevant to the Complaint

Roche, James
Macdill, Florida
Software Validation, White House and Congressional Briefing, CIA Visits, eTreppid Visits
all issues relevant to the Complaint

Rumsfeld, Donald
Florida
Software Validation, White House and Congressional Briefing, CIA Visits, Reputation damage
all issues relevant to the Complaint

Stillman, Phillip
Attorney Dennis Montgomery
Miami, Florida
Dennis Montgomery Legal Briefs, Whistleblower complaints
all issues relevant to the Complaint

Madden, Tom
Boca Raton, Florida
Reputation, damage to reputation in FL
all issues relevant to the Complaint

Olivia, Adrian
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Bartholomew Mary L
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Fiamengo, Nicholas A
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Freeman, Gregory J
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Savage Cynthia

Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

McCool John C
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Temple James K
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Griffin Susan M.
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Russell, Deborah
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Nettelhorst Doug M
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Stallworth Hugh T
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Bob McCaskey
Macdill AFB, Florida
Northrop Grumman TASC
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Crutchfield, Chris
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Melnyk, Michael S.

Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Lopez Tina M
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings

Cerny, Jeffrey D.
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Muccio Anthony B
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

McKinney Scott E LtCol
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Purvis Brad Civ
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

'Kirsch, Jim'
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Hughes Stacey L
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Abramson, Jill
Former New York Times Editor in Chief
New York, NY
Dennis Montgomery Reputation, James Risen, Eric Lichtblau
all issues relevant to the Complaint

Anderson, Jesse
Employee eTreppid Technologies

Reno, Nevada
SOCOM work
all issues relevant to the Complaint

Azzinaro, Neil
2006 Search Warrant
Las Vegas, Nevada
2006 Search Warrant
all issues relevant to the Complaint

Bauder, Jim
Employee eTreppid Technologies
Reno, Nevada
SOCOM work
all issues relevant to the Complaint

Blixseth, Edra
Beverly Hills, CA
760-831-1982
Software Works
all issues relevant to the Complaint

Blixseth, Tim
Medina, WA 98004
760-333-9024
Software Works
all issues relevant to the Complaint

Frye, Doug
Malibu, CA
Government Contracts, Montgomery Reputation, eTreppid Bank Accounts
all issues relevant to the Complaint

Sandoval, Michael
Bellevue, WA
Software Functionality, Mass Surveillance Technology, Congressional Briefing, Mike Flynn

Snowden, Edward
Somewhere in Russia
Mass Surveillance Technology, NSA and CIA Briefing
all issues relevant to the Complaint

Trepp, Warren
Reno, NV
US Government contracts, CIA Briefings, Search Warrant, Software Functionality
all issues relevant to the Complaint

Venables, Sloan
Virginia City, NV
US Government contracts, CIA Briefings, Search Warrant, Software Functionality
all issues relevant to the Complaint

Wiedermann, Peter
Contractor USAF
Kirkland, WA
US Government contracts, CIA Briefings, Search Warrant, Software Functionality
all issues relevant to the Complaint

- This is an initial disclosure witness list and Plaintiff reserves the right to supplement it as this case proceeds to discovery and trial.

Dated: April 27, 2015                                    Respectfully submitted,

                                                        */s/ Larry Klayman*
                                                        Larry Klayman, Esq.
                                                        Klayman Law Firm
                                                        FL Bar No. 246220
                                                        7050 W Palmetto Park Rd.
                                                        Suite 15-287
                                                        Boca Raton, FL 33433
                                                        (310) 595-0800
                                                        leklayman@gmail.com
                                                        Attorney for Plaintiff

Exhibit 14

# Klayman Law Firm

2020 Pennsylvania Avenue, N.W., Suite 800, Washington, DC 20006-1811 ❖ Telephone: (310) 595-0800 ❖ leklayman@gmail.com

VIA FEDERAL EXPRESS AND CERTIFIED MAIL

January 14, 2015

 **① URGENT**

Linda K. Zecher
President, Chief Executive Officer and Director

William Bayers
Executive Vice President and General Counsel

Houghton Mifflin Harcourt
222 Berkeley Street
Boston, MA 02116

## Re: Defamation of Dennis Montgomery in "Pay Any Price" by James Risen.

Dear Ms. Zecher and Mr. Bayers:

I am counsel for Dennis Montgomery.

My client has brought it my attention that the recent publication of "Pay Any Price," written by James Risen, is defamatory. In a later correspondence, I will outline in detail all of the defamatory statements, which are actionable as libel per se. And because Mr. Montgomery is not a public figure, in fact having worked with various intelligence agencies and The White House, he was "undercover" given his duties and responsibilities in gathering intelligence concerning various matters related to terrorism. Thus, to prove a case for defamation, which we will file in Florida if this matter cannot be resolved, one need not even show malice, although it arises in any event from libel per se.

In Risen's book, as just one example of the defamatory conduct, he writes at pages 32-33:

> Whatever else he was, Dennis Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post-9/11 age for what it was, a time to make money.

1

Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it. The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in a series of civil lawsuits involving Montgomery.

It was as if everyone in Washington was afraid to admit that the Emperor of the War on Terror had no clothes.

A former medial technician, a self-styled computer software expert with no experience whatsoever in national security affairs, Dennis Montgomery almost singlehandedly prompted President Bush to ground a series of international commercial flights based on what now appears to have been an elaborate hoax. Even after it appeared that Montgomery had pulled off a scheme of amazing scope, he still had die-hard supporters in the government who steadfastly refused to believe the evidence suggesting that Montgomery was a fake, and who rejected the notion that the super-secret computer software that he foisted on the Pentagon and CIA was anything other than America's salvation.

It is therefore clear that Houghton Mifflin Harcourt, in order to fact-check Risen's statements to responsibly exercise due diligence, even assuming that Risen's statements are not defamatory, would have had to have had access to top secret highly classified information. However, for you the publisher, to have access to this information, without the authorization of the government, would constitute crimes.

Thus, I want to understand how you fact checked Risen before you both decided to defame my client and how, after publication of his book, you furthered Risen's continuing defamatory statements in the print, television and radio media. In short, you not only have corporate and personal significant civil liability to my client, but have you also collectively engaged what is in effect a criminal enterprise for profit.

If you would like to discuss this matter before Mr. Montgomery takes other avenues of redress, please contact me immediately. I am available to meet with you at the end of this month if such a meeting could prove productive to try to resolve this serious matter. Let me know if there is an interest by January 20, 2015 to discuss how you fact-checked Risen's statements; otherwise we will contact the Federal Bureau of Investigation and seek other suitable redress.

Although I am representing Mr. Montgomery in my private capacity, as also a public interest advocate, there is a duty and responsibility on my part not to accede to top secret classified

information being strewn all over the public record, particularly given the rise of Islamic terrorism in recent months and the even heightening risks this presents to the this nation and the free world.

Please govern yourselves accordingly.

Sincerely,

Larry Klayman

cc:     Dennis Montgomery
        James Risen

Exhibit 15

# Klayman Law Firm

2020 Pennsylvania Avenue, N.W., Suite 800, Washington, DC 20006-1811 ® Telephone: (310) 595-0800 ® leklayman@gmail.com

Via Fax and Mail

February 13, 2015

Mr. William Bayers, Esq.
General Counsel
Houghton Mifflin Harcourt Publishing Company
222 Berkeley Street, FL 1-11
Boston, Massachusetts 02116

Mr. James Risen
c/o The New York Times
1627 "I" Street N.W., Suite 700
Washington, D.C. 20006-4007

Mr. James Risen
c/o Houghton Mifflin Harcourt Publishing Company
222 Berkeley Street, FL 1-11
Boston, Massachusetts 02116

Re:   **Demand for Retraction of Defamation Pursuant to § 770.02 Florida Statutes (2012)**

Dear Mr. Bayers and Mr. Risen:

I am writing as legal counsel for Mr. Dennis Montgomery, who is the subject of Chapter 2 and other portions of a book published by Houghton Mifflin Harcourt Publishing Company titled "Pay Any Price:  Greed, Power and Endless War" authored by James Risen.

This letter is to place you on notice pursuant to § 770.02 Florida Statutes (2012) "Notice condition precedent to action or prosecution for libel or slander" that you have published statements concerning our client Dennis Montgomery which constitute defamation *per se*, general defamation and defamation by inference (hereafter "defamatory statements").

You are now on notice that these materials have resulted in severe damage to Dennis Montgomery personally and in his trade and profession, for which you may be held to account for legally.

Your defamatory statements were first and continue to be published in a book with publication date October 14, 2014, by Houghton Mifflin Harcourt Publishing Company at 215 Park Avenue South, New York, New York 10003, under the title "Pay Any Price:  Greed, Power and Endless War" (referred to as "the Book) by author James Risen, Copyright (c) 2014 by James Risen, designated by the Library of Congress by its index system as ISBN 978-0-544-34141-8 (hardback edition).

Retraction Letter
February 13, 2015
Page | 2

The publication dated October 14, 2014, was the first publication of the book worldwide in any language and the first printing run of the book. The book was physically printed in the United States of America. We understand that copies of the Book were distributed to bookstores and/or the public up to a week or two earlier than the designated date of publication (a book's designated publication date being primarily of marketing significance, not necessarily the earliest date of a book's release).

Apart from the book itself, James Risen on behalf of himself and the publisher also engaged in a flurry of news interviews and talk show interviews starting in September, and continuing until the present time, associated with the publication 'roll out' of his book in which Risen made further statements in addition to the words of the book itself and repeated claims from the book itself.

Many of Risen's libelous and slanderous statements were made during written news and talk show interviews in September 2014, October 2014, and November, 2014, and since then, some spoken, some in print, surrounding the publication of his book rather than in the book itself.

Your defamatory statements against Dennis Montgomery are exceedingly numerous, extensive, detailed, and often each defamatory in numerous respects. Many statements each include multiple and overlapping topics of defamation against Dennis Montgomery.

As a result, we have attached as "Attachment A" to this letter a 28-page restatement, summary, and analysis of at least 43 examples of defamatory statements. We expect that James Risen also made other statements during additional radio, television, and print interviews about the Book.

You are now on notice that this article resulted in severe damage to Mr. Montgomery personally and in his trade and profession, for which you all will be held to legally account for.

We demand that you issue a retraction immediately. In your previous letter of January 20, 2015, you denied that any defamatory statements were made. We strongly suggest that you reconsider. Please govern yourselves accordingly.

Sincerely,

Larry Klayman

cc: Dennis Montgomery

## ATTACHMENT A

## LIST OF EXAMPLES OF DEFAMATORY STATEMENTS, COMMENTS

## DEFAMATION *PER SE*

1.      The following statements are "*defamatory per se,*" recognized under Florida law

when statements are so powerful in their ability to hurt someone that Florida law presumes

harmful as a matter of law. *Montgomery v. Knox*, 23 Fla. 595, 3 So. 211, 217 (1887), such that a

judge will allow damages to be awarded in these cases even if no evidence of harm has been

presented. "[T]he law presumes malice in their utterance," *Abraham v. Baldwin*, 52 Fla. 151, 42

So. 591, 592 (1906), where the words are "… of such common notoriety established by the

general consent of men, that the courts must of necessity take judicial notice of its harmful

effect." *Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234, 236 (1933). [1]

2.      **First, on Page 32 of the Book, Risen writes:** [2]

> "Consider the example of Dennis Montgomery.  He provides a
> perfect case study to explain how during the war on terror greed and
> ambition have been married to unlimited rivers of cash to create a
> climate in which someone who has been accused of being a con
> artist was able to create a rogue intelligence operation with little or
> no adult supervision. Crazy became the new normal in the war on
> terror, and the original objectives of the war got lost in the process."

3.      As libel *per se*, Risen asserted that out of "greed" Montgomery "create[d] a rogue

intelligence operation with little or no adult supervision and that he was "someone who has been

accused of being a con artist."

---

[1]      Examples of defamation *per se* include those that hurt one's profession, business or trade; falsely state that a person has a socially unacceptable illness or disease;  or falsely state that a person has been involved in some kind of criminal activity.  *Lawnwood Medical Center Inc. v. Sadow*, 43 So. 3d 710, 729 (Fla. 4th DCA 2010).
[2]      Note that several statements may qualify under different theories, but are presented in full for proper context.  Some statements are repeated for that portion of the statement that qualifies under different theories of defamation under Florida law.

4.    **Second, on Page 32 of the Book, the Risen writes:**

"Whatever else he was, Dennis Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post-9/11 age for what it was, a time to make money. Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it**.** The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in public, a series of civil lawsuits involving Montgomery.  It was as if everyone in Washington was afraid to admit that the Emperor of the War on Terror had no clothes."

5.    As libel *per se*, Risen asserted Montgomery's work "many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic."

6.    As libel *per se*, Risen asserted about the Montgomery that "once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it …"

7.    **Third, on Page 33 of the Book, Risen writes:**

"A former medical technician, a self-styled computer software expert with no experience whatsoever in national security affairs, Dennis Montgomery almost singlehandedly prompted President Bush to ground a series of international commercial flights based on what now appears to have been an elaborate hoax. Even after it appeared that Montgomery had pulled off a scheme of amazing

2

> scope, he still had die-hard supporters in the government who
> steadfastly refused to believe the evidence suggesting that
> Montgomery was a fake, and who rejected the notion that the
> super-secret computer software that he foisted on the Pentagon and
> CIA was anything other than America's salvation."

8. As libel *per se*, Risen asserted that Montgomery's work "now appears to have

been an elaborate hoax."

9. As libel *per se*, Risen asserted that "die-hard supporters in the government who

steadfastly refused to believe the evidence suggesting that Montgomery was a fake."

10. As libel *per se*, Risen asserted that he "that he foisted on the Pentagon and CIA"

super-secret computer software.

11. **Fourth, on Page 34 of the Book, the Risen writes:**

> "Montgomery was an overweight, middle-aged, incorrigible gambler,
> a man who liked to play long odds because he was convinced that he
> could out-think the house. He once boasted to a business partner that
> he had a system for counting an eight-deck blackjack shoe, quite a
> difficult feat for even the best card sharks, and he regularly tested his
> theories at the El Dorado and the Peppermill Casino in Reno. He
> usually came up short but that didn't stop him from playing blackjack
> on a nightly basis, racking up unwieldy debts that eventually led to his
> 2010 arrest for bouncing more than $ 1 million in bad checks at
> Caesar's Palace in Las Vegas."

12. As libel *per se*, Risen asserted about the Montgomery that he was an "incorrigible

gambler," meaning in effect that Montgomery was a gambling addict who was "playing

blackjack on a nightly basis."  Historically, gambling and in particular an uncontrollable

gambling addict is a loathsome social status.

13. *Fifth,* **on Page 36 of the Book, Risen writes:**

> "Michael Flynn, Montgomery's former lawyer— who later
> concluded that Montgomery was a fraud."

14. As libel *per se*, Risen asserted about the Montgomery that Montgomery's lawyer "concluded that Montgomery was a fraud."

15. **Sixth, on Page 37 of the Book, Risen writes:**

> *"By the spring and summer of 2003, eTreppid was awarded contracts by both the air force and U.S. Special Operations Command. Montgomery was able to win over the government in part by offering field tests of his technology —tests that former employees say were fixed to impress visiting officials. Warren Trepp later told the FBI that he eventually learned that Montgomery had no real computer software programming skills, according to court documents that include his statements to the FBI. Trepp also described to federal investigators how eTreppid employees had confided to him that Montgomery had asked them to help him falsify tests of his object recognition software when Pentagon officials came to visit. Trepp said that on one occasion, Montgomery told two eTreppid employees to go into an empty office and push a button on a computer when they heard a beep on a cell phone. Meanwhile, Montgomery carried a toy bazooka into a field outside eTreppid. He was demonstrating to a group of visiting U.S. military officials that his technology could recognize the bazooka from a great distance."*

16. As libel *per se*, Risen asserted about Montgomery that he committed fraud including defrauding the U.S. Government, prohibited under the False Claims Act codified at 31 U.S.C. §§ 3729 – 3733.

17. **Seventh, on Page 37 of the Book, Risen writes:**

> "After he was in place in the field, he used a hidden cell phone to buzz the cell phone of one the eTreppid employees, who then pushed a key on a computer keyboard, which in turn flashed an image of a bazooka on another screen prominently displayed in front of the military officers standing in another room, according to court documents. The military officers were convinced that Montgomery's computer software had amazingly detected and recognized the bazooka in Montgomery's hands. (Montgomery insists that the eTreppid employees lied when they claimed that he had asked them to fix the tests, and also says that the air force issued a report showing that it had verified the tests.)"

18.      As libel *per se*, Risen asserted about Montgomery that he committed fraud

including defrauding the U.S. Government, prohibited under the False Claims Act codified at 31

U.S.C. §§ 3729 – 3733.

19.      ***Eighth,* on Page 40 of the Book, Risen writes:**

> "Montgomery brilliantly played on the CIA's technical insecurities
> as well as the agency's woeful lack of understanding about al
> Qaeda and Islamic terrorism. He was able to convince the CIA that
> he had developed a secret new technology that enabled him to
> decipher al Qaeda codes embedded in the network banner
> displayed on the broadcasts of Al Jazeera, the Qatar-based news
> network. Montgomery sold the CIA on the fantasy that al Qaeda
> was using the broadcasts to digitally transmit its plans for future
> terrorist attacks. And only he had the technology to decode those
> messages, thus saving America from another devastating attack.
> The CIA— more credulous than Hollywood or Las Vegas— fell
> for Montgomery's claims. In short, he convinced CIA officials that
> he could detect terrorist threats by watching television."

20.      As libel *per se*, Risen asserted about Montgomery that "Montgomery sold the

CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for

future terrorist attacks."

21.      As libel *per se*, Risen asserted about Montgomery that he defrauded the CIA.

22.      ***Ninth,* on Page 42 of the Book, Risen writes:**

> "A CIA official defensively pointed out that the agency did not
> actually have a contract with eTreppid at the time Montgomery was
> providing data from the Al Jazeera videotapes. While they were
> working closely together during the final months of 2003, the CIA
> had not yet started paying Montgomery, the official said. The
> agency never finalized a contract with him because agency staff
> eventually realized they had been conned, according to this official.
> But that does not diminish the fact that for a few crucial months, the
> CIA took Montgomery and his technology very seriously."

23.      As libel *per se*, Risen asserted about Montgomery that "agency staff eventually

realized they had been conned, according to this official."

24. **Tenth**, **on Page 46 of the Book, the Risen writes:**

> "It did not take long for the French firm to conclude that the whole thing was a hoax. The French company said that there were simply not enough pixels in the broadcasts to contain hidden bar codes or unseen numbers. The firm reported back to the French government that the supposed intelligence was a fabrication."

25. As libel *per se*, Risen asserted about Montgomery that "the whole thing"

(Montgomery's work) "was a hoax" and a "fabrication."

26. **Eleventh**, **on Page 46 of the Book, the Risen writes:**

> **"**The CIA never investigated the apparent hoax nor examined how it had been handled inside the agency. No one involved in promoting Montgomery, in vouching for his information to the president, or in proposing to shoot down planes based on his claims ever faced any consequences."

27. As libel *per se*, Risen asserted about Montgomery that his work was a hoax.

28. **Twelfth**, **on Page 47 of the Book, the Risen writes:**

> "At the time of the Christmas 2003 scare, John Brennan was head of the newly created Terrorist Threat Integration Center and in charge of distributing terrorism-related intelligence throughout the government. That meant that Brennan's office was responsible for circulating Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration. But Brennan was never admonished for his role in the affair. After Barack Obama became president, Brennan was named to be his top counterterrorism advisor in the White House. He later became CIA director."

29. As libel *per se*, Risen asserted about Montgomery that "That meant that

Brennan's office was responsible for circulating Montgomery's fabricated intelligence to

officials in the highest reaches of the Bush administration."

30. **Thirteenth**, **on Page 50 of the Book, Risen writes:**

> "Edra Blixseth was Dennis Montgomery's latest mark. After being introduced to him by a former Microsoft executive and then hearing Montgomery explain his software, she agreed in 2006 to bankroll Montgomery to launch a new company, to be called Blxware.

> Montgomery needed new government contracts for Blxware, and
> Edra Blixseth had the money and contacts to try to make it happen."

31.     As libel *per se*, Risen asserted about Montgomery that "Edra Blixseth was Dennis

Montgomery's latest mark," clearly asserting Montgomery to be a con man.

32.     The libel is false, including because Montgomery owed no stock or ownership in

BLIXWARE so as to be able to make a "mark" of Edra Blixseth.

33.     ***Fourteenth,*** on November 6, 2014, James Risen appeared as an interview guest

on "The Daily Show with Jon Stewart," by Comedy Central, interviewed by Jon Stewart.

Exhibit A, attached. The television interview was taped at The Daily Show's studio 11th Avenue

between 51st and 52nd Street, New York (Manhattan), New York, and broadcast for the first time

nationwide across the United States of America through cable television and satellite television

on "The Comedy Central" channel.

34.     James Risen stated in said television interview for his statements to be broadcast

on TV that his favorite story is the story of –

> Dennis Montgomery who is this guy was as a computer software
> expert, supposed expert. Who convinced the CIA in 2003 that he had
> the super-secret technology to read Al Jazeera news broadcasts and
> decipher Al Qaeda codes inside the [interrupted by Jon Stewart]
>
> [Jon Stewart]  An Enigma machine for Al Qaeda...?
>
> [Dennis Montgomery] Right.  And he convinced the CIA in 2003 that
> he could read numbers and letters hidden in the Al Jazeera broadcasts
> that corresponded with flights that Al Qaeda was going to shoot down,
> knock--- or blow up….
>
> President Bush was so convinced of this that they grounded flights all
> over the world at Christmas 2003 based on this guy's intelligence or
> supposed intelligence.  It took the French intelligence service, who had
> gotten very mad because they grounded flights from Paris to Los
> Angeles.  And they demanded that the CIA tell them where they were
> getting this information.    And so they finally [non-verbal

interruption]. They finally got the information. The French told them this is a hoax. This is a fabrication.

And as soon as the CIA agreed with them, they covered the whole thing up, and refused to ever talk about it. And Montgomery kept getting more contracts after that.

[Other, extended discussion with Jon Stewart on other topics]

There is lots of raw intelligence every day that says there is an attack about to happen. You really have to be a pretty sophisticated consumer of intelligence after several years to begin to realize what's real and what's not really a credible threat.

35. As libel *per se*, Risen asserted about Montgomery that "he convinced the CIA in 2003 that he could read numbers and letters hidden in the Al Jazeera broadcasts that corresponded with flights that Al Qaeda was going to shoot down, knock--- or blow up….

36. As libel *per se*, Risen asserted about Montgomery that "The French told them this is a hoax. This is a fabrication. And as soon as the CIA agreed with them, they covered the whole thing up, and refused to ever talk about it. And Montgomery kept getting more contracts after that." The statement that "the CIA agreed with them" is Risen's assertion about Montgomery's work that "this is a hoax. This is a fabrication."

37. As libel *per se*, Risen asserted about Montgomery that "they covered the whole thing up, and refused to ever talk about it," as a way of saying that the CIA had been conned.

38. **Fifteenth,** on October 13, 2014, James Risen gave a television interview [3] with Judy Woodruff which was broadcast nationwide by the Public Broadcasting System (PBS). In that interview, James Risen made the following statements for broadcast on television, and Judy Woodruff repeated many points from James Risen's book which Risen agreed with and endorsed. Much of the interview involved other chapters not relevant here.

---

[3]     http://www.pbs.org/newshour/bb/costs-security-price-high/

JUDY WOODRUFF:  In the next chapter, JAMES RISEN, you write about millions of dollars spent on programs that were completely fraudulent.  One was run by a man named Dennis Montgomery.  He was a, He was a .... I guess he had worked in computer software... but he was a GAMBLER! [4]

JAMES RISEN:   Right.

JUDY WOODRUFF:  And he sold the CIA and the Pentagon on technology that turned out to be not at all what he said it was.

JAMES RISEN:   It is difficult to tell in some of these cases who is scamming who.  If you talk to Montgomery, he argues that the CIA wanted him to do what he was doing.  And so its a fascinating dynamic that's developed in the war on terror, between people who recognize the opportunities for this gold rush and the agencies which are... who have so much money to spend now, they're getting so much more money than they ever had before, that in some cases they don't know what to do with.

In this case, they began to believe, in this sort of war fever, that you could find Al Qaeda messages hidden in Al Jazeera broadcasts.  And so that.. that program, that highly secret program, was used to ground planes all over Europe and the United States

JUDY WOODRUFF:  When actually there was nothing to it.

JAMES RISEN:  Right

JUDY WOODRUFF:  It was a hoax.

JAMES RISEN:  Right.  Right.

JUDY WOODRUFF:  And then there was another part of it where he was saying he had special facial recognition software....

JAMES RISEN:  Right.  Right

JUDY WOODRUFF:  ... used on drones?

JAMES RISEN:   Yeah.  There were cases in which people said that he was fooling the military and the CIA about his operations and how... what kind of techniques and technologies he had.  He would argue that the CIA actually wanted him and or the army believed him

---

[4]     Emphasis, by exclamation in tone of voice, the in original conversation.

and tested it.  So it's this very complicated story about a man
recognizing an opportunity who had never been involved in national
security before and the CIA and the military all just hungry for
whoever could come with the latest idea.

39.     As libel *per se*, Risen asserted about Montgomery that "you write about millions
of dollars spent on programs that were completely fraudulent.  One was run by a man named
Dennis Montgomery," which Risen confirms by saying "Right." (Actually where the discussion
is about "the next chapter" that chapter is exclusively about Dennis Montgomery alone.)

40.     As libel *per se*, Risen asserted about Montgomery that "When actually there was
nothing to it," which Risen confirms by saying "Right." And also "It was a hoax," which Risen
confirms by saying "Right.  Right."

41.     As libel *per se*, Risen asserted about Montgomery that "There were cases in
which people said that he was fooling the military and the CIA about his operations and how...
what kind of techniques and technologies he had."

42.     **Sixteenth,** on October 24, 2014, James Risen gave an audio interview with Lucy
Worsley published on the <u>New York Times</u> website, titled **"Inside The New York Times Book
Review: James Risen's 'Pay Any Price'"** which is accessible at that website address.  [5]  In this
interview  "**Inside <u>The New York Times</u> Book Review**," with Pamela Paul, October 24, 2014,
James Risen stated for national broadcast:

> PAMELA PAUL:   How do we count and account for the costs of the
> government's war on terror.  We'll talk to  James Risen, author of Pay
> Any Price:  Greed, Power, and Endless War.

---

[5]     See:  ArtsBeat: Book Review Podcast: James Risen's 'Pay Any Price', by John Williams,
<u>New York Times</u>, October 24, 2014, http://artsbeat.blogs.nytimes.com/2014/10/24/book-review-
podcast-james-risens-pay-any-price/ , based upon Louise Richardson's book review of Risen's
book.

JAMES RISEN ("tease" audio clip):   It seems to me that what the war on terror had become in thirteen years was a search for cash and a search for power and status.

PAMELA PAUL:   What is the British fascination with murder?  Lucy Worsley will explain all joining us to talk with us about her new book:  The Art of the English Murder.

LUCY WORSLEY ("tease" audio clip):  The public used to consume murder in a way that you can still see the modern media doing it today.  Just look at the Pistorius trial.

PAMELA PAUL:   Alexander Alter will be here with Notes from the Publishing world.  And Greg Cole has bestseller news.  This is "Inside the New York Times Book Review."  I am Pamela Paul.

James Risen joins me now.  His new book is Pay Any Price:  Greed, Power, and Endless War.  Hi James.

JAMES RISEN:   Hi, thanks for having me.

PAMELA PAUL:  Thanks for being here. Now this is a book that covers a lot of territory.  Tell us briefly about what it is you set out to write about in the book.

JAMES RISEN:   What I wanted to do was, I'd written one book before about the war on terror, and I wanted to follow up with a new book that kind of looked at where we were 13 years after 9/11 and how we had what started out in the immediate aftermath of 9/11 as kind of a search for justice or a search for retribution or whatever you want to think, say we were doing right after 9/11 as a country.  It seemed to me that what the war had become in 13 years was a search for cash and a search for power and status and that it was becoming an endless war in which we had a new mercenary class of people who were taking advantage of the war on terror.  And that enormous unintended consequences had happened.  And I began to hear about just some really crazy things that were going on.  And so I thought it would make a good story.

[The discussion then covers the Chapter "Rosetta" not relevant here, concerning a lawsuit for 9/11 families against Saudi Arabia, except the ending]

JAMES RISEN [winds up the Chapter on "Rosetta" by saying]:   ....  in the war on terror became so complicated and so difficult to tell what was really going on, to me it was like a case study in how the

war on terror had been turned for other uses, and become a.... something that you could never tell what was the truth and what was not the truth. And that to me was at the heart of the problems with the war on terror, that you could never tell what's real and what was concoction today.

[The discussion then covers how Risen went about researching the book, not relevant here]

PAMELA PAUL:   Did a lot of it arise out of stories that, reporting that you'd originally done for the Times?

JAMES RISEN:   Some of it. For instance, I did a chapter The Emperor of the War on Terror, about Dennis Montgomery who [laughs] who's a strange character, who I'd done a story about him for the New York Times along with Eric Lichtbau my colleague there at the Times. He's one of the most fascinating characters in the war on terror. He... He was a computer software expert who convinced the CIA that he could decipher secret codes from Al Qaeda in the Al Jazeera news broadcasts. And that he could tell the CIA numbers and letters that corresponded with flights that Al Qaeda wanted to attack. And the CIA took this so seriously that they grounded, that the Bush Administration grounded a bunch of international flights in Christmas 2003 based on what this guy was telling them. And when they realized it was a hoax, they covered the whole thing up and never did anything about it. So I had done a story for the Times with....  about that and then expanded on that and got a lot more information for the book.

PAMELA PAUL:   How did you find out about him?

JAMES RISEN:   Well he had been written about a little bit before we wrote about it. But I had also, even before he was written about by other people, I had heard from people in the CIA that there was this crazy operation that nobody wanted to talk about, that they were all embarrassed by. To me that, it was like a case study in just how crazy the war on terror has become. And the only thing that makes sense about why it's gotten so crazy, is I think we kind of have deregulated national security and we took all, you know, Cheney said we're going to take the gloves off. And that means we deregulated national security at the same time we poured hundreds of billions of dollars into counter-terrorism. And so it's had enormous unintended consequences from what is essentially a national security crisis that is kind of like the banking crisis.

[The interview discussion then turns to the alleged deregulation of national security on other topics not relevant here.]

43. As libel *per se*, Risen asserted about Montgomery that "And when they [the CIA] realized it was a hoax, they covered the whole thing up and never did anything about it."

44. The libel is false, for the reasons identified above, and including that Montgomery never purported to be an expert in intelligence but left interpretation of the data he uncovered to intelligence experts of the U.S. Government.

45. *Seventeenth,* James Risen sat for a nationwide television news interview on the television show *DEMOCRACY NOW!* A Daily Independent Global News Hour, with Amy Goodman & Juan González, at 207 W. 25th St., Floor 11, New York, NY 10001 on October 14, 2014. On this nationwide television news broadcast, the conversation turned to:

**AMY GOODMAN:** Dennis Montgomery?

**JAMES RISEN:** Dennis Montgomery is a fascinating character, who—he was a computer software person, self-styled expert, who developed what he said was special technology that would allow him to do things with computers that other people couldn't do. One of the things that he developed was this imaging technology that he said he could find images on broadcast network news tapes from Al Jazeera. He said that he could read special secret al-Qaeda codes in the banners on the broadcasts of Al Jazeera. And the CIA believed this. And he was giving them information based on watching hours and hours of Al Jazeera tapes, saying that "I know where the next al-Qaeda attack is going to be based—is going to happen." And the Bush administration and the CIA fell for this.

**AMY GOODMAN:** And it was in the news zipper at the bottom of the Al Jazeera broadcasts?

**JAMES RISEN:** Well, he says it was in the banner. But anyway. And so, it was this great—if you talk to him, he argues, well, they—that's what they were looking for. You know, they convinced him to look for this. You know, it depends on who you talk to. But it was one of the great hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush administration, based on information they

were getting from Dennis Montgomery's so-called decryption of Al Jazeera broadcasts.

And then there's a whole number of other things, like Alarbus, which was this covert program at the Pentagon where a Palestinian involved in that was actually trying to use the bank account set up by the secret program, Pentagon program, to launder hundreds of millions of dollars. And the FBI investigated this, but then tried to keep the whole thing quiet.

**AMY GOODMAN:** How much did the U.S. government give to Dennis Montgomery?

**JAMES RISEN:** Millions of dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial problems as a result of that. So, it's a strange—to me, the Dennis Montgomery story is one of the strangest, because what it shows is, early on in the war on terror, as I said, the CIA and all these other agencies had so much money to spend on counterterrorism that they were willing to throw it at everything. They were so afraid of the next terrorist attack that they were willing to believe anybody who came up with some idea. And I called that chapter about Montgomery, you know, "The Emperor of the War on Terror," because nobody wanted to say that the emperor had no clothes.

**AMY GOODMAN:** I mean, it had very real effects, aside from spending all that money.

**JAMES RISEN:** Yeah.

**AMY GOODMAN:** For example, planes being sent back.

**JAMES RISEN:** Yes, yes. There were planes grounded. International flights between the United States and Europe and Mexico were grounded. There was talk at the White House even of shooting down planes based on this information.

**AMY GOODMAN:** Because they could be used, as with September 11th, as weapons?

**JAMES RISEN:** Yeah, as missiles or whatever. And so, it was crazy. It was absolutely insane.

**AMY GOODMAN:** And it was only the French government who then did a study?

JAMES RISEN: Yes, yes. Yeah, the French government finally—you know, the U.S.—the CIA and the Bush administration didn't want to tell anybody what was really happening, where they were getting this information. You know, "This supersecret information about Al Jazeera, we can't tell you." And finally, the French intelligence service and the French government said, "You know, you're grounding our planes. You've got to tell us where you're getting this information." And they got—they finally shared the information with them, and the French got a French tech firm to look at this, and they said, "This is nuts. This is fabrication." And after a while, the CIA was finally convinced maybe the French were right, and they stopped talking about it. They didn't do anything else. They just like shut it down eventually, but never wanted to talk about what had really happened.

AMY GOODMAN: Then Dennis Montgomery, revealed as a con man—

JAMES RISEN: Yeah, yeah.

AMY GOODMAN: —in jail for that?

JAMES RISEN: Well, no, he's not in jail. But it was a—he actually got more contracts after that, with the Pentagon and other agencies. And he continued to operate for a long time. You know, he kind of went from one agency to the other.

AMY GOODMAN: We're talking to James Risen, Pulitzer Prize-winning investigative journalist for *The New York Times*. His new book, just out today, *Pay Any Price: Greed, Power, and Endless War*. When we come back, war corrupts, endless war corrupts absolutely. Stay with us.

[break]

46.     As libel *per se*, Risen asserted about Montgomery that "But it was one of the great hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush administration, based on information they were getting from Dennis Montgomery's so-called decryption of Al Jazeera broadcasts."

47.     As libel *per se*, Risen asserted about Montgomery when asked "How much did the U.S. government give to Dennis Montgomery?" Risen answered in reply: "Millions of

dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial

problems as a result of that."

48. As libel *per se*, Risen asserted about Montgomery that "the French got a French

tech firm to look at this, and they said, 'This is nuts. This is fabrication.'"

49. As libel *per se*, Risen asserted about Montgomery when asked "Then Dennis

Montgomery, revealed as a con man—" Risen confirmed in reply: "Yeah, yeah."

50. As libel *per se*, Risen asserted about Montgomery that he should be in jail.

51. ***Eighteenth***, James Risen gave an interview with "Conversations with Great

Minds" of "The Big Picture RT with talk show host Thom Hartmann on October 24, 2014. [6]

> THOM HARTMAN:  ...  [Abrupt change of topic starting at about
> time 5:27]  ...  There's just this enormous amount of government
> money.  Let's throw it at the private sector.  They'll make things well.
> One of the members of the private sector who came forward and said
> I've got a secret, I can figure this stuff out, was a guy by the name of
> Dennis Montgomery.
>
> JAMES RISEN:  Right.  Uh, Dennis Montgomery is one of the best
> stories in the war on terror.  I think somebody should make a movie
> about him.  Dennis Montgomery was a computer software expert who
> said that he had developed technology that basically could find objects
> hidden in the video on television.  And so he convinced, through a
> whole series of contacts and meetings that I detail in the book, he was
> able to get to the CIA  and convince the CIA that he had the technology
> to decipher Al Qaeda codes that were he said were hidden in Al Jazeera
> news broadcasts.
>
> THOM HARTMAN:  They were hidden in the Chiron or the --
>
> JAMES RISEN:  In the banner.  In the banner, actually.  He said that
> he could find numbers and letters that were constantly showing up, or
> not showing up but were being hidden, embedded deeply in the video.
> And he would then give these  numbers and letters to the CIA.  And the
> CIA, either he told them or they convinced themselves that these
> numbers and letters corresponded to flights, international airline flights,
> that Al Qaeda was going to attack.  And so in December, in Christmas

---

[6]     https://www.youtube.com/watch?v=jc_8f4Pp9Zc

2003, the Bush Administration and the CIA took this so seriously that they actually grounded a whole series of international flights coming into and out of the United States, and the White House even considered shooting down some of these flights over the Atlantic.

THOM HARTMAN:   Whoa.

JAMES RISEN:    And once the CIA later was convinced by French intelligence that this was all a fabrication and that this kind of technology didn't exist and that these supposed Al Qaeda codes weren't really in the Al Jazeera newscasts, the CIA covered the whole thing up and never went public with it  and just tried to act like it never happened.

THOM HARTMAN:   Well we know how aggressively this and particularly the Obama Administration right now has gone after whistleblowers and reporters.  You would think they would also go after people who had scammed the CIA.  If one of us walked in off the street and said to the CIA, hey have I got a deal for you, and it was just a total lie, and they gave us millions of dollars, which they gave to Dennis Montgomery, you'd think he would end up in prison.

JAMES RISEN:   Well, no, he ended up getting more contracts from the military... and the Pentagon.  And he was continuing, he continued to operate for several years.  It's really a remarkable story.

THOM HARTMAN:   Yeah, it really and truly is.

[Topic changes abruptly to discussions of torture in the war on terror]

52.     As libel *per se*, Risen asserted about Montgomery that "the CIA later was convinced by French intelligence that this was all a fabrication and that this kind of technology didn't exist."

53.     As libel *per se*, Risen asserted about Montgomery that he belongs in prison, responding to the question "You would think they would also go after people who had scammed the CIA.  If one of us walked in off the street and said to the CIA, hey have I got a deal for you, and it was just a total lie, and they gave us millions of dollars, which they gave to Dennis Montgomery, you'd think he would end up in prison," by Risen answering in reply:  "Well, no,

he ended up getting more contracts from the military... and the Pentagon. And he was

continuing, he continued to operate for several years. It's really a remarkable story."

## GENERAL DEFAMATION

54.     In addition, Risen also made additional defamatory statements that are explicit

defamation under Florida law.

55.     *Nineteenth,* **on Page 49 of the Book, Risen writes:**

> "Trepp was furious. According to court documents, he told the FBI
> that Montgomery had stolen the software eTreppid had used on secret
> Pentagon contracts. As federal investigators moved in to investigate
> the alleged theft of the technology, they heard from Trepp and others
> that Montgomery's alleged technology wasn't real."

56.     As explicit libel, Risen asserted about Montgomery that Montgomery had stolen

valuable software – yet also asserted that the software "wasn't real."

## DEFAMATION BY IMPLICATION UNDER FLORIDA LAW

### Analogous to False Light

57.     For defamation by implication: " . . . [L]iterally true statements can be defamatory

where they create a false impression. This variation is known as defamation by implication and

has a longstanding history in defamation law." *See Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098,

1106 (Fla. 2008). Defamation by implication occurs when a publication states facts that are

literally true, but produces a defamatory meaning apparent from a plain reading of the

publication in its entirety. See *Chapin v. Knight-Ridder, Inc.* 993 F.3d 1087 (4th Cir. 1993).

58.     Montgomery thus claims here that if the Court finds that any of the statements

labeled "First" through "Nineteenth" do not qualify as defamation *per se* or general defamation,

then in the alternative Montgomery claims here that any and all such statements not qualifying as defamation *per se* or general defamation are defamation by implication against Montgomery.

59.    Across the many examples of libelous statements from the Book or slanderous interviews, Risen implies that Montgomery deceived the U.S. Government as to the meaning, purpose, or interpretation of hidden data and clues that Montgomery uncovered, implying that Montgomery defrauded and conned the U.S. Government.

60.    In fact, Montgomery refused to speculate as to the interpretation or meaning of the data and analyses he uncovered, even when pressed to state what he thought the data might mean, but Montgomery left the role of interpretation to U.S. Government intelligence experts.

61.    Thus, throughout the statements presented herein, Risen libels and slanders Montgomery by implication that Montgomery defrauded and scammed the U.S. Government concerning the meaning of the information Montgomery uncovered, implying that Montgomery obtained millions of dollars by frightening and fooling child-like and gullible CIA officials.

62.    Across the many examples of libelous statements from the Book or slanderous interviews, Risen implies that President George W. Bush's alleged decisions to ground and almost shoot down passenger aircraft around Christmas 2003 (which Risen would have no way of knowing about) were a result of Montgomery's fraud and scams, deceptively manipulating the President of the United States and the U.S. national command authority.

63.    Across the many examples of libelous statements from the Book or slanderous interviews, Risen implies that Montgomery should be in jail.

64.    Among the other statements, in particular, the ***First*** example of libel**, on Page 32 of the Book,** states that:

> "Consider the example of Dennis Montgomery.  He provides a perfect
> case study to explain how during the war on terror greed and ambition

19

> have been married to unlimited rivers of cash to create a climate in
> which someone who has been accused of being a con artist was able to
> create a rogue intelligence operation with little or no adult supervision.
> Crazy became the new normal in the war on terror, and the original
> objectives of the war got lost in the process."

65.     Thus, as libel by implication, Risen implies that Montgomery committed fraud

and went to any lengths motivated by greed, to obtain money at any cost.

66.     Among the other statements, in particular, in the **Eleventh** example of libel**, on**

**Page 46 of the Book,** states that:

> "The CIA never investigated the apparent hoax nor examined how it
> had been handled inside the agency."

67.     Here, as libel by implication, even if it is true that "The CIA never investigated"

what Risen describes as an "apparent hoax," the implication is that Montgomery perpetrated a

hoax upon the CIA, and in return for money, which would be both a fraud and a crime.

68.     Similarly, in the **Sixteenth** example of slander from an interview, Risen states that

"It seemed to me that what the war had become in 13 years was a search for cash and a search

for power and status and that it was becoming an endless war in which we had a new mercenary

class of people who were taking advantage of the war on terror," implying that Montgomery's

work is fraudulent in being merely an effort to get cash.

69.     Among the other statements, in particular, the **Nineteenth** example of libel**, on**

**Page 49 of the Book,** states that:

> "Trepp was furious. According to court documents, he told the FBI
> that Montgomery had stolen the software eTreppid had used on secret
> Pentagon contracts. As federal investigators moved in to investigate
> the alleged theft of the technology, they heard from Trepp and others
> that Montgomery's alleged technology wasn't real."

70.     As libel by implication, Risen implies that Montgomery stole valuable software

yet at the same time the software was in fact worthless.

71.     In addition, Risen also made additional defamatory statements that are defamation

by implication under Florida law.

72.     *Twentieth,* on the Preface Page of the Book, Risen writes:

> "I've come back," he repeated.  "I was the King of Kafiristan – me
> and Dravot – crowned Kings we was!  In this office we settled it –
> you setting there and giving us the books.  I am Peachey – Peachey
> Taliaferro Carnehan – and you've been setting here ever since –
> Oh, Lord!"
>
> I was more than a little astonished and expressed my feelings
> accordingly.
>
> "It's true," said Carnehan, with a dry cackle, nursing his fee, which
> were wrapped in rags.  "True as gospel.  Kings we were, with
> crowns upon our head – me and Dravot – poor Dan – oh, poor,
> poor Dan, that would never take advice, not though I begged of
> him!"
>
>     -- Rudyard Kipling, *The Man Who Would be King.*

73. As libel by implication, Risen implies that Montgomery (along with others addressed

in the book) is a fraud and/or con man as in *The Man Who Would be King.*

74. *Twenty-first,* in the Prologue on Page xiv of the Book, Risen writes:

> "The new homeland security-industrial complex operates differently.
> It is largely made up of a web of intelligence agencies and their
> contractors, companies that mostly provide secret services rather than
> large weapons systems and equipment.  These contractors are hired to
> help Washington determine the scale and scope of the terrorist threat;
> they make no money if they determine that the threat is overblown or,
> God forbid, if the war on terror ever comes to an end."

75.     As libel by implication, Risen states "they make no money if they determine that

the threat is overblown or, God forbid, if the war on terror ever comes to an end," suggesting that

Montgomery's and eTreppid's profits were _contingent_ upon results, and false results at that.

76.     *Twenty-second,* in the Prologue on Page xv of the Book, Risen writes:

> "Thus, the creation of a homeland security complex at a time of endless war has bequeathed us with the central narrative of the war on terror – modern tales of greed joined hand in hand with stories of abuse of power.  It was inevitable that those wise in the ways of the world would flock to Washington to try to cash in on the war on terror gold rush – and they have.  This book offers just a few of those stories. But those trying to monetize America's obsession with terrorism are not the only ones who have sought to exploit 9/11."

> "Opportunism comes in many forms and is driven by more than just greed.  Ambition and a hunger for power, status, and glory have become great engines of post-9/11 opportunism as well.  The more troubling stories here concern abuses of power that have extended across two presidencies for well over a decade.  After 9/11, the United States deregulated national security, stripping away the post-Watergate intelligence reforms of the 1970's that had constrained executive power for thirty years.  The results are morally challenging – and continue to this day."

77.     Thus, as libel by implication, Risen implies that Montgomery committed fraud and went to any lengths motivated by greed, to obtain money at any cost.

78.     ***Twenty-third,*** **in the Prologue on Page xvii of the Book, Risen writes:**

> "Washington's global war on terror is now in its second decade, thanks to the bipartisan veneer it has gained under Bush and Obama.  It shows no signs of slowing down, hustlers and freebooters continue to take full advantage, and the war's unintended consequences continue to pile up.  All too often, things are not what they seem."

79.     As libel by implication, Risen implies that Montgomery – one of the key objects of the Book – is a "hustler" and a "freebooter."

80.     ***Twenty-fourth,*** **Part 1 of the Book,** including Chapter 2 which is focused entirely on Dennis Montgomery, Risen have labeled "Part 1:  Greed"

81.     Thus, by placing the chapter focused on Dennis Montgomery under a label for the section of the Book of "Greed," Risen libels Montgomery by implication as being motivated by greed to commit fraud and carry out the alleged hoaxes identified in the rest of the Chapter 2.

82.  **Twenty-fifth,** Risen have labeled Chapter 2 of the Book which is focused entirely on Dennis Montgomery:  "Chapter 2: The Emperor of the War on Terror."

83.  By naming the chapter focused on Dennis Montgomery "The Emperor of the War on Terror," Risen libels Montgomery by implication as being the mastermind of the fraud that Risen seeks to portray the war on terror to be.

84.  **Twenty-Sixth,** on Page 40 of the Book, Risen writes:

> "The CIA's Science and Technology Directorate, which had largely been stuck on the sidelines of the war on terror, saw in Dennis Montgomery an opportunity to get in the game.  The directorate had played an important role in the Cold War, but in the first few years of the war on terror, it was struggling to determine how technology could be leveraged against groups of terrorists who were trying to stay off the grid."

85.  As libel by implication, again, Risen blames Montgomery for the decisions of government officials.

86.  **Twenty-Seventh,** on Page 42 of the Book, Risen writes:

> "Montgomery was telling the CIA exactly what it wanted to hear.  At the time, the Bush Administration was obsessed with Al Jazeera, not only because of the networks' unrelenting criticism of the invasion of Iraq, but also because it had become Osama Bin Laden's favorite outlet for broadcasting his videotaped messages to the world."

87.  As libel by implication, Risen implies that Montgomery defrauded and conned the CIA by "telling the CIA exactly what it wanted to hear."

88.  **Twenty-Eighth,** on Page 42 of the Book, Risen writes:

> "What remains unclear is how Montgomery was able to convince all of them that he had developed secret software that could decode Al Qaeda's invisible messages.  While he had gotten by a few credulous military officers who came to view his demonstrations, he apparently found it just as easy to persuade the CIA as well."

89. As libel by implication, Risen implies that Montgomery conned the U.S. Government

with a hoax.  It would of course be entirely clear "how Montgomery was able to convince all of

them" if Montgomery's work and technology are legitimate.

90. *Twenty-Ninth,* on Page 46 of the Book, Risen writes:

> "Finally the French brought an end to it.  Since Air France flights
> to the United States were among those that had been grounded,
> French officials had taken a dim view of the entire episode.  They
> began demanding answers from the Americans.  The French
> applied so much pressure on Washington that the CIA was finally
> forced to reveal to French intelligence the source of the threat
> information. Once they heard the story of Dennis Montgomery and
> eTreppid, French officials arranged for a French high-tech firm to
> reverse-engineer Montgomery's purported technology.  The
> French wanted to see for themselves whether the claims of hidden
> messages in Al Jazeera broadcasts made any sense."

91. As libel by implication, if not explicit, the passage implies that Montgomery is a fraud

and that his work is a scam and a hoax.

92. *Thirtieth,* on Page 52 of the Book, Risen writes:

> "Montgomery continued to get defense contracts even during the
> Obama administration.  In 2009, Montgomery was awarded another
> air force contract, and later claimed that he had provided the
> government with warning of a threatened Somali terrorist attack
> against President Obama's inauguration.  Joseph Liberatore, an air
> force official who described himself as one of "the believers"  in
> Montgomery and said he had heard from 'various federal agencies
> thanking us' for the support Montgomery and his company provided
> during Obama's inauguration.  The threat, however, later proved to be
> a hoax."

93. As libel by implication, Risen implies that Montgomery's ability to continue to receive

contracts is due to Montgomery's ability to defraud the government (and stupidity of government

officials) rather than an endorsement of the legitimacy of Montgomery's work.

94. *Thirty-First,* on Page 31 of the Book, Risen writes:

"and a new breed of entrepreneur learned that one of the surest and easiest paths to riches could be found not in Silicon Valley building computers or New York designing clothes but rather in Tysons Corner, Virginia, coming up with new ways to predict, analyze, and prevent terrorist attacks— or, short of that, at least in convincing a few government bureaucrats that you had some magic formula for doing so."

95. As libel by implication, Risen implies that Montgomery engaged in fraud to convince a few government bureaucrats that he had a magic formula as an easy path to riches.

96. ***Thirty-Second,*** **on Page 33 of the Book, Risen writes:**

"Montgomery's story demonstrates how hundreds of billions of dollars poured into the war on terror went to waste. With all rules discarded and no one watching the bottom line, government officials simply threw money at contractors who claimed to offer an edge against the new enemies. And the officials almost never checked back to make sure that what they were buying from contractors actually did any good— or that the contractors themselves weren't crooks. A 2011 study by the Pentagon found that during the ten years after 9/ 11, the Defense Department had given more than $ 400 billion to contractors who had previously been sanctioned in cases involving $ 1 million or more in fraud."

97. As libel by implication, Risen implies that the money provided to Montgomery (among others) went to "waste."

98. ***Thirty-Third,*** **on Page 33 of the Book, Risen writes:**

"The Montgomery episode teaches one other lesson, too: the chance to gain promotions and greater bureaucratic power through access to and control over secret information can mean that there is no incentive for government officials to question the validity of that secret information. Being part of a charmed inner circle holds a seductive power that is difficult to resist."

99. As libel by implication, Risen implies that Montgomery's work was fraudulent.

100. ***Thirty-Fourth,*** **on Page 33 of the Book, Risen writes:**

"How his technology worked was a secret. Dennis Montgomery's computer code became the great treasure behind eTreppid Technologies, the company he and Trepp founded. Later, many of

those around Montgomery began to suspect the reason why
Montgomery had to guard his technological innovations so
carefully. They came to believe that at least some of the
technology didn't really exist."

101.     As libel by implication, Risen implies that Montgomery committed fraud.

102.     ***Thirty-Fifth, on Page 35 of the Book, Risen writes:***

"Montgomery was on the lookout for somebody to bankroll him,
and had put out the word to his friends at the casinos that he
frequented the most. A year later, Montgomery and Trepp were in
business together. Trepp was one of the first, but hardly the last, to
be beguiled by Montgomery's claims that he had achieved
breakthroughs in computer technology of historic significance."

103.     As libel by implication, Risen implies that Montgomery "beguiled" Warren Trepp

by committing fraud.

104.     ***Thirty-Sixth, on Page 39 of the Book, Risen writes:***

"For a few months in late 2003, the technology from Dennis
Montgomery and eTreppid so enraptured certain key government
officials that it was considered the most important and most sensitive
counterterrorism intelligence that the Central Intelligence Agency had
to offer President Bush. Senior officials at the CIA's Directorate of
Science and Technology began to accept and vouch for Montgomery
to officials at the highest levels of the government. Montgomery's
claims grew ever more expansive, but that only solidified his position
inside the national security arena. His technology became too
impossible to disbelieve."

105.     As libel by implication, Risen imply that Montgomery committed fraud and is a

con man.

106.     ***Thirty-Seventh, on Page 40 of the Book, Risen writes:***

*"*Montgomery persuaded the spy agency that his special computer
technology could detect hidden bar codes broadcast on Al Jazeera,
which had been embedded into the video feed by al Qaeda. Allegedly,
al Qaeda was using that secret method to send messages to its terrorist
operatives around the world about plans for new attacks. Montgomery
convinced the CIA that his technology had uncovered a series of

hidden letters and numbers that appeared to be coded messages about specific airline flights that the terrorists were targeting.

107.     As libel by implication, Risen imply that Montgomery convinced the CIA of

claims that are not (were not) true.

**108.     *Thirty-Eighth,* on Page 42 of the Book, Risen writes:**

"Based on Montgomery's information, President Bush ordered the grounding of a series of international flights scheduled to fly into the United States. This step caused disruptions for thousands of travelers."

109.     As libel by implication, Risen imply that Montgomery convinced President Bush

and the national command authority of conclusions drawn from Montgomery's work.

**110.     *Thirty-Ninth,* on Page 42 of the Book, Risen writes:**

"One former senior CIA official recalled attending a White House meeting in the week following Christmas to discuss what to do next about the information coming from Montgomery. The official claims that there was a brief but serious discussion about whether to shoot down commercial airliners over the Atlantic based on the intelligence."

111.     As libel by implication, Risen imply that Montgomery convinced President Bush

and the national command authority of conclusions drawn from Montgomery's work.

**112.     *Fortieth,* on Page 47 of the Book, Risen writes:**

"Even more stunning, after the debacle over the bogus Christmas 2003 terrorist threats, Montgomery kept getting classified government contracts awarded through several different corporate entities. Montgomery's problems with the CIA did not stop him from peddling variations of his technology to one government agency after another. The secrecy that surrounded his work once again worked in his favor. CIA officials were reluctant to tell their Pentagon counterparts much about their experiences with Montgomery, so Defense Department officials apparently did not realize that his technology was considered suspect at CIA headquarters."

113.    As libel by implication, Risen implies that Montgomery continued to defraud,

con, and scam the government, rather than concluding that the U.S. Government recognized the

legitimacy of Montgomery's work.

114.    ***Forty-First,*** **on Page 48 of the Book, Risen writes:**

> "He successfully infused a sense of mystery around himself. He was like the Wizard of Oz, but now people were beginning to try to examine the man behind the curtain."

115.    As libel by implication, Risen implies that the Montgomery engaged in fraud and

a hoax by keeping details mysterious.

116.    ***Forty-Second,*** **on Page 48 of the Book, Risen writes:**

> "The technology didn't meet the requirements for us," said a Special Operations Command spokesman drily. Still, there is no evidence that officials at Special Operations Command ever talked with their counterparts at the CIA to check up on Montgomery before awarding him a contract. Special Operations Command paid a total of $ 9.6 million to eTreppid under its contract with the firm."

117.    As libel by implication, Risen imply that Montgomery again repeated his fraud

and hoax against a new government agency.

118.    ***Forty-Third,*** **on Page 54 of the Book, in the Chapter "The New Oligarchs,"**

**Risen writes:**

> CHAPTER 3:  The New Oligarchs
> Page 54:  "Dennis Montgomery is, of course, an extreme example of the new kind of counterterrorism entrepreneur who prospered in the shadows of 9/11.  But he was hardly alone in recognizing the lucrative business opportunities that the war on terror has presented.  In fact, as trillions of dollars have poured into the nation's new homeland security-industrial complex, the corporate leaders at its vanguard can rightly be considered the true winners of the war on terror."

119.    As libel by implication, Risen implies that Montgomery engaged in fraud and a

hoax motivated by greed.

Exhibit 16



**Houghton**
**Mifflin**
**Harcourt**

David Eber
Vice President
Associate General Counsel

January 20, 2015

VIA U.S. MAIL AND ELECTRONIC MAIL

Larry Klayman
Klayman Law Firm
2020 Pennsylvania Avenue, N.W.
Suite 800
Washington, DC 20006-1811
leklayman@gmail.com

　　　　Re: *Pay any Price*, by James Risen

Dear Mr. Klayman:

　　　　We have received your letter dated January 14, 2015, to Linda Zecher and William Bayers at
Houghton Mifflin Harcourt Publishing Company ("HMH").

　　　　We deny your allegations that *Pay any Price* contains defamatory statements concerning your
client Dennis Montgomery, or that HMH or Mr. Risen engaged in any criminal conduct in preparing and
vetting the book. We also decline your invitation to meet to discuss HMH's manuscript review
processes.

Sincerely,

David Eber

cc:　　William Bayers
　　　　James Risen

Exhibit 17

# Electronic Articles of Organization
## For
# Florida Limited Liability Company

L11000101240
FILED 8:00 AM
September 02, 2011
Sec. Of State
jbryan

## Article I

The name of the Limited Liability Company is:

ALEX JAMES LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

1797 N.E. 15TH ST.
FORT LAUDERDALE, FL, US 33305

The mailing address of the Limited Liability Company is:

1797 N.E. 15TH ST.
FORT LAUDERDALE, FL, US 33305

## Article III

The purpose for which this Limited Liability Company is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The name and Florida street address of the registered agent is:

UNITED STATES CORPORATION AGENTS, INC.
13302 WINDING OAK COURT
SUITE A
TAMPA, FL. 33612

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature: MATT PFLEGING, US CORP. AGENTS

# Article V

The name and address of managing members/managers are:

L11000101240
FILED 8:00 AM
September 02, 2011
Sec. Of State
jbryan

Title:  MGRM
JUDY  CROWHURST
1797 N.E. 15TH ST.
FORT LAUDERDALE, FL.  33305  US

Signature of member or an authorized representative of a member

Electronic Signature: MATT PFLEGING, LEGALZOOM.COM, INC.

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

Exhibit 18

# SOCOM & CIA
# Visit 03/20/12

## Location:

75180 Mediterranean
Palm Desert, CA 92211



## Chris Pipes SOCOM

Exhibit 19

# ORDER FOR SUPPLIES OR SERVICES

(Contractor must submit four copies of invoice.)

| | | | | Form Approved OMB No. 0704-0187 Expires June 30, 1997 | PAGE 1 | OF 2 |

Public reporting burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0187), Washington, DC 20503.

**PLEASE DO NOT RETURN YOUR FORM TO EITHER OF THESE ADDRESSES.
SEND YOUR COMPLETED FORM TO THE PROCUREMENT OFFICIAL IDENTIFIED IN ITEM 6.**

| 1. CONTRACT/PURCH ORDER NO. H92222-04-D-0006 | 2. DELIVERY ORDER NO. 0001 | 3. DATE OF ORDER 16-FEB-2004 | 4. REQUISITION/PURCH REQUEST NO. 1SP50040420100 | 5. PRIORITY DO-C9 |
|---|---|---|---|---|

| 6. ISSUED BY | CODE | H92222 | 7. ADMINISTERED BY (if other than 6) S0507A | 8. DELIVERY FOB |
|---|---|---|---|---|
| HQ US Special Operations Command ATTN: SOAL-KB (Holland) 7701 Tampa Point Blvd Macdill AFB, FL 33621 | | | DCMA San Francisco Lathrop Office 700 E. Roth Rd French Camp, CA 95231 | X DEST ☐ OTHER (See Schedule if other) |

| 9. CONTRACTOR | CODE | 3C5X0 | FACILITY CODE | | 10. DELIVER TO FOB POINT BY (Date) (YYMMDD) SEE SCHEDULE | 11. MARK IF BUSINESS IS |
|---|---|---|---|---|---|---|
| NAME AND ADDRESS | e'Treppid Technologies, LLC 755 Trademark Dr Reno, NV 89521 | | TEL: FAX: | | 12. DISCOUNT TERMS | ☐ SMALL ☐ SMALL DISAD-VANTAGED ☐ WOMEN OWNED |
| | | | | | 13. MAIL INVOICES TO See Section G | |

| 14. SHIP TO | CODE | H92222 | 15. PAYMENT WILL BE MADE BY HQ0339 | |
|---|---|---|---|---|
| UQ USSOCOM/SOAL-SP (Mohr) 7701 Tampa Point Blvd MacDill AFB, FL 33621 | | | DFAS-Columbus - West Entitlement Operations PO Box 182381 Columbus, OH 43218 | MARK ALL PACKAGES AND PAPERS WITH CONTRACT OR ORDER NUMBER |
| ATTENTION: SOAL-SP (Brad Mohr) | | | | |

| 16 TYPE OF ORDER | DELIVERY X | This delivery order is issued on another Government agency or in accordance with and subject to terms and conditions of above numbered contract. |
|---|---|---|
| | Reference your | furnish the following on terms specified herein |
| | PURCHASE | ACCEPTANCE. THE CONTRACTOR HEREBY ACCEPTS THE OFFER REPRESENTED BY THE NUMBERED PURCHASE ORDER AS IT MAY PREVIOUSLY HAVE BEEN OR IS NOW MODIFIED, SUBJECT TO ALL OF THE TERMS AND CONDITIONS SET FORTH, AND AGREES TO PERFORM THE SAME. |

ETREPPID TECHNOLOGIES, LLC
NAME OF CONTRACTOR     SIGNATURE     WARREN TREPP, CEO     040216
                                                              TYPED NAME AND TITLE                        DATE SIGNED (YYMMDD)

☐ If this box is marked, supplier must sign Acceptance and return the following number of copies.

| 17. ACCOUNTING AND APPROPRIATION DATA/LOCAL USE |
|---|
| ACRN AA: 974/60300 56SF SD4 52SP 54X000 SP10 525700 F25700    $325,125.00 |

| 18. ITEM NO | 19. SCHEDULE OF SUPPLIES/SERVICES | 20. QUANTITY ORDERED/ ACCEPTED* | 21. UNIT | 22. UNIT PRICE | 23. AMOUNT |
|---|---|---|---|---|---|
| | SEE CONTINUATION SHEET | | | | |

| *If quantity accepted by the Government is same as quantity ordered, indicate by X. If different, enter actual quantity accepted below quantity Ordered and encircle. | 24. UNITED STATES OF AMERICA BY SUSAN M GRIFFIN [signature] CONTRACTING/ORDERING OFFICER | 25. TOTAL | $325,125.00 |
|---|---|---|---|
| | | 26. DIFFERENCES | |

| 26. QUANTITY IN COLUMN 20 HAS BEEN ☐ INSPECTED ☐ RECEIVED ☐ ACCEPTED, AND CONFORMS TO THE CONTRACT EXCEPT AS NOTED | 27. SHIP NO. | 28. D.O. VOUCHER NO. | 30. INITIALS |
|---|---|---|---|
| | ☐ PARTIAL ☐ FINAL | 32. PAID BY | 33. AMOUNT VERIFIED CORRECT FOR |
| _____ DATE SIGNATURE OF AUTHORIZED GOVERNMENT REPRESENTATIVE | 31. PAYMENT ☐ COMPLETE ☐ PARTIAL ☐ FINAL | | 34. CHECK NUMBER |
| 36. I certify this account is correct and proper for payment | | | 35. BILL OF LADING NO. |
| _____ DATE SIGNATURE AND TITLE OF CERTIFYING OFFICER | | | |
| 37. RECEIVED AT | 38. RECEIVED BY (Print) | 39. DATE RECEIVED (YYMMDD) | 40. TOTAL CONTAINERS | 41. S/R ACCOUNT NUMBER | 42. S/R VOUCHER NO. |

DD FORM 1155, JUN 94         PREVIOUS EDITION MAY BE USED

H92222-04-D-0006
Task Order 0001
Page 2 of 2

Continuation Sheet

1. **CONTRACT LINE ITEMS**:

| ITEM NO | SUPPLIES/SERVICES | MAX QUANTITY | UNIT | UNIT PRICE | MAX AMOUNT |
|---------|-------------------|--------------|------|------------|------------|
| 0001AA | | 1 | Each | $25,000.00 | $25,000.00 |
| | Falconview (PFPS) Maps - Compression | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | FOB:  Destination | | | | |
| 0001AB | | 1 | Each | $40.00 | $40.00 |
| | Falconview (PFPS) Maps - Plug-in Decoder | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | FOB:  Destination | | | | |
| 0001AC | | 1 | Each | $25,000.00 | $25,000.00 |
| | Still Image Compression | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | FOB:  Destination | | | | |
| 0001AD | | 1 | Each | $10.00 | $10.00 |
| | Still Image Decoder | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | FOB:  Destination | | | | |
| 0001AE | | 1 | Each | $50,000.00 | $50,000.00 |
| | Video Imagery w/ Audio - Compression | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | FOB:  Destination | | | | |
| 0001AF | | 1 | Each | $25.00 | $25.00 |
| | Video Imagery w/ Audio - Decoder | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | FOB:  Destination | | | | |
| 0001AN | | 1 | Each | $125,000.00 | $125,000.00 |
| | Generic Data Compression | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | FOB:  Destination | | | | |

| 0001AP | | 1 | Each | $50.00 | $50.00 |
|---|---|---|---|---|---|

Generic Data Decompressor
FFP
1 Each = 1 CPU that this software is installed on.

FOB: Destination

| 0001AQ | | 1 | Each | $100,000.00 | $100,000.00 |
|---|---|---|---|---|---|

Detection of Human and Non-Human Objects
FFP
1 Each = 1 CPU that this software is installed on.

FOB: Destination

2. **GOVERNMENT FURNISHED PROPERTY**.

a) The Government will furnish one laptop computer to:
   eTreppid Technologies
   755 Trademark Dr
   Reno NV 89521.

b) Upon receipt of the Government-furnished laptop, the Contractor shall load the software ordered on the task order and return the laptop to:
   HQ USSOCOM
   ATTN: SOAL-SP (Brad Mohr)
   7701 Tampa Point Blvd
   MacDill AFB, FL 33621.

3. **DELIVERY TIMEFRAME**. The contract shall have 14 days from the receipt of the Government-furnished laptop to load the software and return the laptop to the Government. If the 14th day falls on a weekend or federal holiday, the due date shall automatically extend to the next business day.

//nothing follows//

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 28th day of April, 2015, a true and correct copy of the foregoing (Case No. 15-cv-20782) was filed via CM/ECF and served upon the following:

**Sanford Lewis Bohrer**
**Brian Toth**
Holland & Knight, LLP
Suite 3000
701 Brickell Ave
Miami, FL 33131
Email: sbohrer@hklaw.com
Email: brian.toth@hklaw.com

**Laura R. Handman**
**Micah Ratner**
Davis Wright Tremaine LLP
1919 Pennsylvania Ave., N.W., Suite 800
Washington D.C. 20006-3401
Email: laurahandman@dwt.com
Email: MicahRatner@dwt.com

/s/ Larry Klayman
Larry Klayman, Esq.

**EXHIBIT B**

CONFIDENTIAL

1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
2              CASE NO. 15-cv-20782-MARTINEZ/GOODMAN

3

4    DENNIS MONTGOMERY,

5          Plaintiff,

6    -vs-

7    JAMES RISEN, ET AL.,

8          Defendants.

9

     _____/

10

11

12              Thursday, August 20, 2015
                Holland & Knight, LLP
13              701 Brickell Avenue, Suite 3300
                Miami, Florida 33131
14              9:13 a.m. - 6:36 p.m.

15

16      VIDEOTAPE DEPOSITION OF DENNIS MONTGOMERY

17          (VOLUME I - PAGES 1 THROUGH 185)

18

19   Videotape deposition taken before TAMMY WALKER ZIVITZ,

20   Registered Professional Reporter and Notary Public in and

21   for the State of Florida at Large, in the above cause.

22

23

24

25

Page 2

1  APPEARANCES:
2     On behalf of the Plaintiff:
3       Larry Klayman, Esq.
        LARRY KLAYMAN, P.A.
4       7050 W. Palmetto Park Road, #15-287
        Boca Raton, Florida  33433
5
6     On behalf of the Defendants:
7       Laura R. Handman, Esq. and Micah J. Ratner, Esq.
        DAVIS WRIGHT TREMAINE, LLP
8       1919 Pennsylvania Avenue, NW
        Suite 800
9       Washington, D.C.  20006
10    On behalf of the Defendants:
11      Brian Toth, Esq.
        HOLLAND & KNIGHT, LLP
12      701 Brickell Avenue
        Suite 3300
13      Miami, Florida  33131
14      ALSO PRESENT:  Dina James, Paralegal and
        Videographer, Christopher Hernandez
15
16
17
18
19
20
21
22
23
24
25

Page 3

1            - - -
2          I N D E X
3            - - -
4  WITNESS:     DIRECT  CROSS   REDIRECT  RECROSS
5  DENNIS MONTGOMERY
6  BY MS. HANDMAN   10            292
7  BY MR. KLAYMAN        282
8            - - -
            E X H I B I T S
9            - - -
10
    DEFENDANTS'                    PAGE
11
    Exhibit 1-Emails               12
12  Exhibit 2-Motion/emails        30
    Exhibit 3-Transcript           30
13  Exhibit 4-Amended Complaint       40
    Exhibit 5-Voter registration      40
14  Exhibit 6-Complaint            43
    Exhibit 7-Plaintiff's responses   56
15  Exhibit 8-Medical records      61
    Exhibit 9-Declaration; Cecelia Wang     82
16  Exhibit 10-Articles           118
    Exhibit 11-Twitter            176
17  Exhibit 12-John Brennan questions      207
    Exhibit 13-Contract           216
18  Exhibit 14-Emails             216
    Exhibit 15-Declaration of Montgomery     223
19  Exhibit 16-Declaration of Cecelia Wang    273
    Exhibit 17-Swedish hospital notes       292
20
21
22
23
24
25

Page 4

1         THE VIDEOGRAPHER:  We're on the record.
2  The date is August 20, 2015.  The time is
3  9:13 a.m.  This is Media Unit 1.  This is the
4  video deposition of Dennis Montgomery in the
5  matter of Dennis Montgomery versus James Risen,
6  et al.
7         This deposition is being held at 701
8  Brickell Avenue, Miami, Florida 33131.  The
9  court reporter is Tammy Zivitz.  The
10 videographer is Christopher Hernandez.
11        MS. HANDMAN:  Laura Handman; Davis Wright
12 Tremaine, counsel for the defendants.
13        MR. RATNER:  Michael Ratner; Davis Wright
14 Tremaine, counsel for defendants.
15        MR. KLAYMAN:  Larry Klayman,
16 K-L-A-Y-M-A-N, counsel for plaintiff.  Sitting
17 with me is Miss Dina James, paralegal.
18        (DENNIS MONTGOMERY)
19 Having been first duly sworn or affirmed, was
20 examined and testified as follows:  I do.
21        MR. KLAYMAN:  I want to put on the record
22 that Mr. Montgomery is handicapped.  He's
23 severely debilitated as a result of a brain
24 aneurysm and several strokes so there needs to
25 be an opportunity for him to be able to

Page 5

1  respond, and there needs to be a pause to see
2  whether or not I need to make an objection
3  because communication is more difficult as a
4  result.
5         In addition, Mr. Montgomery is someone who
6  has worked inside of the intelligence community
7  as we know from this lawsuit, and he has had
8  access to classified and/or sensitive
9  information, so, therefore, before a response
10 is made, I need to know whether or not to
11 elicit an objection to this, and I need time to
12 do that.
13        In addition, that's to the benefit of
14 defense counsel too because should defense
15 counsel inadvertently or by design elicit
16 classified information, that could subject
17 defense counsel to potential liability.  So we
18 need to be very, very careful here today, and
19 go slowly and deliberately and try to cooperate
20 with each other in that regard.
21        MS. HANDMAN:  And I too wish to put
22 something on the record.  We are here pursuant
23 to a Notice of Deposition.  We offered to do
24 the deposition in Seattle, our district, DC or
25 Miami, and the plaintiff chose Miami.

CONFIDENTIAL

Page 14

BY MS. HANDMAN:

1 BY MS. HANDMAN:
2   Q   Let me ask you, Mr. Montgomery: Do you
3 think over the course of those four years, you had
4 more than five emails with Edra Blixseth?
5   A   Yes.
6   Q   And did you delete emails with Edra
7 Blixseth?
8   A   Over that period of time, possibly.
9   Q   Have you deleted any emails with Edra
10 Blixseth since you commenced this lawsuit?
11   A   No, I haven't.
12   Q   And what did you do to search for emails
13 with Edra Blixseth?
14   A   I looked on the stuff I had to see if
15 there was that stuff.
16   Q   And were you -- did you perform the search
17 yourself?
18   A   Yes.
19   Q   And are you able to read a computer?
20   A   You mean, look at a computer?
21   Q   Mm-hmm.
22   A   Yes, when I enlarge the, you know, fonts
23 and all of that.
24   Q   Mm-hmm.  And when you say, you looked for
25 these emails, how did you go about doing that, do

Page 15

1 you have an archive that is related to Ms. Blixseth?
2   A   Well, I had some disc drives that I looked
3 on.
4   Q   And you came up with only five emails?
5   MR. KLAYMAN:  Objection.  Same objection.
6   THE WITNESS:  I don't recall if that's all
7 I came up with.
8 BY MS. HANDMAN:
9   Q   Do you have a video showing your work?
10   MR. KLAYMAN:  Objection, vague.
11 BY MS. HANDMAN:
12   Q   Showing your work with the software
13 technology?
14   MR. KLAYMAN:  Same objection.
15   MS. HANDMAN:  We'll mark as an exhibit --
16 let's move on for now and we'll do it later.
17 BY MS. HANDMAN:
18   Q   Mr. Montgomery, where do you live?
19   MR. KLAYMAN:  I'm going to stop this
20 deposition at this point.
21   What I want to know, Ms. Handman, I want
22 to proffer from you, whether you're
23 coordinating this deposition with Rafael Gomez
24 and the Justice Department, and whether you
25 have communicated with them concerning

Page 16

1 Mr. Montgomery in anything dealing with
2 substance, I want a proffer from you on that
3 basis.
4   MS. HANDMAN:  I'm not required to give you
5 such a proffer, and I have notified them
6 because you raised that the documents were
7 classified, and, therefore, couldn't be
8 produced, and, therefore, I notified them.
9   MR. KLAYMAN:  But what I want to know is,
10 whether or not you have had access to
11 classified information, and whether they leaked
12 it to you?
13   MS. HANDMAN:  I'm not even going to bother
14 to answer such a foolish question.
15   MR. KLAYMAN:  It's not foolish, Ms.
16 Handman.
17   MS. HANDMAN:  Yes, it is.  Let's move on,
18 Mr. Klayman.
19   THE WITNESS:  Don't raise your voice.
20 It's hard for me to understand.
21   MS. HANDMAN:  I apologize.  Mr. Klayman,
22 this is my deposition.  I do not want to waste
23 it with this kind of discussion.  If you want
24 to raise it with magistrate at some point in
25 time, be my guest, and the answer is that, it

Page 17

1 is not relevant to this discussion, and you
2 have no basis for suggesting it.
3   MR. KLAYMAN:  Well, it is because of the
4 ground rules that I've set was we're wanting to
5 obey all laws and all procedures as
6 appropriate, and that's why I wanted to know
7 whether, in fact, Mr. Gomez has leaked
8 information to you that would be improper.
9 BY MS. HANDMAN:
10   Q   Mr. Montgomery, where do you live?
11   A   In Miami.
12   Q   What's your address in Miami?
13   A   REDACTED
14   Q   And how big of a place is that?
15   A   It's a condominium.
16   Q   And how many bedrooms?
17   A   I don't recall.
18   Q   You don't recall how many bedrooms?  Who
19 lives there with you?
20   A   Hector Mendez.
21   Q   And who is Hector Mendez?
22   A   A friend of somebody that I knew that I
23 worked with in Florida.
24   Q   And does he own the condo?
25   A   I believe so, yes.

5 (Pages 14 - 17)

CONFIDENTIAL

Page 18

```
 1   Q   And do you pay him rent?
 2   A   I haven't yet, but I committed to.
 3   Q   And how much did you commit to pay?
 4   A   200 a month.
 5   Q   And did you commit -- does that permit you
 6  to be there all month long or is that on a per week
 7  or per day basis?
 8   A   When I need to be there.
 9   Q   When you need to be?
10   A   I live there.  I mean, that's the gist.
11   Q   Well, when did you move there, what day
12  and month?
13   A   Well, it would have been -- I don't know
14  the date.  It would have been in, I believe, March.
15   Q   And you say that -- have you signed a
16  lease with Mr. Mendez?
17   A   No, no, I have not.
18   Q   So this is just an oral agreement?
19   A   Yes.
20   Q   And you just have one room in his condo?
21   A   Yes.
22   Q   And did you move any furniture to that
23  room?
24   A   No.  I physically hadn't moved in there
25  yet with furniture and everything because I had
```

Page 19

```
 1  fallen and injured myself in Seattle.
 2   Q   And when did you fall and injure yourself
 3  in Seattle?
 4   A   September of 2014, January, March and
 5  recently.  I mean, there's been a few other times.
 6   Q   That you've fallen?
 7   A   And hurt myself, yes.
 8   Q   Have you had to go to the hospital for
 9  those falls?
10   A   Yes, I have.
11   Q   And have you had to stay in the hospital?
12   A   Well, I've -- from the falls or ever?
13   Q   From the falls?
14   A   I wasn't hospitalized overnight, if that's
15  the question.
16   Q   That's what I mean; inpatient?
17   A   No.
18   Q   How do you spell Mr -- the person you
19  shared the condo with?
20   A   Hector Mendez, M-E-D -- M-E-N-D-E-Z.
21   Q   And you said you're there when you need to
22  be.  Were you there yesterday?
23   A   No, I want to make sure I'm saying
24  something correctly.
25       I had not gotten to move in yet because of
```

Page 20

```
 1  my injuries and so forth, and my doctor has advised
 2  that I need to be in some kind of semi-independent
 3  living arrangement, you know, where there's nurses
 4  and stuff, and that's what I'm actively pursuing to
 5  get now.
 6   Q   So when did you come to Miami for this
 7  deposition?
 8   A   What is today?
 9   Q   Today is Thursday.
10   A   Monday.
11   Q   Monday.  And you came from where?
12   A   I'm sorry?
13   Q   Where did you come from?
14   A   Seattle, Washington.
15   Q   And is that where you have been up until
16  Monday?
17   A   You mean --
18   Q   Right.  Have you been in Miami prior to
19  Monday, say, in August of this year?
20   A   Before Monday, is that what you're --
21   Q   Yes, yes.
22   A   No.
23   Q   And in July, were you in Miami?
24   A   No.
25   Q   And in June, were you in Miami?
```

Page 21

```
 1   A   No.
 2   Q   And in May, were you in Miami?
 3   A   You mean this year, right?
 4   Q   Yes, yes.
 5       MR. KLAYMAN:  Objection -- line of
 6  questioning, relevancy -- the entire line of
 7  questioning.
 8  BY MS. HANDMAN:
 9   Q   Were you in Miami in May of this year?
10   A   No.
11   Q   And were you in Miami in April of this
12  year?
13   A   I was evicted from my home in April.
14   Q   Your home was where?
15   A   My residence where I was staying, in
16  Yarrow Point, Washington, and I was in the process
17  of moving my stuff out of the home and moving into
18  here.
19   Q   And where is your stuff now that you moved
20  out of the home in Yarrow Point?
21   A   In a storage facility, or most of it I've
22  now sold.
23   Q   Who are you living with in Seattle?
24   A   My son-in-law when I'm there.
25   Q   And your daughter?
```

6 (Pages 18 - 21)

CONFIDENTIAL

Page 22

1   A   Yes.
2   Q   Where do they live?
3       MR. KLAYMAN:  Objection, relevancy.  I
4   don't think this is necessary.  Why are you
5   getting into that?
6       MS. HANDMAN:  I'm wanting to know where
7   he's living.
8       MR. KLAYMAN:  He said "Seattle."  Why are
9   you probing?
10  BY MS. HANDMAN:
11  Q   I wish to know the address of where you
12  are living.
13  A   I don't know the exact address, I'm sorry,
14  I'm not being --
15      MR. KLAYMAN:  I don't understand the
16  relevancy of that, other than you're trying to
17  harass him.  He said he was staying in Seattle.
18  What's the point, Ms. Handman?
19      MS. HANDMAN:  I'm trying to establish
20  domicile.
21      MR. KLAYMAN:  It has nothing to do with
22  that.
23      MS. HANDMAN:  Yes, it does.
24      MR. KLAYMAN:  If he said he was in Seattle
25  during that period, how does it matter where

Page 23

1   the address of his -- he said -- let me put
2   this on the record, okay, and I'm not going to
3   tolerate your harassing this man.  Already
4   you've done it, and I'm not going to get into
5   the record too much on that.  But the reality
6   is, he said he was in Seattle during that
7   period, and he told you why, and to put the
8   address of his daughter and his son-in-law on
9   the record, given the fact that he has been
10  working for intelligence agencies, given the
11  fact that he has, as you know, been assisting
12  in the fight against terrorism, given, as you
13  know, our concerns about his safety, why would
14  you want to jeopardize the safety of his
15  daughter and his son-in-law?
16      MS. HANDMAN:  You can designate it as
17  confidential subject to the protective order.
18  BY MS. HANDMAN:
19  Q   Please answer the question.  What is the
20  address where you live with your daughter and
21  son-in-law?  And I presume your wife as well, do you
22  live with your wife there too?
23      MR. KLAYMAN:  Same objection.
24      THE WITNESS:  Yes.  What month are you
25  referring to?

Page 24

1   BY MS. HANDMAN:
2   Q   Well, you said in April you were evicted
3   from your home in Yarrow Point?
4   A   I was homeless at that time.
5   Q   When did you start living with your
6   son-in-law and your daughter?
7   A   Sometime in -- that was 2004, right?
8   Q   No.  You were evicted in April of this
9   year.
10  A   Excuse me.  Dates are difficult.
11  Q   2015.
12  A   I think it was late May, early June.
13  Q   Do you remember telling your doctors that
14  you were living with your wife and daughter, I
15  think, in March of this year?
16  A   Which doctor are you referring to?
17  Q   I'll have to get the record.  You said
18  that you're looking for some assisted living space?
19  A   That's the word, "assisted."
20  Q   And what steps have you taken to secure
21  assisted living in Florida?
22  A   I contacted multiple -- I contacted the
23  places, and they give you an agent or something, and
24  then I've contacted them and they've began the
25  process for doing that for me.

Page 25

1   Q   Who's the agent that you've contacted?
2   A   I don't have their names off the top of my
3   head.  It was involved with the facilities.
4   Q   Why don't we leave a blank for you to fill
5   in, in the deposition who the agent is who is
6   looking for assisted living space.
7   A   I'm also here now to do it myself with my
8   son-in-law also.
9   Q   And your son-in-law's name is?
10  A   I thought I just gave you that.
11  Q   Ishtvan --
12  A   You want his name?
13  Q   Yes.
14  A   Ishtvan Borgyan.
15  Q   I think we'll be able to fill in the
16  spelling.  Is he known as "Ish," is that his
17  nickname?
18  A   I call him that.  Other people have, yes.
19  Q   We'll call him that for purposes of
20  simplicity in the deposition.
21  A   All right.
22  Q   Is he here now with you, then?
23  A   Yes.
24  Q   And you were in business with him; is that
25  correct?

CONFIDENTIAL

Page 26

1    A    Yes.
2    Q    What was the name of the company?
3    A    When we were working with Edra, you mean?
4    Q    Yes.
5    A    Well, he worked at Blxware, like I did
6  originally.  In fact -- and the company was actually
7  called Opspring, and then it became Blxware.
8    Q    Have you visited any assisted living
9  places since you've been here?
10   A    Not yet.
11   Q    And prior to -- do you have any doctors in
12 Florida that you see?
13   A    No, but I have -- I still have quite a
14 severe problem, and they are -- I've asked for names
15 of neurosurgeons and neuro people for the Miami
16 area.
17   Q    And did you ask your doctors whether you
18 should travel to Miami for this deposition?
19   A    They've discouraged me from traveling when
20 I'm injured, and, obviously, I have an ongoing brain
21 aneurysm, but I knew it was important for me to come
22 here and I came.
23   Q    Are you aware that there are criminal
24 proceedings pending against you in Clark County,
25 Nevada?

Page 27

1        MR. KLAYMAN:  Objection, relevancy.
2  BY MS. HANDMAN:
3    Q    Can answer.
4        THE WITNESS:  Am I to answer that?
5        MR. KLAYMAN:  You can answer.
6        THE WITNESS:  Yes.
7  BY MS. HANDMAN:
8    Q    And are you aware that you were supposed
9  to appear in those proceedings last week on
10 August 12th?
11       MR. KLAYMAN:  It assumes facts not in
12 evidence.  Objection.
13       THE WITNESS:  I don't remember when the
14 date was.
15 BY MS. HANDMAN:
16   Q    Was there an appearance that was due
17 sometime this month?
18   A    I believe there was.
19   Q    And did you appear?
20       MR. KLAYMAN:  Objection.  Relevancy to all
21 this line of questioning.  Move to strike.
22 BY MS. HANDMAN:
23   Q    Did you appear --
24       THE WITNESS:  Am I to answer?
25       MR. KLAYMAN:  You can answer.

Page 28

1  BY MS. HANDMAN:
2    Q    Yes.
3    A    No, I did not.
4    Q    And do you know what your lawyer told the
5  judge as to why you were not appearing?
6        MR. KLAYMAN:  Objection.  Assumes facts
7  not in evidence.
8  BY MS. HANDMAN:
9    Q    Did a lawyer appear on your behalf?
10   A    Well, I'm using a public defender.
11   Q    And did the public defender appear on your
12 behalf?
13       MR. KLAYMAN:  Objection.  Relevancy to all
14 this line of questioning.  Continuing
15 objection.
16       THE WITNESS:  I don't recall.
17       MS. HANDMAN:  Let's mark as an exhibit the
18 transcript of August 12th.
19       MR. KLAYMAN:  Objection, relevancy.  Lacks
20 foundation.
21 BY MS. HANDMAN:
22   Q    Were you too ill to travel to Nevada?
23   A    I don't remember the date that it was on.
24 If you know, you can tell me.
25   Q    It was August 12th, last Wednesday.

Page 29

1    A    I believe because of the severity of my
2  headaches and my condition, I saw my
3  neuro-ophthalmologist because they were concerned.
4    Q    Who was that?
5    A    Who was what?
6    Q    Who's the neuro-ophthalmologist that you
7  saw?
8    A    Dr. Eugene May.
9    Q    And is Dr. Eugene May in the Seattle area?
10   A    Yes, he is, yes.
11   Q    And did he provide a report to give to the
12 judge that said that you were too ill to travel?
13   A    Well, what do you mean "ill"?  My vision
14 was very bad.
15   Q    Did he say -- well, your lawyer
16 represented to the judge in Nevada that you were
17 still in Washington and too ill to travel.
18       MR. KLAYMAN:  Objection.  Move to strike.
19 You're not testifying, Ms. Handman.  This is
20 inappropriate.  If you want to show him
21 something, fine.  It's irrelevant.
22       Objection, move to strike.  But for you to
23 tell him what his lawyer said --
24       MS. HANDMAN:  I will read from the
25 transcript, which was attached to our papers

8 (Pages 26 - 29)

CONFIDENTIAL

1   that we've submitted.
2       MR. KLAYMAN:  Fine.  Go ahead, read.  It's
3   still irrelevant.
4       THE WITNESS:  Will you just read slowly,
5   please?
6       (Exhibit 2 and 3 were marked for identification.)
7   BY MS. HANDMAN:
8       Q    Sure.  I will.  It was attached -- let's
9   mark as an Exhibit 2 what was our Exhibit 6 to our
10  prehearing memorandum; is that right?  No.  It's our
11  Motion to Modify the Deadlines.  It's Exhibit 6
12  through 11, 12 -- 11, and this is Exhibit 11 that
13  was filed in this case.  The caption is District
14  Court, Clark County, Nevada, State of Nevada versus
15  Dennis L. Montgomery, and the date is -- Exhibit 3
16  is a transcript of August 12, 2015 in the State of
17  Nevada versus Dennis Montgomery.
18      A    This was filed in this action on
19  August 17th with -- what is today?
20      Q    This is -- the date of the transcript is
21  August, Tuesday, August 12, 2015, and it's the State
22  of Nevada versus Dennis Montgomery, District Court,
23  Clark County, Nevada, and your lawyer says I would
24  ask that you waive --
25      MR. KLAYMAN:  Wait.  The fact that you're

1   reading something doesn't mean that his lawyer
2   said that, okay, so, objection.
3       MS. HANDMAN:  Well, it's a transcript.
4       MR. KLAYMAN:  I don't care what it is.  It
5   could be the Holy Grail.  It doesn't mean that
6   his lawyer said that.  They could be
7   mistranscribed or whatever.  So just say you're
8   reading from a transcript, and don't play games
9   with my client.
10  BY MS. HANDMAN:
11      Q    I'm reading from a transcript, Shana
12  Bachman on behalf of Mr. Montgomery.
13      A    I don't know who that is.
14      Q    She's a deputy public defender.
15      A    I've never met her.
16      Q    She is -- in this transcript, it says, "I
17  would ask that you waive his client's appearance.
18  ==Mr. Montgomery is still in Washington State and is==
19  ==unable to travel== because he is suffering from the
20  effects of his stroke.  He is working on getting a
21  letter from his doctor, but he needs to get an
22  appointment."
23      A    What day of the week was that?
24      Q    It says it's August 12, which --
25      A    I meant the day.

1       Q    August 12th, I believe, was Wednesday,
2   last Wednesday.
3       A    I believe the day before I saw the -- I
4   have severe shoulder pain and injury from the
5   stroke, and I saw a Dr. Porhco also the day before.
6       Q    How do you spell his name?
7       A    Really?
8       Q    Well, we'll leave a blank, and you can
9   fill it in.
10      A    I think it's P-O-R-H-C-O.
11      Q    Thank you.  We leave blanks, and then you
12  and your counsel can fill in the names.
13      A    Okay.
14      Q    And you saw him the day before for a
15  shoulder injury?
16      A    My entire left side is injured from my
17  toes to the top of my head.  So I have paralysis,
18  and I'm not a doctor.  I'm just trying to explain it
19  to you in layman's terms.  Everything on my left
20  side is in extreme pain and problem.
21      Q    And did he provide a letter for your
22  counsel saying that you were too ill to travel to
23  Nevada?
24      A    The primary --
25      MR. KLAYMAN:  Objection, relevance.  Go

1   ahead.  You can answer.
2       THE WITNESS:  You've seen, because I gave
3   you the list of all the doctors that take care
4   of me.
5   BY MS. HANDMAN:
6       Q    Yes, and you saw him the day before this
7   hearing?
8       A    You mean today?
9       Q    No, the day before the hearing in Nevada.
10      A    And I also saw Dr. Lim -- my -- Dr. Lim is
11  kind of -- Dr. Lim is kind of the -- I think he's
12  called a physiatrist, which deals with people with
13  my conditions, you know.
14      Q    And how often do you see him?
15      A    Well, I saw him obviously in the hospital
16  every day.
17      Q    But I'm talking in the last three months,
18  how often have you seen him?
19      A    I believe, three times.  He's the director
20  of rehab at Swedish.  So there are days in which I'm
21  required to -- I see him, but because of
22  emergencies, you know how that goes?  Am I making
23  sense to you?  What I'm saying, I'm trying to -- I
24  might have an appointment to go see him and I get
25  there and there's an emergency because the hospital

9 (Pages 30 - 33)

CONFIDENTIAL

1 that I stayed in at Cherry Hill is a neuro hospital
2 for strokes, and those types of things, brain
3 injuries. So I think I've seen him three times in
4 three months.
5    Q    And did you produce the records of those
6 visits to us?
7    A    Well, I just got them because you don't --
8 let me -- I don't communicate a lot with the public
9 defender obviously because of his schedule. I mean,
10 I'm not his only client I guess if that makes sense.
11    Q    Well, was the statement truthful that you
12 were still in Washington State and unable to travel
13 because you were suffering from the effects of a
14 stroke, is that a truthful statement?
15    A    Yeah, the injuries that I sustained.
16    Q    And did you ask any of these doctors
17 whether you could come travel across the country to
18 Miami for this deposition in the case that you have
19 brought against Mr. Risen and Houghton Mifflin?
20    A    Have I ever asked? I think there are
21 times they have written.
22    Q    Well, you saw them last week, and you were
23 planning to travel across the country for this
24 deposition. Would that be contrary to medical
25 advice?

1       MR. KLAYMAN: Objection, compound
2 question.
3       THE WITNESS: I don't remember if I did or
4 not.
5 BY MS. HANDMAN:
6    Q    Did they advise you not to travel?
7    A    When I'm injured, yes.
8    Q    Are you injured now?
9    A    Yes. Well, when you fall down a set of
10 stairs, it takes -- you don't just recover from that
11 immediately, and they know that I -- the sooner I
12 get into some kind of assisted living, I think it's
13 called, obviously, that would be better for me.
14    Q    Do you have any caregivers with you here
15 in Miami while you're here?
16    A    My son-in-law's here with me.
17    Q    Mr. Montgomery, do you remember --
18    A    Are you saying something? I didn't hear
19 you.
20    Q    No, I'm talking to my colleague here. Do
21 you recall -- strike that. Are your taxes being
22 audited currently?
23       MR. KLAYMAN: Objection, relevancy.
24       THE WITNESS: Yes.
25

1 BY MS. HANDMAN:
2    Q    And did you appear by phone on -- at a
3 hearing in tax court on February 23rd?
4    A    Can somebody turn that off? That hurts
5 me. Well, I've only appeared telephonically.
6    Q    And did you represent yourself in that
7 hearing?
8    A    Yes.
9    Q    Did you indicate to the judge that you
10 were appearing from Washington State?
11    A    I don't remember if that was even asked.
12    Q    Is that where you were at the time on
13 February 23rd?
14    A    As far as I know.
15    Q    And on February 23rd, did you register to
16 vote in Florida?
17    A    I don't remember the exact date.
18    Q    Where were you when you registered to
19 vote?
20    A    Well, I was there, but I registered to
21 vote.
22    Q    What do you mean "there"?
23    A    I was in the State of Washington when I
24 registered to vote in Florida.
25    Q    You registered by mail?

1    A    Yes.
2    Q    And at that point in time when you
3 registered to vote in Florida, did you have a
4 Residence in Florida?
5    A    Well, yes, I had established -- I don't
6 remember the first address. Yes, I had made
7 arrangements to live there.
8    Q    And had you spent any time in that
9 facility?
10    A    No.
11    Q    And what was the nature of the place that
12 you found?
13    A    Well, it was -- I believe it was an
14 Extended Stay that I had made arrangements to live
15 for two months.
16    Q    And did you spend any of those two months
17 in that home?
18    A    No.
19    Q    And did you pay any rent?
20       MR. KLAYMAN: Objection.
21       THE WITNESS: I don't recall if I did or
22 not.
23 BY MS. HANDMAN:
24    Q    Do you have any records showing that you
25 had leased that Extended Stay property?

10 (Pages 34 - 37)

CONFIDENTIAL

Page 38

1  MR. KLAYMAN: Objection. Assumes facts
2  not in evidence.
3  THE WITNESS: I don't recall.
4  MR. KLAYMAN: We're going to take a break
5  shortly because of his health. He needs a
6  break. We've been going about an hour.
7  THE WITNESS: I develop these outrageous
8  muscle spasms, you know. It's part of the
9  injuries.
10  MR. KLAYMAN: Let's take a break now,
11  then.
12  THE WITNESS: I can't control.
13  MS. HANDMAN: Do you wish to take a break
14  now?
15  THE WITNESS: Yes, I have to go to the
16  bathroom real quick, and then I can return if
17  that's all right.
18  MS. HANDMAN: Sure.
19  THE WITNESS: Everyone doesn't have to
20  leave and all that. I'm just going to do that.
21  MR. KLAYMAN: I'll help you to the
22  bathroom.
23  THE VIDEOGRAPHER: We're off the record.
24  The time is 10:03 a.m.
25  (A recess was taken after

Page 39

1  which the following proceedings were had:)
2  THE VIDEOGRAPHER: Back on the record.
3  The time is 10:08 a.m.
4  BY MS. HANDMAN:
5  Q  Mr. Montgomery, when did you begin your
6  arrangements with Mr. Mendez at your current
7  residence, condo residence?
8  A  January or February, I believe.
9  Q  January or February is when you began it?
10  A  I believe so.
11  Q  Well, you testified just now that you had
12  made an arrangement with the Extended Stay facility
13  when you registered to vote in February?
14  A  Yes, and it was after that point.
15  Q  When?
16  A  I don't know the exact date. I
17  registered -- I don't know what day I registered to
18  vote. You must.
19  Q  I do, I do, February 23rd, 2015.
20  MR. KLAYMAN: Wait a second. We don't
21  know that you do, Ms. Handman. You already
22  submitted an affidavit under oath under your
23  name that was false so I'm not taking a
24  reference what you say you know. You've
25  already been proved not to be truthful to this

Page 40

1  court.
2  THE WITNESS: Are you waiting for me to
3  say something?
4  BY MS. HANDMAN:
5  Q  Was it before or after you registered to
6  vote that you made the arrangement with Mr. Mendez?
7  A  I believe after.
8  MS. HANDMAN: Let's mark as Exhibit 4, the
9  Amended Complaint, and Exhibit 5 the -- your
10  voters registration.
11  THE WITNESS: Okay.
12  (Exhibits 4 and 5 were marked for identification.)
13  BY MS. HANDMAN:
14  Q  Take a look at Exhibit 5.
15  MR. KLAYMAN: I object to Exhibit 5. Is
16  this your Exhibit 5 or our Exhibit 5? How are
17  you labeling this?
18  MS. HANDMAN: This is my Exhibit 5. It's
19  part of your plaintiff's initial disclosure
20  with an added attachment related to the
21  Extended Stay.
22  THE WITNESS: I'm just covering the things
23  because that yellow is --
24  MS. HANDMAN: Okay.
25  MR. KLAYMAN: Well, I want you to

Page 41

1  represent -- was this Extended Stay of America
2  part of an exhibit in our complaint, is that
3  what you're saying? Where did you get this?
4  MS. HANDMAN: We got that by looking on
5  the Internet at the address that is listed in
6  the registration, and I'm about to ask --
7  MR. KLAYMAN: Well, just be careful how
8  you're representing things because you already
9  misrepresented his voter registration once
10  before, so you're implying that this was part
11  of his voter registration by stapling this
12  together, is that what you're doing, another
13  slick technique?
14  BY MS. HANDMAN:
15  Q  Mr. Montgomery --
16  MR. KLAYMAN: I object to your
17  characterization of this being part of his
18  voter registration.
19  BY MS. HANDMAN:
20  Q  The first page and the second page of
21  exhibit -- the first page is marked as plaintiff's
22  initial disclosures, 057, and you will see the date
23  of registration there is 2/23/15?
24  MR. KLAYMAN: So which --
25

11 (Pages 38 - 41)

CONFIDENTIAL

Page 42

1 BY MS. HANDMAN:
2    Q   Does that refresh your recollection as to
3 when you registered to vote?
4        MR. KLAYMAN:  Objection to this exhibit,
5    insofar as you have appeared to piece together
6    different documents from different sources that
7    are not part of the voter registration.  So I
8    just want you to be clear on the record where
9    this stuff came from.
10 BY MS. HANDMAN:
11    Q   The second page is also from plaintiff's
12 initial disclosure, 61?
13    A   The second document I'm looking at?
14    Q   It's actually on the back of the -- to
15 save trees we two-sided it, and you will see on the
16 back there.
17        MR. KLAYMAN:  Yeah, certainly your large
18    law firm, which has hundreds of people needs to
19    save trees.
20        THE WITNESS:  There's stuff coming through
21    it.  What's the small print stuff?
22 BY MS. HANDMAN:
23    Q   It's a FedEx, and it's from -- was
24 produced by your -- by you.
25    A   No, but there's all these little, tiny

Page 43

1 letters.  I don't know what those say.
2    Q   All right.  Let's move on.
3    A   Do you mind if I turn these over because
4 the yellow is -- does bizarre things to my eyes?
5        MS. HANDMAN:  Let's mark as Defendants'
6    Exhibit 6, the complaint that was filed by you
7    in this case on February 24th, 2015.
8        (Exhibit 6 was marked for identification.)
9 BY MS. HANDMAN:
10    Q   If you would look, Mr. Montgomery, at
11 paragraph 6 -- let me ask you first, did you review
12 the complaint before it was filed on your behalf in
13 this lawsuit?
14    A   I'm sure I did or somebody sent it to me
15 or read it to me.
16    Q   And it is an accurate, you agree that
17 everything in here is accurate?
18        MR. KLAYMAN:  Can you show him the
19    complaint?
20        MS. HANDMAN:  I will.
21 BY MS. HANDMAN:
22    Q   I'm going to refer you particularly to
23 paragraph 6 of the complaint.  You want me to read
24 it to you?
25    A   Yes.  Can I give it back to you?

Page 44

1    Q   Sure.  "Dennis L. Montgomery is a natural
2 person, an individual, and a citizen of the United
3 States.  He is a citizen of Florida, which has set
4 forth above is where much of this work has taken
5 place and will continue to take place."
6        Were you on February 24th when you filed
7 this complaint a citizen of Florida?
8    A   Yes, I believe so.
9    Q   And what's the basis for that belief?
10    A   Well, I changed my voter registration in
11 Washington implied here, and I was in the process of
12 moving until I injured myself.
13    Q   And in what steps had you taken to move to
14 Florida?
15        MR. KLAYMAN:  Objection, asked and
16    answered, but you can go over.
17        THE WITNESS:  Well, I located the housing
18    and I was selling my furniture, obviously,
19    because I didn't have the money to move all of
20    that across the country.
21 BY MS. HANDMAN:
22    Q   And you were being evicted from your
23 Yarrow Point home?
24        MR. KLAYMAN:  Objection, asked and
25    answered.

Page 45

1        THE WITNESS:  I don't know what date that
2    exactly took place.
3 BY MS. HANDMAN:
4    Q   April 1st, I believe?
5    A   That sounds right.
6    Q   Did you set up a bank account in Florida?
7    A   No, I didn't.
8    Q   Do you receive Social Security Disability?
9    A   Yes, I do.
10    Q   And do those checks come by mail?
11    A   No.
12    Q   They deposit it in a bank?
13    A   Yes.
14    Q   And where is that bank?
15    A   Well, it's in the United States.
16    Q   Well, what bank is it?
17    A   I think at first it was Citibank, and then
18 it was Bank of America or reverse, I don't remember.
19    Q   And what address does your bank account
20 there have for you?
21    A   I don't recall.
22    Q   Does it have your Florida address?
23    A   It might.
24    Q   Do you remember changing -- notifying them
25 that you were now in Florida?

12 (Pages 42 - 45)

CONFIDENTIAL

1     A   I don't recall.
2     Q   Where is your wife registered to vote?
3        MR. KLAYMAN: Objection. Assumes facts
4   not in evidence.
5   BY MS. HANDMAN:
6     Q   Is your wife registered to vote?
7     A   I don't know.
8     Q   Do you know whether she registered to vote
9   in Florida when you did?
10    A   I don't know.
11    Q   You have said you have longstanding plans
12  to move to Florida.
13       Had you taken any steps to -- prior to
14  registering to vote to move to Florida?
15    A   I was hoping to get work here again before
16  my stroke, obviously, and I had made contact with
17  some people, I don't remember, yes.
18    Q   Who did you make contact with?
19    A   I don't remember their names exactly.
20    Q   Do you remember what companies or entities
21  they were associated with?
22    A   Well, my son -- I can say "Ish," is that
23  right?
24    Q   Yes.
25    A   He had a contract, and I was helping him

1   at the time with a company in Florida developing a
2   cardiac monitoring device.
3     Q   And what was the name of that company?
4     A   Cardiac Networks.
5     Q   And when was that?
6     A   2010.
7     Q   And have you had any contacts with
8   companies in Florida since then?
9     A   Yes, Mr. -- yes.
10    Q   Who?
11    A   Anthony Fisher has another company here,
12  and I had contacted him to try to do business also
13  here.
14    Q   And what company is he with?
15    A   I can't remember the name of the company,
16  I apologize. He was a member of Cardiac Networks
17  and then had moved on.
18    Q   Do you have any documents or records of
19  any sort reflecting your contacts with him?
20    A   I believe so.
21    Q   Have you produced those?
22    A   I don't recall if I did or not.
23    Q   And when did -- when was your contact with
24  him?
25    A   Well, I mean, I had contact with him in

1   2010 and '11 and so forth.
2     Q   And when was your last contact with him?
3     A   Four days ago.
4     Q   And what was that regarding?
5     A   Trying to possibly see if I could do some
6   work here.
7     Q   Are you able to work?
8     A   Well, that's a good question. I don't
9   know.
10    Q   When was the last time you worked?
11    A   Before my first brain surgery.
12    Q   Which was in 2013; is that the coiling
13  procedure?
14    A   Yes, I had a brain coiling, is that what
15  you're asking me?
16    Q   Mm-hmm. Is that what you're referring to?
17    A   I don't understand.
18    Q   I asked: When was the last time you
19  worked, and you said: It was before your first
20  brain procedure?
21    A   Yes, that's correct.
22    Q   Have you had any contact with anyone at
23  MacDill Air Force Base in the last -- since your --
24  when was the last contact you've had with anyone at
25  MacDill Air Force Base?

1     A   2012.
2     Q   Who was that with?
3     A   SOCOM.
4     Q   And who at SOCOM?
5        MR. KLAYMAN: Objection, only to the
6     extent that you can identify someone publicly.
7     It wasn't some intelligence officer whose
8     identity is undercover.
9        THE WITNESS: I think you know who they
10    are, don't you? Are you trying to ask me who
11    SOCOM is?
12  BY MS. HANDMAN:
13    Q   No, I'm asking you, who you had contact
14  with at SOCOM in 2012?
15    A   His first name is Chris.
16    Q   Would that be Chris Pipes?
17    A   That sounds like the individual, yes.
18    Q   And did he come to your facility in
19  California in 2012?
20    A   Yes.
21    Q   And that's where you met him -- that's
22  where you met with him?
23    A   I don't understand what you mean: "I met
24  with him."
25    Q   Did he come to your facility in 2012?

13 (Pages 46 - 49)

**EXHIBIT C**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 15-cv-20782-MARTINEZ/GOODMAN

DENNIS L. MONTGOMERY,

      Plaintiff,

v.

JAMES RISEN, HOUGHTON MIFFLIN
HARCOURT PUBLISHING CO., MIFFLIN
HARCOURT CO., HMH HOLDINGS, INC.,

      Defendants.

_____/

**DEFENDANTS' MOTION TO DISMISS OR TRANSFER
FOR LACK OF PERSONAL JURISDICTION OVER RISEN AND
HOUGHTON MIFFLIN HARCOURT COMPANY, DISMISS OR TRANSFER
FOR IMPROPER VENUE, TRANSFER UNDER 28 U.S.C. § 1404(a), OR DISMISS
FOR FAILURE TO STATE A CLAIM AND MEMORANDUM IN SUPPORT**

| | |
|---|---|
| **HOLLAND & KNIGHT LLP** | **DAVIS WRIGHT TREMAINE LLP** |
| Sanford L. Bohrer | Laura R. Handman (admitted *pro hac vice*) |
|   Sandy.Bohrer@hklaw.com |   laurahandman@dwt.com |
| Brian W. Toth | Micah J. Ratner (admitted *pro hac vice*) |
|   Brian.Toth@hklaw.com |   micahratner@dwt.com |
| 701 Brickell Avenue, Suite 3300 | 1919 Pennsylvania Ave., NW, Suite 800 |
| Miami, Florida 33131 | Washington, D.C. 20006 |
| Tel: (305) 374-8500 | Tel.: (202) 973-4200 |
| Fax: (305) 789-7799 | Fax: (202) 973-4499 |

*Counsel for Defendants*

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ....................................................................... 1

II. STATEMENT OF FACTS ............................................................................ 3

    A. Facts Applicable to Personal Jurisdiction, Improper Venue, and Transfer ........... 4

    B. Facts Applicable to the Motion to Dismiss for Failure to State a Claim ............... 8

        1. Media Coverage of Montgomery Before the Book ................................... 8

        2. Reliance on FBI Reports, Court Documents, and Congressional Records for Allegations of Fake Software ................................................ 10

        3. Reliance on FBI Reports and Court Documents for Allegations of Rigged Demonstrations of Software to U.S. Government Officials ......... 13

        4. Complaint Allegations ............................................................................. 14

III. ARGUMENT ............................................................................................... 15

    A. The Court Lacks Personal Jurisdiction Over Risen and HMHC .......................... 15

    B. The Court Should Dismiss or Transfer for Improper Venue ................................ 21

    C. The Court Should Transfer Venue Under 28 U.S.C. § 1404(a) ............................ 22

    D. The Court Should Dismiss Under Rule 12(b)(6) Because Plaintiff Fails to Plead a Plausible Claim for Defamation or Other Related Torts ..................... 26

        1. The Fair Report Privilege Protects the Statements at Issue ...................... 27

        2. Many of the Challenged Statements Are Non-Actionable Opinion and Rhetorical Hyperbole Protected by the First Amendment ................. 30

        3. The Complaint Should Be Dismissed For Failure to Plausibly Plead Actual Malice or Any Other Applicable Fault .......................................... 31

            a. Montgomery Is a Limited-Purpose Public Figure ........................ 32

            b. Montgomery Fails to Plausibly Plead Actual Malice, or Any Other Applicable Standard of Fault ...................................... 34

        4. Montgomery's Other Tort Claims Fail .................................................... 39

IV. CONCLUSION ............................................................................................. 40

**TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Acosta Orellana v. CropLife Int'l*,
711 F. Supp. 2d 81 (D.D.C. 2010) ............................................................40

*Adelson v. Harris*,
973 F. Supp. 2d 467 (S.D.N.Y. 2013), *questions certified*, 774 F.3d 803
(2d Cir. 2014) .........................................................................................35

*Algodonera De Las Cabezas S.A. v. Am. Suisse Capital, Inc.*,
432 F.3d 1343 (11th Cir. 2005) ............................................................22

*Alternate Energy Corp. v. Redstone*,
328 F. Supp. 2d 1379 (S.D. Fla. 2004) .............................................17, 19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................26, 34, 35

*Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*,
134 S. Ct. 568 (2013)..............................................................................21

*Baxter v. Palmigiano*,
425 U.S. 308 (1976)..............................................................................38

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................................26, 27, 35

*Bell v. Associated Press*,
584 F. Supp. 128 (D.D.C. 1984) ............................................................37

*Biro v. Condé Nast*,
963 F. Supp. 2d 255 (S.D.N.Y. 2013)........................................35, 36, 39

*Brueggenmeyer v. ABC*,
684 F. Supp. 452 (N.D. Tex. 1988) ........................................................32

*Bryant v. Avado Brands Inc.*,
187 F.3d 1271 (11th Cir. 1999) ............................................................8

*Buckley v. N.Y. Times Co.*,
338 F.2d 470 (5th Cir. 1964) .................................................................16

*Busch v. Viacom International Inc.*,
    477 F. Supp. 2d 764 (N.D. Tex. 2007) .................................................................19

*CACI Premier Tech., Inc. v. Rhodes*,
    536 F.3d 280 (4th Cir. 2008) .......................................................................33, 37

*Calder v. Jones*,
    465 U.S. 783 (1984).....................................................................................17, 20

*Cellularvision Tech. & Telecomm., L.P. v. Alltel Corp.*,
    508 F. Supp. 2d 1186 (S.D. Fla. 2007) ..................................................23, 24, 25

*Chaiken v. VV Publ'g Corp.*,
    119 F.3d 1018 (2d Cir. 1997)..........................................................................38

*Chapin v. Knight-Ridder, Inc.*,
    993 F.2d 1087 (4th Cir. 1993) .........................................................................29

*Church of Scientology Int'l v. Behar*,
    238 F.3d 168 (2d Cir. 2001)............................................................................37

*Clyburn v. News World Commc'ns, Inc.*,
    903 F.2d 29 (D.C. Cir. 1990)......................................................................32, 34

*Cohen v. Cowles Media Co.*,
    501 U.S. 663 (1991)..........................................................................................39

*Coles v. Washington Free Weekly, Inc.*,
    881 F. Supp. 26 (D.D.C. 1995), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996)............28, 29

*Coquina Investments v. TD Bank, N.A.*,
    760 F.3d 1300 (11th Cir. 2014) .......................................................................38

*Crane v. Ariz. Republic*,
    972 F.2d 1511 (9th Cir. 1992) ..........................................................................29

*Dameron v. Wash. Magazine, Inc.*,
    779 F.2d 736 (D.C. Cir. 1985) ..........................................................................29

*Diario El Pais, S.L. v. Nielsen Co. (US)*,
    2008 WL 4833012 (S.D.N.Y. Nov. 6, 2008).......................................................35

*Ditton v. Legal Times*,
    947 F. Supp. 227 (E.D. Va. 1996), *aff'd*, 129 F.3d 116 (4th Cir. 1997)................29

*Dorsey v. Nat'l Enquirer, Inc.*,
    973 F.2d 1431 (9th Cir. 1992) ..........................................................................29

*Dowd v. Calabrese*,
  589 F. Supp. 1206 (D.D.C. 1984) ........................................................29

*Earley v. Gatehouse Media Pa. Holdings, Inc.*,
  2013 WL 5466149 (M.D. Pa. Sept. 30, 2013) ......................................35

*Edwards v. National Audubon Soc'y, Inc.*,
  556 F.2d 113 (2d Cir. 1977) ................................................................36

*Egiazaryan v. Zalmayev*,
  2011 WL 6097136 (S.D.N.Y. Dec. 7, 2011) ........................................35

*Farah v. Esquire Magazine*,
  736 F.3d 528 (D.C. Cir. 2013) ..................................................... *passim*

*Fetter v. N. Am. Alcohols, Inc.*,
  2007 WL 551512 (E.D. Pa. Feb. 15, 2007) ..........................................30

*Forbes v. Lenox Fin. Mortg. LLC*,
  2008 WL 2959727 (S.D. Fla. July 30, 2008) ........................................22

*Foretich v. Chung*,
  1995 WL 224558 (D.D.C. Jan. 25, 1995) .............................................28

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974) .............................................................................34

*Global Relief Found. Inc. v. N.Y. Times Co.*,
  390 F.3d 973 (7th Cir. 2004) ...............................................................29

*Hakky v. Wash. Post Co.*,
  2010 WL 2573902 (M.D. Fla. June 24, 2010) ................................34, 35

*Hanks v. Wavy Broad., LLC*,
  2012 WL 405065 (E.D. Va. Feb. 7, 2012) ............................................35

*Hargrave v. Wash. Post*,
  2009 WL 1312513 (D.D.C. May 12, 2009), *aff'd*, 365 F. App'x 224
  (D.C. Cir. 2010) ..................................................................................27

*Harper v. Walters*,
  822 F. Supp. 817 (D.D.C. 1993), *aff'd*, 40 F.3d 474 (D.C. Cir. 1994) ...................28

*Heidbrink v. ThinkDirect Mktg. Grp., Inc.*,
  2014 WL 3585698 (M.D. Fla. July 21, 2014) ......................................16

*Hemispherx Biopharma, Inc. v. MidSouth Capital, Inc.*,
  669 F. Supp. 2d 1353 (S.D. Fla. 2009) ...........................................21, 22

*Hoechst Celanese Corp. v. Nylon Eng'g Resins, Inc.*,
   896 F. Supp. 1190 (M.D. Fla. 1995) ..................................................................................19

*Hustler Magazine v. Falwell*,
   485 U.S. 46 (1988) ...........................................................................................................40

*Ins. Co. of N. Am. v. Levin*,
   2011 WL 1398473, at *4 (S.D. Fla. Mar. 28, 2011), *report & recommendation
   adopted*, 2011 WL 2610754 (S.D. Fla. July 1, 2011) ............................................26

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945) ...........................................................................................................15

*Jaisinghani v. Capital Cities/ABC, Inc.*,
   973 F. Supp. 1450 (S.D. Fla. 1997), *aff'd*, 149 F.3d 1195 (11th Cir. 1998) ............................24

*Jenkins Brick Co. v. Bremer*,
   321 F.3d 1366 (11th Cir. 2003) ......................................................................................22

*Keeton v. Hustler Magazine*,
   465 U.S. 770 (1984) ...........................................................................................................17

*Klayman v. City Pages*,
   2015 WL 1546173 (M.D. Fla. Apr. 3, 2015) ...........................................................37, 39

*Lavin v. N.Y. News, Inc.*,
   757 F.2d 1416 (3d Cir. 1985) ..........................................................................................28

*Law Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.*,
   844 F.2d 955 (2d Cir. 1988) .............................................................................................29

*Levan v. Capital Cities/ABC*,
   190 F.3d 1230 (11th Cir. 1999), *cert. denied*, 528 U.S. 1198 (2000) ......................................38

*Liberty Lobby, Inc. v. Dow Jones*,
   838 F.2d 1287 (D.C. Cir. 1988) .......................................................................................36

*Licciardello v. Lovelady*,
   544 F.3d 1280 (11th Cir. 2008) ......................................................................................17

*Lieberman v. Fieger*,
   338 F.3d 1076 (9th Cir. 2003) .........................................................................................31

*Loeb v. New Times Commc'ns Corp.*,
   497 F. Supp. 85 (S.D.N.Y. 1980) ....................................................................................36

*Logan v. District of Columbia*,
   447 F. Supp. 1328 (D.D.C. 1978) ....................................................................................32

*Lohrenz v. Donnelly*,
 350 F.3d 1272 (D.C. Cir. 2003) ..................................................................34, 36

*Madara v. Hall*,
 916 F.2d 1510 (11th Cir. 1990) ..................................................................18, 19

*Manuel v. Convergys Corp.*,
 430 F.3d 1132 (11th Cir. 2005) ..........................................................................26

*Mason v. Smithkline Beecham Clinical Labs.*,
 146 F. Supp. 2d 1355 (S.D. Fla. 2001) ................................................................25

*Mayfield v. NASCAR, Inc.*,
 674 F.3d 369 (4th Cir. 2012) ..............................................................................35

*McDowell v. Paiewonsky*,
 769 F.2d 942 (3d Cir. 1985)................................................................................33

*McFarlane v. Esquire Magazine*,
 74 F.3d 1296 (D.C. Cir. 1996) ................................................................17, 34, 38

*McFarlane v. Sheridan Square Press, Inc.*,
 91 F.3d 1501 (D.C. Cir. 1996)......................................................................36, 39

*McManus v. Doubleday & Co.*,
 513 F. Supp. 1383 (S.D.N.Y. 1981)....................................................................38

*Medico v. Time, Inc.*,
 643 F.2d 134 (3d Cir. 1981)................................................................................29

*Metcalf v. KFOR-TV*,
 828 F. Supp. 1515 (W.D. Okla. 1992) ................................................................30

*Meterlogic, Inc. v. Copier Solutions, Inc.*,
 185 F. Supp. 2d 1292 (S.D. Fla. 2002) ....................................................23, 25, 26

*Milkovich v. Lorain Journal Co.*,
 497 U.S. 1 (1990)................................................................................................30

*Moldea v. N.Y. Times Co.*,
 15 F.3d 1137 (D.C. Cir. 1994) ............................................................................30

*Moldea v. N.Y. Times Co.*,
 22 F.3d 310 (D.C. Cir. 1994) ........................................................................30, 39

*Montgomery v. eTreppid Techs., LLC*,
 2010 WL 1416771 (D. Nev. Apr. 5, 2010)..........................................................23

*N. Atl. Marine, Ltd. v. Sealine Int'l, Ltd.*,
    2007 WL 5298433 (S.D. Fla. Mar. 29, 2007) ........................................................................ 8

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ........................................................................ 39

*Obsidian Fin. Grp., LLC v. Cox*,
    812 F. Supp. 2d 1220 (D. Or. 2011), *aff'd*, 740 F.3d 1284 (9th Cir. 2014) ...................... 30

*Pan Am Sys., Inc. v. Hardenbergh*,
    871 F. Supp. 2d 6 (D. Me. 2012) ........................................................................ 35

*Parisi v. Sinclair*,
    845 F. Supp. 2d 215 (D.D.C. 2012) ........................................................................ 35, 36

*Peter Scalamandre & Sons, Inc. v. Kaufman*,
    113 F.3d 556 (5th Cir. 1997) ........................................................................ 37

*Pierson v. Orlando Reg'l Healthcare Sys., Inc.*,
    2010 WL 1408391 (M.D. Fla. Apr. 6, 2010), *aff'd*, 451 F. App'x 862
    (11th Cir. 2012) ........................................................................ 28

*Piper Aircraft Co. v. Reyno*,
    454 U.S. 235 (1981) ........................................................................ 24

*Poncy v. Johnson & Johnson*,
    414 F. Supp. 551 (S.D. Fla. 1976) ........................................................................ 25, 26

*Q Int'l Courier, Inc. v. Seagraves*,
    1999 WL 1027034 (D.D.C. Feb. 26, 1999) ........................................................................ 28

*Revell v. Lidov*,
    317 F.3d 467 (5th Cir. 2002) ........................................................................ 19

*Reynolds v. Int'l Amateur Athletic Fed'n*,
    23 F.3d 1110 (6th Cir. 1994) ........................................................................ 20

*Rhodes v. Placer Cnty.*,
    2011 WL 1302240 (E.D. Cal. Mar. 31, 2011) ........................................................................ 31

*Schatz v. Republican State Leadership Comm.*,
    669 F.3d 50 (1st Cir. 2012) ........................................................................ 35

*Sculptchair, Inc. v. Century Arts, Ltd.*,
    94 F.3d 623 (11th Cir. 1996) ........................................................................ 15, 16

*Serian v. Penguin Grp. (USA), Inc.*,
    2009 WL 2225412 (N.D. W. Va. July 23, 2009) ........................................................................ 31

*Silvester v. ABC*,
    839 F.2d 1491 (11th Cir. 1988) ........................................................................33

*Spelson v. CBS, Inc.*,
    581 F. Supp. 1195, 1203 (N.D. Ill. 1984), *aff'd*, 757 F.2d 1291 (7th Cir. 1985) ...................31

*St. Amant v. Thompson*,
    390 U.S. 727 (1968)........................................................................................34

*Stern v. News Corp.*,
    2008 WL 10712037 (S.D. Fla. Aug. 26, 2008)......................................................24

*Tavoulareas v. Piro*,
    759 F.2d 90 (D.C. Cir. 1985), *rev'd on other grounds*, 817 F.2d 762
    (D.C. Cir. 1987) (*en banc*) ............................................................................39

*Tavoulareas v. Piro*,
    817 F.2d 762 (D.C. Cir. 1987) (*en banc*)..................................................32, 35

*Thomas v. News World Commc'ns*,
    681 F. Supp. 55 (D.D.C. 1988) ........................................................................30

*Van Dusen v. Barrack*,
    376 U.S. 612 (1964)........................................................................................23

*Wai v. Rainbow Holdings*,
    315 F. Supp. 2d 1261 (S.D. Fla. 2004) ..............................................................21

*Waldbaum v. Fairchild Publ'ns, Inc.*,
    627 F.2d 1287 (D.C. Cir. 1980) ........................................................................32

*Walden v. Fiore*,
    134 S. Ct. 1115 (2014)....................................................................................20

*Washington v. Smith*,
    80 F.3d 555 (D.C. Cir. 1996) ..........................................................................30

*Weinstein v. Friedman*,
    859 F. Supp. 786 (E.D. Pa. 1994) ....................................................................24

*Weyrich v. New Republic, Inc.*,
    235 F.3d 617 (D.C. Cir. 2001)..........................................................................30

*White v. Fraternal Order of Police*,
    909 F.2d 512 (D.C. Cir. 1990)..............................................................27, 28, 29

*Windmere Corp. v. Remington Prods., Inc.*,
    617 F. Supp. 8 (S.D. Fla. 1985) ........................................................................24

*Winn v. United Press Int'l*,
    938 F. Supp. 39 (D.D.C. 1996), aff'd, 1997 WL 404959 (D.C. Cir. 1997)............................34

*Yohe v. Nugent*,
    321 F.3d 35 (1st Cir. 2003)......................................................................................................29

**State Cases**

*Alpine Indus. Computers, Inc. v. Cowles Publ'g Co.*,
    57 P.3d 1178 (Wash. Ct. App. 2002), *amended*, 64 P.3d 49
    (Wash. Ct. App. 2003) .........................................................................................................27, 29

*Fikes v. Furst*,
    61 P.3d 855 (N.M. Ct. App. 2002)...........................................................................................31

*Foretich v. CBS, Inc.*,
    619 A.2d 48 (D.C. 1993) ..........................................................................................................34

*Gleichenhaus v. Carlyle*,
    591 P.2d 635 (Kan. Ct. App.), *aff'd in relevant part*, 597 P.2d 611
    (Kan. 1979) ...............................................................................................................................33

*Huszar v. Gross*,
    468 So. 2d 512 (Fla. 1st DCA 1985) ........................................................................................28

*Jackson v. District of Columbia*,
    412 A.2d 948 (D.C. 1980) ........................................................................................................40

*Jung v. Jung*,
    791 A.2d 46 (D.C. 2002) ..........................................................................................................40

*Mosesian v. McClatchy Newspapers*,
    285 Cal. Rptr. 430 (Cal. Ct. App. 1991)...................................................................................33

*O'Brien v. Franich*,
    575 P.2d 258 (Wash. App. Ct. 1978)........................................................................................28

*Pegasus v. Reno Newspapers, Inc.*,
    57 P.3d 82 (Nev. 2002)..............................................................................................................38

*Phillips v. Evening Star Newspaper Co.*,
    424 A.2d 78 (D.C. 1980) ..........................................................................................................34

*Quinn v. Jewel Food Stores, Inc.*,
    276 Ill. App. 3d 861 (Ill. App. Ct. 1995) ..................................................................................31

*Rojas v. Debevoise & Plimpton*,
    634 N.Y.S.2d 358 (N.Y. Sup. Ct. 1995) ...................................................................................31

*Sahara Gaming Corp. v. Culinary Workers Union Local,*
   984 P.2d 164 (Nev. 1999) ..................................................................................27

*Shaw v. Palmer,*
   197 S.W.3d 854 (Tex. Ct. App. 2006) .................................................................31

*Sipple v. Found. for Nat'l Progress,*
   83 Cal. Rptr. 2d 677 (Cal. Ct. App. 1999) ...........................................................28

*Solers, Inc. v. Doe,*
   977 A.2d 941 (D.C. 2009) ...................................................................................40

*Stepien v. Franklin,*
   528 N.E.2d 1324 (Ohio Ct. App. 1988) ..............................................................31

*Stewart v. Sun Sentinel Co.,*
   695 So. 2d 360 (Fla. 4th DCA 1997) ..............................................................27, 28

*Yauncey v. Hamilton,*
   786 S.W.2d 854 (Ky. 1989) ................................................................................31

**Constitutional Provisions**

U.S. Const. amend I ...........................................................................3, 27, 30, 39

U.S. Const. amend. V...................................................................3, 10, 37, 38

**Federal Statutes**

28 U.S.C. § 1391 ..............................................................................................21, 22

28 U.S.C. § 1404(a) .........................................................................................1, 22

28 U.S.C. § 1406(a) .........................................................................................1, 21

**State Statutes**

Cal. Civ. Code § 47(d) .........................................................................................27

Cal. Civ. Code § 47(e) .........................................................................................27

Fla. Stat. § 48.193(2).............................................................................................16

**Rules**

Fed. R. Civ. P. 12(b) ....................................................................................... *passim*

S.D. Fla. L.R. 5.4 ...................................................................................................23

**MOTION TO DISMISS OR TRANSFER AND REQUEST FOR HEARING**

Defendants James Risen ("Risen"), Houghton Mifflin Harcourt Publishing Company ("HMH"), and Houghton Mifflin Harcourt Company ("HMHC"), improperly sued as HMH Holdings, Inc., (together "HMH Companies"), respectfully move this Court for an Order: (1) dismissing or transferring this action to the U.S. District Court for the District of Columbia for lack of personal jurisdiction over Risen and HMHC under Fed. R. Civ. P. 12(b)(2); (2) dismissing or transferring this action for improper venue under Fed. R. Civ. P. 12(b)(3) and 28 U.S.C. § 1406(a); (3) transferring this action under 28 U.S.C. § 1404(a); or (4) dismissing the complaint with prejudice under Fed. R. Civ. P. 12(b)(6).[1]  Defendants request a hearing due to the number of motions, and the complexity and number of issues involved.

## I.     PRELIMINARY STATEMENT

Plaintiff Dennis Montgomery brings this libel action against Pulitzer Prize-winning author James Risen, who works and lives in the Washington, D.C. ("D.C.") area, and his publisher HMH, a Massachusetts company headquartered in Boston, arising from statements in Chapter 2 ("Chapter") of his book, *Pay Any Price: Greed, Power, and the Endless War* (the "Book"), that report allegations that Montgomery perpetrated a fraud on the federal government – allegations widely published in articles as far back as 2008, that were never the subject of a libel claim until now.  The Court should dismiss or transfer to the district court in D.C. for the following reasons:

***First***, this Court lacks personal jurisdiction over Risen and HMHC, which is merely a holding company in Delaware.  Risen resides in a Maryland suburb of D.C. and works for the *New York Times* in its D.C. bureau.  Montgomery does not assert general jurisdiction, and none

---

[1] If the Court does not grant the relief above, it should grant the concurrently filed Special Motion to Dismiss Under the Applicable Anti-SLAPP Statute.

exists here. The Court lacks specific jurisdiction over Risen because Risen did not expressly aim the story about Montgomery at Florida and Florida was not the focal point of the tort or the brunt of the alleged harm. Risen did not rely on Florida sources, gather information for the Chapter in Florida, or even reference Florida. The focal point of the Chapter is D.C., where Montgomery's reputation as a government contractor lies, where many of the sources are located, and where Risen gathered documents, interviewed sources, and wrote the Chapter. Montgomery cannot manufacture jurisdiction based on his own alleged contacts – if any – with Florida. Even if Montgomery moved to Florida when he filed suit, by all accounts, he did not reside in Florida at the critical time when the events took place, he was interviewed and the Book was published.

*Second*, the Court should dismiss or transfer for the independent reason that venue is improper here. Montgomery failed to meet his burden to show proper venue because the bases for venue he alleges – a district where all defendants reside and a provision that applies only to the federal government – do not apply here. Since no substantial part of the events giving rise to the claim occurred in Florida, venue is not proper here.

*Third*, even if venue is otherwise proper, the Court may transfer venue for convenience of witnesses and parties. The Chapter focuses on D.C., and most of the critical witnesses and documents are in the D.C. area. The military witnesses cited by Montgomery in Florida, even assuming any have relevant knowledge, are not located in this district or within 100 miles. Thus, the Court should transfer this action to D.C., where Risen and key witnesses are located.

*Fourth*, if the Court does not dismiss or transfer for the above reasons, Montgomery's Amended Complaint should be dismissed because he fails to state a claim, as a matter of law, under Rule 12(b)(6).

a) Montgomery's Amended Complaint is barred by the fair report privilege. The privilege protects the Chapter, which accurately summarized official documents, including FBI

2

reports, court records, and statements in congressional records – all of which alleged that Montgomery rigged demonstrations and provided bogus software to the federal government.

b)　　　　Other statements Montgomery challenges are non-actionable expressions of opinion and rhetorical hyperbole, not verifiable statements of fact. That the hoax Montgomery allegedly perpetuated was "crazy," that he was motivated by "greed" and accused of being a "con artist," are all subjective opinions protected by the First Amendment.

c)　　　　Plaintiff, a limited-purpose public figure, has not and cannot plausibly plead adequate facts to support actual malice or any other applicable standard of fault. Risen interviewed Montgomery, published his denials, relied on reputable news articles and on official records, including testimony of his former business partner, his former lawyer, and Montgomery's own repeated invocation of the Fifth Amendment privilege against self-incrimination when asked in deposition whether his software was a fraud, and the 2013 Congressional testimony of John Brennan, now Director of the CIA, who testified that Montgomery's software "was determined not to be an accurate source of information."

d)　　　　Montgomery's other tort claims are barred for the same reasons as the libel claims and because he fails to plausibly plead facts to allege the elements of those claims.

## II.　　STATEMENT OF FACTS

*Pay Any Price* is a nine-chapter book that describes how the war on terror led to waste, fraud, and abuse by U.S. government officials and the contractors who stood to gain from it. Chapter 2 of the Book titled *The Emperor of the War on Terror* focuses on how, after the terrorist attacks of September 11, 2001, government officials were willing to accept any intelligence – no matter how suspect – that might prevent the next terrorist attack. In that context, Risen recounts Montgomery's story retreading ground covered by previous media reports, most notably a 2010 *Playboy Magazine* feature titled *The Man Who Conned the*

*Pentagon* ("Playboy Article"), which revealed the central allegations Montgomery now

challenges, and a 2011 *New York Times* article titled, *Hiding Details of Dubious Deal, U.S.*

*Invokes National Security*, which Risen co-authored ("New York Times Article"), attached as

Exhibits 1 and 2, respectively, to the Declaration of Laura Handman ("Handman Decl.").

### A.  Facts Applicable to Personal Jurisdiction, Improper Venue, and Transfer

Risen has *no* connections to Florida that would give rise to personal jurisdiction over

him.  Risen is not a Florida resident; he resides in a Maryland suburb of D.C. and works for the

New York Times in its D.C. bureau.  (Declaration of James Risen ("Risen Decl.") ¶¶ 2, 3.)

HMH, the publisher of the Book, is incorporated in Massachusetts and has its principal place of

business in Boston.  Its parent company, HMHC, improperly sued as HMH Holdings, Inc., is a

Delaware holding company and is not authorized to do business in Florida.  (Am. Compl. ¶¶ 15-

18; Handman Decl. Exs. 3 and 4.)

Risen gathered documents and information, including about Montgomery, while working

in D.C. and Maryland.  (Risen Decl. ¶¶ 2, 8.)  Risen did much of the newsgathering for the

Chapter about Montgomery for his earlier New York Times Article, published February 19,

2011, which he co-authored with Eric Lichtblau, also in the D.C. bureau of the *New York Times*.

(*Id.* ¶ 8.)  For the Chapter, Risen interviewed Montgomery by phone and email while

Montgomery lived in California and/or Washington State ("Washington").  (*Id.* ¶ 6.)

Nothing discussed in the Chapter took place in Florida.  The two businesses with which

Montgomery was involved, eTreppid and Blxware, and which were the subject of Risen's

reporting, were based in Nevada and Washington, respectively.[2]  When Montgomery became

---

[2] eTreppid Technologies, LLC ("eTreppid") was a Nevada corporation headquartered in Reno,
http://nvsos.gov/sosentitysearch/CorpDetails.aspx?lx8nvq=9ugC9Jz33%252bzPvBGw4H3zqw%
253d%253d&nt7=0).  Blxware, LLC was a Delaware corporation headquartered in Bellevue,
Washington (https://delecorp.delaware.gov/tin/controller, last visited May 12, 2015).

involved with eTreppid, the Book says that Montgomery lived in Nevada.  (Book at 35.)  Key events discussed in the Chapter took place in Nevada.[3]  At the time Montgomery was involved with Blxware, the Chapter describes a demonstration of his software at a warehouse in Palm Springs, California (*id.* at 52).  Government officials mentioned in the Chapter who discussed and took action based on Montgomery's software, were in the D.C. area at the CIA, Air Force, the White House, and Congress (*id.* at 39, 51, 52, 53).  The Chapter discusses the high-powered D.C. lobbyist hired to secure contracts for Montgomery's software (*id.* at 38), the high-powered D.C. lawyer who represented Gibbons (*id.* at 50), and the later litigation involving Montgomery and his former partners in Nevada, California, Montana, and Washington.

Risen (and Lichtblau) interviewed key sources – who are also potential witnesses – located in or near D.C., California, New York, and Washington by phone, email, or in person.  (Risen Decl. ¶ 8.)  Past and current Government witnesses and documents are located in or within a 100-mile radius of D.C., including current and former CIA, Air Force, and White House officials with knowledge of Montgomery's software.  (*See* Handman Decl. Ex. 27.)  Key officials in the D.C. area include Donald Kerr, then chief of the CIA's Science and Technology Directorate; Joseph Liberatore, an Air Force official, who allegedly believed in Montgomery's work; John Brennan, then head of the Terrorist Threat Integration Center, now CIA Director, who passed on Montgomery's intelligence and then concluded it was "inaccurate"; George Tenet, then CIA Director who a CIA source in Chapter 2 says "allowed [scientists] to circumvent the CIA's normal reporting and vetting channels, and rushed the raw material fed to the agency by Montgomery directly to the president"; Jose Rodriguez, head of the CIA Counterclaim

---

[3] These include: a meeting with CIA officials (*id.* at 40, 41); a meeting with an Air Force colonel (*id.* at 36); a dinner with a member of congress who became governor of Nevada, Jim Gibbons, later cleared of bribery charges pressed by Montgomery (*id.* at 38-39); claims by Montgomery of access to Predator drone information from Nellis Air Force base in Nevada (*id*. at 48, 51); and his arrest for passing $1 million in bad checks at casinos in Nevada (*id.* at 52).

Center, who said Montgomery's intelligence was "crazy"; Paul Haraldsen, who led the Air Force Special Investigation Inquiry into Montgomery's software; and Samantha Ravich, then advisor to Vice President Dick Cheney, who pressed Montgomery for proof that his software worked. (Risen Decl. ¶¶ 10, 11.) Other important witnesses are Michael Flynn, Montgomery's former lawyer, who is located in California; Warren Trepp, Montgomery's former partner who is located in Nevada; and Tim Blixseth, the ex-husband of Montgomery's former business partner, who is located in Washington. (*Id.* ¶ 13.) None of Defendants' key witnesses is in Florida. (*Id.*)

With the possible exception of one contact with a spokesperson at Special Operations Command, Risen did not have any contact with Florida, whether by telephone, written communications, or in person, in either preparing the Chapter or in connection with the interviews he has given to promote the Book. (*Id.* ¶ 9.) Neither the Chapter about Montgomery nor the television and radio interviews promoting the Book mention Florida and, indeed, Montgomery did not give Risen any reason to believe Montgomery had any connection to Florida. (*Id.* ¶ 14.) In Montgomery's initial disclosures served after filing the lawsuit, he lists a number of witnesses apparently located at MacDill Air Force Base in Tampa and Eglin Air Force Base near Pensacola, with whom Montgomery claims to have worked at some point in time (Am. Compl. Ex. 13), unbeknownst to Risen.

In fact, the first Risen and HMH heard of any specific connection with Florida was in the Complaint, filed February 24, 2015, that alleged Montgomery is "a citizen of Florida." (Compl. ¶ 6.); (Risen Decl. ¶ 7.) Montgomery did not allege that he resided or was domiciled in Florida and still refuses to disclose his address for "security reasons" (Am. Compl. at 1 n.1), speculating that the Book caused him, "in effect," to be subject to a "fatwah" from "terrorists who have sworn to attack those assisting the U.S. military and Government." (*Id.* ¶¶ 21, 95, 254.) Apparently, the basis for Montgomery's allegation of citizenship was that Montgomery

registered to vote in Florida from Washington by FedEx literally the day before he filed the Complaint, and listed a temporary address at a hotel in Florida and claims to have since rented an apartment at an undisclosed location.  (Handman Decl. Ex. 5; Amended Compl. Ex. C ¶¶ 8, 9.)

Montgomery was a resident of Washington at the time the Book was published in October, 2014; at most, he has only just moved to Florida.  On September 12, 2013, Montgomery's counsel stipulated to transfer of a defamation action filed against him from the Central District of California to the Western District of Washington because Montgomery had "relocated to the State of Washington," was "currently [a] citizen[ ] of the state of Washington," and "reside[d] in Yarrow Point, Washington."[4]  On June 10, 2014, a journalist wrote about meeting Montgomery at his residence in Yarrow Point, Washington.[5]  On January 6, 2015, he was under the care of a doctor in Seattle, Washington.  (Am. Compl. Ex. 10.)  On February 18, 2015, a Western District of Washington judge issued an order requiring Montgomery and his wife to vacate their property in Yarrow Point by April 1, 2015.[6]  This order suggests that Montgomery actually resided in Washington when he alleged in his Complaint on February 24, 2015 that he was a "citizen of Florida."  (Compl. ¶ 6.)

Montgomery pleads in support of jurisdiction in Florida that "the most recent commercial opportunities for the Plaintiff's work were contract and projects made available through military bases and Government facilities in Florida" (Am. Compl. ¶ 4), but gives no specifics as to who, what or where.  Given Plaintiff's own allegations of ill health and continuing medical treatment in Seattle, it is hard to imagine he resides in Florida or is actively pursuing any current

---

[4]  (Handman Decl. Ex. 6.)
[5]  (Handman Decl. Ex. 7.)
[6]  (Handman Decl. Ex. 8.)

commercial opportunities in Florida.  (Am. Compl. ¶ 13 & Ex. 10.)[7]  Plaintiff asserts that a

substantial portion of the harm occurred in Florida, because "Florida is the third (3rd) largest

state by population," and "Defendants knew or should have known of the large counter-

terrorism, military, and intelligence presence within the state of Florida" because "Risen is a

'national security expert' who has intimate knowledge of the U.S. Military."  (Am. Compl. ¶¶ 5,

10, 11, 12.)  By that logic, Florida, by virtue of its population and military and intelligence

installations, would have jurisdiction over every author of a book on national security whose

work enjoyed nationwide distribution.  That is not the law.

### B.    Facts Applicable to the Motion to Dismiss for Failure to State a Claim

#### 1.    Media Coverage of Montgomery Before the Book

Montgomery has been the subject of extensive media coverage since at least November 1,

2006, when the *Wall Street Journal* ran a front-page story, titled *Congressman's Favors for*

*Friend Include Help in Secret Budget*, revealing that Montgomery had accused then-

Congressman, subsequently Nevada Governor, Jim Gibbons of taking bribes from Warren Trepp,

Montgomery's former business partner at eTreppid Technologies ("eTreppid").  (Handman Decl.

Ex. 9.)[8]  In a follow-up *Wall Street Journal* article, titled *Nevada Governor Faces FBI Probe Into*

*Contracts*, Trepp accused Montgomery of giving "false testimony" in their litigation over

---

[7] He claims to have formed a Florida corporation in September, 2011, but the Legalzoom filing,
which Montgomery attaches to his Amended Complaint, lists Montgomery as a contact at a Palm
Desert, California address.  (Am. Compl. Ex. 5.)  As of 2012, the company referenced in Ex. 17
of the Amended Complaint was inactive.  (Handman Decl. Ex. 10.)

[8] The Court may consider documents subject to judicial notice, such as news articles and court
and congressional records, without converting this motion into one for summary judgment.  *N.*
*Atl. Marine, Ltd. v. Sealine Int'l, Ltd.*, 2007 WL 5298433, at *4 (S.D. Fla. Mar. 29, 2007)
(Martinez, J.) ("'[t]he Eleventh Circuit has held that, when considering a 12(b)(6) motion to
dismiss, a court may take judicial notice of the public record, without converting the motion to
one for summary judgment'") (citing *Bryant v. Avado Brands Inc.*, 187 F.3d 1271, 1279-80 (11th
Cir. 1999)); *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) ("Judicial notice is
properly taken of publicly available historical articles" on a Rule 12(b)(6) motion).

Montgomery's software.  (Handman Decl. Ex. 11.)  Montgomery exploited the media spotlight, giving an exclusive interview to NBC News on May 11, 2007, in which he repeated the "explosive charge" against Trepp and Gibbons.  (Handman Decl. Ex. 12.)  By creating the controversy over whether Trepp bribed a public official to steer government contracts to eTreppid, Montgomery invited media scrutiny of his work at eTreppid for the U.S. government.  Gibbons was ultimately cleared in 2008 with Associated Press quoting his lawyer as saying, "It should be crystal clear that the only persons who should be investigated or charged are those who made false allegations of wrongdoing and who tried to fuel this investigation for their own private purposes."  (Handman Decl. Ex. 13; Book at 50.)

The allegations that Montgomery provided bogus software to the government were published in an August 2008 *Bloomberg News* article, titled *Yellowstone Club Divorcee Entangled in Terrorist Software Suits*.  (Handman Decl. Ex. 14, at 1-2, 4-5, 9.)  The article summarized Trepp's allegations in court records that Montgomery stole eTreppid's "computer code that purportedly could sift through broadcasts from Qatar-based news network Al-Jazeera and find embedded messages to terrorists," and quoted Montgomery's former attorney's charge that the "software was a sham."  (*Id.*)

Then again in 2010, the Playboy Article revealed the central allegations Montgomery now challenges.  Its investigation claimed that Montgomery rigged software demonstrations and sold the U.S. government sham "noise filtering" software to decode purported Al Qaeda messages hidden in Al Jazeera broadcasts – bogus intelligence that led the White House to ground international flights and to consider shooting down transatlantic flights around Christmas in 2003.  (Handman Decl. Ex. 1.)  Soon after, the Playboy Article explained, a French contractor determined that not enough pixels existed in Al Jazeera broadcasts to include the hidden messages and the CIA and White House soon concluded that they had been hoodwinked.

9

According to the Playboy Article, because of the secrecy surrounding the project, other government agencies continued to contract with Montgomery until 2009.

Risen and Eric Lichtblau's 2011 New York Times Article, covered much of the same material, but focused on the U.S. government's invocation of the state-secrets privilege to cover up Montgomery's misdeeds and the government's gullibility.  Notably, the New York Times Article said that in Montgomery's deposition in November 2011, "when asked if his software was a 'complete fraud', he answered, 'I'm going to assert my right under the Fifth Amendment.'"  (Handman Decl. Ex. 2, at 6.)[9]  Risen expressly acknowledges in the Book that he relied on the Playboy Article and New York Times Article.  (Book at 53.)  The Book added Montgomery's denials to the narrative, obtained after Risen interviewed him.  (*Id*. at 33-34, 37, 51, 53).

Further, as catalogued in the Handman Declaration (Ex. 16), other reputable media outlets published numerous news stories about Montgomery before release of the Book in October 2014.  These include a 2012 article in *Defense News*, "*Obama's Counterterrorism Czar Gave Bogus Intel to Bush White House*," in which the then-head of the CIA's Counterterrorism Center describes Montgomery's software as "crazy" (Handman Decl. Ex. 17).  These articles – never retracted, much less the subject of a lawsuit – all track what Risen wrote in the Chapter.   Montgomery now brings suit to challenge publication of these facts after nearly seven years in circulation.

### 2. Reliance on FBI Reports, Court Documents, and Congressional Records for Allegations of Fake Software

As with his New York Times Article and prior media accounts, Risen primarily based the Chapter on court records and other official documents.  The Chapter refers to FBI interviews of Warren Trepp, Montgomery's partner in the software venture, eTreppid, and its employees.  The

---

[9]  Relevant excerpts of Montgomery's deposition in which he repeatedly asserted the Fifth Amendment to questions about his software, are attached to the Handman Declaration. (Handman Decl. Ex. 15.)

Book expressly states that, "according to court documents that include his statements to the FBI," Montgomery's software was fake because "Trepp later told the FBI that he eventually learned that Montgomery had no real computer software programming skills." (Book at 37.)[10] Similarly, the Chapter accurately quotes statements in FBI reports in which an eTreppid employee Sloan Venables began to suspect Montgomery's software was fake. Venables "*told the FBI* that another employee, Patty Gray, began to suspect that Montgomery 'was doing something other than what he was actually telling people he was doing'" and "added *in his statement to the FBI* that he knew that 'Montgomery promised products to customers that he had not been completed or even assigned to programmers.'" (Book at 48-49) (emphasis added).

Then, citing court documents, the Chapter states: "Over the Christmas holidays [of 2005], Montgomery allegedly went into eTreppid's offices and deleted all of the computer files containing his source code and software development data, *according to court documents*." (Book at 49) (emphasis added). Later, "*[a]ccording to court documents*, [Trepp] *told the FBI* that Montgomery had stolen the software eTreppid had used on secret Pentagon contracts" but "[a]s federal investigators moved in to investigate the alleged theft of the technology, they heard from Trepp and others that Montgomery's alleged technology wasn't real." (*Id.*) (emphasis added). The Chapter correctly summarizes FBI reports contained in court records showing that the technology "wasn't real." (*Id.*)[11]

---

[10] The FBI report contained in court records states, "recently Trepp has found out that Montgomery's skills may not be what he has purported them to be. Trepp cited a recent Air Force Office of Special Investigation Inquiry, which determined that Montgomery's programming skills were not what he alleged." (Handman Decl. Ex. 18 at Bates No. 00002)

[11] An eTreppid employee, "Gray said that on 21 Dec 2005 . . . she told Trepp that she had reason to believe [Montgomery] had not written significant software for the company." (Handman Decl. Ex. 18 at Bates No. 00121.) Another employee, "Anderson also informed Trepp that [Montgomery] was using open source to develop eTreppid Source Code, [Montgomery] was dishonest," and that "he had suspicions that [Montgomery] was less technically competent than he led people to believe." (Handman Decl. 18 at Bates No. 00123.)

The Chapter also recounts how Montgomery's later benefactor and business partner at
Blxware, Edra Blixseth, was "going through an extremely bitter divorce, and Montgomery
became caught up in their legal battles."  (Book at 52.)  "Mysteriously, government lawyers
sometimes sought to intervene in their court cases . . . to keep classified information stemming
from Montgomery's work with the intelligence community out of the public records."  (*Id.*)  In
those public court records, Edra's ex-husband, Tim Blixseth, alleged the fraud in an affidavit,
stating: "Montgomery and Edra Blixseth have engaged in an extensive scheme to defraud the
U.S. Government," a "fraud [that] involves Mr. Montgomery's purported 'noise filtering
software technology,' which "does not exist, yet has been used repeatedly by Edra Blixseth and
Montgomery to commit financial frauds . . . ."[12]  Michael Flynn, Montgomery's former attorney,
stated in an affidavit that, "Based upon personal knowledge, and information and belief, Blxware
possesses no marketable technology, the technology as represented does not exist[.]"[13]

The Book recounts that Montgomery's gambling and other debts led to bankruptcy and
his arrest for passing $1 million in bad checks.  (Book at 34.)  In that bankruptcy proceeding,
Flynn told Montgomery in a deposition: "I know you conned me and you conned the U.S.
Government. . . .  You're a computer hacker and you're a fraud, Mr. Montgomery."  (Handman
Decl. Ex. 15 at 230.)

The Book also expressly relies on congressional records to confirm that Montgomery's
software was fake.  The Book explains that, "[a]t the time of the Christmas 2003 scare, John
Brennan was the head of the Terrorist Threat Integration Center," which "meant that Brennan's
office was responsible for circulating Montgomery's fabricated intelligence to officials in the
highest reaches of the Bush administration."  (Book at 47.)  The Book states that, "[i]n 2013, while

---

[12]  (Handman Decl. Ex. 19.)
[13]  (Handman Decl. Ex. 20.)

the Senate was considering whether to confirm Brennan to run the CIA, Sen. Saxby Chambliss, a

Georgia Republican who was vice chairman of the Senate Intelligence Committee, submitted a

written question to Brennan about his role in the intelligence community's dealings with

Montgomery." (*Id.*) Indeed, Senator Chambliss' written question titled "Bogus Intelligence,"

states that "[m]edia reports indicate that when you led the Terrorist Threat Integration Center

(TTIC), you championed a program involving IT contractors in Nevada who claimed to intercept

al-Qaida targeting information encrypted in the broadcasts of TV news network Al Jazeera."[14] The

written questions confirm in congressional records that not only "[t]he media" but "*documents we

have reviewed show*, that CIA officials derided the contractor's information, but nonetheless, you

passed it to the White House and alert levels ended up being raised unnecessarily." (*Id.*) (emphasis

added). Accurately quoting Brennan's response, the Book states that, "[i]n response": (1)

"Brennan denied that he had been an advocate for Montgomery and his technology"; (2) "insisted

that the Terrorism Threat Integration Center was merely a recipient of the information and data,

which had been passed on by the CIA"; (3) he "included Montgomery's data 'in analytic

products'"; and (4) confirmed that Montgomery's purported software "'was determined *not to be a

source of accurate information*.'" (Book at 47) (quoting Brennan Response at 9) (emphasis added).

### 3. Reliance on FBI Reports and Court Documents for Allegations of Rigged Demonstrations of Software to U.S. Government Officials

The Book also explicitly relies on court records and FBI reports, in which "Trepp also

described to federal investigators how eTreppid employees had confided to him that Montgomery

had asked them to help him falsify tests of his object recognition software when Pentagon

officials came to visit." (Book at 37.) Indeed, "Trepp said that on one occasion, Montgomery

told two eTreppid employees to go into an empty office and push a button on a computer when

---

[14] (Handman Decl. Ex. 20.)

they heard a beep on a cell phone." (*Id.*)  Then "[a]fter he was in place in the field, he used a hidden cell phone to buzz the cell phone of one the eTreppid employees, who then pushed a key on a computer keyboard, which in turn flashed an image of a bazooka on another screen prominently displayed in front of the military officers standing in another room, *according to court documents*." (*Id.*) (emphasis added).  Thus, "[t]he military officers were convinced that Montgomery's computer software had amazingly detected and recognized the bazooka in Montgomery's hands." (*Id.*)  The Book again includes Montgomery's denials. (*Id.* at 15, 37.) Once again, the Book accurately describes the FBI report contained in court documents.[15]

### 4.  Complaint Allegations

Montgomery's 271-page, 268-paragraph Amended Complaint boils down to one central allegation: that Risen and HMH defamed him by publishing allegations that he defrauded the federal government by peddling bogus software.[16]  In particular, Montgomery takes issue with statements that his software, which supposedly decoded hidden Al Qaeda messages in Al Jazeera broadcasts, was a sham, and that the intelligence he passed on to federal agencies led the White House to raise the terrorist threat level in late 2003, ground international flights, and consider shooting down transatlantic flights. (*Id.* ¶¶ 107, 112, 114, 126, 129, 131, 133.)  Montgomery also

---

[15] "Trepp recently learned that Montgomery would require eTreppid employees to falsify the results of live demonstrations for its customers.  Jesse Anderson, a programmer for eTreppid, told Trepp that Montgomery would require Anderson and Jim Bauder, another eTreppid employee, to go into an office at eTreppid while Montgomery was out in a nearby field with a toy bazooka to demonstrate eTreppid's recognition software capabilities.  Montgomery instructed Anderson and Bauder to go into a room and wait to hear a noise on their cell phone and then instructed them to press a button on a computer keyboard that would display an image of a bazooka on the computer screen viewed by the customers, including Department of Defense employees.  Trepp advised that the Department of Defense employees were at the demonstration to make a judgment regarding the purchase of this technology." (Handman Decl. 18 at Bates No. 00002.)  Employees confirmed these accounts in their interviews with the FBI. (*Id.* at Bates Nos. 00125, 00126.)

[16] (Am. Compl. ¶¶ 120, 122, 124, 127, 181, 184, 202, 204, 206, 208, 210, 212, 214, 216, 218, 219, 221, 230, 232, 234, 236.)

14

challenges recitation of allegations former eTreppid employees made in FBI investigative reports that Montgomery rigged demonstrations of his object recognition software. (*Id*. ¶¶ 122, 124.) He takes issue with the statements that Montgomery's "lawyer 'concluded that Montgomery was a fraud,'" and "that out of 'greed' Plaintiff Montgomery 'create[d] a rogue intelligence operation with little or no adult supervision' which was 'crazy' and that he was 'someone who has been ac-cused of being a con artist.'" (*Id*. ¶¶ 110, 120; *see id.* ¶ 194.) The Amended Complaint states that a retraction was requested after publication of the Book, but HMH rejected the request. (*Id.* ¶ 44.)

### III.   ARGUMENT

#### A.   The Court Lacks Personal Jurisdiction Over Risen and HMHC

Plaintiff fails to allege facts under which this court could assert personal jurisdiction over Risen or HMHC, improperly sued as HMH Holdings, Inc., the parent company. HMH, the operational company, is not contesting jurisdiction. The court analyzes whether it has personal jurisdiction over a nonresident defendant under a two-part test. *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 626 (11th Cir. 1996). *First*, the court examines Florida's long-arm statute. *Id. Second*, the court must determine whether sufficient minimum contacts exist between the defendant and Florida such that jurisdiction over the defendant comports with "traditional notions of fair play and substantial justice" under the Due Process Clause. *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Minimum contacts only exist when: (1) the contacts arise from or relate to the cause of action; (2) the defendant purposefully avails himself of the privilege of conducting activities within the forum, thus invoking the benefits and protections of its laws; and (3) the defendant's contacts within the forum demonstrate that he reasonably anticipated being haled into court there. *Id.* at 631.

The plaintiff bears the initial burden. If the plaintiff establishes a *prima facie* case of personal jurisdiction through the allegations of his complaint, the defendant may challenge those

allegations through affidavits, shifting the burden back to the plaintiff to prove jurisdiction. *Sculptchair*, 94 F.3d at 627. If the defendant sustains its burden, the plaintiff must substantiate the jurisdictional allegations by affidavits or other competent proof, not merely repeat allegations in the complaint.

Here, Montgomery does not allege that general jurisdiction exists over Risen or HMHC under Fla. Stat. § 48.193(2), but, rather, attempts to assert specific jurisdiction, claiming that: (1) "[t]he Causes of Action and injuries" occurred in Florida and worldwide; (2) "some of the most recent commercial opportunities for the Plaintiff's work were contracts and projects made available through military bases and Government facilities in Florida"; (3) "a huge and substantial portion of the nationwide harm has occurred in Florida"; (4) he is currently a "citizen of Florida"; (5) "Defendants knew or should have known of Plaintiff's substantial ties to counter-terrorism, military and intelligence contracts and intended on harming Plaintiff in Florida"; and (6) "Defendants knew that if Plaintiff's reputation was harmed in Florida, the large military presence in Florida would ensure that Plaintiff would lose jobs and not be hired for any more jobs and contracts." (Am. Compl. ¶¶ 3-12.) These allegations are insufficient to establish personal jurisdiction over Risen or HMHC[17] under due process.

Nationwide circulation of a book and broadcast of interviews are insufficient to confer personal jurisdiction.[18] For jurisdiction to exist in Florida, Risen himself must have engaged in

---

[17] Plaintiff's allegation that HMHC is the parent company and owner of the publisher is insufficient, as a matter of law, to subject HMHC – a Delaware company not authorized to conduct business in Florida – to personal jurisdiction in Florida. Indeed, "Florida law is clear that the relationship of parent-subsidiary alone is insufficient to confer personal jurisdiction over the foreign parent corporation in the forum in which the subsidiary acts." *Heidbrink v. ThinkDirect Mktg. Grp., Inc.*, 2014 WL 3585698, at *3 (M.D. Fla. July 21, 2014) (collecting cases). Plaintiff does not – and could not – allege facts sufficient to pierce the corporate veil to subject HMHC to jurisdiction in Florida based on HMH's actions.

[18] *See Buckley v. N.Y. Times Co.*, 338 F.2d 470, 474 (5th Cir. 1964) (holding "mere circulation" of national newspaper and "sporadic news gathering by reporters on special assignment" in the

intentional conduct outside of Florida calculated to cause injury to Montgomery in Florida.[19]  In *Calder v. Jones*, the *National Enquirer*'s editor and reporter argued that California lacked jurisdiction over them for an article published in California, but prepared in Florida.  The Supreme Court found that, at the time the article was written and edited, defendants were well aware that plaintiff, Hollywood star Shirley Jones, resided in California, her career was centered in Hollywood, and the *National Enquirer* had a substantial circulation there.  Moreover, in the course of their newsgathering for the story, they had extensive contact with California.  The Court found that because the reporter and editor were "primary participants in an alleged wrongdoing intentionally directed at a California resident, and jurisdiction over them is proper on that basis."  465 U.S. 783, 789 (1984).  As the Eleventh Circuit explained, the "*Calder* effects test for personal jurisdiction" requires (1) "the commission of an intentional tort," (2) "expressly aimed at a specific individual in the forum" (3) "whose effects were suffered in the forum." *Licciardello v. Lovelady*, 544 F.3d 1280, 1288 (11th Cir. 2008).  In *Calder*, "defendants knew that the 'brunt of the harm' . . . would be suffered in California" and "California was the focal point of the tort" so "jurisdiction was proper there."  *Id.* at 1285-86.

Here, in contrast to *Calder*, none of the newsgathering was done in Florida, the "focal point" of Risen's Chapter was Montgomery's alleged fraud on the federal government by selling bogus terrorist detection software from companies located in Nevada, Washington, and California. Risen's references to Montgomery were "expressly aimed" at CIA, Pentagon, NSA, White House,

---

forum do not satisfy due process); *Alternate Energy Corp. v. Redstone*, 328 F. Supp. 2d 1379, 1383 (S.D. Fla. 2004) ("[U]nder *Calder*, the mere fact that allegedly libelous statements appeared in a publication sold to Florida residents is not sufficient to give a defendant fair warning that he may be haled into court here.").

[19] The Court must assess Risen's contacts with Florida separately from the publisher and holding company.  *E.g.*, *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1300 (D.C. Cir. 1996) ("The writer is not the publisher; [the writer's] contacts must be assessed separately.") (citing *Keeton v. Hustler Magazine*, 465 U.S. 770, 781 n.13 (1984)).

and Congressional officials who were based in the D.C. area. Nothing in the Chapter about Montgomery or Risen's remarks on television and radio programs were specifically directed at Florida and none of Risen's information gathering (with the possible exception of one contact with a Special Operations Command spokesperson) was conducted in Florida. (Risen Decl. ¶ 14.) The "brunt of the harm," if any, would be felt by Montgomery in the D.C. area, where government intelligence and military officials make contracting decisions and evaluated his software, or in Nevada[20] or California where Montgomery lived and worked when the alleged fraud took place, or California or Washington where he was living when he was interviewed by Risen, and/or Washington where he was living when the Book was published – at no critical time was he a resident of Florida. Contrary to Plaintiff's allegation, the "brunt of the harm" could not occur in Florida and Florida was not the focal point – indeed, Risen was not aware of the Florida connection Montgomery now claims. (*Id.* ¶ 7.)

The facts here have even less connection with the forum than those that have been found inadequate to satisfy due process in other defamation cases. For example, in *Madara v. Hall*, 916 F.2d 1510 (11th Cir. 1990), the Eleventh Circuit affirmed dismissal of a defamation action brought in Florida against singer Daryl Hall for his comments quoted in a nationally distributed trade publication about working with plaintiff who, Hall said, was "a small-time . . . guy" and Hall was "bein' *screwed* by him, basically." *Id.* at 1513. Hall had performed in Florida fewer than eight times during the relevant timeframe. Although his musical recordings were widely distributed in Florida and he was an investor in several limited real estate partnerships in Florida, he had no agents or office there and the claims did not arise from those contacts. These facts

---

[20] According to a May 2, 2015 letter filed in federal court in Arizona ("*Arpaio* Litigation")by Montgomery's counsel, "Dennis Montgomery was previously a resident of Nevada for many years and much of his work in the past occurred in Nevada." (Handman Decl. Ex. 22, at 8.)

persuaded the court that "to subject [] Hall to the jurisdiction of a Florida court in this case would offend due process." *Id*. at 1519.

In *Revell v. Lidov*, a professor based in Massachusetts authored an article he posted on a New York website arguing that plaintiff, a former Associate Director of the FBI residing in Texas, conspired with senior Reagan administration officials to refuse to stop a terrorist bombing and to cover up the conspiracy. 317 F.3d 467, 469 (5th Cir. 2002). Plaintiff sued for libel in Texas, and the Fifth Circuit affirmed dismissal for lack of personal jurisdiction distinguishing *Calder*. It held that the forum was not the "focal point" of the article, where, as here, the author did not know plaintiff resided in the forum, the article did not mention the forum, and no newsgathering occurred in the forum. *Id.* at 473-75. Because the article was about the federal government's alleged failure to stop terrorism and its cover up – just as here where the Chapter addresses fraud in federal government contracting concerning terrorism detection and a cover up – "[i]f the article had a geographic focus it was Washington, D.C." *Id.* at 476.

Similarly, in *Busch v. Viacom International Inc.*, a Texas district court found no personal jurisdiction in Texas over Jon Stewart – the host of *The Daily Show* whose interview with Risen in New York is also a claim in this case (Am. Compl. ¶¶ 43, 139-141) – because, as here, "[t]he piece was not directed at viewers of *The Daily Show* in Texas, but was broadcast nationwide." 477 F. Supp. 2d 764, 772-73 (N.D. Tex. 2007). Residence by the plaintiff in the forum state and circulation of allegedly defamatory statements there were insufficient to confer jurisdiction. *Id.*[21]

Plaintiff also cannot create personal jurisdiction over Risen based on Plaintiff's **own** relationships to Florida, which are tenuous at best. As the Supreme Court recently made clear, "the

---

[21] *See also Redstone*, 328 F. Supp. 2d at 1383 (dismissing under Rule 12(b)(2) when "there is no indication that Defendant 'expressly aimed' its publication at the state of Florida"); *Hoechst Celanese Corp. v. Nylon Eng'g Resins, Inc.*, 896 F. Supp. 1190, 1195 (M.D. Fla. 1995) (dismissing under Rule 12(b)(2) libel claim brought by a company headquartered in Florida arising out of an interview in Ohio that circulated to subscribers in Florida).

plaintiff cannot be the only link between the defendant and the forum." *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014). Defendant's "suit-related conduct" must have a "substantial connection" to the forum; "random, fortuitous, or attenuated contacts" with "persons affiliated with the State" are not sufficient, and plaintiff's own contacts with the forum "cannot be decisive." *Id.* at 1121-23.

Here, Plaintiff claims jurisdiction in Florida because "some of the most recent commercial opportunities for the Plaintiff's work were contract and projects made available through military bases and Government facilities in Florida." (Am. Compl. ¶ 4.) Even if these allegations were true – and his recent filings suggest his opportunities have been in Arizona, not Florida[22] – and even if the key decision makers were actually in Florida and not in D.C., this is precisely the logic rejected by *Walden* as "impermissibly allow[ing] a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." *Id.* at 1125; *Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1118 (6th Cir. 1994) (holding in libel action that no jurisdiction existed over defendant based in England because plaintiffs' Ohio residence was "merely fortuitous" and plaintiffs' action "unilateral"). Rather, personal jurisdiction "must arise out of contacts that the 'defendant *himself*' creates with the forum." *Walden*, 134 S. Ct. at 1122 (citation omitted). Unlike *Calder*, Risen's suit-related conduct had nothing to do with Florida.

Thus, this Court should dismiss the action as to Risen and HMHC for lack of personal jurisdiction in Florida. Alternatively, the Court should transfer this action as to all defendants, so the action may proceed in one court, to the U.S. District Court for the District of Columbia.

---

[22] Based on Montgomery's own filings seeking to intervene in the *Arpaio* Litigation, his recent job opportunities seem to have been with Sheriff Arpaio in Arizona, not Florida, until the Arizona officials reached the same conclusion as the federal officials – his intelligence was "junk." (Handman Decl. Ex. 23, ECF No. 1058, Mem. Law in Support of Mot. to Recuse/Disqualify Judge G. Murray Snow under 28 U.S.C. § 144, at 8 (May 7, 2015), Emergency Petition for Writ of Mandamus for Recusal, ECF No. 9533074 (9th Cir. May 11, 2015), Order denying petition, ECF No. 15-71433 (9th Cir. May 12, 2015); *see also* Am. Compl. Ex. 12, *Sheriff Joe vs. Uncle Sam*, The Atlantic (discussing sheriff's investigation of presiding federal judge's wife).

**B.      The Court Should Dismiss or Transfer for Improper Venue**

Even if the Court does not dismiss or transfer for lack of personal jurisdiction over Risen

and HMHC, it should do so because venue in this District is "improper."  28 U.S.C. § 1406(a);

Fed. Civ. P. 12(b)(3).  "When a defendant objects to venue under Rule 12(b)(3), the plaintiff

bears the burden of showing that the venue selected is proper."  *Hemispherx Biopharma, Inc. v.*

*MidSouth Capital, Inc.*, 669 F. Supp. 2d 1353, 1356 (S.D. Fla. 2009).  The court need not accept

plaintiff's allegations in the complaint as true if they are "contradicted by the defendants'

affidavits."  *Wai v. Rainbow Holdings*, 315 F. Supp. 2d 1261, 1268 (S.D. Fla. 2004). "When an

allegation is challenged, the court may then examine facts outside of the complaint to determine

whether venue is proper."  *Hemispherx Biopharma*, 669 F. Supp. 2d at 1356.

"[W]ether venue is 'wrong' or 'improper' – is generally governed by 28 U.S.C. § 1391."

*Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 134 S. Ct. 568, 577 (2013).  Venue

is proper in:

> (1) a judicial district in which any defendant resides, if all defendants are residents
> of the State in which the district is located; (2) a judicial district in which a
> substantial part of the events or omissions giving rise to the claim occurred . . . ;
> or (3) if there is no district in which an action may otherwise be brought as
> provided in this section, any judicial district in which any defendant is subject to
> the court's personal jurisdiction with respect to such action.

*Id.* § 1391(b).  "When venue is challenged, the court must determine whether the case falls with-

in one of the three categories set out in § 1391(b)."  *Atl. Marine Constr.*, 134 S. Ct. at 577.  "[I]f

it does not, venue is improper, and the case must be dismissed or transferred under § 1406(a)."

*Id.*  Plaintiff invokes § 1391(b)(1) and (e) (Am. Compl. ¶ 2), but neither applies.  Montgomery

does not allege – and cannot allege – that Risen and the HMH Companies all reside in Florida

under § 1391(b)(1) or that any is a government agency, officer, or employee under § 1391(e).

(Am. Compl. ¶¶ 15-16; Risen Decl. ¶¶ 2, 3; Handman Decl. ¶¶ 3, 4.)

Nor could Montgomery plead venue under § 1391(b)(2), which provides venue where "a substantial part of the events or omissions giving rise to the claim occurred." "Only those acts which were, in and of themselves, 'wrongful' or had a 'close nexus' to the wrong could form the basis of proper venue." *Forbes v. Lenox Fin. Mortg. LLC*, 2008 WL 2959727, at *3 (S.D. Fla. July 30, 2008) (quoting *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1372 (11th Cir. 2003)). The events giving rise to the alleged libel did not take place in Florida and it is not the focal point of the harm. (*See* III.A *supra*.) The only connections with Florida are Plaintiff's claim of citizenship – of very recent vintage, if that; a 2004 order for supplies from eTreppid in Reno to MacDill Air Force Base outside this judicial district and alleged but unspecified recent "commercial opportunities." (Am. Compl. ¶¶ 4, 13 & Ex. 19.) But the venue statute "protect[s] defendants" and thus "require[s] courts to focus on relevant activities of the defendant, not of the plaintiff." *Jenkins Brick,* 321 F.3d at 1371-72 (11th Cir. 2003); *Hemispherx Biopharma*, 669 F. Supp. 2d at 1356-57 ("[Plaintiff] focuses largely on its own activities and location, but the proper focus of the venue inquiry is on the relevant activities of the Defendants.").

Finally, Montgomery could not invoke "fallback venue" under § 1391(b)(3), because the action "may otherwise be brought" in D.C. *Algodonera De Las Cabezas S.A. v. Am. Suisse Capital, Inc.*, 432 F.3d 1343, 1345 (11th Cir. 2005) ("[V]enue may be predicated on § 1391([b])(3) only when neither § 1391([b])(1) or (2) are satisfied."). Venue in Florida is improper, so the Court should dismiss or transfer venue to D.C. where venue is proper.

### C. The Court Should Transfer Venue Under 28 U.S.C. § 1404(a)

Even if the Court does not dismiss or transfer the action for improper venue, it should still transfer the action "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). The purpose of transfer under § 1404(a) "is to prevent the waste 'of time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary

inconvenience and expense[.]" *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964). Transfer is

within "the broad discretion of the trial court." *Meterlogic, Inc. v. Copier Solutions, Inc.*, 185

F. Supp. 2d 1292, 1299 (S.D. Fla. 2002). Courts generally apply a two-part test: "(1) whether the

action 'might have been brought' in the proposed transferee court and (2) whether various factors

are satisfied so as to determine if a transfer to a more convenient forum is justified." *Id.* at 1299

(internal quotation marks omitted).

First, venue is proper in D.C. (*See* III.B *supra*.) Second, as explained below, the

interests of justice and the convenience of witnesses and parties strongly support transfer.

*Meterlogic*, 185 F. Supp. 2d at 1300 (listing factors); *see also Cellularvision Tech. & Telecomm.,*

*L.P. v. Alltel Corp.*, 508 F. Supp. 2d 1186, 1189 (S.D. Fla. 2007). Indeed, none of the crucial

third-party witnesses can be forced to attend trial in this district.

**Convenience of the Parties.** The convenience of the parties weighs strongly in favor of

transferring this action to D.C. Defendants, all located outside Florida, will be inconvenienced

by being forced to litigate this case in Florida. In contrast, while Montgomery claims that he has

become a Florida citizen and resident, he refuses to disclose his address in the Amended

Complaint. (Am. Compl. ¶ 13.)[23] On September 12, 2013, in support of transfer of an action

from California to Washington, Montgomery's counsel stipulated Montgomery was "currently

[a] citizen[ ] of the state of Washington" and "reside[d] in Yarrow Point, Washington."[24]

Montgomery registered to vote in Florida from Washington by FedEx the day before he filed the

Complaint in this case, and listed a hotel address in Florida. (Handman Decl. Ex. 5.) Indeed,

---

[23] Plaintiff violated Local Rule 5.4 by filing the address under seal, and doing so prevents
Defendants from verifying his address. Montgomery's credibility on such matters is
questionable; a federal judge found Montgomery committed perjury in a declaration supporting
an opposition to a motion for attorneys' fees when he argued that "California, not Nevada, was
the proper forum to resolve the fee dispute." *Montgomery v. eTreppid Techs., LLC*, 2010 WL
1416771, at *16 (D. Nev. Apr. 5, 2010).
[24] (Handman Decl. Ex. 6.)

Montgomery resided in Yarrow Point, Washington probably as late as April 1, 2015.  (Handman Decl. Ex. 8, at 2.)  Per his Amended Complaint, he is ill and under the care of a doctor in Seattle. (Am. Compl. ¶ 13 & Ex. 10.)  Thus, Montgomery may not have been a Florida resident when he filed the case and may not be one now.  When, as here, "a plaintiff has chosen a forum that is not its home forum, only minimal deference is required, and it is considerably easier to satisfy the burden of showing that other considerations make transfer proper."  *Cellularvision*, 508 F. Supp. 2d at 1189 (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255-56 (1981)).

Even if Montgomery, in fact, recently moved to Florida, the Court should still transfer. Montgomery bears "[t]he burden . . . to demonstrate that he changed his domicile to Florida; the presumption is that it remained in" his previous domicile.  *Jaisinghani v. Capital Cities/ABC, Inc.*, 973 F. Supp. 1450, 1454 (S.D. Fla. 1997), *aff'd*, 149 F.3d 1195 (11th Cir. 1998).  In *Stern v. News Corp.*, the Southern District of Florida transferred venue to New York when the plaintiff – a former New York resident also represented by Montgomery's attorney Larry Klayman – moved to Florida only two-and-a-half months before filing his suit in this court against a New York-based publisher.  2008 WL 10712037, at *1 (S.D. Fla. Aug. 26, 2008).  In *Stern*, the defendants, witnesses, and events giving rise to the alleged libel occurred in New York and New York law applied.  Similarly, here, Risen and many witnesses are in D.C., D.C. law applies, and none of the operative facts giving rise to the causes of action occurred in Florida.[25]

**Convenience of Witnesses, Access to Proof.**  "Important considerations under this factor are whether these witnesses have actual knowledge about the issues in the case, where they are

---

[25] *See Weinstein v. Friedman*, 859 F. Supp. 786, 789-90 (E.D. Pa. 1994) (transferring libel action to S.D.N.Y. where plaintiff was domiciled in Israel, defendant book publishers and author were located in New York, witnesses were in New York, and the cause of action arose in New York); *Windmere Corp. v. Remington Prods., Inc.*, 617 F. Supp. 8, 10 (S.D. Fla. 1985) ("[W]here the operative facts underlying the cause of action did not occur within the forum chosen by the Plaintiff, the choice of forum is entitled to less consideration.").

located, and whether it will be more convenient for them if the action is in [the transferor state] or

[the transferee state]." *Cellularvision*, 508 F. Supp. 2d at 1190. In particular, "[t]he convenience

of non-party witnesses is an important factor in determining whether a transfer should be granted."

*Mason v. Smithkline Beecham Clinical Labs.*, 146 F. Supp. 2d 1355, 1361 (S.D. Fla. 2001).

    The only material witness allegedly in this district or within 100 miles of it is

Montgomery himself, if he lives here at all.[26] Montgomery lists over two dozen witnesses at

MacDill and Eglin Air Force Bases (Am. Compl. Ex. 13), located outside this district and

beyond this Court's subpoena power, so these witnesses do not weigh against transfer. In

contrast, many of the key third-party witnesses who have "actual knowledge about the issues"

are located in the D.C. area.[27] (Risen Decl. ¶¶ 10-12; Handman Decl. Ex. 27.) *Meterlogic*, 185

F. Supp. 2d at 1301. If this action remains in Florida, these third-party witnesses could not be

compelled to attend trial in Florida, including crucial current and former CIA, Pentagon, and

White House witnesses. "The possibility that a case may be tried where certain crucial witnesses

could not be compelled to attend is an important consideration." *Poncy v. Johnson & Johnson*,

414 F. Supp. 551, 556 (S.D. Fla. 1976) (citation and quotation marks omitted). The parties could

compel many of the third-party witnesses to testify in D.C. because they are located within a

---

[26] Notably, notwithstanding Montgomery's claimed health issues, he chose not to bring this
action in Washington. Plaintiff has not submitted any medical reports that state that his health is
at imminent risk, his most recent doctor's note from January 2015 said he was now in "outpatient
PT, OT to work," and the doctor's note indicating that he could not travel to testify is a year old.
(Am. Compl. Exs. 9, 10.) Whatever his current health, he is actively litigating in three
jurisdictions, including D.C. In addition to seeking to intervene in the *Arpaio* Litigation in
Arizona (Handman Decl. Ex. 23), on March 20, 2015, Montgomery's counsel, Larry Klayman,
asked the federal court in D.C. to take testimony of Montgomery in D.C. *in camera* and *ex parte*.
(Handman Decl. Ex. 24.) Just as it is convenient for Montgomery to appear in D.C. when
Klayman is the plaintiff, it would be convenient in this case, when Montgomery is the plaintiff.
[27] Third-party witnesses who are not in D.C. are either in California, Nevada, or Washington, for
whom this District and D.C. are equally inconvenient.

100-mile radius of D.C. district court.  (Risen Decl. ¶¶ 10, 11, 12.)  *Meterlogic*, 185 F. Supp. 2d at 1301.

**The Public Interest.**  The public interest also heavily weighs in favor of transfer to the D.C.[28]  Florida substantive law is not likely to apply, a factor in assessing the convenience of the forum.  *See Poncy*, 414 F. Supp. at 556 (holding that New Jersey federal court "is a more appropriate forum than this Court for applying substantive New Jersey law").  For the reasons more fully discussed in Defendants' Renewed Special Motion to Dismiss under the Applicable Anti-SLAPP Law, II.A, D.C. law – not Florida law – is most likely to apply.[29]  Applicability of D.C. law is another reason favoring transfer to D.C.

### D.    The Court Should Dismiss Under Rule 12(b)(6) Because Plaintiff Fails to Plead a Plausible Claim for Defamation or Other Related Torts

If the Court does not dismiss or transfer for the reasons outlined above, it should dismiss under Rule 12(b)(6).  Although a court must take the well-pleaded *factual* allegations as true for a Rule 12(b)(6) motion, legal conclusions "are not entitled to the assumption of truth."  *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009).  Under *Twombly* and *Iqbal*, a plaintiff must provide "enough facts to state a claim to relief that is *plausible* on its face," rather than merely possible.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (emphasis added); *Iqbal*, 556 U.S. at 695-96.  Where plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

---

[28] The "public interest factors include: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflicts of law or in the application of foreign law."  *Ins. Co. of N. Am. v. Levin*, 2011 WL 1398473, at *4 (S.D. Fla. Mar. 28, 2011) (citation and quotation marks omitted), *report & recommendation adopted*, 2011 WL 2610754 (S.D. Fla. July 1, 2011).  *See also Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005).

[29] Other states with a significant relationship to this action include Washington, California, and Nevada, so if the Court decides D.C. law does not apply, it should apply the law of one of those states, none of which have any substantive conflict as applied to Defendants' 12(b)(6) motion.

Modern litigation is cripplingly expensive regardless of the outcome, so courts have stressed that Rule 12(b)(6) weeds out meritless claims. *Id.* at 546. Such concerns are especially present in defamation cases, where forcing defendants to incur unnecessary costs defending ultimately meritless suits can chill speech.[30] Thus, courts routinely dismiss libel claims at the pleading stage *before* discovery for the deficiencies set forth in this motion. *See* cases cited at notes 32, 41, and 48 *infra*. Under D.C. law, or any other applicable law, the outcome is the same: Plaintiff's claims fail as a matter of law and should be dismissed under Rule 12(b)(6).

### 1. The Fair Report Privilege Protects the Statements at Issue

Montgomery's claim should be dismissed under Rule 12(b)(6) because the challenged statements in the Chapter are privileged under the fair report privilege. The privilege protects against defamation suits where – as here – a publication accurately summarizes court records, congressional records, and government investigative reports. It applies as long as "the reports were substantially accurate" and fair, and "concern a governmental proceeding," even if the underlying information ultimately proves to be false. *White v. Fraternal Order of Police*, 909 F.2d 512, 527 (D.C. Cir. 1990).[31] Whether the fair report privilege protects the publication is a question of law that courts routinely decide on an initial pre-discovery motion by comparing official records subject to judicial notice with the publication in suit. *See* note 8 *supra*.[32]

---

[30] *Farah*, 736 F.3d at 534 (recognizing in affirming Rule 12(b)(6) dismissal that "summary proceedings are essential in the First Amendment area because if a suit entails 'long and expensive litigation,' then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails") (quotation omitted); *Stewart v. Sun Sentinel Co.*, 695 So. 2d 360, 363 (Fla. 4th DCA 1997) ("[P]retrial dispositions are 'especially appropriate' because of the chilling effect [libel] cases have on freedom of speech").

[31] The fair report privilege of other potentially relevant states is similar, as is Florida's. *Alpine Indus. Computers, Inc. v. Cowles Publ'g Co.*, 57 P.3d 1178, 1186 (Wash. Ct. App. 2002), *amended*, 64 P.3d 49 (Wash. Ct. App. 2003); *Sahara Gaming Corp. v. Culinary Workers Union Local*, 984 P.2d 164 (Nev. 1999); Cal. Civ. Code § 47(d), (e); *Stewart*, 695 So. 2d at 362-63.

[32] *See Hargrave v. Wash. Post*, 2009 WL 1312513 (D.D.C. May 12, 2009), *aff'd*, 365 F. App'x 224 (D.C. Cir. 2010) (dismissing libel claim under Rule 12(b)(6) because report of plaintiff's

Here, the Book serves the critical function that the fair report privilege is designed to protect: providing "both a fair and accurate accounting of public proceedings as well as informed commentary"[33] and thus advancing "[t]he purpose of the privilege" by "promot[ing] public scrutiny of governmental affairs."[34] Indeed, the Book accurately summarizes witness statements made in FBI investigative reports filed in court proceedings, quotes affidavits and deposition transcripts and other filed court documents, and discusses the contents of congressional records. Each of these plainly fall within the fair report privilege. *See White*, 909 F.2d at 527 (explaining that privilege "extends broadly to the report 'of any official proceeding, or any action taken by any officer or agency of the government,'" including not only government proceedings themselves, but also allegations or findings that prompt such proceedings) (citation omitted). Courts routinely hold that reporting on court records, judicial proceedings, and discovery documents, including affidavits and depositions,[35] law enforcement investigations and reports,[36] and congressional records and statements,[37] is protected.

---

criminal testimony protected by fair report privilege); *Q Int'l Courier, Inc. v. Seagraves*, 1999 WL 1027034, at *4-5 (D.D.C. Feb. 26, 1999) (dismissing libel claim on a pre-discovery motion for summary judgment under fair report privilege); *Foretich v. Chung*, 1995 WL 224558, at *1-2 (D.D.C. Jan. 25, 1995) (dismissing on pre-discovery summary judgment motion libel claim against news anchor for reporting allegations in judicial proceedings); *Huszar v. Gross*, 468 So. 2d 512, 513, 516 (Fla. 1st DCA 1985) (affirming dismissal of libel claim with prejudice because newspaper's statements protected by fair report privilege); *Stewart*, 695 So. 2d at 362-63 (affirming pre-discovery motion to dismiss libel claim or summary judgment where newspaper's statements protected by fair report privilege). *Cf. Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, 2010 WL 1408391, at *9-10 (M.D. Fla. Apr. 6, 2010) (dismissing libel claim for failure to plausibly plead facts to overcome common-law qualified privilege), *aff'd*, 451 F. App'x 862, 864 & n.3 (11th Cir. 2012).

[33] *Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26, 34 (D.D.C. 1995), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996).

[34] *Harper v. Walters*, 822 F. Supp. 817, 823 (D.D.C. 1993), *aff'd*, 40 F.3d 474 (D.C. Cir. 1994).

[35] *See Q Int'l Courier*, 1999 WL 1027034, at *4 (privilege applies to report on civil complaint); *O'Brien v. Franich*, 575 P.2d 258, 260 (Wash. App. Ct. 1978) (reports on lawsuits covered by fair report privilege); *Lavin v. N.Y. News, Inc.*, 757 F.2d 1416, 1419 (3d Cir. 1985) (reports of affidavits privileged); *Sipple v. Found. for Nat'l Progress*, 83 Cal. Rptr. 2d 677, 687-88 (Cal. Ct. App. 1999) (report on deposition testimony privileged).

Moreover, the Book *expressly* reports on and refers to the government investigations, congressional records, and court proceedings. *See Dameron v. Wash. Magazine, Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985) (fair report privilege applies where "apparent either from specific attribution or from the overall context that the article is quoting, paraphrasing or otherwise drawing upon official documents or proceedings"); *Ditton v. Legal Times,* 947 F. Supp. 227, 230 (E.D. Va. 1996) ("A publisher properly attributes a report if the average reader is likely to understand that the report summarizes or paraphrases from the judicial proceedings."), *aff'd*, 129 F.3d 116 (4th Cir. 1997).

Montgomery has not – and cannot – plausibly allege that the Book is anything but a fair and "substantially accurate," *White*, 909 F.2d at 527, account of the findings and allegations in the investigative reports, congressional records, and court proceedings.[38]  Indeed, Risen obtained and published Montgomery's comments, making the report more than "fair" for purposes of the privilege.[39]  Thus, Montgomery's claims are barred by the fair report privilege and the Amended Complaint should be dismissed under Rule 12(b)(6).

---

[36] *See Medico v. Time, Inc.*, 643 F.2d 134, 139 (3d Cir. 1981) (fair report privilege applies to report on FBI documents that "express only tentative and preliminary conclusions that the FBI has never adopted as accurate"); *White*, 909 F.2d at 527-28 (privilege applies to report of D.C. administrative committee); *Global Relief Found. Inc. v. N.Y. Times Co.*, 390 F.3d 973 (7th Cir. 2004) (affirming dismissal; privilege applies to report of federal investigation into Islamic charity for possible link to terrorism); *Yohe v. Nugent*, 321 F.3d 35, 44 (1st Cir. 2003) (articles giving "rough-and-ready summary" of official statement by police protected by fair report privilege); *Law Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.*, 844 F.2d 955, 960 (2d Cir. 1988) (statement by FBI official about execution of search warrant protected); *Dowd v. Calabrese*, 589 F. Supp. 1206, 1217 (D.D.C. 1984) (report of DOJ investigation protected).

[37] *Crane v. Ariz. Republic*, 972 F.2d 1511, 1517 (9th Cir. 1992) (secret investigation of House Select Committee on Narcotics Abuse and Control was official proceeding under the privilege); *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1097 (4th Cir. 1993) ("[A] fair and accurate report of the public remarks of a member of Congress fits within the 'fair report' privilege[.]").

[38] *See Yohe*, 321 F.3d at 44 ("'[A]ccuracy' for fair report purposes refers only to the factual correctness of the events reported and not to the truth about the events that actually transpired."); *Coles*, 881 F. Supp. at 31 n.3; *Alpine Indus. Computers*, 57 P.3d at 1187 ("It is not necessary that it be exact in every immaterial detail[.]").

[39] *See, e.g.*, *Dorsey v. Nat'l Enquirer, Inc.*, 973 F.2d 1431, 1437, 1440 (9th Cir. 1992) (tabloid "did not exceed the degree of flexibility and literary license accorded newspapers in making a

### 2. Many of the Challenged Statements Are Non-Actionable Opinion and Rhetorical Hyperbole Protected by the First Amendment

Statements of opinion that do "not contain a provably false factual connotation" are protected under the First Amendment. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990); *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 313 (D.C. Cir. 1994) ("*Moldea II*"). In addition, an opinion is also not actionable if it cannot be objectively verified as false or cannot "reasonably [be] interpreted as stating actual facts" about the plaintiff. *Milkovich*, 497 U.S. at 18-20; *Washington v. Smith*, 80 F.3d 555, 556-57 (D.C. Cir. 1996). Rhetorical language that is "loose, figurative [and] hyperbolic" is also not actionable. *Milkovich*, 497 U.S. at 21.

Whether the allegedly defamatory statements are non-actionable opinion is a question of law to decide on a motion to dismiss. *Moldea v. N.Y. Times Co.*, 15 F.3d 1137, 1144 (D.C. Cir. 1994) ("*Moldea I*"). The court must analyze the challenged statements in their entirety, taking into account both the immediate context and the larger social context in which they appeared. *See Moldea II*, 22 F.3d at 314; *see also Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001); *Thomas v. News World Commc'ns*, 681 F. Supp. 55, 64 (D.D.C. 1988).

Here, Montgomery's allegation that Defendants said that government contractors, including Montgomery, were motivated by "greed"[40] and that "crazy became the new normal in the war on terror"[41] are non-verifiable statements of subjective opinion and rhetorical hyperbole

---

'fair report'" by reporting that petition filed against entertainer said entertainer had AIDS; last paragraph of report included entertainer' statement that charge was an "utter fabrication").

[40] *See Obsidian Fin. Grp., LLC v. Cox*, 812 F. Supp. 2d 1220, 1233 (D. Or. 2011) (blogger's statement plaintiff was "greedy," was "figurative, hyperbolic, imaginative, or suggestive"), *aff'd*, 740 F.3d 1284 (9th Cir. 2014); *Fetter v. N. Am. Alcohols, Inc.*, 2007 WL 551512, at *12 (E.D. Pa. Feb. 15, 2007) (statement "that the plaintiff was greedy, unreasonable, or foolish reflect personal opinion and therefore do not constitute defamation"); *Metcalf v. KFOR-TV*, 828 F. Supp. 1515, 1530 (W.D. Okla. 1992) (statement that organizations were "shams perpetrated on the public by greedy doctors" was protected opinion).

[41] *See Farah*, 736 F.2d at 531 (affirming Rule 12(b)(6) dismissal of claims challenging satirical speech and statements of opinion); *Weyrich*, 235 F.3d at 624 (statement that plaintiff experienced

that are non-actionable. (Am. Compl. ¶¶ 110, 181.)[42]  Moreover, read in its proper context, statements that Montgomery "has been accused of being a con artist" (Am. Compl. ¶ 110) (quoting Book at 32) are non-actionable opinion based on disclosed facts, including that Montgomery's own former business partner, employees, and lawyer all accused him in court records of being a con artist and a fraud.[43]  Thus, to the extent the statements are not protected under the fair report privilege, Montgomery fails to state a claim based on these opinions.

### 3. The Complaint Should Be Dismissed For Failure to Plausibly Plead Actual Malice or Any Other Applicable Fault

Plaintiff's claim fails for another, independent reason under Rule 12(b)(6):

Montgomery – a limited-purpose public figure – does not and cannot plausibly plead, as a matter of law, actual malice (or, indeed, any other applicable standard of fault).

---

bouts of "paranoia" was protected opinion); *Lieberman v. Fieger*, 338 F.3d 1076, 1080 (9th Cir. 2003) (statement in Court TV interview that plaintiff, a psychiatric expert, is "crazy," was protected opinion); *Serian v. Penguin Grp. (USA), Inc.*, 2009 WL 2225412, at *9 (N.D.W.Va. July 23, 2009) (statement in national security book that plaintiff was "very crazy" was non-actionable "subjective opinion[]"); *Rhodes v. Placer Cnty.*, 2011 WL 1302240 (E.D. Cal. Mar. 31, 2011) (calling plaintiff "a 'crazy flute player'" was "[s]tatement[] of hyperbole"); *Rojas v. Debevoise & Plimpton*, 634 N.Y.S.2d 358, 362 (N.Y. Sup. Ct. 1995) (statement that plaintiff was "crazy" protected opinion); *Stepien v. Franklin*, 528 N.E.2d 1324, 1327 (Ohio Ct. App. 1988) (same); *Shaw v. Palmer*, 197 S.W.3d 854, 857-58 (Tex. Ct. App. 2006) (same).

[42] That Plaintiff is an "incorrigible gambler" (Am. Compl. ¶¶ 117-118) is also non-actionable opinion where he was arrested for passing a million dollars in bad checks to a casino in Nevada and had to declare bankruptcy. The FBI Report shows that he was a gambler and "incorrigible" is a subjective assessment of his motivation that is opinion. (Handman Decl. 18 at Bates Nos. 00002, 00021-22); *Fikes v. Furst*, 61 P.3d 855, 864-65 (N.M. Ct. App. 2002) (statement that plaintiff was "pursuing a bizarre obsession" was protected opinion).

[43] *See Spelson v. CBS, Inc.*, 581 F. Supp. 1195, 1203 (N.D. Ill. 1984) (statement that "individuals are 'cancer con-artists' and 'practitioners of fraud,'" were opinion)), *aff'd*, 757 F.2d 1291 (7th Cir. 1985); *Yauncey v. Hamilton*, 786 S.W.2d 854 (Ky. 1989) (acquaintance of suspected murder's statement to newspaper that suspect was a "con artist" was protected opinion); *Quinn v. Jewel Food Stores, Inc.*, 276 Ill. App. 3d 861, 866-67 (Ill. App. Ct. 1995) (employer's evaluation stating that plaintiff was a "con artist" was protected opinion).

### a.    Montgomery Is a Limited-Purpose Public Figure

Montgomery's naked allegation that he is a private figure carries no weight.  (Am. Compl. ¶¶ 24-29.)  "Whether the plaintiff is a public figure is a question of law for the court to resolve."  *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1294 n.12 (D.C. Cir. 1980).  As a matter of law, Montgomery is a "limited purpose public figure," having "inject[ed]" himself into and been "drawn into a particular public controversy" centered on widely-publicized allegations that he committed fraud in government-contracting work he performed for the U.S. government.  *Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C. Cir. 1987) (*en banc*).

*First*, Montgomery became a limited-purpose public figure when he publicly accused his business partner of paying bribes to then Congressman – later Governor – Gibbons, to obtain government contracts for Montgomery's company.  (Handman Decl. Exs. 9, 10.)  By publicizing this accusation that Montgomery had made in his lawsuit against Trepp, he invited and received national media attention, including an exclusive interview with NBC News – a glaring spotlight that exposed his alleged government-contracting fraud to the public eight years before the Book.  (*Id*. Ex. 11.)  By creating the public controversy about his company's alleged bribes in national security contracting, he opened the door to media scrutiny about his own alleged government-contracting fraud at this and other companies.[44]  *Second*, he also became a limited-purpose figure

---

[44] *See, e.g.*, *Clyburn v. News World Commc'ns, Inc.*, 903 F.2d 29, 32 (D.C. Cir. 1990) (finding a public controversy, in which plaintiff became embroiled as public figure, because he was associated with the mayor and lied to the press about his involvement in the death of a friend, prompting "the DEA, the U.S. Attorney's office, and the D.C. Police Department investigat[ion]"); *Logan v. District of Columbia*, 447 F. Supp. 1328, 1331 (D.D.C. 1978) (holding plaintiff was a limited purpose public figure because he was arrested in connection with a large undercover operation, accused of serious crimes, and voluntarily injected himself into the operation by telling an undercover agent he had committed murder while trying to obtain a position as a hit man); *Brueggenmeyer v. ABC*, 684 F. Supp. 452, 458 (N.D. Tex. 1988) (finding plaintiff was a limited purpose public figure because "the course of conduct in which [plaintiff] engaged generated consumer complaints, government legal actions, BBB investigations, and media attention").

no later than 2008 when Bloomberg, Playboy and other media outlets began reporting that Montgomery had provided bogus software to the U.S. government to decode Al Qaeda messages on Al Jazeera television. (*Id*. Exs. 1, 2, 7, 9, 11-14, 16, 17.)[45] *Third*, Montgomery further became a public figure because he sought out U.S. government contracts involving national security even after he was subject to extensive media scrutiny, thus assuming the risk of further public scrutiny about his alleged contracting fraud. *See CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 295 (4th Cir. 2008) (government contractor "became a public figure because," when the U.S. military "engaged [the contractor] to provide civilian interrogators at Abu Ghraib," it "surely knew when it accepted the interrogation work that it was potentially exposing itself to the inhospitable climate of media criticism").[46] Thus, he is unquestionably – as a matter of law – a limited-purpose public figure regarding his alleged fraud on the government.

---

[45] Indeed, a Twitter account that, by all indications, is the account of Dennis L. Montgomery at Yarrow Point, Washington, bore as the banner the image of the title page of the 2010 Playboy article, *The Man Who Conned the Pentagon.* Whether he posted the image himself, thereby exploiting his own public figure status, or someone else set up the Twitter page, it underscores that this controversy has become part of his public persona. A printout of the Twitter account as of March 19, 2015 is attached to the Handman Declaration as Ex. 25.

[46] *See also McDowell v. Paiewonsky*, 769 F.2d 942, 947-51 (3d Cir. 1985) (holding that architect was limited-purpose public figure because he accepted government contracts and was subject to previous media scrutiny about his work on public projects); *Mosesian v. McClatchy Newspapers*, 285 Cal. Rptr. 430, 439 (Cal. Ct. App. 1991) (president of company who was subject to media attention in public debate about award of a public contract to company to put on horse-racing event a limited-purpose public figure); *Gleichenhaus v. Carlyle*, 591 P.2d 635, 641 (Kan. Ct. App.) (contributor to political campaign who later obtained government contract was a limited-purpose public figure), *aff'd in relevant part*, 597 P.2d 611, 612-13 (Kan. 1979). *Cf. Silvester v. ABC*, 839 F.2d 1491, 1495-97 (11th Cir. 1988) (finding jai alai fronton owners public figures by "entering a strictly regulated, high-profile industry in which there were few major participants" and "[t]he potential loss of tax revenue because of corruption" was public controversy).

b.     **Montgomery Fails to Plausibly Plead Actual Malice, or Any Other Applicable Standard of Fault**

As a public figure, Montgomery is required to plead facts showing that Defendants acted with actual malice by clear and convincing evidence, but he cannot plausibly do so.[47]  *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 331-32 (1974); *Clyburn*, 903 F.2d at 33.  "The standard of actual malice is a daunting one."  *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996).  Plaintiff must plead that the speaker knew the statements were false or "in fact entertained serious doubts as to the truth" when he made defamatory statements.  *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *Foretich v. CBS, Inc.*, 619 A.2d 48, 59 (D.C. 1993).  A plaintiff could support a defamation claim with allegations of facts evidencing that a defendant was subjectively aware when the defendant published that the story was "'(1) fabricated; (2) so inherently improbable that only a reckless person would have put [it] in circulation; or (3) based wholly on an unverified anonymous telephone call or some other source that [defendant] had obvious reasons to doubt.'"  *Lohrenz v. Donnelly*, 350 F.3d 1272, 1283 (D.C. Cir. 2003) (citation omitted).  "For [the actual malice] standard to be met, the publisher must come close to willfully

---

[47] Even if Montgomery were not a public figure (which he is), the Complaint must be dismissed because it cannot succeed on a negligence claim, the lower standard applicable to private-figure plaintiffs.  *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 87 (D.C. 1980) ("[T]he basic standard of care in the District of Columbia for media defamation of private individuals . . . [is] that of negligence."); *see also Gertz*, 418 U.S. at 347 (holding that states may not impose "liability without fault" in libel cases brought by private plaintiffs).  Montgomery cannot show negligence, as a matter of law.  As the Chapter reflects, Risen relied on articles previously published in reputable publications, relied on official records and included Montgomery's denials in the Chapter, and HMH relied on a reputable author – all factors that show, as a matter of law, not just no actual malice, but no negligence.  *See, e.g.*, *Winn v. United Press Int'l*, 938 F. Supp. 39, 45 (D.D.C. 1996) ("[A] periodical that relies on articles from other reliable publications is not negligent as a matter of law when it does not verify those articles with their original sources."), aff'd, 1997 WL 404959 (D.C. Cir. 1997); *Hakky v. Wash. Post Co.*, 2010 WL 2573902, at *6 (M.D. Fla. June 24, 2010) (dismissing libel claim against media company because, in part, "under *Iqbal,* Plaintiff failed to allege sufficient facts demonstrating negligence . . . .").

blinding itself to the falsity of its utterance." *Tavoulareas*, 817 F.2d at 776. Montgomery cannot clear this high hurdle, even at the pleading stage.

In the wake of *Iqbal* and *Twombly*, a plaintiff cannot state a claim simply by making conclusory assertions of the elements of actual malice, which is all Montgomery's Amended Complaint does. (Am. Compl. ¶¶ 53, 98, 162, 172.) Indeed, federal courts in Florida and across the country now routinely dismiss defamation cases for failure to state a claim where, as here, the plaintiff fails to plead allegations to make actual malice plausible. *See Hakky*, 2010 WL 2573902, at *6-7 (dismissing libel claim under Rule 12(b)(6) where plaintiff failed to plausibly allege facts to support actual malice); *Parisi v. Sinclair*, 845 F. Supp. 2d 215, 219 (D.D.C. 2012) (same).[48] Because the Chapter expressly relies on previously published articles in reputable publications and statements in official court records, FBI reports, and the Congressional Record, and includes Plaintiff's denials, Plaintiff cannot plausibly meet the "daunting" standard of actual malice.[49]

---

[48] *See also Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012) (dismissing libel complaint because "none of [plaintiff's] allegations . . . plausibly suggest that, given the articles' reporting," defendant acted with actual malice); *Mayfield v. NASCAR, Inc.*, 674 F.3d 369, 377-78 (4th Cir. 2012) (dismissing libel claim where plaintiffs pleaded only "conclusory" allegations of actual malice amounting to "a mere recitation of the legal standard"); *Adelson v. Harris*, 973 F. Supp. 2d 467, 471 (S.D.N.Y. 2013) (dismissing libel claims under Nevada anti-SLAPP law and Rule 12(b)(6) where statements were non-actionable opinion, protected by fair report privilege, and evidence of actual malice was insufficient), *questions certified*, 774 F.3d 803 (2d Cir. 2014); *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 279-81, 284-85 (S.D.N.Y. 2013) (dismissing for failure to plausibly allege actual malice); *Earley v. Gatehouse Media Pa. Holdings, Inc.*, 2013 WL 5466149, at *6 (M.D. Pa. Sept. 30, 2013); *Egiazaryan v. Zalmayev*, 2011 WL 6097136, at *8 (S.D.N.Y. Dec. 7, 2011); *Diario El Pais, S.L. v. Nielsen Co., (US)*, 2008 WL 4833012, at *6-7 (S.D.N.Y. Nov. 6, 2008); *Hanks v. Wavy Broad., LLC*, 2012 WL 405065, at *12 (E.D. Va. Feb. 7, 2012); *Pan Am Sys., Inc. v. Hardenbergh*, 871 F. Supp. 2d 6, 17 (D. Me. 2012).

[49] *Parisi*, 845 F. Supp. 2d at 219 (finding failure to plead actual malice when plaintiff cited defendant's book showing defendant took steps to verify the statements and relied on multiple sources); *Diario El Pais, S.L. v. Nielsen Co., (US), Inc.*, 2008 WL 4833012, at *6-7 (S.D.N.Y. Nov. 6, 2008) (finding failure to plausibly plead actual malice when complaint showed defendant took actions to ensure accuracy and thus it did not possess a subjective belief of falsity).

Indeed, the facts here, based on these documentary records, conclusively demonstrate an absence of actual malice by Defendants, as a matter of law. The Book reflects that Risen extensively interviewed Montgomery – facts showing the absence of actual malice. *See Parisi*, 845 F. Supp. 2d at 218-19 (dismissing for failure to plausibly allege actual malice when defendant interviewed plaintiff) (citing *Lohrenz*, 350 F.3d at 1283).[50] The Book includes Montgomery's denials throughout the Chapter. (Book at 33-34, 37, 51, 53.) This further precludes a finding of actual malice. *See Lohrenz*, 350 F.3d at 1286 ("[R]eporting perspectives at odds with the publisher's own 'tend[s] to rebut a claim of malice'"); *Biro*, 963 F. Supp. 2d at 288 (finding failure to plausibly plead actual malice when defendant printed plaintiff's denials).[51]

Reliance on previously published material from reputable publications also precludes Montgomery from plausibly pleading actual malice, as a matter of law. *See, e.g.*, *Liberty Lobby, Inc. v. Dow Jones*, 838 F.2d 1287, 1297 (D.C. Cir. 1988) ("[G]ood faith reliance on previously published materials in reputable sources . . . precludes a finding of actual malice as a matter of law."); *Biro*, 963 F. Supp. 2d at 279 (plaintiff could not plausibly plead actual malice because defendants republished an article from *The New Yorker*, a reputable publication). Here, the Book expressly cites the comprehensive Playboy Article and New York Times Article, which contain

---

[50] *See also Biro*, 963 F. Supp. 2d at 288 (plaintiff failed to plausibly plead actual malice where they had interviewed plaintiff and included denials); *Loeb v. New Times Commc'ns Corp.*, 497 F. Supp. 85, 93 (S.D.N.Y. 1980) ("It cannot be said that the defendants' conduct constitutes an 'extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.' Loeb himself was interviewed . . . .").

[51] Montgomery's general denials do not establish knowledge or recklessness as to falsity. *See Edwards v. National Audubon Soc'y, Inc.*, 556 F.2d 113, 121 (2d Cir. 1977) (actual malice "cannot be predicated on mere denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error"); *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1510-11 (D.C. Cir. 1996) (no actual malice even though plaintiff was not contacted because "[Defendant] knew . . . that [plaintiff] had sued . . . for defamation based upon similar allegations; [plaintiff] could reasonably expect [defendant] to deny any involvement regardless of the facts.").

all the facts Plaintiff now challenges, facts first published in the 2008 article in *Bloomberg News*, also a reputable publication.  Plaintiff has not – and could not – allege that he had obtained retractions or challenged any of these publications in a lawsuit.  Reliance on these reputable sources defeats actual malice.

Moreover, reliance on official reports or official sources, as Risen did here, cannot constitute actual malice.[52]  No less a prominent official than the Director of the CIA, in Congressional testimony, supported the claim that Montgomery's information was not accurate or, as Senator Chambliss described it "bogus."[53]  These official views echoed what Plaintiff's ` former business partner in eTreppid told the FBI and said in court records: the demonstrations were rigged and the software non-existent.  The court records include what Plaintiff's former lawyer said: "Based upon personal knowledge, and information and belief, Blxware possesses no marketable technology, the technology as represented does not exist[.]"  (Handman Decl. Ex. 20.)  The New York Times Article, co-written and expressly relied upon by Risen in the Book, reported that Montgomery invoked his Fifth Amendment right against self-incrimination in his deposition "when asked if his software was a 'complete fraud,'" (Handman Decl. Ex. 2, at 6; Ex. 15 at 57-58, 60, 80-81, 188-191, 199-201, 273).  In a civil case, an adverse inference that the

---

[52] *Bell v. Associated Press*, 584 F. Supp. 128, 129, 132 (D.D.C. 1984) (no actual malice as a matter of law where reporter relied on arrest report); *Klayman v. City Pages*, 2015 WL 1546173, at *16-17 (M.D. Fla. Apr. 3, 2015) (granting motion for summary judgment, because, in part, plaintiff could not prove actual malice when newspapers and authors relied on judicial opinions and public filings in Florida Bar disciplinary proceedings); *CACI Premier Tech.*, 536 F.3d at 292 (no actual malice as a matter of law where radio commentator relied on official reports about the conditions set by government contractor that led to torture, rape, and murder at Abu Ghraib prison); *Peter Scalamandre & Sons, Inc. v. Kaufman*, 113 F.3d 556, 562-63 (5th Cir. 1997) (no actual malice as a matter of law where arson allegations were based on a police report); *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 175 (2d Cir. 2001) (no actual malice as a matter of law where author relied on sources including a police report).

[53] In a 2012 article in *Defense News*, Jose Rodriguez, the man who had been in charge of the CIA's Counterterrorism Center, said the Center had been "skeptical," viewed the software as "crazy" and passing it along to the White House "ridiculous."  (Handman Decl. Ex. 20.)

software was a fraud may be drawn from Montgomery's invocation.[54] In the face of this adverse

inference and "[i]n view of the vast number of objective sources who condemned" Montgomery

as a fake, this Court should "conclude as a matter of law" that Defendants "did not entertain

serious doubts that the gist" of the Chapter "was true." *Levan v. Capital Cities/ABC*, 190 F.3d

1230, 1244 (11th Cir. 1999) (reversing plaintiff's jury verdict on actual malice and entering

judgment for defendant), *cert. denied*, 528 U.S. 1198 (2000).

Moreover, given that the Book was the work of a highly reputable author – the Amended

Complaint itself admits that Risen "is a Pulitzer Prize-winning journalist," and a "national

security expert" (Am. Compl. ¶¶ 10, 14) who had published the same allegations in the *New York

Times* in 2011 without legal challenge – Montgomery cannot plausibly plead that HMH was even

negligent, much less acted with actual malice, in relying on and publishing Risen's work. *See

Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1032 (2d Cir. 1997) (publisher may not be liable for

article "if it relies upon the integrity of a reputable author and has no serious reason to question

the accuracy of the information provided by that author").[55] Indeed, HMH would have no reason

to doubt Risen since other reputable publications had also published the same allegations for

years without legal challenge.[56]

---

[54] *See, e.g.*, *Coquina Investments v. TD Bank, N.A.*, 760 F.3d 1300, 1310 (11th Cir. 2014) ("In civil cases, . . . 'the Fifth Amendment does not forbid adverse inferences against parties . . . when they refuse to testify . . . .'") (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)).

[55] *See McManus v. Doubleday & Co.*, 513 F. Supp. 1383, 1390 (S.D.N.Y. 1981) (co-author and publisher were "entitled as a matter of law to rely on [author's] proven reportorial ability"); *Pegasus v. Reno Newspapers, Inc.*, 57 P.3d 82, 93 (Nev. 2002) (newspaper did not act with actual malice where "there is no evidence that . . . anyone at [the newspaper] had any reason to believe [the freelance reporter] would lie . . .").

[56] Plaintiff does not allege any facts that would suggest that the publisher HMH acted with any degree of fault. *See McFarlane*, 74 F.3d at 1303 (explaining that, because actual malice is a question of each defendant's subjective state of mind, absent respondeat superior, actual malice will not be imputed from the author to the publisher). The Amended Complaint also does not allege facts to suggest that Houghton Mifflin Harcourt Company, which Plaintiff alleges is merely a holding company of the publisher (Am. Compl. ¶ 16), had anything to do with

Finally, the allegation that Defendants rejected Montgomery's request for retraction (Am. Compl. ¶ 44) fails to plausibly plead actual malice, again as a matter of law, because it does not prove the wrongful state of knowledge at the time of the initial publication. *See Biro*, 963 F. Supp. 2d at 281-82, 286 (holding that defendant's after-the-fact refusal to retract fails to plausibly allege actual malice as a matter of law because "a failure to retract occurs, by definition, *after* publication, meaning that its probative value as to a defendant's state of mind at the time of publication is dubious at best."); *Klayman*, 2015 WL 1546173, at *15 ("[T]hat Plaintiff alerted Defendants after publication that he believed the statements were false and that he wanted some kind of correction or retraction does not help Plaintiff to establish actual malice.").[57] Here, where there was no plausible allegation of error, the "refusal to retract" is only further evidence of "*no* actual malice." *Tavoulareas v. Piro*, 759 F.2d 90, 132 n.51 (D.C. Cir. 1985) ("[T]he refusal may show that the publisher believed and still believes that the falsehood was true."), *rev'd on other grounds*, 817 F.2d 762 (D.C. Cir. 1987) (*en banc*). In sum, Montgomery fails to plausibly plead actual malice, or any other applicable level of fault, and the Court should therefore dismiss the libel claim, with prejudice.

### 4. Montgomery's Other Tort Claims Fail

Because Montgomery's "defamation claim fails, so do [his] other tort claims based upon the same allegedly defamatory speech." *Farah*, 736 F.3d at 540. "[A] plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim." *Moldea II*, 22 F.3d at 319-20 (citing *Cohen v. Cowles Media Co.*, 501 U.S. 663, 670 (1991)). "The First

---

publication of the Book or is at fault in any way. This is an additional reason why the Amended Complaint should be dismissed as to both HMH Companies.

[57] *See McFarlane*, 91 F.3d at 1515 ("McFarlane presents no authority, however, nor are we aware of any, for the proposition that a publisher may be liable for defamation because it fails to retract a statement upon which grave doubt is cast after publication."); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 286 (1964) (the *Times*' "failure to retract upon respondent's demand . . . is likewise not adequate evidence of malice for constitutional purposes").

Amendment considerations that apply to defamation therefore apply also to" Montgomery's

claims for tortious interference, intentional infliction of emotional distress, and assault. *Farah*,

736 F.3d at 540 (dismissing tortious interference claim); *Hustler Magazine v. Falwell*, 485 U.S.

46, 50 (1988) (dismissing intentional infliction claims). In addition, Montgomery fails to state

facts to plausibly plead the elements of these claims.[58]

## IV. CONCLUSION

For the foregoing reasons, defendants HMH Companies and Risen respectfully request

that the Court grant their motions: (1) to dismiss or transfer for lack of personal jurisdiction over

Risen and HMHC; (2) dismiss or transfer for improper venue; (3) transfer for convenience; or

(4) dismiss the complaint with prejudice under Fed. R. Civ. P. 12(b)(6).

---

[58] For example, Plaintiff cannot show intent or that the statements were threats of civil assault, and cannot show "extreme and outrageous" conduct, intent, or severe distress as to IIED. *See Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 92 (D.D.C. 2010) (assault if "(a) they act intending to cause a harmful or offensive contact . . . or an imminent apprehension of such a contact, and (b) the other party is thereby put in such imminent apprehension") (alterations omitted); *Jackson v. District of Columbia*, 412 A.2d 948, 955 n.15 (D.C. 1980) (no liability for assault for negligent or reckless behavior lacking the intent to commit an assault); *Solers, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009) (dismissing for failure to state a claim because "plaintiff must show that the interference was intentional and that there was resulting damage" to state a tortious interference claim); *Jung v. Jung*, 791 A.2d 46, 50 (D.C. 2002) ("To establish a claim for intentional infliction of emotional distress, a plaintiff must prove that the defendant engaged in: (1) extreme and outrageous conduct that (2) intentionally or recklessly caused (3) severe emotional distress to another.").

**CERTIFICATE OF GOOD-FAITH CONFERENCE; CONFERRED BUT
UNABLE TO RESOLVE THE ISSUES PRESENTED IN THE MOTION**

In accordance with Local Rule 7.1(a)(3)(A), the undersigned certifies that counsel for

Defendants has conferred with all parties or non-parties who may be affected by the relief sought

in this motion in a good-faith effort to resolve the issues but has been unable to resolve the

issues.

                                            s/Sanford L. Bohrer

Dated: May 15, 2015

                                          Respectfully submitted,

                                          HOLLAND & KNIGHT LLP

                                          By: s/ Sanford L. Bohrer
                                                Sanford L. Bohrer
                                              Brian W. Toth
                                              701 Brickell Avenue, Suite 3300
                                              Miami, Florida  33131
                                              Tel.: (305) 374-8500
                                              Fax: (305) 789-7799

                                          DAVIS WRIGHT TREMAINE LLP

                                          By: s/ Laura R. Handman
                                              Laura R. Handman (admitted *pro hac
                                              vice*)
                                              Micah J. Ratner (admitted p*ro hac vice*)
                                              1919 Pennsylvania Ave., NW, Suite 800
                                              Washington, D.C.  20006
                                              Tel.: (202) 973-4200
                                              Fax: (202) 973-4499

                                          *Counsel for Defendants*

41

## CERTIFICATE OF SERVICE

I certify that on May 15, 2015, I filed this document with the Clerk of Court using

CM/ECF, which will serve this document on all counsel of record.


s/Sanford L. Bohrer

**EXHIBIT D**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 15-cv-20782-MARTINEZ/GOODMAN

DENNIS MONTGOMERY,                    **Sealed**

　　　　　Plaintiff,

v.

JAMES RISEN et al.,

　　　　　Defendants.
_____/

> FILED by **TS** D.C.
>
> SEP 0 2 2015
>
> STEVEN M. LARIMORE
> CLERK U.S. DIST. CT.
> S. D. of FLA. – MIAMI

## NOTICE OF SUPPLEMENTAL AUTHORITY CONCERNING
## DEFENDANTS' MOTION TO DISMISS OR TRANSFER

Defendants James Risen ("Risen"), Houghton Mifflin Harcourt Publishing Company

("HMH"), and Houghton Mifflin Harcourt Company ("HMHC"), improperly sued as HMH

Holdings, Inc., (together "Defendants"), file this notice of supplemental authority to update the

Court on recently discovered facts relevant to their motions: (1) to dismiss or transfer this action

to the U.S. District Court for the District of Columbia for lack of personal jurisdiction over Risen

and HMHC under Fed. R. Civ. P. 12(b)(2); (2) to dismiss or transfer this action for improper

venue under Fed. R. Civ. P. 12(b)(3) and 28 U.S.C. § 1406(a); and (3) to transfer this action

under 28 U.S.C. § 1404(a) ("Motion to Dismiss or Transfer"). (ECF No. 52 (May 15, 2015);

ECF No. 77 (June 11, 2015).) The recently discovered facts only further confirm that this action

does not belong in this jurisdiction.

### 1. Motion to Dismiss or Transfer for Lack of Personal Jurisdiction

In the Motion to Dismiss or Transfer, Defendants argued that, because Chapter 2 (the

"Chapter") of *Pay Any Price: Greed, Power, and the Endless War* (the "Book") does not

mention Florida, the newsgathering for the Chapter 2 did not take place in Florida, and Plaintiff

did not live in Florida when HMH published the Book, Plaintiff failed to established personal

jurisdiction over Risen and the holding company HMHC, neither of which is in Florida. (Defs.'

Mot. to Dismiss or Transfer at 15-20, ECF No. 52.) Discovery has confirmed that Plaintiff did

*not* live in Florida during any time relevant to the personal jurisdiction analysis (or since).

Plaintiff admitted in his response to interrogatories that he lived in California and Washington

when Risen researched and wrote the Chapter during 2011-14, and in Washington when HMH

published the Book in October 2014. (Defs.' Notice of Hr'g at 8, Pl.'s Resp. to Interrog. 7, ECF

No. 90-2.) Further, discovery revealed that he does not have real "multiple and ongoing"

business in Florida or tangible business opportunities in Florida,[1] and certainly not any alleged

injury in Florida to which the Chapter – again allegedly – caused calculated harm. Thus, *no*

connection exists between the parties and Florida that would satisfy due process.

### 2. Motion to Dismiss or Transfer for Improper Venue

As Defendants argued, the statutory venue provisions the Amended Complaint cites in 28

U.S.C. § 1391 do not apply. (Defs.' Mot. to Dismiss or Transfer at 21-22, ECF No. 52.)

Plaintiff's opposition did not even respond to this venue argument, thus waiving the contrary

argument that venue is proper. On that ground alone, the case should be dismissed or transferred

for improper venue. (Defs.' Reply in Support of Mot. to Dismiss or Transfer at 8-9, ECF No.

77.)

---

[1] (Pl.'s Dep. 46:13-50:16; 268:6-271:10, Aug. 20, 2015, relevant excerpts attached hereto as
Exhibit 1.) Under the Protective Order entered in this action, the deposition transcript is
confidential for 10 days after receipt of the transcript. (Protective Order at 6, ¶ 6, ECF No. 89.)
This period has not elapsed. Thus, as required by the Protective Order, Defendants are filing the
relevant excerpts of the deposition transcript and an unredacted notice of supplemental authority
with references to the transcript under seal, along with a motion to seal. Defendants are also
filing redacted versions of these documents publicly.

Plaintiff alleged "citizenship" in Florida when he filed suit (Compl. ¶ 6, ECF No. 1), but later events and facts revealed during discovery demonstrate that Plaintiff was, and *is*, in fact, domiciled in Washington. The following chronology is instructive.

- **February 23, 2015** –
  - Plaintiff appeared telephonically *from Washington* before a U.S. Tax Court judge in Los Angeles and led the court to believe he lived *in Washington*.[2]
  - Plaintiff sent his Florida voter registration documents by mail *from Washington*, and stated he was then residing in Florida. He gave a Miami temporary address but has now admitted he never stayed there.[3]

- **February 24, 2015** – Plaintiff filed suit here claiming to be a Florida citizen although the day before he was actually living *in Washington*.[4]

- **April 28, 2015** – Plaintiff filed his Amended Complaint again claiming that he was a Florida resident,[5] but he has later admitted in his deposition that he was still living *in Washington* at this time.[6]

- **May 13, 2015** – Plaintiff's public defender in his criminal prosecution in Nevada for allegedly passing bad checks obtained a continuance representing to the court that Plaintiff lived *in Washington* and was too ill to travel to Nevada.[7]

- **July 15, 2015** - Plaintiff stated in response to an interrogatory and later confirmed at deposition that all his doctors are *in Washington* even though Plaintiff claims he is under constant medical care – the basis for his request for an accelerated discovery and trial schedule in this case.[8]

- **August 12, 2015** – Plaintiff's public defender once again obtained a continuance of his criminal prosecution by representing that Plaintiff was too ill to travel to Nevada and "*still in Washington State*."[9]

---

[2] (*Montgomery v. Commissioner*, No. 9008-09, Tr. 34:21-35:6; 37:11-22 (U.S. Tax Court Feb. 23, 2015), relevant excerpts attached hereto as Exhibit 2.)

[3] (Defs.' Mot. to Dismiss or Transfer at 34, ECF No. 52; Pl.'s Dep. 36:15-37:18.)

[4] (Compl. ¶ 6, ECF No. 1.)

[5] (Am. Compl. ¶ 13, ECF No. 44.)

[6] (Pl.'s Dep. 85:17-86:5.)

[7] (*State v. Montgomery*, No. C-268764, Tr. 1:17-21 (Nev. D. Ct., Clark Cnty. May 13, 2015), attached hereto as Exhibit 3.)

[8] (Defs.' Notice of Hearing at 24, Pl.'s Resp. to Interrog. 22, ECF No. 90-2; Pl.'s Dep. 26:11-13.) *In re Lordy*, 214 B.R. 650, 662 (Bankr. S.D. Fla. 1997) ("location of the person's doctors" is domicile factor).

[9] *State v. Montgomery*, No. C-268764, Tr. 2:9-21 (Nev. D. Ct., Clark Cnty. Aug. 12, 2015), attached hereto as Exhibit 4) (emphasis added.)

- **August 16, 2015** – Plaintiff traveled *from Washington* to Miami in connection with the taking of his deposition in this case according to his deposition testimony, even though Defendants had offered to take his deposition in Seattle.[10]

- **August 19, 2015** – Plaintiff's public defender told the Nevada court that he has "regular contact with" Plaintiff who "calls him regularly."[11] The public defender then represented to the court that Plaintiff is "not able to travel," and "*[he]'s up in Washington State in the Seattle area right now, still recovering,*"[12] notwithstanding that Plaintiff was actually in Miami for this civil case.

- **August 20, 2015** – Plaintiff sat for his deposition in Miami and testified that he has on an oral understanding with a friend in Miami where he can rent a room in the friend's condo for $200 per month to stay there when he wants, but he has not paid the friend yet and has never stayed in the room. Tellingly, he does not know how many bedrooms are in his friend's condo, his wife lives *in Washington*, his belongings are *in Washington*, and he did not set foot in Florida until August 16, 2015.[13]

- **August 28, 2015** – Plaintiff produced bank records further to the Magistrate Judge's August 22 order, showing that he has not changed his *Washington* address with the bank where his Social Security Disability checks are deposited, notwithstanding his claimed intent to move to Florida.[14]

Without concurrent *physical presence* in Florida coupled with a *present* intention to

remain here indefinitely, he cannot show domicile in Florida.[15] Thus, it is now plain that

Plaintiff misrepresented that he is domiciled in Florida to manufacture venue here, when he

actually is domiciled in Washington. This is not surprising, because his and his counsel's

credibility on such matters is dubious. As noted in the Motion to Dismiss or Transfer, a federal

judge found Plaintiff committed perjury in a declaration opposing a motion for attorneys' fees

---

[10] (Disc. Hr'g Tr. 71:15-25, Aug. 21, 2015, ECF No. 111-1, at 72; Pl.'s Dep. 20:6-22-1.)

[11] (*State v. Montgomery*, No. C-268764, Tr. 2:8-9; 2:17-19 (Nev. D. Ct., Clark Cnty. Aug. 19, 2015), attached hereto as Exhibit 5.)

[12] (*Id.*) (emphasis added.)

[13] (Pl.'s Dep. 17:10-26:22; 43:5-50:16; 75:13-19; 85:13-87:13.)

[14] (*See* Pl.'s Redacted Bank Statements, attached hereto as Exhibit 6.)

[15] *See Scoggins v. Pollock*, 727 F.2d 1025, 1026 (11th Cir. 1984) (explaining that "a change of domicile requires '[a] concurrent showing of (1) physical presence at the new location with (2) an intention to remain there indefinitely ....'"); *Jaisinghani v. Capital Cities/ABC, Inc.*, 973 F. Supp. 1450, 1453 (S.D. Fla. 1997) (same), *aff'd*, 149 F.3d 1195 (11th Cir. 1998).

4

when he argued that "California, not Nevada, was the proper forum to resolve the fee dispute."[16] The Middle District of Florida recently found that Plaintiff's counsel "misrepresented the basis for venue in [that] case," and transferred the case to D.C.[17] This Court should similarly dismiss the action or transfer to D.C. for improper venue.

### 3. Motion to Transfer Under for the Convenience of Witnesses and Parties

As Defendants argued, the Court should transfer this action to D.C. for the convenience of witnesses and parties and in the interest of justice under 28 U.S.C. 1404(a). (Defs.' Mot. to Dismiss or Transfer at 22-26, ECF No. 52.) Because Plaintiff is not actually domiciled in Florida, his choice of forum here is not entitled to deference. (*Id.* at 24.) Nor would travel to D.C. inconvenience Plaintiff more than travel to Florida. Plaintiff admitted in his deposition that he traveled to D.C. just eight weeks after his stroke in 2014 for work with Sheriff Joseph Arpaio's office.[18] Plaintiff's counsel represented to Magistrate Judge Goodman that he and Plaintiff also met with Judge Royce C. Lamberth in D.C. in October of 2014 and counsel filed a request in March 2015 asking Judge Richard Leon in D.C. to hear Mr. Montgomery's testimony *in camera*.[19] On August 16, 2015, even though Defendants offered to take Plaintiff's deposition in Seattle for his convenience, Plaintiff traveled from his home in Washington to Miami for his

---

[16] (Defs. Mot. to Dismiss or Transfer at 23 n.23, ECF No. 52); *Montgomery v. eTreppid Techs., LLC*, 2010 WL 1416771, at *16-18 (D. Nev. Apr. 5, 2010) (sanctioning Montgomery for committing perjury where he falsely declared under oath that his former counsel held himself out as licensed in California, despite knowing his former counsel was only licensed in Massachusetts, which was "material because Montgomery was attempting to convince" Nevada and California courts that "disputes [with his former counsel] should be heard" in California).

[17] (Order at 5-8, *Freedom Watch, Inc. v. U.S. Dep't of State*, No. 5:13-cv-419-Oc-22PRL (M.D. Fla. Oct. 27, 2014, ECF No. 35) (finding "clearly and convincingly" that plaintiff, represented by its general counsel Mr. Klayman, "deliberately misrepresented" its principal place of business was in Ocala, Florida to obtain venue in Florida, where later complaints Mr. Klayman filed stated that its principal place of business was in D.C.), attached hereto as Exhibit 7.)

[18] (Pl.'s Dep. 67:14-23.)

[19] (Disc. Hr'g Tr. 12:21-13:12; 14:6-9, ECF No. 111-1, at 13, 15; Defs.' Mot. to Dismiss or Transfer at 25 n.26, ECF No. 52.)

deposition and sat for the full 7 hours on August 20.[20] Thus, transfer to D.C. will be equally convenient for Plaintiff.

Moreover, the convenience of third-party witnesses strongly favors transfer to D.C. On August 12, 2015, Plaintiff disclosed that just 6 of Plaintiff's possible 50 witnesses, including Plaintiff and his wife, allegedly reside in Florida.[21] None of Defendants' witnesses are in Florida and most, on both lists, are in subpoena range of D.C.[22] Similarly, in his July 15, 2015 response to an interrogatory to list all persons with "knowledge or information pertaining to any fact in the Amended Complaint or any fact underlying the subject matter of this action," Plaintiff listed 16 persons – *not* one of whom is in Florida while 13 are in the D.C. area.[23]

In sum, for the reasons articulated in Defendants' motion to dismiss and transfer, their reply, and this notice of supplemental authority, the Court should dismiss or transfer this action before further discovery or pretrial proceedings occur here.

Dated: September 2, 2015

Respectfully submitted,

Sanford L. Bohrer
Florida Bar No. 160643
sbohrer@hklaw.com
Brian W. Toth
Florida Bar No. 57708
brian.toth@hklaw.com
HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
Telephone: (305) 374-8500
Fax: (305) 789-7799

---

[20] (Disc. Hr'g Tr. 71:15-25, ECF No. 111-1, at 72; Pl.'s Dep. 20:6-22-1.)

[21] (*See* Pl.'s Witness List, attached hereto as Exhibit 8.)

[22] (Defs.' Witness List, attached hereto as Exhibit 9.)

[23] (Defs.' Notice of Hr'g at 2-4, Pl.'s Resp. to Interrog. 1, ECF No. 90-2.)

– and –

Laura R. Handman (admitted *pro hac vice*)
laurahandman@dwt.com
Micah J. Ratner (admitted *pro hac vice*)
micahratner@dwt.com
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Ave., NW, Suite 800
Washington, D.C. 20006
Tel.: (202) 973-4200
Fax: (202) 973-4499

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that on September 2, 2015, I filed this document conventionally with the Clerk

of Court, and also that I e-mailed this document on all counsel of record.

Brian N. Toth

**EXHIBIT E**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

DENNIS L. MONTGOMERY

              Plaintiff,

    v.

HOUGHTON MIFFLIN HARCOURT
PUBLISHING COMPANY

       and

HMH HOLDINGS, INC.

       and

JAMES RISEN, an individual, Author

          Defendants.

Civil Action No.
15-cv-20782-MARTINEZ/GOODMAN

### WITNESS LIST OF PLAINTIFF DENNIS MONTGOMERY

Pursuant to the scheduling order of the Court, "Order Setting Civil Trial Date and Pretrial

Schedule, Requiring Mediation and Referring Certain Motions to Magistrate Judge" May 4, 2015

(Docket No. 48), the Plaintiff hereby submits his list of witnesses which may be called at trial.

1) REDACTED

2) REDACTED

3) Istvan Burgyan, c/o at 2020 Pennsylvania Ave. #800, Washington, DC 20006

4) James Risen, 1627 "I" Street N.W., Suite 700, Washington, D.C. 20006-4007

5) Eric Lichtblau, 1627 "I" Street N.W., Suite 700, Washington, D.C. 20006-4007

6) Aram Roston, 9346 Civic Center Drive, Suite 200, Beverly Hills, CA 90210

7) Ms. Linda K. Zecher, 222 Berkeley Street, FL 1-11, Boston, Massachusetts 02116

8) Dr. Joe Eskridge, MD, 550 Seventeenth Avenue, Suite 500, Seattle, Washington

98122

9) Dr. Paul Chuwn Lim, MD, 1600 East Jefferson Street, Suite 600, Seattle, Washington 98122

10) Dr. Lina Fine, 550 17th Ave, Seattle, Washington 98122

11) Dr. Abhineet Chowdhary, M.D., 116th Avenue Northeast, Bellevue, WA

12) Dr. Michael Schatman, Ph.d, 1601 114th Ave SE #100, Bellevue, WA 98004

13) Mike Zullo, 550 West Jackson Street, Phoenix, Arizona 85003

14) Edra Blixseth, Beverly Hills, California

15) Michael Sandoval, 800 Bellevue Way, Bellevue, WA 98004 (425) 635-3900

16) Philip Stillman, 300 South Pointe Drive, Suite 4206 M, Miami Beach, Florida

17) Jim Bauder, 755 Trademark Drive, Reno, Nevada 89521

18) Patty Gray, 755 Trademark Drive, Reno, Nevada 89521

19) Kenny Rogers, Beaver Dam Farm, Georgia  3085 Smithsonia Road, Colbert, Georgia 30628

20) Jeff Johnson, 21700 Atlantic Boulevard, Suite 240, Dulles, Virginia 20166

21) Wayne Prim, State Line Highway, Glen Brook (Incline Village), Nevada

22) Letitia White, 511 C Street, NE, Washington DC 20002

23) Paul Heraldson, 11350 Random Hills Rd., Fairfax VA 22030

24) Mike Flynn, 6125 El Torto, Rancho Santa Fe, CA 90267

25) Sloan Venables, Virginia City, Nevada

26) Dr. Peter Wiedermann, Kirkland, Washington

27) Jill Abramson, 229 West 43rd Street, New York, NY 10036

28) Warren Trepp, 755 Trademark Drive, Reno, Nevada 89521

29) Sue Perez, 755 Trademark Drive, Reno, Nevada 89521

30) Bruce Nichols, 222 Berkeley Street, FL 1-11, Boston, Massachusetts 02116

31) Nathan Siegel, 222 Berkeley Street, FL 1-11, Boston, Massachusetts 02116

32) Tina Bennett, 1325 Avenue of the Americas, New York, New York 10019

33) Michael Hawes, 4168 Douglas Blvd Suite 300, Granite Bay, CA 95746

34) Donald Kerr, 7525 Colshire Drive, McLean, Virginia 22102

35) Michael K. McCullough, 203 West Losey Street, Illinois 62225-5222

36) Marianne Midgett, 203 West Losey Street, Illinois 62225-5222

37) Yong C. Chong, 203 West Losey Street, Illinois 62225-5222

38) Barton Gellman, 1150 L Street, NW, Washington, D.C. 20005

39) Porter Goss, Miami, Florida

40) Tom Madden, 240 West Palmetto Park Road, Boca Raton, Florida 33432

41) Robert Bennett, Esq., 555 Thirteenth Street, NW Washington DC 20004

42) Stuart Liner, 1100 Glendon Ave # 14, Los Angeles, CA 90024

43) Randall Sunshine, 1100 Glendon Ave # 14, Los Angeles, CA 90024

44) Ellyn Garofalo, 1100 Glendon Ave # 14, Los Angeles, CA 90024

45) Governor Brian Sandoval, 101 N. Carson Street, Carson City, Nevada 89701

46) Corporate Designee witness from Houghton Mifflin Harcourt Publishing Company
with regard to operations of Houghton Mifflin Harcourt facility in Orlando, Florida

47) Corporate Designee from Houghton Mifflin Harcourt Publishing Company with
regard to sales nationwide and in Florida of Pay Any Price

48) Rosemary Moseley, 91 Hickory Hills Circle, Lake Placid, Florida 33825

49) Ms. Kimberly Hines, Ft. Lauderdale, Florida

50) Edward Snowden, Moscow, Russia

**Plaintiff reserves the right to supplement this witness list as discovery proceeds.**

Dated: August 12, 2015

Respectfully submitted,

Larry Klayman
FL Bar No. 246220
7050 W Palmetto Park Rd.
Suite 15-287
Boca Raton, FL 33433
(310) 595-0800
leklayman@gmail.com

Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of August 2015, a true and correct copy of the foregoing was served via email and U.S. Mail upon the following:

**Sanford Lewis Bohrer**
**Brian Toth**
Holland & Knight, LLP
Suite 3000
701 Brickell Ave
Miami, FL 33131
Email: sbohrer@hklaw.com
Email: brian.toth@hklaw.com

**Laura R. Handman**
**Micah Ratner**
Davis Wright Tremaine LLP
1919 Pennsylvania Ave., N.W., Suite 800
Washington D.C. 20006-3401
Email: laurahandman@dwt.com
Email: MicahRatner@dwt.com

*Attorneys for Defendants*

/s/ *Larry Klayman*
Larry Klayman, Esq.

**EXHIBIT F**

What is LinkedIn?    Join Today    Sign In



# Istvan Burgyan

CEO/Founder at PCI

Greater Seattle Area | Computer Software

| | |
|---|---|
| Current | PCI |
| Previous | Blxware, Lehman Brothers |
| Education | University Of Pheonix |

102
connections

## Join LinkedIn and access Istvan's full profile. It's free!

As a LinkedIn member, you'll join 300 million other professionals who are sharing connections, ideas, and opportunities.

- See who you know in common
- Get introduced
- Contact **Istvan** directly

**View Istvan's Full Profile**

## Experience

### CEO/Founder
PCI

2010 – Present (5 years)

PCI, LLC, is a software development company located in a suburb Seattle Washington. PCI has developed a new patent pending universal compression technology called "nX", that will change the way video or data is compressed and streamed for business or personal use forever.
---nX Features---
* We stream 4k video at 5Mbps
* 5X More Data on the Same Bandwidth
* Little to NO Buffering
* Put up to 10 TB of data on a 1 TB drive
* 75% More Effecient than h.265 and VP9

### Special Projects Manager
Blxware

2006 – 2009 (3 years)

### Account Executive
Lehman Brothers

2005 – January 2007 (2 years)

## Languages

**Hungarian**          **Spanish**



**Find a different Istvan Burgyan**

First Name    Last Name

**Example:** Istvan Burgyan

**ISTVAN BURGYAN**
Academy Director / Chief Instructor
United States

More professionals named Istvan Burgyan

**People Also Viewed**

**Brian Calhoun**

**Arash Ghaemi**
Web Developer, SEO & Digital Business Manager, Educational Consultant, ESL Instructor, Musician

**Natalie Velasco**
--

**Ann Scranton**

**Gary Gray**

**Genevieve Chambliss**
Design Assistant

**Barry Meyer**
President at Tuff-N-Uff Productions, Inc.

**Tony Tasler**
Fraud & Loss Specialist

**James Fierro**
Patient and Surgery Coordinator

**Parris Loder**
Web Developer at Web Development and Design



**RESPOND**

**Answer client needs as they happen.**

**Bloomberg Law**
A Bloomberg BNA Product

LEARN MORE >>

Istvan Burgyan | LinkedIn                                    https://www.linkedin.com/in/istvan-burgyan-6254148

What is LinkedIn?   Join Today   Sign In

Skills

| | | | | |
|---|---|---|---|---|
| Microsoft Office | PowerPoint | Strategic Planning | Photoshop | Project Management |
| Sales Management | Account Management | New Business Development | Sales | |
| Negotiation | Business Strategy | Marketing | Computer Hardware | |
| Process Improvement | Project Planning | Team Leadership | | |

Education

**University Of Pheonix**
, Business Administration and Management, General
2002 – 2005

## View Istvan's full profile to...

- See who you know in common
- Get introduced
- Contact **Istvan** directly

**View Istvan's Full Profile**

Not the Istvan you're looking for? View more

LinkedIn member directory:  a  b  c  d  e  f  g  h  i  j  k  l  m  n  o  p  q  r  s  t  u  v  w  x  y  z  more  |  Browse members  by country

© 2015  |  User Agreement  |  Privacy Policy  |  Community Guidelines  |  Cookie Policy  |  Copyright Policy  |  Unsubscribe

**EXHIBIT G**

CONFIDENTIAL

Page 1

```
 1            UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
 2            CASE NO. 15-cv-20782-MARTINEZ/GOODMAN
 3
 4   DENNIS MONTGOMERY,
 5           Plaintiff,
 6   -vs-
 7   JAMES RISEN, ET AL.,
 8           Defendants.
 9
     _____/
10
11
12            Thursday, August 20, 2015
              Holland & Knight, LLP
13            701 Brickell Avenue, Suite 3300
              Miami, Florida 33131
14            9:13 a.m. - 6:36 p.m.
15
16      VIDEOTAPE DEPOSITION OF DENNIS MONTGOMERY
17         (VOLUME I - PAGES 1 THROUGH 185)
18
19   Videotape deposition taken before TAMMY WALKER ZIVITZ,
20   Registered Professional Reporter and Notary Public in and
21   for the State of Florida at Large, in the above cause.
22
23
24
25
```

CONFIDENTIAL

Page 2

1  APPEARANCES:
2      On behalf of the Plaintiff:
3          Larry Klayman, Esq.
            LARRY KLAYMAN, P.A.
4          7050 W. Palmetto Park Road, #15-287
            Boca Raton, Florida  33433
5
6      On behalf of the Defendants:
7          Laura R. Handman, Esq. and Micah J. Ratner, Esq.
            DAVIS WRIGHT TREMAINE, LLP
8          1919 Pennsylvania Avenue, NW
            Suite 800
9          Washington, D.C.  20006
10     On behalf of the Defendants:
11         Brian Toth, Esq.
            HOLLAND & KNIGHT, LLP
12         701 Brickell Avenue
            Suite 3300
13         Miami, Florida  33131
14     ALSO PRESENT:  Dina James, Paralegal and
            Videographer, Christopher Hernandez
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              - - -
2          I N D E X
3              - - -
4  WITNESS:      DIRECT  CROSS  REDIRECT  RECROSS
5  DENNIS MONTGOMERY
6  BY MS. HANDMAN  10          292
7  BY MR. KLAYMAN      282
8              - - -
            E X H I B I T S
9              - - -
10
DEFENDANTS'                          PAGE
11
   Exhibit 1-Emails                    12
12  Exhibit 2-Motion/emails             30
    Exhibit 3-Transcript                30
13  Exhibit 4-Amended Complaint             40
    Exhibit 5-Voter registration        40
14  Exhibit 6-Complaint                 43
    Exhibit 7-Plaintiff's responses     56
15  Exhibit 8-Medical records           61
    Exhibit 9-Declaration; Cecelia Wang     82
16  Exhibit 10-Articles                 118
    Exhibit 11-Twitter                  176
17  Exhibit 12-John Brennan questions       207
    Exhibit 13-Contract                 216
18  Exhibit 14-Emails                   216
    Exhibit 15-Declaration of Montgomery    223
19  Exhibit 16-Declaration of Cecelia Wang  273
    Exhibit 17-Swedish hospital notes   292
20
21
22
23
24
25

Page 4

1          THE VIDEOGRAPHER:  We're on the record.
2  The date is August 20, 2015.  The time is
3  9:13 a.m.  This is Media Unit 1.  This is the
4  video deposition of Dennis Montgomery in the
5  matter of Dennis Montgomery versus James Risen,
6  et al.
7          This deposition is being held at 701
8  Brickell Avenue, Miami, Florida 33131.  The
9  court reporter is Tammy Zivitz.  The
10  videographer is Christopher Hernandez.
11         MS. HANDMAN:  Laura Handman; Davis Wright
12  Tremaine, counsel for the defendants.
13         MR. RATNER:  Michael Ratner; Davis Wright
14  Tremaine, counsel for defendants.
15         MR. KLAYMAN:  Larry Klayman,
16  K-L-A-Y-M-A-N, counsel for plaintiff.  Sitting
17  with me is Miss Dina James, paralegal.
18         (DENNIS MONTGOMERY)
19  Having been first duly sworn or affirmed, was
20  examined and testified as follows:  I do.
21         MR. KLAYMAN:  I want to put on the record
22  that Mr. Montgomery is handicapped.  He's
23  severely debilitated as a result of a brain
24  aneurysm and several strokes so there needs to
25  be an opportunity for him to be able to

Page 5

1  respond, and there needs to be a pause to see
2  whether or not I need to make an objection
3  because communication is more difficult as a
4  result.
5          In addition, Mr. Montgomery is someone who
6  has worked inside of the intelligence community
7  as we know from this lawsuit, and he has had
8  access to classified and/or sensitive
9  information, so, therefore, before a response
10  is made, I need to know whether or not to
11  elicit an objection to this, and I need time to
12  do that.
13         In addition, that's to the benefit of
14  defense counsel too because should defense
15  counsel inadvertently or by design elicit
16  classified information, that could subject
17  defense counsel to potential liability.  So we
18  need to be very, very careful here today, and
19  go slowly and deliberately and try to cooperate
20  with each other in that regard.
21         MS. HANDMAN:  And I too wish to put
22  something on the record.  We are here pursuant
23  to a Notice of Deposition.  We offered to do
24  the deposition in Seattle, our district, DC or
25  Miami, and the plaintiff chose Miami.

CONFIDENTIAL

Page 22

1    A   Yes.
2    Q   Where do they live?
3        MR. KLAYMAN:  Objection, relevancy.  I
4    don't think this is necessary.  Why are you
5    getting into that?
6        MS. HANDMAN:  I'm wanting to know where
7    he's living.
8        MR. KLAYMAN:  He said "Seattle."  Why are
9    you probing?
10   BY MS. HANDMAN:
11   Q   I wish to know the address of where you
12   are living.
13   A   I don't know the exact address, I'm sorry,
14   I'm not being --
15       MR. KLAYMAN:  I don't understand the
16   relevancy of that, other than you're trying to
17   harass him.  He said he was staying in Seattle.
18   What's the point, Ms. Handman?
19       MS. HANDMAN:  I'm trying to establish
20   domicile.
21       MR. KLAYMAN:  It has nothing to do with
22   that.
23       MS. HANDMAN:  Yes, it does.
24       MR. KLAYMAN:  If he said he was in Seattle
25   during that period, how does it matter where

Page 23

1    the address of his -- he said -- let me put
2    this on the record, okay, and I'm not going to
3    tolerate your harassing this man.  Already
4    you've done it, and I'm not going to get into
5    the record too much on that.  But the reality
6    is, he said he was in Seattle during that
7    period, and he told you why, and to put the
8    address of his daughter and his son-in-law on
9    the record, given the fact that he has been
10   working for intelligence agencies, given the
11   fact that he has, as you know, been assisting
12   in the fight against terrorism, given, as you
13   know, our concerns about his safety, why would
14   you want to jeopardize the safety of his
15   daughter and his son-in-law?
16       MS. HANDMAN:  You can designate it as
17   confidential subject to the protective order.
18   BY MS. HANDMAN:
19   Q   Please answer the question.  What is the
20   address where you live with your daughter and
21   son-in-law?  And I presume your wife as well, do you
22   live with your wife there too?
23       MR. KLAYMAN:  Same objection.
24       THE WITNESS:  Yes.  What month are you
25   referring to?

Page 24

1    BY MS. HANDMAN:
2    Q   Well, you said in April you were evicted
3    from your home in Yarrow Point?
4    A   I was homeless at that time.
5    Q   When did you start living with your
6    son-in-law and your daughter?
7    A   Sometime in -- that was 2004, right?
8    Q   No.  You were evicted in April of this
9    year.
10   A   Excuse me.  Dates are difficult.
11   Q   2015.
12   A   I think it was late May, early June.
13   Q   Do you remember telling your doctors that
14   you were living with your wife and daughter, I
15   think, in March of this year?
16   A   Which doctor are you referring to?
17   Q   I'll have to get the record.  You said
18   that you're looking for some assisted living space?
19   A   That's the word, "assisted."
20   Q   And what steps have you taken to secure
21   assisted living in Florida?
22   A   I contacted multiple -- I contacted the
23   places, and they give you an agent or something, and
24   then I've contacted them and they've began the
25   process for doing that for me.

Page 25

1    Q   Who's the agent that you've contacted?
2    A   I don't have their names off the top of my
3    head.  It was involved with the facilities.
4    Q   Why don't we leave a blank for you to fill
5    in, in the deposition who the agent is who is
6    looking for assisted living space.
7    A   I'm also here now to do it myself with my
8    son-in-law also.
9    Q   And your son-in-law's name is?
10   A   I thought I just gave you that.
11   Q   Ishtvan --
12   A   You want his name?
13   Q   Yes.
14   A   Ishtvan Borgyan.
15   Q   I think we'll be able to fill in the
16   spelling.  Is he known as "Ish," is that his
17   nickname?
18   A   I call him that.  Other people have, yes.
19   Q   We'll call him that for purposes of
20   simplicity in the deposition.
21   A   All right.
22   Q   Is he here now with you, then?
23   A   Yes.
24   Q   And you were in business with him; is that
25   correct?

7 (Pages 22 - 25)

CONFIDENTIAL

Page 26

1   A   Yes.
2   Q   What was the name of the company?
3   A   When we were working with Edra, you mean?
4   Q   Yes.
5   A   Well, he worked at Blxware, like I did
6   originally.  In fact -- and the company was actually
7   called Opspring, and then it became Blxware.
8   Q   Have you visited any assisted living
9   places since you've been here?
10  A   Not yet.
11  Q   And prior to -- do you have any doctors in
12  Florida that you see?
13  A   No, but I have -- I still have quite a
14  severe problem, and they are -- I've asked for names
15  of neurosurgeons and neuro people for the Miami
16  area.
17  Q   And did you ask your doctors whether you
18  should travel to Miami for this deposition?
19  A   They've discouraged me from traveling when
20  I'm injured, and, obviously, I have an ongoing brain
21  aneurysm, but I knew it was important for me to come
22  here and I came.
23  Q   Are you aware that there are criminal
24  proceedings pending against you in Clark County,
25  Nevada?

Page 27

1       MR. KLAYMAN:  Objection, relevancy.
2   BY MS. HANDMAN:
3   Q   Can answer.
4       THE WITNESS:  Am I to answer that?
5       MR. KLAYMAN:  You can answer.
6       THE WITNESS:  Yes.
7   BY MS. HANDMAN:
8   Q   And are you aware that you were supposed
9   to appear in those proceedings last week on
10  August 12th?
11      MR. KLAYMAN:  It assumes facts not in
12  evidence.  Objection.
13      THE WITNESS:  I don't remember when the
14  date was.
15  BY MS. HANDMAN:
16  Q   Was there an appearance that was due
17  sometime this month?
18  A   I believe there was.
19  Q   And did you appear?
20      MR. KLAYMAN:  Objection.  Relevancy to all
21  this line of questioning.  Move to strike.
22  BY MS. HANDMAN:
23  Q   Did you appear --
24      THE WITNESS:  Am I to answer?
25      MR. KLAYMAN:  You can answer.

Page 28

1   BY MS. HANDMAN:
2   Q   Yes.
3   A   No, I did not.
4   Q   And do you know what your lawyer told the
5   judge as to why you were not appearing?
6       MR. KLAYMAN:  Objection.  Assumes facts
7   not in evidence.
8   BY MS. HANDMAN:
9   Q   Did a lawyer appear on your behalf?
10  A   Well, I'm using a public defender.
11  Q   And did the public defender appear on your
12  behalf?
13      MR. KLAYMAN:  Objection.  Relevancy to all
14  this line of questioning.  Continuing
15  objection.
16      THE WITNESS:  I don't recall.
17      MS. HANDMAN:  Let's mark as an exhibit the
18  transcript of August 12th.
19      MR. KLAYMAN:  Objection, relevancy.  Lacks
20  foundation.
21  BY MS. HANDMAN:
22  Q   Were you too ill to travel to Nevada?
23  A   I don't remember the date that it was on.
24  If you know, you can tell me.
25  Q   It was August 12th, last Wednesday.

Page 29

1   A   I believe because of the severity of my
2   headaches and my condition, I saw my
3   neuro-ophthalmologist because they were concerned.
4   Q   Who was that?
5   A   Who was what?
6   Q   Who's the neuro-ophthalmologist that you
7   saw?
8   A   Dr. Eugene May.
9   Q   And is Dr. Eugene May in the Seattle area?
10  A   Yes, he is, yes.
11  Q   And did he provide a report to give to the
12  judge that said that you were too ill to travel?
13  A   Well, what do you mean "ill"?  My vision
14  was very bad.
15  Q   Did he say -- well, your lawyer
16  represented to the judge in Nevada that you were
17  still in Washington and too ill to travel.
18      MR. KLAYMAN:  Objection.  Move to strike.
19  You're not testifying, Ms. Handman.  This is
20  inappropriate.  If you want to show him
21  something, fine.  It's irrelevant.
22      Objection, move to strike.  But for you to
23  tell him what his lawyer said --
24      MS. HANDMAN:  I will read from the
25  transcript, which was attached to our papers

8 (Pages 26 - 29)

**EXHIBIT H**

**From:**         <u>Ratner, Micah</u>
**To:**             <u>Galloway, Angela</u>
**Subject:**    FW: Conference Call.
**Date:**        Monday, December 07, 2015 12:41:03 PM

---

**From:** Ratner, Micah
**Sent:** Friday, September 18, 2015 6:04 PM
**To:** 'Larry Klayman'
**Cc:** Brian.Toth@hklaw.com; <Sandy.Bohrer@hklaw.com>; Handman, Laura; Dina James; Naveed Mahboohian; Jonathon Moseley
**Subject:** RE: Conference Call.

Mr. Klayman,

We are available for a call between 11 and 2 EDT on Monday, September 21 to discuss mutually acceptable dates for the rescheduled 30(b)(6) depositions of the corporate representatives. Counsel, and our clients, are available on October 7 and 8, 8 and 9, or 14 and 15 for the 30(b)(6) depositions. We would appreciate it if you could notice the 30(b)(6) depositions to occur in New York City. We do not understand your reference to "your producing the requested documents in advance of the depositions of the designated reps." We have produced all documents Plaintiff has requested.

As you know from our prior e-mail, we expect you to cover expenses incurred as a result of your last-minute cancellation of the 30(b)(6) depositions, which were scheduled for September 18, 2015. This scheduling was not as a "courtesy" to us, but, rather, because you had unilaterally scheduled those depositions for September 15, 2015, on Rosh Hashanah, when counsel and in-house counsel were unavailable. We agreed to September 18 to accommodate you because, at the time, the discovery cut-off was September 16 and by the time the deadline was extended, arrangements for the 18th had already been made and you said you wanted to forward. As a result of your cancellation on September 16, over our objection, of the depositions scheduled for the 18th, our client incurred, on the 16th, travel expenses to New York to prepare the witness. We will not ask you to pay the train and airfare, even though, but for the scheduled deposition, those costs would not have been incurred. We will ask, however, for the non-refundable plane cancellation fee of $200 for Laura's plane travel to Boston on September 17 and the non-refundable Boston hotel cancellation fee of $299. Please send a check for $499 made out to Davis Wright Tremaine LLP.

Please provide us dates in October at our Monday call for the deposition of Istvan Burgyan. You listed his address on your witness list as: c/o 2020 Pennsylvania Ave., N.W., #800, Washington, DC 20006. We assume you will accept service on his behalf. We will notice the deposition for our offices in Seattle.

Please advise us on Monday if you have provided FBI Associate Division Counsel Edward Williams the information requested in Mr. Baker's September 8, 2015 letter in order to comply with Paragraph 6 of the August 22 Order:

(1)  The number or designation of the drive on which the software is present;
(2)  The file name of the software;
(3)  The creation date of the software;
(4)  Any other identifier(s) for the software.

In addition, the August 22 Order at paragraph 5 required all documents responsive to Defendants' Document Request for Production 7, including "documents related to disclosure and production of the subject software to the FBI." These documents were due August 31, 2015. Among the documents that have not been produced are the letters of July 28 and August 12, 2015, referenced in Mr. Baker's September 8 letter.

Since Judge Goodman denied the stay, the August 22 Order, ¶¶ 5 and 6 are still in effect and require immediate compliance. We will seek relief from Judge Goodman if you do not comply by 6 p.m. EDT on September 24, 2015.

There are a number of additional outstanding matters we wish to raise.  You have not provided us with the Florida phone number Mr. Montgomery testified he obtained in March, 2015. Please provide by 6 p.m. EDT on September 24, 2015.

Mr. Montgomery also referenced both in response to discovery and at deposition a video demonstrating his software and indicated he would provide it. Please provide the video by 6 p.m. EDT on September 24, 2015.

On September 4, per the August 22 Order, Mr. Montgomery furnished medical records from April 2015 forward, but these did not include any reports of recent CAT Scans or MRIs of Mr. Montgomery's brain, if such scans or MRIs were performed. Please provide these records by 6 p.m. on September 24, 2015.

Finally, we assume you will be identifying on Monday, September 21, 2015, those pages of Mr. Montgomery's deposition that you wish to maintain confidential under the Protective Order. As you know, Brian furnished a copy of the deposition at your request as a courtesy on September 10, 2015 and you have 10 days from receipt to make your designations.

The same call-in number will apply to the Monday, September 21, call.  Please let us know what time (between 11 and 2 EDT) for the call.

Have a good weekend.


Thank you,
Micah



**From:** Larry Klayman [mailto:leklayman@gmail.com]
**Sent:** Thursday, September 17, 2015 7:23 PM
**To:** Ratner, Micah; Brian.Toth@hklaw.com; <Sandy.Bohrer@hklaw.com>; Handman, Laura; Dina

James; Naveed Mahboohian; Jonathon Moseley
**Subject:** Conference Call.

What time are you free tomorrow or Monday to discuss mutually convenient dates for the renoticed depositions of the 30 (b)(6) designated corporate reps.

As I wrote yesterday, we need two days of testimony for these reps since the Magistrate Judge quashed our notices of deposition for the corporate executives. As a result, we will need to attempt to elicit all required discovery from the designated reps and that is why we need more time. If we get responsive answers and no obstructionist or speaking objections, we can and will move along with the testimony as quickly as possible and may not need the full 14 hours of testimony (7 hours for each witness under Local Rules). But we clearly need more time under the present circumstances than the few hours for each designated corporate rep previously anticipated before the Magistrate Judge issued his ruling, as we had planned to get complementary testimony for the corporate executives.

We should also discuss your producing the requested documents in advance of the depositions of the designated corporate reps, as this will speed along their testimony  and reduce deposition time. This will benefit all concerned.

As I also mentioned we accommodated you and your clients when we reset the dates of the original notices of deposition of the designated corporate reps, so we thank you in advance for your reciprocal courtesy in this regard.

Sincerely,

Larry Klayman

**EXHIBIT I**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

**DENNIS L. MONTGOMERY**

Plaintiff/Petitioner

vs.

**JAMES RISEN; ET AL.**

Defendant/Respondent

| | |
|---|---|
| CASE NO: | **15-CV-20782** |
| FILING DATE: | |
| DIVISION: | |
| HEARING DATE: | **11/04/2015** |

RETURN OF NON-SERVICE

Received by **Eric Traina**, on the **9th day of October, 2015 at 12:45 PM** to be served upon **ISTVAN ANDRAS BURGYAN** at **4425 ISSAQUAH PINE LAKE RD APT A31, SAMMAMISH, King County, WA 98075**.

On the **9th day of October, 2015 at 8:00 PM**, I, **Eric Traina**, **NON-SERVED** the within named defendant.

**NON-SERVICE** after due search, careful inquiry and diligent attempts at **4425 ISSAQUAH PINE LAKE RD APT A31, SAMMAMISH, King County, WA 98075**, I have been unable to effect process upon the person/entity being served due to the following reason(s):

**10/9/2015 8:00 PM: Per JANE DOE, WHO REFUSED TO GIVE NAME, RESIDENT, a blonde-haired white female contact approx. 35-45 years of age, 5'6"-5'8" tall and weighing 140-160 lbs; subject unknown. NEIGHBOR CHECK WHITE MALE 40S SERVEE UNKNOWN. MANAGEMENT CANNOT PROVIDE INFO RE : RESIDENCY**

**Documents Served:** SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION, with the date and hour of service endorsed thereon by me.

I am a citizen of the United States, over the age of eighteen, not a party to nor interested in the above entitled action, and have the proper authority in the jurisdiction in which this service was made, pursuant to Chapter 48 of Florida Statutes. Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true and accurate.

Notary not required pursuant to F.S. 92.525(2).

| | | |
|---|---|---|
| NAME: _____ | 307327 | October 12, 2015 |
| Eric Traina | Server ID # | Date |



**REF: 96293-9 (for Marni Shapiro in the DC office) A**



**EXHIBIT J**

**Slaughter, Devra**

| | |
|---|---|
| **From:** | Ratner, Micah |
| **Sent:** | Wednesday, October 14, 2015 6:26 AM |
| **To:** | Larry Klayman |
| **Cc:** | Handman, Laura; Sandy.Bohrer@hklaw.com; Brian.Toth@hklaw.com |
| **Subject:** | Istvan Burgyan |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Mr. Klayman,

In your August 12, 2015 witness list, you stated that Istvan Burgyan should be contacted care of your 2020 Pennsylvania Ave NW, Washington DC office address. Thus, we ask you to accept service of a subpoena to Mr. Burgyan at that address.

Otherwise, please send Mr. Burgyan's current address to us. Your client knows this address. Mr. Burgyan is your client's son-in-law and your client testified he stays with Mr. Burgyan in Washington State. Yet your client refused to provide the address at his deposition on grounds of relevance, which is not a basis to refuse to answer a deposition question.

If you do not accept service or provide us Mr. Burgyan's address by October 15 at 4pm EDT, we may bring this issue to Judge Goodman's attention at the hearing on Friday.

Regards,
Micah

1

**EXHIBIT K**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

**DENNIS L. MONTGOMERY**

vs.

**JAMES RISEN; ET AL**

Plaintiff/Petitioner

Defendant/Respondent

CASE NO:     **15-CV-20782**
FILING DATE:
DIVISION:
HEARING DATE: **11/06/2015  9:00 AM**

RETURN OF NON-SERVICE

Received by **Eric Traina**, on the **22nd day of October, 2015 at 5:42 PM**, by **Angela Drew**, on the
_____10/22/15_____ to be served upon **ISTVAN ANDRAS BURGYAN at 4425 ISSAQUAH PINE LAKE
RD APT A31, SAMMAMISH, King County, WA 98075**.

On the **23rd day of October, 2015 at 9:43 AM**, we, **Eric Traina**, and **Angela Drew**, **NON-SERVED** the within named
defendant.

**NON-SERVICE** after due search, careful inquiry and diligent attempts at **4425 ISSAQUAH PINE LAKE RD APT A31,
SAMMAMISH, King County, WA 98075**, we have been unable to effect process upon the person/entity being served due
to the following reason(s):

**10/22/2015 6:47 PM - Eric Traina: No answer at door. ONE LIGHT**
**10/22/2015 7:17 PM - Eric Traina: No answer at door. NO CHANGES**
**10/23/2015 9:43 AM - Angela Drew: Per phone call to 425-998-7992 by speaking with UNKNOWN, a male contact;
address invalid. Person on the phone said, the address for Pacific Coast Innovations at 227 Bellevue Way, NE
#241 Bellevue, WA 98004 was no longer valid. They only have a Post Office box now.**

**Documents Served:** SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION; ATTACHMENT; WITNESS
CHECK, with the date and hour of service endorsed thereon by us.

We are citizens of the United States, over the age of eighteen, not parties to nor interested in the above entitled action,
and have the proper authority in the jurisdiction in which this service was made, pursuant to Chapter 48 of Florida
Statutes. Under penalties of perjury, we declare that we have read the foregoing document and that the facts stated in it
are true and accurate.

Notary not required pursuant to F.S. 92.525(2).

NAME: _____                307327

Eric Traina                                              Server ID #                      Date


REF: **96293-9**

Page 1 of 2
Tracking #: **0009111006**

Case No:                    **15-CV-20782**
Plaintiff/Petitioner:       **DENNIS L. MONTGOMERY**
Defendant/Respondent:       **JAMES RISEN; ET AL**

---

NAME: _(signature)_       1518803       10/27/15

Angela Drew       Server ID #       Date

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

**DENNIS L. MONTGOMERY**

                         Plaintiff/Petitioner

vs.
**JAMES RISEN; ET AL**

                  Defendant/Respondent

CASE NO:     **15-CV-20782**
FILING DATE:
DIVISION:
HEARING DATE: **11/08/2015  9:00 AM**

<u>RETURN OF NON-SERVICE</u>

Received by **Angela Drew**, on the 27th day of October, 2015 at 2:01 PM to be served upon **ISTVAN ANDRAS BURGYAN at 4425 ISSAQUAH PINE LAKE RD APT A31, SAMMAMISH, King County, WA 98075.**

On the **23rd day of October, 2015 at 9:43 AM, I, Angela Drew, NON-SERVED** the within named defendant.

**NON-SERVICE** after due search, careful inquiry and diligent attempts at 227 BELLEVUE WAY NE #241, BELLEVUE, King County, WA 98004, I have been unable to effect process upon the person/entity being served due to the following reason(s):

**10/23/2015 9:43 AM: Per phone call to 425-998-7992 by speaking with UNKNOWN, a contact.  Per phone call to 425-998-7992 by speaking with UNKNOWN, a male contact; address invalid. Person on the phone said, the address for Pacific Coast Innovations at 227 Bellevue Way, NE #241 Bellevue, WA 98004 was no longer valid. They only have a Post Office box now.**
**10/23/2015 9:43 AM: Per phone call to 425-998-7992 by speaking with UNKNOWN, a male contact. Per phone call to 425-998-7992 by speaking with UNKNOWN, a male contact; address invalid. Person on the phone said, the address for Pacific Coast Innovations at 227 Bellevue Way, NE #241 Bellevue, WA 98004 was no longer valid. They only have a Private Post Office box now.**

<u>Documents Served:</u> **SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION; ATTACHMENT; WITNESS CHECK**, with the date and hour of service endorsed thereon by me.

I am a citizen of the United States, over the age of eighteen, not a party to nor interested in the above entitled action, and have the proper authority in the jurisdiction in which this service was made, pursuant to Chapter 48 of Florida Statutes. Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true and accurate.

Notary not required pursuant to F.S. 92.525(2).

REF: **96293-9**

Page 1 of 2
Tracking #: **0009111015**

Case No:              **15-CV-20782**
Plaintiff/Petitioner:   **DENNIS L. MONTGOMERY**
Defendant/Respondent:  **JAMES RISEN; ET AL**

NAME: _____     1518803          10/27/15
      Angela Drew                          Server ID #         Date

**EXHIBIT L**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

**DENNIS L. MONTGOMERY**

Plaintiff/Petitioner

vs.

**JAMES RISEN; ET AL**

Defendant/Respondent

CASE NO:        **15-CV-20782**
FILING DATE:
DIVISION:
HEARING DATE:  **11/06/2015  9:00 AM**

RETURN OF SERVICE

Received by **Timothy Peterson**, on the **23rd day of October, 2015 at 11:17 AM** to be served upon **ISTVAN ANDRAS BURGYAN** at **4425 ISSAQUAH PINE LAKE RD APT A31, SAMMAMISH, King County, WA 98075**.

On the **23rd day of October, 2015 at 12:09 PM**, I, **Timothy Peterson**, **SERVED** the within named defendant at **4425 ISSAQUAH PINE LAKE RD APT A31, SAMMAMISH, King County, WA 98075** in the manner indicated below:

**INDIVIDUAL SERVICE**, by personally delivering **1** copy(ies) of the below-listed documents to the named Defendant.

**Documents Served:** **SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION; ATTACHMENT; WITNESS CHECK**, with the date and hour of service endorsed thereon by me.

THE DESCRIPTION OF THE PERSON WITH WHOM THE COPY OF THIS PROCESS WAS LEFT IS AS FOLLOWS:
**Who tried to refuse service, with identity confirmed by verbal communication, a white female approx. 35-45 years of age, 5'4"-5'6" tall, weighing 80-120 lbs with dyed hair with an accent.**

I asked the indicated person whether the defendant was presently in the military service of the United States Government or in active duty in the military service of the State of Florida and was told defendant was not.

I am a citizen of the United States, over the age of eighteen, not a party to nor interested in the above entitled action, and have the proper authority in the jurisdiction in which this service was made, pursuant to Chapter 48 of Florida Statutes. Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true and accurate.

Notary not required pursuant to F.S. 92.525(2).

NAME: _____ 9307747 _____

Timothy Peterson                    Server ID #                    Date


REF:  **96293-9**



**EXHIBIT M**

**From:** Ratner, Micah
**To:** Galloway, Angela
**Subject:** FW: Hearing Before Magistrate Judge Goodman
**Date:** Monday, December 07, 2015 12:42:45 PM

**From:** Larry Klayman [mailto:leklayman@gmail.com]
**Sent:** Monday, October 26, 2015 6:09 PM
**To:** Brian.Toth@hklaw.com; <Sandy.Bohrer@hklaw.com>; Handman, Laura; Ratner, Micah; Dina James; Naveed Mahboohian; Jonathon Moseley
**Subject:** Hearing Before Magistrate Judge Goodman

We are moving for sanctions with regard to the deposition of Flynn and the harassment of Dennis Montgomery's family concerning his daughter, son in law and their children.

Magistrate Goodman is available for a 30 minute hearing on Nov 3 at 10:00 am, Nov 4 at 2:30 pm and Nov. 5 at 10:30 pm.

Please chose one and revert today.

We will then notice the hearing.

Thank you,

Larry Klayman

**EXHIBIT N**

# FAX COVER SHEET

| TO | Laura |
|---|---|
| COMPANY | Handman |
| FAX NUMBER | 12124898340 |
| FROM | Dennis Montgomery |
| DATE | 2015-11-02 17:35:06 GMT |
| RE | Istvan Burgyan |

## COVER MESSAGE

Objection to subpoena.

**Office of Istvan Burgyan**

# Fax

| TO | Laura Handman | FROM: | Istvan Burgyan |
|----|----|----|----|
| FAX: | 212.489.8340  202.973.4499 | PAGES: | 1 |
| PHONE: | 212.489.8230  202.973.4224 | DATE: | 10/31/2015 |
| RE: | Subpoena | CC: | |

☐ Urgent      ☐ For Review      ☐ Please Comment      ☐ Please Reply      ☐ Please Recycle

I am objecting to your attempt to subpoena me on the basis of insufficency of service of process and relavancy.

Istvan Burgyan

**EXHIBIT O**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.:  15-cv-20782-JEM

```
DENNIS L. MONTGOMERY,      )
                          )
                          )
            Plaintiff,    )
v.                        )
                          )              November 4, 2015
JAMES RISEN, et al.,      )
                          )
                          )
            Defendants.   )              Pages 1 - 33
_____/
```

DISCOVERY HEARING PROCEEDINGS

BEFORE THE HONORABLE JONATHAN GOODMAN
UNITED STATES, MAGISTRATE JUDGE

APPEARANCES:

On behalf of the Plaintiff:

                          KLAYMAN LAW FIRM
                          2520 Coral Way,
                          Suite 2027,
                          Miami, FL 33145
                          BY:  LARRY E. KLAYMAN, ESQ.

```
1

2    APPEARANCES CONTINUED:

3

4    On behalf of the Defendant:

5                              Davis Wright & Tremaine
                               1919 Pennsylvania Avenue, NW
6                              Suite 800,
                               Washington, DC 20006
7                              BY:  BRIAN W. TOTH, ESQ.

8    (Telephonically:)        BY:  MICA RADNER, ESQ.
                               BY:  LAURA R. HANDMAN, ESQ.
9

10

11   Transcribed By:

12                             Bonnie Joy Lewis, R.P.R.
                               7001 SW 13 Street
13                             Pembroke Pines, FL  33023
                               954-985-8875
14                             caselawrptg@gmail.com

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (Thereupon, the following proceeding was held:)

 2                    THE COURTROOM DEPUTY:  All rise.  Calling case

 3       15-20782; Montgomery versus Risen.  The Honorable Jonathan

 4       Goodman presiding.

 5                    THE COURT:  Good afternoon, folks.  It's Jonathan

 6       Goodman.  Appearances please, starting first with the

 7       Plaintiff.

 8                    MR. KLAYMAN:  Good afternoon, Your Honor.  Larry

 9       Klayman for the Plaintiff Montgomery.

10                    THE COURT:  And for the Defense.

11                    MR. RADNER:  Good afternoon.

12                    Mica Radner and Laura Handman on the phone for

13       Defendants and I believe Brian Toth is in the courtroom with

14       you.

15                    MR. TOTH:  Good afternoon, Your Honor.  Brian Toth

16       for Defendants.

17                    THE COURT:  That's true.

18                    So let me just note for the record that it is now

19       2:30.  I say this because we have half an hour for this

20       telephone hearing.  Anything further, any discovery disputes

21       longer than half an hour, require an in-person appearance.

22       That doesn't mean that people cannot participate by phone as

23       well, but it means for an in-person appearance I need at least

24       one lawyer per side here in person.

25                    So over the past 24 hours we have received many
```

1    submissions.  And let's first start talking about the agenda

2    for the hearing that we're going to be having today.  The

3    agenda for the hearing that we're having today will be the two

4    topics listed in the Plaintiff's October 27th notice ECF 165.

5              Specifically, the alleged obstruction of the

6    Plaintiff's ability to serve a subpoena on and to take the

7    deposition of Michael Flynn;

8              And number two, the Defendant's alleged harassment

9    of Plaintiff, his wife, his daughter, and his son-in-law.

10             So phrased differently, this hearing will not --

11   N-O-T -- not address the new and different topics listed in the

12   Plaintiff's modified notice ECF 171, which was served yesterday

13   afternoon.

14             So before we get into the actual two topics for

15   the hearing, Mr. Klayman, I feel compelled to comment about

16   your continued failure to comply with my discovery procedures.

17             Here's the thing.  I do my best to try to

18   accommodate all parties in all of my cases and to timely issue

19   rulings, especially on discovery disputes, but as I am sure you

20   can appreciate this is not my only case.  Every party thinks

21   that their case is important and this case is no exception, but

22   your case does not take priority over any other case.

23             And therefore, this courtroom, Mr. Klayman, is not

24   your personal forum and your personal fiefdom and you cannot

25   unilaterally try to highjack my calendar and try to control my

1  calendar.  You are like all other litigants and all other

2  attorneys here and you need to follow the procedures and the

3  rules, which means that you and your assistant cannot simply

4  notice a hearing and, then, unilaterally change the topics the

5  day before.  That is not fair to the opposing party and it is

6  not fair to me.

7          It also, means, Mr. Klayman that you and your

8  assistant need to coordinate hearings with my law clerk on the

9  telephone.  And therefore, it means that you and your assistant

10  cannot simply send an e-mail to us saying we are having a

11  hearing on such and such a date and just announce, if you are

12  waving a magic wand, that a particular hearing will take place

13  on a particular date at a particular time.

14          We have to follow rules and procedures because if

15  I allowed hearings to be scheduled according to the protocol

16  that you and your assistant seem to believe should control, we

17  would have complete chaos here.

18          I would have lawyers and their assistants, and

19  paralegals, and secretaries, and associates just willy nilly

20  sending e-mails purporting to schedule hearings whether or not

21  we have the time to accommodate them or not.

22          So we are not -- N-O-T -- not going to be

23  substantively considering the topic that you listed in your

24  modified notice, namely your intent to take three depositions

25  in New York and the objections raised by both the Defendants

1    and the third party witnesses.  And even though we are not

2    going to be substantively considering those topics I do have

3    some observations to make.

4                    Number one, you need to serve opposing counsel

5    with subpoenas and the document schedule and not just a notice

6    of taking deposition;

7                    Number two, if you do, in fact, have disputes over

8    these depositions pursuant to subpoenas that were served on

9    parties in New York, then, those disputes and those objections

10   are properly heard in the Federal District Court in New York

11   and not here;

12                   Number three, you cannot have a discovery hearing

13   concerning these three subpoenas, whether it is here in the

14   Southern District of New York, or any other court that you can

15   consider or persuade to entertain your objections, unless you

16   have the third parties themselves at the hearing.

17                   And therefore, you need to give those third

18   parties timely notice that their fate will be discussed at a

19   hearing.  That's fundamental due process, Mr. Klayman.  These

20   subpoenas concern third parties.  And apparently, you were

21   certainly willing to go forward this afternoon with a hearing

22   to enforce these three subpoenas without these three deponents

23   or scheduled deponents even participating.

24                   So the other comment I have is, until about an

25   hour ago, I received no backup materials for the first two

1   topics in the first notice, namely, the alleged harassment and

2   the so-called difficulty in taking the deposition of Mr. Flynn.

3            About an hour ago I received what, perhaps, would

4   be called a courtesy copy of materials, but I call that a

5   discourteous copy.  The hearing was scheduled for many, many

6   days.  We received nothing on that hearing and, then, an hour

7   ago I received some papers.

8            That is not the way to prepare the Court for a

9   hearing and I am not going to be accepting those kind of

10  submissions in the future.

11           Your modified notice, by the way, was not even

12  sent until yesterday afternoon.  So the backup materials for

13  the first topic listed in the notice should have been received

14  already.

15           And I should also note, Mr. Klayman, that under

16  your theory of noticing and re-noticing hearings a party could

17  issue a notice 15 minutes before a hearing was to take place

18  listing a completely different set of topics.  And that is not

19  the way I run my discovery calendar and I suspect it is not the

20  way that most judges conduct their calendars.

21           So before we get to the two topics that were

22  listed in your original notice, I will give you an opportunity

23  to explain to me, Mr. Klayman, or try to persuade me why I

24  should not award fees against you concerning all of this SNAFU

25  and chaos concerning the hearing, the re-notice, the last

1     minute notice, and not contacting these third parties.  Why

2     should I not award fees against you?

3                Not as a sanction, necessarily.  Not as a

4     disciplinary finding, but simply as a natural consequence of

5     the fact that you have created all of these problems and you

6     have not been the prevailing party on this new notice because

7     we are simply not going to consider it for all the reasons that

8     I just listed.

9                So why should I not award fees against you under

10    Rule 37?

11               MR. KLAYMAN:  The reason is, Your Honor, and we

12    didn't intend to in any way not accommodate you.

13               And in fact, the issues that are in front of us

14    today by Your Honor's ruling I didn't intend to take up a lot

15    of your time.  Not even though those 30 minutes.

16               I just simply wanted to he get an instruction from

17    you to the parties that we should move expeditiously and

18    smoothly during this discovery process with regard to Mr. Flynn

19    and with regard to the issue of the alleged harassment of the

20    family of Mr. Montgomery.  These are serious matters.

21               I was intending to raise them, but in the interim

22    and related to this, was an issue involving what I thought was

23    going to be another matter that Your Honor could instruct the

24    parties on.  And I was not coming in front of you to get a

25    ruling with regard to New York.  I am well aware that if there

1   is an objection and these parties don't want to show up that I

2   have to go to New York to do that.  Just like we have to go to

3   the Southern District of California with regard to Mr. Flynn,

4   but this deals with conduct between the parties and it is

5   interrelated.

6            And what I had hoped to get with regard to this

7   issue of the so-called reporters privilege, which really

8   doesn't exist here, is an instruction from you that we are

9   proceeding pursuant to Florida law.  We sent those two cases to

10  you and the other side that that would be what would govern if

11  we have to enforce the subpoenas in New York.  I was trying to

12  move this along.

13           And let me explain to you what has come up here,

14  without getting into too much of the substance.  Not only did

15  we get a statement that the so-called reporters privilege and

16  you know, what we learned recently with regard to the

17  depositions of Miss Nichols, the 30(b)6 reps, was that Simon

18  and Schuster refused to publish Mr. Risen's book.  He had been

19  his longstanding publisher.

20           And we believe it is related to Simon and Schuster

21  not wanting to libel Mr. Montgomery and/or being subjected to

22  liability for the use of alleged classified information.  And

23  we sent those cases because, clearly, this deals with the issue

24  of actual malice, which they said we have to prove and bad

25  faith, which deals with punitive damages.

1              So I just wanted to get an instruction from you

2    that we are going under Florida law here so, then, I could go

3    to New York and enforce these subpoenas.  And that's why I

4    didn't bring the other ones in at this point in time.

5              I didn't intend to use a lot of time of Your Honor

6    and I am sorry if I give you this misimpression, but this issue

7    just came up in the last 48 hours.  And tried to move the case

8    along because we do have a discovery cutoff of November 19th

9    and I wanted to be able to discuss that with you.

10             We had tried to resolve this with Defense counsel

11   with a meet and confer.  They took the position that we

12   couldn't even take videoconference depositions.  And of course,

13   there is a body of law and I was prepared to cite all of that

14   that to save money and we are not well off -- my client -- that

15   this is reasonable.  We sent letters to the deponent's counsel

16   and deponents saying we'll get the documents in advance so we

17   can mark the exhibits so we can move this along.

18             I just wanted Your Honor to be able to step into

19   it to avoid having to come back to you on several different

20   occasions.  We don't like to use your time.  We know that it is

21   valuable and I thought that we could discuss these various

22   things.

23             I understand your feelings, but in all due respect

24   to you, and I do respect you a great deal, I don't think that

25   attorney's fees are warranted here because we were trying to

1   make things more easier and not more difficult.  We are a very

2   small party.  Mr. Montgomery has recently been in the hospital.

3   We provided supplemental discovery on his failing health.  He

4   may not even survive in time to get to a trial in March.  He is

5   probably going to have another brain (inaudible) and time is

6   short and we have a November 19th deadline.

7               So it wasn't to violate your standing orders, Your

8   Honor.  It was, basically, because these are part and parcel to

9   a pattern of upping the expense, and cost, and time to the

10  Plaintiff which, of course, is a common defense strategy when

11  defendants have a lot of resources and individual plaintiffs

12  don't.  And I just wanted to get an instruction with regard to

13  Mr. Flynn and with regard to, you know, and I will explain to

14  you what happened with regard to the children, if I may.

15              THE COURT:  Well, not quite yet, Mr. Klayman.

16              I will give you that opportunity in just a minute

17  because that is the actual topic that we were covering in the

18  hearing, but to get back to what you were saying before, I

19  don't understand how you thought you could simply notice a

20  hearing today having to do with these depositions in New York

21  where you wanted me to simply issue an instruction to the

22  parties.

23              When, in fact, the parties in New York, whose

24  depositions you wanted to take and whose subpoenas are in

25  dispute, as I understand it, their lawyer apparently affiliated

1    with CBS somebody who wrote a very, very lengthy single spaced

2    document, a lawyer -- let me see if I can track down this

3    person's name -- Andrew Nieh; N-I-E-H -- wrote you a very

4    lengthy letter pointing out all the reasons he objected to the

5    subpoenas.  Including, numbered Paragraph 2 objections under

6    the First Amendment Second Circuit precedent, Eleventh Circuit

7    precedent, the New York Constitution, the Florida Constitution,

8    common law, as well as statutory privileges, including, but not

9    limited to the New York Shield Law.

10           So given the fact that Mr. Nieh is not present

11   here and apparently was not noticed and the three persons who

12   he represented are not here, how did you want me to issue an

13   instruction when the parties who would be directly effected,

14   Mr. Nieh's clients are not even going to be participating this

15   afternoon?  How did you think that was going to happen?

16           MR. KLAYMAN:  Well, because I thought, Your Honor,

17   you could make an instruction that Florida law would apply

18   here.  We are in Florida.  They have been trying to argue

19   otherwise throughout this case and we are still in Florida and

20   going to trial in a few months and discovery is over on

21   November 19th.

22           So I didn't want to take your time up by noticing

23   up another hearing.  I was going to say -- I was trying to say

24   use this 30 minutes to discuss this important issue.  And I

25   wanted to raise the issues of Mr. Flynn and the children

1   briefly.   I never intended to use 30 minutes of that, but I am

2   very concerned because what happened with regard to the

3   children is a process server shows up with a picture of the

4   family with the children in it.

5                   It literally terrorized -- and I don't represent

6   them -- the daughter of Mr. Montgomery, and his wife, and his

7   son-in-law, and himself, and he was in the hospital at the

8   time.   And I was dealing with people that I thought, frankly,

9   was going to go over the edge, particularly, Mr. Montgomery who

10  was in the hospital for exacerbated injuries concerning his

11  brain aneurism.   I just don't think that is the right thing to

12  do.

13                  And I have gone through this myself in prior

14  experiences when I was litigating against the Clintons back in

15  the '90s.   I mean, someone asked about my infant daughter

16  Isabelle at a deposition.   The President's lawyer, an

17  associate, and she had only been born for a few days and they

18  knew her name.

19                  And some of the women who I represented had the

20  same thing happen to them, you know, during the whole

21  impeachment proceeding and such.   And it really terrorized them

22  and it is not the right thing to do.   I mean, they had a

23  private investigator by their own admission, a former FBI

24  agent.   They clearly know what the son-in-law of Mr. Montgomery

25  looks like.   And I don't represent him, but they didn't have to

1   have a picture of the kids.

2            THE COURT:  Sir, we are getting far field where

3   you are not really answering my direct questions.  You are

4   getting into the substance of the topics that are listed on the

5   agenda for today.

6            MR. KLAYMAN:  Let me answer that.

7            THE COURT:  So I understand that you thought you

8   would be able to just ask me for a simple instruction that a

9   particular state law applied, or a particular shield law either

10   did or did not apply, but those are, in fact, the very

11   arguments that Mr. Nieh was raising on behalf of his three

12   clients, the ones whose depositions you took.

13            And they were certainly not invited to participate

14   in this hearing and I think it would be a significant due

15   process issue if I were to just willy nilly, at your request,

16   start issuing instructions about which state law applied and

17   what shield law applied when the persons involved are not even

18   participating.  So you have not convinced me, Mr. Klayman, that

19   fees are not warranted.  I think that they are.

20            So my question now, is for the Defense.  I took a

21   look at this five-page objection to Plaintiffs's modified

22   notice of hearing.  Who prepared that?  Was it Mr. Toth, Mr.

23   Moore, Miss Handman, or someone else?

24            MR. RADNER:  This is Mica Radner for the

25   Defendants.

1          Mr. Toth primarily prepared that and, then, myself
2  and Laura Handman in D.C. added some substance.
3          THE COURT:  Mr. Toth, how much time did you spend
4  putting this together?
5          MR. TOTH:  Three hours.
6          THE COURT:  And what is your hourly billing rate?
7          MR. TOTH:  $425 an hour.
8          THE COURT:  Is that the hourly rate that you are
9  using in this case?
10          MR. TOTH:  I don't believe so.
11          THE COURT:  Well, what is the rate that you are
12  using in this case?
13          MR. TOTH:  I don't know.
14          THE COURT:  Well, is it anything less than $300?
15          MR. TOTH:  I think $300 is about correct.  Miss
16  Handman might know the answer to that.
17          THE COURT:  And Miss Handman, how much time did
18  you or your colleagues spend reviewing and/or modifying, or
19  editing this five-page submission?
20          MS. HANDMAN:  I believe we, both Mica and I, each
21  spent about an hour and I don't know what our rates are in this
22  matter.  It is below our hourly rate.  That I know for sure.
23          THE COURT:  Well, how many years have you been
24  practicing?
25          MS. HANDMAN:  I've been practicing since 1977.  So

1    I am embarrassed to admit.

2              THE COURT:  And what about Mr. Radner?

3              MR. RADNER:  I've been practicing for six years,

4    Your Honor.

5              THE COURT:  Okay.  So Mr. Klayman, I am going to

6    enter a fees award of $1500, which I think, by the way, is

7    quite reasonable under the circumstances because I think if

8    calculate it by the hourly fees, it would be significantly more

9    than that.

10             It will need to be paid within ten days.  This is

11   to be paid by you and not Mr. Montgomery.  You will need to

12   also submit an affidavit of compliance confirming payment that

13   will need to be done within two days of the payment.  That

14   affidavit of compliance need not be filed on CM/ECF, but

15   instead, should be filed -- I should say not filed, but

16   submitted to my E-file in-box.

17             And I will, as usual, include the standard

18   footnote indicating that this is simply a cost shifting

19   mechanism and not a disciplinary sanction or finding.  And it

20   would not require you to say that you have been sanctioned or

21   disciplined by a court.

22             So now let's get to the actual substantive matters

23   that are, in fact, on the agenda for today.

24             Which one would you like to address first?

25             MR. KLAYMAN:  I would like to address the issue of

1    Mr. Flynn.  Excuse me, Your Honor.

2                And again, I was looking primarily for an

3    instruction from you so we could move things along here because

4    we have served Mr. Flynn, you can see that.  We have the

5    process server's return of service and the magistrate in

6    San Diego got confused.  So we submitted a motion for

7    reconsideration or an objection with a copy of that notice and

8    original notice of service.

9                Originally the process server, after he made

10   service, got sick or got in a car accident and we couldn't find

11   him.  So my colleague, Mr. Marubian (phonetic) did an affidavit

12   because he had talked with the process server that there had

13   been service.

14               And we followed that up and, apparently, the

15   magistrate didn't see it, but the problem is this.  You see

16   this letter or this e-mail of September 3rd, 2015, from Michael

17   Flynn and, of course, you might remember what this is all

18   about.

19               THE COURT:  Yes, I do.

20               MR. KLAYMAN:  It's dealing with the documents that

21   he provided contrary to attorney/client privilege and work

22   product apparently 20,000 pages to Mr. Risen.  We have been

23   trying to get them and we have been unsuccessful with him or

24   even Mr. Lichtblau who noted that in an e-mail.  We have

25   problems with that too, enforcing that.

1          We're all over the place here, but that e-mail is

2    important here because calling themselves by their first names

3    as though they are friends at this point, Laura and Mike Flynn,

4    conveniently tells Miss Handman that she is not available until

5    December.  Now, this e-mail goes back to September 3rd, 2015.

6          Well, conveniently that is after the discovery

7    cutoff in this case.  So it would appear that there is a

8    likelihood of collusion here to make him unavailable.  And I

9    just wanted to get an instruction that the parties should

10   cooperate.

11         I've been trying to get ahold of Mr. Flynn.  He

12   won't take my phone call.  He won't respond to me and so we

13   couldn't work it out.  And so, to try to get things moving, I

14   thought that we should raise this with you.  I did not intend

15   to take the whole half hour.

16         Now, the second issue is --

17         THE COURT:  Well, wait, wait just a minute.  Let's

18   not get to the second issue first.

19         Let's deal with the first issue because we need to

20   give the other side the opportunity to respond, but before I

21   hear from the Defendants on the response, my question to you,

22   Mr. Klayman, is what exactly would you like me to do about this

23   first issue?

24         In other words, I heard what you said.  I

25   understand your concern.  I understand that you and your client

1    have particular gripes and problems with Mr. Flynn if he,

2    indeed, did turn over 20,000 pages of privileged information

3    without obtaining permission from the client.

4            I understand that you perceive that you are having

5    difficulties obtaining service on him.  And I also, now,

6    understand that you suspect that, perhaps, the Defense counsel

7    may be colluding with Mr. Flynn in order to postpone his

8    deposition.  So I hear all of those things.

9            And so, I am going to ask you a question that I

10   ask a lot of attorneys that I ask at a lot of hearings, which

11   is, all right, I've processed the information.  What ruling

12   would you like me to make?

13           If you are going to say to me, well, Judge, I

14   would like you to compel Mr. Flynn to appear for a deposition

15   in the month of December, I don't have jurisdiction to do that.

16   The subpoena was served in California.  The Motion to Compel

17   was already filed in California Federal Court and you already

18   have a ruling from a Federal Magistrate Judge in California and

19   a motion for reconsideration is pending.

20           If you suspect there is collusion, then, you can

21   file a motion, I suspect, with the Magistrate Judge in

22   California.  And add that argument and ask that the deposition

23   take place in the next two to three weeks assuming that service

24   was proper.  But other than sort of listening to you and

25   saying, well, if all those things are true, you raise some

```
 1    interesting issues.  I don't know what particular ruling you
 2    think I can make here.  So is there some --
 3              MR. KLAYMAN:  Yes, there is.
 4              THE COURT:  What?  Tell me what ruling you think I
 5    could make here.
 6              MR. KLAYMAN:  Just to instruct Defense counsel not
 7    to do this kind of thing because the costs are running up and
 8    Mr. Montgomery cannot afford it, number one.
 9              And number two, to make a ruling that since he is
10    not available until December, taking him on his face, that we
11    will be able to depose him once we get a ruling from San Diego.
12    He clearly was served.  We have that affidavit of service.
13              So all of this was specious in terms of him not
14    being subject to deposition.  He is a very important witness
15    here.  20,000 documents went over to Mr. Risen.  So I would
16    like to get a ruling from you that we can depose him in
17    December taking him on his face.
18              THE COURT:  Let me hear from the Defense.  Who is
19    going to be speaking for the Defendants on this issue?
20              MR. RADNER:  This is Michael Radner for the
21    Defendants on the phone.
22              Let me just say that Mr. Klayman has provided
23    absolutely no evidence that there is any collusion.  He says he
24    suspects it but this e-mail doesn't provide any evidence of
25    collusion and there was no collusion at all.
```

1          Second of all, just quickly, we believe this issue

2     is moot.  There is an order from the Southern District to have

3     California denying the Motion to Compel and although Mr.

4     Klayman has filed a motion for reconsideration and objection

5     the order denying the Motion to Compel is the order on the

6     books.  So right now, the ruling is that Mr. Flynn wasn't

7     served and it is in the I object correct jurisdiction.  So this

8     is a moot issue about the deposition.

9          Getting back to the e-mail, though, Mr. Klayman

10    mentions that Mr. Flynn used Laura's first name around signs it

11    with his first name.  You will note that Miss Handman addressed

12    her e-mail:  Dear Mr. Flynn.

13         And besides that, this is an e-mail in which Miss

14    Handman has told this third party that the Defendants will not

15    be able to attend a deposition because it is on Rosh Hashanah.

16    And the Defendants have offered updates to the Plaintiff's

17    counsel and Miss Handman is simply getting in touch with this

18    third party in order to see if Mr. Flynn is available for

19    earlier dates.

20         In response, without prompting, Mr. Flynn offers

21    up this information that he was not served with subpoena and he

22    has no notice and he is traveling during certain dates from the

23    4th of September to the 12th and out of the country from

24    September 12th through the 30th and not available in December.

25    To suggest that the Defendants had anything to do with Mr.

1   Flynn's schedule is unsupported and completely wrong.

2            So I will ask this Court to deny the motion and I

3   will note that as the Court mentioned, there really is no

4   relief that the Court can provide that will mean anything.  So

5   again, I ask the Court to deny Mr. Klayman's motion.

6            MR. KLAYMAN:  May I respond, Your Honor?

7            THE COURT:  I'm sorry what?

8            MR. KLAYMAN:  May I respond briefly to that?

9            THE COURT:  Yes, but I would focus my efforts on

10  the word briefly.

11           MR. KLAYMAN:  Yes.  Well, first of all, the e-mail

12  says, as you know, I am representing the Defendant Jim Risen.

13  So it is clear what was known what the situation was here, but

14  I am also asking you to allow us because we did get service and

15  the subpoena is going to be enforced.

16           Mr. Flynn was within 100 miles within the place

17  that it was noticed, 96 miles to be exact, in Los Angeles

18  County.  La Mirada is 96 miles from that.  It is clearly

19  enforceable and it will be enforced, but we want leave to be

20  able to take his deposition in December in light of what

21  occurred.

22           And I just wanted an instruction that the parties

23  should try to get along because it is a Defense strategy to run

24  it up for the Plaintiff.  That happens nearly all the time.

25  And making our life difficult and that's what I was trying to

1  do for the other thing too, but we would like to grant leave to

2  take Mr. Flynn's deposition in December.

3        And so we tonight have to do this back and forth

4  and he has not contacted me yet, he is calling Laura, Laura and

5  he's Mike.  So I wouldn't understand why he would not contacted

6  me when I have left messages for him.

7        THE COURT:  Mr. Klayman, I appreciate your

8  position, but I am really not in a position to provide relief

9  that you are looking for a number of reasons.

10        Number one, I do not have jurisdiction over this

11  particular dispute.  The magistrate judge in California has

12  already ruled.

13        Number two, when you say to me service has now, in

14  fact, been made, I can't make that ruling and that is an issue

15  that is before the magistrate judge in connection with your

16  motion for reconsideration.  So I cannot give that instruction

17  or make that finding.

18        Number three is, I heard your comment or your

19  suspicion about collusion involving Mr. Flynn and Miss Handman.

20  And quite frankly, the mere fact that he happens to call her

21  Laura, to me, is not evidence of collusion.

22        And the fact that he says I am not available for a

23  deposition in December, that may or may not be true, but it

24  does not look as though Miss Handman has anything to do with

25  that.  And if you are of the opinion that Mr. Flynn is

```
 1    deliberately toying with you and is making misstatements about
 2    his availability and that it is ridiculous for him to postpone
 3    for two months, a deposition, then you can take that up with
 4    the magistrate judge in California who is preceding over the
 5    dispute, but right now there is not a ruling that I can make
 6    for those reasons.  So let's go on to issue number two, please.
 7                  MR. KLAYMAN:  One last thing, if I may.
 8                  You can say we can take his deposition in
 9    December.  Understanding rule that.
10                  THE COURT:  I am not, at this point, going to
11    micromanage the discovery here and who is going to take whose
12    deposition at which date.  I can't say that his deposition can
13    be taken in December, Mr. Klayman, because I do not know enough
14    about the facts.
15                  Assume, for the sake of discussion, that Mr. Flynn
16    is now in Africa on a three-month safari on a trip that he
17    planned for a year.  So if I were to enter a ruling that his
18    deposition will take place in December that is going to be
19    inconsistent with the hypothetical fact situation.
20                  So I do not know enough about the background
21    information to go out on a limb and tell you that the
22    deposition will, in fact, take place in December because of
23    that reason.  And also, by the way, it seems to me in order to
24    assure that a deposition will take place you need to effectuate
25    proper service.  You say that proper service has been made
```

1     right now.  The only order that I have seen in the case to the

2     contrary the magistrate's order denying your motion.  I know

3     you have a motion for reconsidering pending.

4              Maybe you will convince the magistrate judge that

5     your right in which case you will have a finding that there has

6     been proper service.  But right now I haven't even reached that

7     threshold step yet.  So I am not going to make that comment

8     either.  So let's go on to step two.

9              MR. KLAYMAN:  Second point, Your Honor, and I am

10    not seeking sanctions.  Okay.  I was not trying to do that.  I

11    am trying to make this process move along without the potential

12    risk to my client and that gets to number two.

13              They would like to take the deposition of the

14    son-in-law of Mr. Montgomery.  I don't represent Mr.

15    Montgomery.  He was listed on our witness statement, but that

16    was because we listed everybody, including the Defendant's

17    witnesses just out of the an abundance of caution.  We do not

18    intend to call him, unless something arises that requires it.

19    We don't represent him.

20              The Defendants have acknowledged and stated to me

21    that they have a private investigator, a FBI agent, a former

22    FBI agent, in fact, that came up at the early hearing because

23    that was the execution for submitting a false affidavit with

24    regard to voter registration with Mr. Montgomery.

25              THE COURT:  Excuse me for just a minute.

1            Is there some statute, rule of procedure local

2    rule combined or case law which prevent parties from hiring

3    private investigators or prevent parties from hiring retired

4    FBI agents I am not aware.

5            MR. KLAYMAN:  I'm am not, Your Honor.

6            I am just trying to lay a foundation here.  And

7    consequently, because they have obvious surveillance on Mr.

8    Montgomery and his family, the process server, should have been

9    track instructed not to go to the house.

10           THE COURT:  To whose house?

11           MR. KLAYMAN:  To the house of Mr. Montgomery's

12   daughter and show a picture which he didn't need to show with

13   her six-year-old child on it.  And I got all kinds of calls and

14   effortless from Mr. Montgomery, you know, please, Larry, do

15   something about this.  My daughter is having a nervous

16   breakdown and my family is extremely test institute her life

17   his wife also at the point of a nervous breakdown.

18           He was in the hospital with regard to his brain

19   aneurism.  He had slipped and fallen in his bathtub and he may

20   need near operation.  So my goal here was not to be punitive,

21   but to say, hey, don't do these kinds of things in the future

22   because it is very painful.  And my client instructed me to do

23   something about this and I thought the best thing to do was to

24   come to you on that and say, please, prevent that kind of thing

25   from happening.

1          Because I remember myself -- and I said a little

2    bit about this in the beginning -- my kids were threatened

3    during the Clinton years and, you know, it was very unnerving

4    to me.  And at that point, I went to Judge Lamberth with a

5    motion to conceal this thing and please prevent the Clinton

6    lawyers from doing this kind of thing with regard to my newly

7    born daughter.

8          And I represented a number of the women who

9    claimed to be harassed; Paula Jones, Gennifer Flowers, Dala

10   Clown Browning, Kathleen Willey.  Private detectives came up to

11   them with pictures of their kids and they almost had a

12   meltdown, some of them.

13         So I think that is serious.  There is no reason,

14   given the fact that Mr. Montgomery is under surveillance, to do

15   that, to flash a picture of the six-year-old kid with the

16   family in front of the daughter when the father is in the

17   hospital nearly dying.

18         So these are the kind of tactics, whether by

19   design or negligently, need to be avoided in this case because

20   I had a client -- and I am not lying -- and we recently gave

21   him more medical information could die at any moment.

22         So that is the reason, Your Honor.  It is not to

23   take your time or to ask that anybody be sanctioned, but just

24   to be considerate to Mr. Montgomery and his family.

25              THE COURT:  Mr. Radner, are you going to be

 1   responding for the Defendants or someone else?

 2                MR. RADNER:  For the Defendants, Judge.  This is

 3   Mr. Radner.

 4                I think it is really important to understand the

 5   context of this.  There was absolutely no harassment of Mr.

 6   Montgomery's family.  That's not something that we do and that

 7   is not something that we would do.

 8                First of all, Mr. Klayman says and assumes that

 9   there is some sort of surveillance here of Mr. Montgomery's

10   daughter.  And therefore, that we did not have any reason to do

11   the service the way we did.  That is just not true.  There is

12   isn't any surveillance of Mr. Montgomery's daughter or of Mr.

13   Montgomery and that is an assumption that is just not true.

14                As I said, I think the context is important.  As

15   Mr. Klayman mentioned, on August 12, he put Mr. Burgyan, Mr.

16   Montgomery's son-in-law on his witness list.

17                THE COURT:  What is Mr. Burgyan's first name?

18                MR. RADNER:  Istvan Burgyan; I-S-T-V-A-N and the

19   last name is B-U-R-G-Y-A-N.

20                THE COURT:  That's Mr. Montgomery's son-in-law?

21                MR. RADNER:  Yes.

22                THE COURT:  All right.  Please continue.

23                MR. RADNER:  Mr. Klayman put Mr. Burgyan on his

24   witness list and listed Mr. Burgyan's address as care of 2020

25   Pennsylvania Avenue Northwest, Washington, D.C., which is Mr.

1    Klayman's office address of his own law firm.  Mr. Klayman,

2    also, listed Mr. Montgomery's wife, Brenda Montgomery on the

3    witness list.

4              So to avoid the hassles of service and we asked

5    Mr. Klayman to accept service of the subpoena on September

6    18th.  And Mr. Klayman, a couple days later, said he did not

7    represent Mr. Burgyan and he refused to accept service.

8              So on October 9th, we tried to serve Mr. Burgyan

9    at an address we found for him in Washington State.  That day a

10   blonde haired woman opened up the door and told the process

11   server that it was the wrong address.

12             Then, so on October 14th, we e-mailed Mr. Klayman

13   and, again, asked him to accept service.  And again noted that

14   he put his own address as a contact address for Mr. Burgyan.

15   Mr. Klayman, again, refused.  And so we had to do more

16   searching to figure out where Mr. Burgyan was.

17             On October 22nd, we found a picture of Mr. Burgyan

18   and his family -- and I want to emphasize this -- a public

19   website.  A public website with their names on it .  With their

20   names on it.

21             So this is a completely public picture and that's

22   what we could find.  We sent the picture to the process server

23   company, to the original process server, who said that he

24   thought the blonde woman in the picture we provided was

25   Kathleen Burgyan, who is the Plaintiff's daughter and the

1    son-in-law's wife.

2                In other words, it was only through the picture

3    that we were able to figure out that Kathleen Burgyan was

4    probably the person who misdirected our process server.  So

5    that same day we sent a process server to this address and

6    tried to serve again and only the light was on no one answered

7    the door.

8                A different process server, not the process server

9    who had originally gone to the door and spoken to Miss Burgyan,

10   a different process server went to that address later that day

11   -- excuse me -- on October 23rd the next day and tried to serve

12   the subpoena.

13               Again, Kathleen Burgyan answered the door.  She

14   put on a fake French accent and denied who she was.  It was

15   only when the process server pulled out a picture with the

16   Burgyan family name on it and her picture on it that she

17   admitted who she was and this was the right address.  The

18   process server, then, gave her the subpoena.

19               Again, it was only through the padding the picture

20   and confronting her with the picture that Kathleen Burgyan

21   admitted that this was the correct address for her husband.

22               That same day Mr. Klayman e-mailed Defendant's

23   counsel and e-mailed us and accused us of harassing the family.

24   We insisted on a meet and confer call and Mr. Klayman says, you

25   know, the thing he thought to do was to ask this Court for

1    relief, but he didn't even want to do a meet and confer call

2    with us before.

3              The thing to do in this kind of situation when

4    there is a misunderstanding is to reach out to us and ask us

5    what is going on.  We got our meet and confer call.  I told Mr.

6    Klayman all the facts that we knew, at the time, which is most

7    of these facts and Mr. Klayman insisted on coming to this Court

8    and, frankly, wasting this Court's time on an issue that we

9    explained to him.

10             Finally, just to wrap up, it is clear that Mr.

11   Burgyan got the subpoena on November 2nd.  He faxed an

12   objection saying that we hadn't served him correctly and also a

13   relevancy objection.  So I would like to ask the Court for

14   relief here because we have a situation of a third party

15   evading service.

16             I would like to ask the Court to order Mr. Klayman

17   to accept service of the subpoena.  He has clearly put his own

18   address, his office address as Mr. Burgyan's address.  He has

19   listed him on his witness list.

20             And by the way, he has listed the wife of Mr.

21   Montgomery on his witness list, which we also want service on.

22   So we ask this Court to order substitute service on Mr.

23   Klayman.  And he is, obviously, in communication with his

24   client, Mr. Montgomery, and their family.  Either --

25             THE COURT:  Wait.  Mr. Radner.

1          I am sorry.  It is almost 4:15 and we are well

2     over my half hour limit.  So here is the thing.

3          What is sauce for the goose is sauce for the

4     gander.  And therefore, I have to treat you and your request

5     the same way that I treated Mr. Klayman's request.  So you are

6     now asking me for some relief that was not on the agenda.

7          This was not on the notice of hearing and you are

8     now sort of pulling this out of left field out of your pocket

9     and wanting me to provide you with some relief.  I wouldn't let

10    Mr. Klayman do it with his modified notice and I am not letting

11    you do it either.

12          Point number two is, if you have a problem with

13    whether or not service was properly made on Mr. Montgomery's

14    son-in-law, Istvan Burgyan, then, the proper forum to seek

15    enforcement of that subpoena is, if I heard you correctly, a

16    court -- was it in the State of Washington?  Is that what I

17    heard you say?

18          MR. RADNER:  Yes.

19          THE COURT:  All right.  So you are going to have

20    to go to an appropriate Federal Court in Washington and seek

21    enforcement of this subpoena.

22          And Mr. Klayman, as to your request that I order

23    the parties not to do this in the future, I am not going to

24    issue that request at all because, quite frankly, based on the

25    summary that I heard, it sounds like your client's son-in-law,

1   or perhaps I should say his daughter, was involved in some

2   fairly blatant dramatic efforts to avoid service, to evade

3   service such adopting a phony French accent and denying that

4   this was, in fact, her house, et cetera.

5           So when somebody engages in those sorts of

6   tactics, process servers need to take steps to confirm or

7   negate the identity of the persons to whom they are speaking.

8   And I, therefore, do not find they did anything inappropriate

9   and I am not going to issue the instruction that you wanted me

10  to give.

11          So now it is 4:15.  The hearing is over and I will

12  be issuing a followup written post hearing administrative order

13  summarizing the rulings.

14          We will be in recess.  Thank you.  Take care.

15          MR. KLAYMAN:  Thank you, Your Honor.

16          MS. HANDMAN:  Thank you.

17          (Thereupon, the proceedings concluded.)

18

19

20

21

22

23

24

25

1

2                              CERTIFICATE

3

4            I hereby certify that the foregoing transcript is

5    an accurate transcript of the audio recorded proceedings in the

6    above-entitled matter.

7

8

9

10
     11/10/15                          Bonnie Joy Lewis,
11                            Registered Professional Reporter
                                 CASE LAW REPORTING, INC.
12                              7001 Southwest 13 Street,
                              Pembroke Pines, Florida 33023
13                                    954-985-8875

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT P**

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

Southern District of Florida

| | | |
|---|---|---|
| Dennis L. Montgomery | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  15-cv-20782 |
| James Risen, Houghton Mifflin Harcourt Publ'g Co., | ) | |
| Houghton Mifflin Harcourt Co. & HMH Holdings, Inc. | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:      Mr. Istvan Andras Burgyan, c/o 2020 Pennsylvania Ave., N.W., #345, Washington, DC 20006 AND
4425 Issaquah Pine Lake Road, Apt. A31, Sammamish, WA  98075-6255

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:*  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

See Attachment A hereto

| Place: Davis Wright Tremaine LLP<br>1201 Third Avenue - Suite 2200<br>Seattle, WA  98101 | Date and Time:<br>11/19/2015 9:00 am |
|---|---|

The deposition will be recorded by this method:    videographer/court reporter

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:  See Attachment A hereto

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      11/04/2015

| | | |
|---|---|---|
| *CLERK OF COURT* | | |
| | OR | |
| | | /s/ Laura Handman |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   James Risen, Houghton Mifflin Harcourt Publ'g Co., et al.                             , who issues or requests this subpoena, are:

Laura Handman, Suite 800, 1919 Pennsylvania Ave., NW, Washington, DC 20006, laurahandman@dwt.com, 202-973-4224

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   15-cv-20782

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____50.35_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) For Other Discovery.** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) Command to Produce Materials or Permit Inspection.**
  **(A)** Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) Quashing or Modifying a Subpoena.**

  **(A)** When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
  **(A)** Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
  **(D)** Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
  **(A)** Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## ATTACHMENT A

### DEFINITIONS

A.      "You" and "your" mean Istvan Andras Burgyan and any directors, officers, employees, agents, representatives, or other persons acting, or purporting to act, on behalf of Istvan Andras Burgyan.

B.      "Montgomery" means Dennis L. Montgomery, the Plaintiff in this action.

C.      The "Companies" means eTreppid Technologies, LLC, Opspring LLC, Blxware LLC, AziMyth LLC, Atigeo LLC, Offshore Ltd. D, Demaratech LLC, Alex James, LLC, MB Communications LLC, Lumaskinz LLC, MBR Technologies, Cardiac Networks, or Pacific Coast Innovations, LLC.

D.      The singular includes the plural and vice versa; the terms "and" or "or" are both conjunctive and disjunctive; and the terms "including," "include," and "includes" mean "including but not limited to" and "including without limitation."

E.      "Document" means any writing, recording, electronically stored information, or photograph in your possession, custody, or control, which pertain directly or indirectly, in whole or in part, either to any of the subjects listed in the subpoena or to any other matter relevant to the issues in this action, or which are themselves listed in the subpoena as specific documents, including: correspondence, memoranda, notes, messages, diaries, minutes, books, reports, charts, ledgers, invoices, computer printouts, microfilms, video tapes or tape recordings.

F.      "Electronically stored information" means all data, material, images, coding, and other information stored, collected, created, received, or processed by or through any and all electronic devices, mediums, and systems under your possession, custody, or control.  This information includes all electronic communications, electronic-mail, recorded telephone

1

messages, instant messages, pages, photographs, images, video files, audio files, meta-data, program files, computer programs (including object and source code), social media account pages, and all instructions and programs necessary to search and retrieve such information.

G.     "Agent" means any agent, employee, officer, director, attorney, independent contractor, or any other person acting at the direction of or on behalf of another.

H.     "Person" means any individual, corporation, company, proprietorship, partnership, trust, organization, association, government entity, or any other entity.

I.     "Pertain to" or "pertaining to" mean relates to, refers to, contains, concerns, describes, embodies, mentions, constitutes, constituting, supports, corroborates, demonstrates, proves, evidences, shows, refutes, disputes, rebuts, controverts, or contradicts.

J.     "Communications" means any statement or utterance, whether written or oral, made by one person to another, or in the presence of another, or any document or electronically stored information delivered or sent from one person to another.

## COMMAND FOR PRODUCTION

Please produce the following documents and electronically stored information in your possession, custody, or control.

1.     Any communications between you and Montgomery from January 1, 2005 to the present pertaining to the Companies, or Montgomery's or the Companies' video compression software, object detection software, or noise filtering software.

2.     Any documents and electronically stored information pertaining to your, Montgomery's, or the Companies' work to obtain a contract with U.S. Special Operations Command.

2

3. Any copies of your, Montgomery's, or the Companies' video compression software, object detection software, or noise filtering software.

4. Any tests or evaluations of your, Montgomery's, or the Companies' video compression software, object detection software, or noise filtering software by the U.S. Government.

5. Any contracts, including licenses, between the U.S. Government and you, Montgomery, or the Companies.

6. Any documents and electronically stored information reflecting any payments by the Companies to Montgomery.

7. Any other documents and electronically stored information referring or relating to the Companies, or your, Montgomery's, or the Companies' video compression software, object detection software, or noise filtering software, including but not limited to communications with Edra Blixseth, Barry Foote, Thomas Meaders, Joseph Liberatore, and Christopher Pipes.

8. All documents, for the period starting January 1, 2015 to the present, including but not limited to communications referring or relating to providers or potential providers of medical services to Montgomery located in Florida.

9. All documents, for the period starting January 1, 2015 to the present, referring or relating to efforts to secure a permanent residence in Florida for Montgomery, including all contracts, leases, and communications.

10. All documents, including but not limited to, communications referring or relating to a meeting in Miramar, Florida on August 19, 2015 with representatives of the United States Government, including but not limited to the FBI and Assistant United States Attorney Deborah Curtis.

3

11.     All documents, for the period starting January 1, 2010 to the present, including but not limited to communications, referring or related to contacts with persons or businesses regarding business opportunities in connection with your, Montgomery's, or the Companies' video compression software, object detection software, or noise filtering software, including but not limited to any contracts, licenses or other agreements.

12.     All documents referring or relating to Nick Valdez regarding your, Montgomery's, or the Companies' video compression software, object detection software, or noise filtering software, including but not limited to any communications with Mr. Valdez, or any tests performed or footage taken by Mr. Valdez.

13.     All documents including but not limited to communications referring or relating to David Warlow or Warlow Associates, in regard to your, Montgomery's, or the Companies' video compression software, object detection software, or noise filtering software.

14.     All documents, for the period starting January 1, 2015 to the present, referring or related to and communications with Anthony Fisher regarding business opportunities.

15.     All sworn testimony you have given, whether at deposition, at trial, by declaration or affidavit, in any litigation involving you, Montgomery, or any of the Companies.

**EXHIBIT Q**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

DENNIS L. MONTGOMERY,

                       Plaintiff(s),

Vs.

JAMES RISEN; et al.,

                     Defendant(s).

NO.  15-cv-20782

NARRATIVE AFFIDAVIT OF SERVICE OF:
SUBPOENA TO TESTIFY AT A DEPOSITION IN A
CIVIL ACTION; CHECK NO. 30455 IN THE
AMOUNT OF $50.35.

STATE OF WASHINGTON  )
                          ) ss.
COUNTY OF KING          )

The undersigned, being first duly sworn, on oath states:

That I am now, and at all times herein mentioned, was a citizen of the United States and a resident of the State of Washington, over the age of 18 years, not a party to or interested in the above entitled action, and am competent to be a witness therein.

That at 7:17 A.M. on November 5th, 2015, at 4425 Issaquah Pine Lake Road Southeast, Unit A-31, Sammamish, Washington, I duly served the above-described documents in the above-described matter upon Istvan Andras Burgyan, by then and there personally delivering a true and correct copy thereof by leaving the same with John Doe, believed to be Istvan Andras Burgyan, also known as Ish, being a Caucasian male, approximately 35 to 40 years old, 6'1, and 180 to 200lbs, in the following manner:

I arrived at 5:00 A.M. and waited for the subject to exit the residence. I had a photograph of Istvan Burgyan, also known as Ish, as well as a photograph of him, his wife and child, to help identify him at the time of service.

At approximately 7:17 A.M., I observed Istvan Burgyan and his family, who all matched the photographs I had, exit the residence and walk toward a white SUV. A copy of these two photographs are attached as Exhibit A.

I walked up and asked, "Ish?" to which John Doe replied, "Huh?" and he turned to face me. Once he saw the documents in my hand he stated, "That's not me," and his wife immediately and simultaneously said the same. I stated that these documents were for him and placed the documents on the roof of the white SUV.

1

_HEATHER COX_                     KING CO. # 1518804

Service Fees:
Ferry tolls:           SUBSCRIBED AND SWORN to before me on: NOV 0 5 2015
Travel:
SSA:
Trace:
Bad Address:           _____
Aff./Notary Fee:       JOSEPH ERIC WUOLLET
Special Fee:           NOTARY PUBLIC in and for the State
Wait:                  of Washington residing at: Seattle.
                       My commission expires: 02-25-16.
_____
   TOTAL   $

2

# wim
## WASHINGTON LEGAL MESSENGERS

PROCESS SERVICE
SPECIAL MESSENGER
SKIP TRACE
PROCESS FORWARDING
LEGAL RESEARCH

206 374 0100

last day and time
for completion

date: | | time:

today's date:

| |

name:

address:

contact:

phone:

Documents:

## Special Instructions:

## Messenger

☐ PICK UP          ☐ ROUND TRIP
☐ DELIVER ONLY     ☐ DO NOT FILE RETURN ORIG
☐ RETURN COPY      ☐ SIGNATURE REQUIRED



## Filing:

COUNTY

SUPERIOR ☐          AUDITOR ☐          APPEAL:

EXHIBIT A

**EXHIBIT R**

# FAX COVER SHEET

| TO | Laura |
|---|---|
| COMPANY | Handman |
| FAX NUMBER | 12124898340 |
| FROM | Dennis Montgomery |
| DATE | 2015-11-16 16:09:47 GMT |
| RE | Istvan Burgyan |

## COVER MESSAGE

Objections to you latest subpoena:

Case 2:15-cv-01955-JLR   Document 2-1   Filed 12/08/15   Page 430 of 448

**Office of Istvan Burgyan**

# Fax

| TO | Laura Handman | | FROM: | Istvan Burgyan |
|---|---|---|---|---|
| FAX: | 212.489.8340 | 202.973.4499 | PAGES: | 1 |
| PHONE: | 212.489.8230 | 202.973.4224 | DATE: | 11/15/2015 |
| RE: | Subpoena | | CC: | |

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

I am objecting to your attempt to subpoena me on the basis of insufficency of service of process and relavancy.  Based on those objections, I will not appear.

I am the primary caregiver for my father in law; who was recently hospitalized with a concussion; and is still recovering from a stroke.  He requires 24 care.

I am the primary caregiver for my wife who suffers from seizures

Istvan Burgyan

**EXHIBIT S**


**Davis Wright Tremaine LLP**

Suite 800
1919 Pennsylvania Avenue NW
Washington, DC  20006-3401

**Micah Ratner**
202.973.4223 tel
202.973.4499 fax

micahratner@dwt.com


*VIA FAX:  (786) 221-2570*

December 4, 2015

Istvan Andras Burgyan
4425 Issaquah Pine Lake Road, Apt. A31
Sammamish, WA  98075-6255

Re:      Subpoena to you regarding *Montgomery v. Risen, et al.*, Case No. 20782-JEM (S.D. Fla.)

Dear Mr. Burgyan:

As you know, this Firm represents Defendants James Risen, Houghton Mifflin Harcourt Publishing Company, and Houghton Mifflin Harcourt Company in the above-styled action brought by Plaintiff Dennis Montgomery.  We reach out to meet and confer about your non-compliance with the subpoena we served on you on November 5, 2015.

Our subpoena scheduled your deposition for November 19, 2015 at 9:00 a.m. in our Seattle office and sought production of relevant documents due that day.  On November 16, 2015, we received your objections to this subpoena from the fax number listed above stating that you would not appear for the deposition or produce documents on grounds of purported improper service and lack of relevance.  We disagree with your objections.  The subpoena was served correctly on you and the testimony and documents we seek are highly relevant to issues such as Mr. Montgomery's alleged software at the heart of the case, his alleged damages, his assertion of personal jurisdiction over our clients in Florida, and his choice of venue in Florida.

Please call me at (202) 973-4223 to discuss narrowing the areas of disagreement over the subpoena or resolving the issues.  If we do not hear from you by 2:00 p.m. PDT on Monday, December 7, 2015, we will file a motion to compel compliance with the subpoena in the U.S. District Court for Western District of Washington.

Very truly yours,

Micah J. Ratner

cc:      Larry Klayman
         Laura Handman
         Sanford Bohrer
         Brian Toth

**EXHIBIT T**

## Slaughter, Devra

| | |
|---|---|
| **From:** | Galloway, Angela |
| **Sent:** | Monday, December 07, 2015 7:10 AM |
| **To:** | Galloway, Angela |
| **Subject:** | FW: Istvan Burgyan |

**From:** Larry Klayman [mailto:leklayman@gmail.com]
**Sent:** Friday, December 04, 2015 8:37 PM
**To:** Ratner, Micah
**Cc:** Handman, Laura; Sandy.Bohrer@hklaw.com; Brian.Toth@hklaw.com; Shapiro, Marni; Dina James
**Subject:** Re: Istvan Burgyan

While I do not represent Mr. Burgyan, defendants did not seek to enforce the apparently  improperly served subpoena before the close of discovery, as is required by procedure and law. This threat thus appears to be another attempt to harass Mr. Burgyan and his family and by doing so retaliate against my client, Mr. Montgomery.

Larry Klayman, Esq.
Counsel for Plaintiff

On Fri, Dec 4, 2015 at 2:10 PM, Ratner, Micah <MicahRatner@dwt.com> wrote:

Counsel,


Please see the attached correspondence that was just faxed to Mr. Burgyan.


Regards,

Micah


**Micah Ratner** | Davis Wright Tremaine LLP
1919 Pennsylvania Avenue NW, Suite 800 | Washington, DC 20006-3401
Tel: 202-973-4223 | Fax: 202-973-4423
Email: micahratner@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C

1

**EXHIBIT U**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 15-cv-20782-MARTINEZ/GOODMAN

DENNIS MONTGOMERY,

       Plaintiff,

v.

JAMES RISEN et al.,

       Defendants.

_____/

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR
EXTENSION OF TIME TO RESET DISCOVERY DEADLINE**

| | |
|---|---|
| **HOLLAND & KNIGHT LLP** | **DAVIS WRIGHT TREMAINE LLP** |
| Sanford L. Bohrer | Laura R. Handman (admitted *pro hac vice*) |
|   Sandy.Bohrer@hklaw.com |   laurahandman@dwt.com |
| Brian W. Toth | Micah J. Ratner (admitted *pro hac vice*) |
|   Brian.Toth@hklaw.com |   micahratner@dwt.com |
| 701 Brickell Avenue, Suite 3300 | 1919 Pennsylvania Ave., NW, Suite 800 |
| Miami, Florida 33131 | Washington, D.C. 20006 |
| Tel: (305) 374-8500 | Tel.: (202) 973-4200 |
| Fax: (305) 789-7799 | Fax: (202) 973-4499 |

*Counsel for Defendants*

In his Motion for Extension,[1] Plaintiff, for two reasons, seeks an order extending the now-expired discovery deadline through December 19, 2015.[2] First, Plaintiff states that such an extension would provide the FBI more time "to determine if the 47 hard drives and 600 million pages of documents and materials provided" to the FBI by Plaintiff secretly and without the knowledge of Defendants or the Court in August 2015 "contain any software which Defendants have sought" in this action. Mot. for Extension 1. Second, Plaintiff states that such an extension would allow for the adjudication of two motions to compel compliance with non-party subpoenas that Plaintiff filed in other courts, and, if the motions are granted, for Plaintiff to obtain any discovery in connection with those subpoenas. *See* Supp. 1–2. Plaintiff seeks a one-month extension of the discovery deadline, but, if Plaintiff gets his way, "all other pre-trial and trial dates [would be left] in place." Mot. for Extension 3.

Defendants oppose the Motion for Extension, and will address each of Plaintiff's reasons put forth in support thereof—and the specific relief that Plaintiff requests—below.

## I. The Court Should Not Extend the Discovery Deadline Based on Plaintiff's Demonstrably False Assertion that the FBI Is Searching for the Software.

The Court should not extend the discovery deadline based on the claim that the FBI is determining whether any of the software can be found among the massive amount of data that Plaintiff dumped on the FBI in August 2015. Plaintiff's claim is demonstrably false; by letter, the FBI recently stated that it is not searching for the software. Further, the software, which is at the

---

[1] Herein, Defendants respond both to Plaintiff's Motion for Extension of Time to Reset Discovery Deadline, ECF No. 181, and to Plaintiff's Supplement to the Motion for Extension of Time to Reset Discovery Deadline, ECF No. 182. In citations, Defendants will cite the Motion for Extension as "Mot. for Extension" and the Supplement as "Supp." In text, however, Defendants will refer to the Motion for Extension and to the Supplement together as the "Motion for Extension."

[2] The discovery deadline is November 19, 2015. *See* Order of September 10, 2015 (the "Scheduling Order"), ECF No. 131.

heart of Plaintiff's case, has been the subject of a long-running dispute that has resulted in multiple court orders and has culminated in a pending, case-dispositive motion for sanctions. By seeking to extend discovery based on the software, Plaintiff merely seeks to delay the inevitable: the dismissal of his case.

As the Court is now well aware, just about everything in this case—Plaintiff's allegations in the operative complaint, discovery disputes, highly unusual communications with high-ranking governmental officials, a motion for sanctions—concerns the software. According to the amended complaint, Defendants allegedly defamed Plaintiff by writing and publishing in a chapter of the book *Pay Any Price: Greed, Power, and Endless War* (the "Book") that Plaintiff sought to get rich off the federal government in the post–September 11 era by selling bogus counterterrorism software (the "Software"). *See generally* Am. Compl., ECF No. 52. Since June 2015, Defendants—in order to demonstrate that Plaintiff will not be able to show that what Defendants wrote and published was false—have requested that the Software be produced. And, since August 2015, Judge Goodman has repeatedly ordered that the Software be produced. Plaintiff, however, has not done so. For a thorough account on the many reasons why Plaintiff has not done so, see Defendants' Memorandum of Law in Support of Their Motion for Sanctions ("Mot. for Sanctions") 2–11, ECF No. 166.

In summary, Plaintiff has not produced the Software solely because of his and his counsel's own choices and actions in this lawsuit—and nobody else's. First, Plaintiff did not produce the Software because he claimed it was irrelevant and classified. *See id.* 3. Then, after a motion to compel the production of the Software had been filed, Plaintiff testified at his deposition that, just the day before he was deposed, he gave his one and only copy of the Software to the FBI—without telling Defendants, without telling the Court, and without keeping

a copy for himself. *See id.* 5.[3] The next day, in response to searching questions by Judge

Goodman, Plaintiff's counsel confirmed Plaintiff's testimony in open court: "[The FBI] has the

software, yes." *Id.* (quoting Disco. Hr'g Tr. 7:1 (Aug. 21, 2015)). Subsequently, Judge

Goodman, who found that the Software "is highly relevant for the case," entered orders requiring

Plaintiff to use "his self-described right of continued access" to the Software and to produce it to

Defendants. *Id.* 6–7. Plaintiff failed to do so, however. *Id.* 7.

On September 8, 2015, James A. Baker, the General Counsel of the FBI, wrote a letter to

Plaintiff's counsel about the Software. *Id.* 8. Among other things, Baker wrote that because

Plaintiff had given to the FBI a "massive" amount of information—as stated, 47 hard drives

containing over 600 million pages of documents—the FBI had "no reasonable way … to locate

and provide the alleged software, absent specific instructions" from Plaintiff, and Baker

requested them. *Id.* 8–9 (quoting Letter from James A. Baker to Larry Klayman 4 (Sept. 8,

2015)). Judge Goodman then ordered Plaintiff to provide to the FBI those specific instructions to

locate the alleged software. *Id.* 9.

On October 21, 2015, Plaintiff filed a stunning declaration with the Court:

> [U]pon searching my memory, I do not believe that I have had any access to
> the subject software, nor did I provide it to the [FBI] when I turned over the
> drives ….

*Id.* To seem as though he was at least partially working with Baker and following Judge

Goodman's order, however, Plaintiff also declared that he was "providing some additional

---

[3] Plaintiff claims that he produced his Software as part of his alleged whistleblowing activities, *see* Mot. for Extension 1–2, but his counsel admitted and the FBI confirmed that the Software has no relevance to the data he gave the FBI as part of his alleged whistleblowing activities, *see* Mot. for Sanctions 8. Thus, there was no reason he could not segregate and keep his Software separate and apart from whatever he produced to the FBI.

information (attached) which may allow the FBI to see if the software—in whole or in part—exists on the drives I turned over to the FBI." *Id.* 10.

To all concerned, this was a surprising about-face. And, because of it, the FBI, on October 23, 2015, informed Plaintiff's counsel that the FBI was no longer searching for the Software. *Id.* Plaintiff and his counsel have since purported to provide additional information to locate the Software, always with the caveat "if it exists." But the FBI has not informed counsel that it has changed its position regarding the Software. So, as things stand today, there is no reason to believe that the FBI is searching for the Software, and Plaintiff has not come forward with anything suggesting otherwise. *See* Defs.' Reply Mot. for Sanctions 1 & n.1, ECF No. 184. Plaintiff's first reason to extend the discovery deadline—to allow the FBI more time to search for the Software—is no reason at all, because there is no reason to extend the deadline for the FBI to do something that it has specifically stated it is not doing.

There would still be no basis to extend the discovery deadline even if the FBI were searching for the Software. A court's scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "This good cause standard precludes modification unless the schedule cannot 'be met despite the diligence of the party seeking the extension.'" *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998) (quoting Fed. R. Civ. P. 16 advisory cmt. note). Plaintiff's reason to extend the deadline makes a mockery of the good-cause standard. Plaintiff claims the deadline cannot be met because the FBI needs more time to complete its (again, nonexistent) search for the Software. But, even if true, this predicament is entirely of Plaintiff's own inexplicable and sanctionable making. To be sure, if—instead of committing spoliation by secretly giving his only copy of the Software to the FBI—Plaintiff had produced the Software to Defendants in discovery, then Plaintiff never would have

needed to request that the Court extend the discovery deadline in order to get the Software back. In short, Plaintiff, from the beginning, ***could have met the discovery deadline***. Instead, in Judge Goodman's words, Plaintiff choose to "sequester what could be the most important evidence in the entire case." Order Denying Pl.'s Mot. to Stay One Para. of a Disco. Order 6, ECF No. 122. The Court should not permit Plaintiff to commit spoliation and then claim "diligence" in trying to make things right.[4]

Finally, citing the FBI's nonexistent search for the Software also makes a mockery out of the careful, reasoned, and repeated orders that Judge Goodman has entered, after considering all the evidence and arguments, requiring Plaintiff to produce the Software. Plaintiff's failure to comply with those orders—in addition to his spoliation of the Software—has led to the case-dispositive motion for sanctions now pending before Judge Goodman. There should no doubt about this: Plaintiff and his counsel have led Defendants, Judge Goodman, and the FBI on a wild goose chase, all with the very clear purpose to avoid ever having to produce the Software (thus exposing that it doesn't work) or to avoid admitting to the world that the Software never, in fact, existed at all.

## II.    The Court Should Not Extend the Discovery Deadline Because of the Motions to Compel.

In addition to the Software, Plaintiff also states that the discovery deadline should be extended to allow for the adjudication of two motions to compel—the first filed in the U.S. District Court for the Central District of California and the second filed in the U.S. District Court for the Southern District of New York. This, too, provides no reason to extend the deadline.

---

[4] Further, even if the FBI were to produce the Software to Plaintiff and Plaintiff were to produce it to Defendants by December 19, Defendants and their expert would have no opportunity to determine whether it works and to prepare an expert report by the extended discovery deadline—which, it bears mentioning, includes all expert discovery. *See* Scheduling Order.

The first motion to compel can be swiftly disposed of. It concerned Plaintiff's trying to compel his former lawyer to sit for a deposition and to produce documents. *See* Ex. 1 to Supp. Mot. for Extension, ECF No. 182-1. On December 2, 2015, U.S. Magistrate Judge Jay C. Gandhi denied the motion to compel. *See* Exhibit A attached hereto: (In Chambers) Order Denying Mot. to Compel, No. 15-mc-00031-CJC-JCG (C.D. Cal. Dec. 2, 2015), ECF No. 9 (subpoena was not properly served). There is thus no reason to extend the discovery deadline because of the first motion to compel.

The second motion to compel concerned Plaintiff's seeking to compel deposition testimony and documents from non-parties Simon & Schuster, Inc., Priscilla Painton, and Tina Bennett. Plaintiff claimed that discovery was necessary to uncover what Plaintiff believes to be information showing that Simon & Schuster decided not to publish an earlier version of the Book out of fear that the Book contained false and defamatory content about Plaintiff. After opposition briefs from the non-parties and Defendants (attached hereto collectively as Exhibit B) and a hearing on December 1, 2015, U.S. District Judge Cote entered an order significantly narrowing the discovery and requiring the non-parties by December 15 to produce responsive documents, if any, "indicat[ing] whether Simon & Schuster communicated its reasons for its decision not to publish *Pay Any Price* to Mr. Risen, Ms. Bennett, or Houghton Mifflin Harcourt, and if such documents exist, they must be produced to the extent they discuss passages in the book related to Dennis Montgomery, the time of the publication date, or the organization of the book." Exhibit C attached hereto: Order, No. 15-mc-00363-P1 (S.D.N.Y. Dec. 1, 2015), ECF No. 35. Judge Cote directed that the parties agree on possible depositions, if any, and inform her by December 22. *Id.*

Defendants understand that Plaintiff and the non-parties will comply with Judge Cote's order, although Judge Cote specifically stated at the hearing that she understood her order could be subject to this Court's decision on the pending Motion for Extension. In any event, any limited information that may be discovered does not require an extension of the discovery deadline. The better course is for the parties to complete such discrete and limited discovery served before the November 19 deadline as expeditiously as possible, and then supplement the record in this case, as necessary.[5]

III.    **If the Court Grants Plaintiff Relief, the Court Should Extend All Remaining Deadlines.**

Putting to the side the reasons Plaintiff gives for extending the discovery deadline, the specific relief Plaintiff seeks is unusual and unfair to Defendants and to the Court. Plaintiff asks to "reset" the discovery deadline to December 19, 2015, but to "leav[e] all other pre-trial and trial dates in place, since Plaintiff Montgomery could otherwise not make it to any later trial given his declining health, for which he was recently hospitalized." Mot. for Extension 3.

If the Court is inclined to extend the discovery deadline through December 19, then the Court should also extend all other deadlines by one month. Unless the Court by December 14

---

[5] Similarly, Defendants are pursuing two discrete avenues of discovery that were noticed and served before the November 19 discovery deadline. The first concerns Defendants' attempts to serve Istvan Burgyan, Plaintiff's son in law whom Plaintiff listed on his witness list "c/o" Plaintiff's counsel. After Plaintiff's counsel refused on October 6 to accept service of a subpoena to depose Burgyan, Defendants have been forced to try to serve Burgyan with the subpoena, beginning on October 9. After many attempts owing to Burgyan's evading service, Defendants served Burgyan on November 5. Burgyan objected on November 16. If Burgyan does not agree to comply, Defendants, on Monday, December 7, will move to compel in the U.S. District Court for the Western District of Washington, which has jurisdiction over Burgyan. The second concerns a subpoena served on November 5 by Defendants on the U.S. Department of the Air Force (the "USAF") to obtain documents relevant to this action. The USAF has informed Defendants that, in accordance with federal law, it is determining whether it may produce the information requested. If Plaintiff is permitted to complete the New York discovery, Defendants similarly seek to complete these discrete lines of discovery served before the November 19 discovery deadline.

grants Defendants' Motion to Dismiss or Transfer, ECF No. 52, Defendants will be moving for summary judgment on December 14—which is the current summary-judgment deadline. Yet, if Plaintiff has his way, then Defendants will be forced to move for summary judgment without having the benefit of any discovery that Plaintiff obtains on or after December 14. The better course would be to extend the summary-judgment deadline by one month—until January 14— which would permit Defendants to file their summary-judgment motion after having considered all discovery taken in the action. Further, to permit sufficient time for Plaintiff to file his memorandum of law in opposition to Defendants' summary-judgment motion, for Defendants to file their reply in support thereof, and for the Court properly and fully to consider the motion and enter an order thereon before the March 21 trial date, all other deadlines—including the trial date—should be extended by one month, too.

After having pressed for an expedited schedule and opposed any extension, Plaintiff now is asking for an extension of discovery, but claims the trial date could not be extended by one month because Plaintiff could die before then. *See* Mot. for Extension 3. Although Plaintiff states he is "terminally ill" and "was recently hospitalized," *id.*, Plaintiff has put forth no recent medical records suggesting that his health is in imminent peril, or that he was recently hospitalized overnight. Defendants are sympathetic to Plaintiff's medical condition, but there is no reason to believe that Plaintiff "could otherwise not make it to any later trial," as he claims. *Id.*[6]

---

[6] Indeed, in August, when Defendants' counsel offered in consideration of Plaintiff's health to take his deposition in Seattle, where he is living, he chose, instead, to fly clear across the country and insisted the deposition proceed in Miami. *See* Notice of Supp. Authority Concerning Defs.' Mot. to Dismiss or Transfer 5–6, ECF No. 119. Surely, he will be able to attend trial one month later than originally scheduled if the case is not first transferred to D.C. for improper venue or for a more convenient forum or dismissed for lack of personal jurisdiction or failure to state a claim,

**IV.    Conclusion.**

In sum, the Court should deny the Motion for Extension. If, however, the Court enters an

order extending the discovery deadline through December 19, 2105, then it should also extend by

one month all other remaining deadlines of the Scheduling Order. ECF No. 131.

---

*see* Mot. to Dismiss or Transfer, dismissed in accordance with the pending Motion for Sanctions,
or on summary judgment.

Dated: December 4, 2015

Respectfully submitted,

s/Brian W. Toth
Sanford L. Bohrer
Florida Bar No. 160643
sbohrer@hklaw.com
Brian W. Toth
Florida Bar No. 57708
brian.toth@hklaw.com
HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
Telephone: (305) 374-8500
Fax: (305) 789-7799

– and –

Laura R. Handman (admitted *pro hac vice*)
laurahandman@dwt.com
Micah J. Ratner (admitted *pro hac vice*)
micahratner@dwt.com
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Ave., NW, Suite 800
Washington, D.C. 20006
Tel.: (202) 973-4200
Fax: (202) 973-4499

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that on December 4, 2015, I filed this document with the Clerk of Court using CM/ECF, which will serve this document on all counsel of record.

s/Brian W. Toth

**EXHIBIT V**

# FAX COVER SHEET

| TO | Laura |
|----|-------|
| COMPANY | Handman |
| FAX NUMBER | 12124898340 |
| FROM | Dennis Montgomery |
| DATE | 2015-12-07 17:18:00 GMT |
| RE | Istvan Burgyan |

## COVER MESSAGE

I am objecting to your letter dated December 4, 2015.  Your demands I appear to for a deposition is nothing more than harassment to me and my family.

It is my understanding discovery was closed in the Risen matter on November 19, 2015. Your threat to take me to court appears to be baseless.

I don't have the funds to hire an attorney to battle you over this matter.  If I have to defend myself I will ask the court for legal fees and sanctions against you and your firm